**NON-CONFIDENTIAL VERSION**

**2023-2266**

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

**PIRELLI TYRE CO., LTD., PIRELLI TYRE S.P.A., PIRELLI TIRE LLC,**

*Plaintiffs-Appellants*

**SHANDONG NEW CONTINENT TIRE CO., LTD.,**

*Plaintiff*

v.

**UNITED STATES, THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,**

*Defendants-Appellees*

---

Appeal from United States Court of International Trade
Court No. 1:20-cv-00115-JCG, Judge Jennifer Choe-Groves

---

**OPENING BRIEF OF PLAINTIFFS-APPELLANTS PIRELLI TYRE CO., LTD., PIRELLI TYRE S.P.A., PIRELLI TIRE LLC.**

---

Daniel L. Porter
James P. Durling
James C. Beaty
Katherine R. Afzal

Curtis, Mallet-Prevost, Colt &
Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-452-7373

*Counsel for Counsel for Pirelli Tyre Co.,*
October 24, 2023                    *LTD, Pirelli Tyre S.P.A., Pirelli Tire LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 23-2266 |
| **Short Case Caption** | Pirelli Tyre Co., Ltd. v. US |
| **Filing Party/Entity** | Pirelli Tyre Co., Ltd., Pirelli Tyre S.P.A., Pirelli Tire LLC |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/24/2023

Signature: /s/Daniel L. Porter

Name: Daniel L. Porter

**FORM 9. Certificate of Interest**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Pirelli Tyre Co., Ltd. | | |
| Pirelli Tyre S.P.A. | | |
| Pirelli Tire LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable               ☐     Additional pages attached

| | | |
|---|---|---|
| Daniel L. Porter | Katherine R. Afzal | |
| James P. Durling | | |
| James C. Beaty | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable               ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## **TABLE OF CONTENTS**

STATEMENT OF CONFIDENTIAL INFORMATION ..........................................1

STATEMENT OF RELATED CASES ....................................................................2

JURISDICTIONAL STATEMENT ..........................................................................3

STATEMENT OF THE ISSUES...............................................................................4

STATEMENT OF THE CASE ...................................................................................5

SUMMARY OF THE ARGUMENT ......................................................................17

ARGUMENT ..........................................................................................................20

I.    COMMERCE'S APPROACH TO ANALYZING WHETHER
       PIRELLI ITALY WAS CONTROLLED BY THE CHINESE
       GOVERNMENT WAS UNLAWFUL..........................................................20

       A.    Commerce Did Not Properly Apply The Applicable Legal
              Criteria for Analyzing Separate Rate Eligibility.................................21

       B.    Commerce Adopted an Unlawful Interpretation and Application
              of "Rebuttable Presumption" ..............................................................31

II.   COMMERCE'S DETERMINATION THAT PIRELLI FAILED TO
       REBUT THE PRESUMPTION OF GOVERNMENT CONTROL IS
       NOT SUPPORTED BY SUBSTANTIAL EVIDENCE...............................38

       A.    Commerce's Finding that Pirelli's Shareholding Structure
              Allowed Chinese Owned Companies to Control Pirelli Tyre's
              Operational Activities Is Not Supported By Substantial
              Evidence ..............................................................................................40

       B.    Contrary To Commerce's Implicit Finding, The Majority Of
              Members Of Pirelli Italy's Board Of Directors Are Independent
              From The Chinese Shareholders ..........................................................45

       C.    Commerce's Conclusion That Chinese State-Owned
              Shareholders Exercised *De Facto* Operational Control Over
              Pirelli Ignores Substantial Evidence That Pirelli's Day-To-Day

Management Was Insulated From Chinese Shareholder's Control ........................................................................................ 52

1.    Contrary to Commerce's conclusion, substantial evidence demonstrates that Pirelli Italy's CEO, Mr. Marco Tronchetti Provera, had exclusive day-to-day management authority ....... 54

2.    Upon the relisting of Pirelli Italy, Chinese state-owned shareholders ceased to have management and coordination activity over the company ........................................................ 60

3.    As a publicly listed company, Pirelli Italy was legally required under Italian law to maintain relative independence from its largest shareholders in order to protect the interest of minority shareholders ........................................................ 62

D.    Commerce's Conclusion That The Minority Chinese State-Owned Shareholder Could Influence Pirelli's *Export Activities* Is Completely Unsupported by Substantial Evidence ........................ 64

CONCLUSION AND RECOMMENDED APPELLATE REMEDY ................... 66

## Confidential Material Omitted

The material omitted on page 13 and 42 describes the percentage ownership of Pirelli companies and 41 details the company organization and ownership.

# <u>TABLE OF AUTHORITIES</u>

## Cases

*A. C. Aukerman Co. v. R. L. Chaides Constr. Co.*,
   960 F.2d 1020 (Fed. Cir. 1992) ..............................................................32

*A. L. A. Schecther Poultry Corp. v. United States*,
   295 U.S. 495 (1935)..............................................................................27

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
   203 F. Supp. 3d 1256 (Ct. Int'l Trade 2017) ......................................30

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
   284 F. Supp. 3d 1350 (Ct. Int'l Trade 2017) ......................................30

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962)..............................................................................37

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*,
   28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ................................. 29, 30

*Pennzoil Co. v. Federal Energy Regulatory Comm'n.*,
   789 F.2d 1128 (5th Cir. 1986) ..............................................................32

*Pirelli Tyre Co. v. United States*,
   638 F. Supp. 3d 1361 (Ct. Int'l Trade 2023)............................... passim

*Qingdao Sentury Tire Co. v. United States*,
   539 F. Supp. 3d 1278 (Ct. Int'l Trade 2021) ......................................44

*Securities Exchange Comm'n v. Chenery Corp.*,
   332 U.S. 194 (1947)..............................................................................37

*Shandong Yongtai Grp. Co. v. United States*,
   415 F. Supp. 3d 1303 (Ct. Int'l Trade 2019)....................................9, 10

*Shandong Yongtai Grp. Co. v. United States*,
   487 F. Supp. 3d 1335 (Ct. Int'l Trade 2020)............................... 10, 43

**Statutes**

19 U.S.C. § 1516a(b) ...............................................................35

28 U.S.C. § 1295(a)(5) ..............................................................3

**Administrative Decisions**

*Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018,* 85 Fed. Reg. 22,396 (April 22, 2020) ......................................................... passim

*Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Order; and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order,* 80 Fed. Reg. 47,902 (August 10, 2015) .................................................................7

*Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016,* 83 Fed. Reg. 11,690 (Dep't Commerce Mar. 16, 2018) ...................................8, 9

*Diamond Sawblades and Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011–2012,* 79 Fed. Reg. 35,723 (June 24, 2014).................................................................27

*Silicon Carbide From the People's Republic of China: Notice of Final Determination of Sales at Less Than Fair Value,* 59 Fed. Reg. 22,585, 22,587 (May 2, 1994)................................................. 25, 26

*Sparklers From the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 56 Fed. Reg. 20,588, 20589 (May 6, 1991).....................26

**Other Authorities**

Black's Law Dictionary (6th Ed.)........................................................ 31, 36

Regolamento recante disposizioni in materia di operazioni con parti correlate (adottato dalla Consob con delibera n. 17221 del 12 marzo 2010), Article 4 .....64

Codice civile (approvato con Regio Decreto del 16 marzo 1942, n. 262) Article 2359 ......................................................................61

Codice civile (approvato con Regio Decreto del 16 marzo 1942, n. 262)
  Article 2391 ..........................................................................................51

Codice civile (approvato con Regio Decreto del 16 marzo 1942, n. 262)
  Article 2497-sexies ......................................................................... 50, 61

Decreto Legislativo n. 58 del 24 febbraio 1998, Article 113 ...................................63

Decreto Legislativo n. 58 del 24 febbraio 1998, Article 114 ...................................63

Decreto Legislativo n. 58 del 24 febbraio 1998, Article 147 ............................ 48, 63

Codice di Autodisciplina, Comitato per la Corporate Governance (Luglio 2018),
  Article 3 ............................................................................................47

## STATEMENT OF CONFIDENTIAL INFORMATION

Pursuant to Federal Circuit Rule 28(d), Plaintiffs–Appellants state that their Opening Brief contains certain confidential business proprietary information protected by Administrative Protective Order in the underlying agency proceeding. Such confidential business proprietary information ("BPI") consists of information contained in business proprietary documents and data provided to the Department of Commerce ("Commerce"). During the underlying proceeding, Commerce accepted the BPI designation and agreed to accord confidential treatment to the BPI.

Accordingly, confidential information has been redacted from the following pages of the non-confidential version of this Opening Brief: 13, 41, and 42.

**STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5(a), Plaintiffs–Appellants state that there is no other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court.

And pursuant to Federal Circuit Rule 47.5(b), we note there are other cases before this Court that also argue that Commerce's overall approach to analyzing whether a Chinese exporter with only a minority ownership Chinese Government shareholder was sufficiently controlled by the Chinese Government was contrary to law.

# JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. §1295(a)(5), this Court has jurisdiction over "appeal{s} from a final decision of the United States Court of International Trade." 28 U.S.C. §1295(a)(5).

The Trade Court issued its final judgment in this proceeding on June 9, 2023 sustaining Commerce's Remand Redetermination.  Pirelli Tyre Co., Ltd., Pirelli Tyre S.P.A. and Pirelli Tire LLC (collectively referred to as the Plaintiffs–Appellants or Pirelli) timely filed a notice of appeal to the Trade Court on August 4, 2023.  As such, this Court has jurisdiction over the instant appeal.

## STATEMENT OF THE ISSUES

This case involves the following issues:

1.      Whether Commerce's approach in analyzing if Pirelli Tyre Co., Ltd. ("Pirelli Tyre") was controlled by the Chinese Government was unlawful.

2.      Even if Commerce's analytic approach was lawful, whether Commerce' conclusion that the Chinese Government controlled Pirelli Tyre's export activities was unsupported by substantial evidence.

## STATEMENT OF THE CASE

In this brief, we have used the designation "**Pirelli Tyre**" as a short-hand reference for "Pirelli Tyre Co., Ltd.," which was the specific exporter making the separate rate application in the underlying AD review at issue here.  We have used the designation "**Pirelli USA**" to refer to "Pirelli Tire LLC," which was the affiliated U.S. importer that undertook the U.S. sales subject to the AD review at issue here.  We have used **"Pirelli Italy"** to refer to Pirelli & C. S.p.A., the Italian parent company of the separate rate applicant.

The substance of this case raises important issues about Commerce's determination that Pirelli Italy, was somehow controlled by the Chinese Government.  This determination – made to determine antidumping ("AD") duty liability – rested on a legally flawed framework and a total disregard of the factual record.  Commerce mechanically applied a presumption, and largely ignored the facts: that there was a less than majority ownership interest by the Chinese state-owned entity, the composition of the Board of Directors had changed, Pirelli Italy had been re-listed as a public company on the Milan Stock exchange, and Pirelli Italy had adopted a new shareholder agreement confirming that the Italian national CEO, Marco Tronchetti Provera, had complete authority over Pirelli's day-to-day operations.  The Commerce Department largely ignored these facts and their

logical implications based on a "rebuttable" presumption that in practice has become an irrebuttable presumption to guarantee Commerce's desired outcome.[1]

As a result of Commerce's reliance on the presumption, Commerce assessed Pirelli Tyre an AD liability equal to the China-wide entity rate of 76.46 percent instead of the 0.00 percent AD rate assigned to other companies that were able to demonstrate their independence from the Chinese Government. *See Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018,* 85 Fed. Reg. 22,396 (April 22, 2020) ("Final Results"), Appx0170-0173, and the accompanying Issues and Decisions Memorandum ("Final IDM"), Appx0136-0169.

Because Commerce refused to apply the specific AD assessment rate calculated for separate rate respondents to Pirelli USA's import entries, Commerce's determination is unlawful.  Commerce's underlying conclusion that Pirelli Tyre's export activities were controlled by Chinese state-owned shareholders results from an unlawful analytic approach and is also not supported by substantial evidence.

---

[1] The nature of this presumption is explained more thoroughly below.

**The original AD investigation and imposition of AD Order**

The underlying Commerce original investigation that led to the antidumping order at issue concluded in August 2015:  *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Order; and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order* 80 Fed. Reg. 47,902 (August 10, 2015) and accompanying issues and decision memorandum.  Pirelli Tyre fully participated in the original investigation by submitting a separate rate application.  In its final antidumping determination, Commerce granted Pirelli Tyre separate rate status, given Commerce's conclusion that Pirelli Tyre demonstrated both a *de jure* and *de facto* absence of government control, with respect to their respective exports of the merchandise under investigation. *Id.*

**Commerce's AD review for *POR1* and Subsequent Court Appeal**

August is the anniversary month of the AD order for PVLT Tires from China, and therefore August is the month in which interested parties can request an AD administrative review.  In August 2016, Commerce received a request for an AD review for PVLT tires from China from the U.S. petitioner.  This AD review request identified multiple Chinese exporters for whom the Petitioner wanted Commerce to conduct an AD review.  Pirelli Tyre was included in this list.

Accordingly, Commerce initiated an AD administrative review for PVLT tires for the POR1 AD review time period, January 2015 – July 2016. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg 71,061 (Dep't Commerce Oct. 14, 2016)

In both the preliminary and final results, Commerce found that some of the Chinese exporters demonstrated eligibility for separate rate status, but that the Pirelli Tyre had not. *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission, in Part; 2015-2016*, 82 Fed Reg 42,281 (Dep't Commerce Sept. 7, 2017); *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 11,690 (Dep't Commerce Mar. 16, 2018) and accompanying Issues and Decision Memorandum ("POR1 Final IDM"). Accordingly, Commerce determined that the Pirelli Tyre was part of the China-wide entity. *Id*.

Commerce's conclusion that the Chinese Government controlled the Pirelli Tyre was based on its subsidiary conclusion that the Chinese Government exercised *de facto* control over Pirelli Tyre's export activities. That conclusion was based on the following rationale and logic:

Pirelli Tyre did not qualify for separate rate status because there was *de facto* Chinese government control over the company <u>through Chem China's {majority} ownership of Pirelli S.p.A.</u>

POR1 Final IDM at 28 (emphasis added).

This single sentence was the entire <u>and only</u> sum and substance of Commerce's conclusion that the Chinese Government controls Pirelli Tyre's export activities.  Or stated differently, Commerce's POR1 AD review determination readily admitted that its conclusion was <u>premised entirely on ownership</u>; the fact that China National Chemical Corporation ("Chem China") had a majority ownership of Pirelli Italy.

Pirelli Tyre filed a timely appeal to the Court of International Trade (Trade Court) challenging Commerce's final POR1 AD review decision.  Pirelli Tyre offered multiple reasons why Commerce's determination was not supported by substantial evidence and why it was also unlawful.  Of particular relevance was the argument that Commerce's conclusion that the Chinese Government (through Chinese state-owned companies) controlled Pirelli Tyre's export activities should not apply to the time period prior to when the Chinese shareholders assumed majority ownership of Pirelli.  *Shandong Yongtai Grp. Co. v. United States*, 415 F. Supp. 3d 1303, 1317-1319 (Ct. Int'l Trade 2019).

The Trade Court's final decision in POR1 ultimately disagreed with the Pirelli's primary argument that there was substantial evidence demonstrating that,

in fact, the Chinese shareholders did not control Pirelli Tyre's export activities, notwithstanding their majority ownership during most of the POR1 AD review time period. *Shandong Yongtai Grp. Co. v. United States*, 487 F. Supp. 3d 1335, 1346 (Ct. Int'l Trade 2020).

The Trade Court agreed, however, with the argument that Commerce's conclusion regarding control through certain shareholders should not apply to that time period before Chem China acquired majority ownership of the Pirelli Italy. *Shandong Yongtai Grp. Co.*, 415 F. Supp. 3d at 1317.

**Commerce's AD review for POR3 - Pirelli Tyre's Separate Rate Application**

In August of 2018, the Plaintiff-Appellants requested an AD review of the entries made by Pirelli USA between August 2017 – July 2018 ("POR3"). Appx0195-0200.  Other exporters also requested their own review.  Accordingly, Commerce initiated the AD review.  Appx1546-1555.

On November 14, 2018, Pirelli Tyre timely submitted its separate rate application ("SRA") that contained detailed information and supporting documentation concerning both the original acquisition of majority interest by Chinese state-owned shareholders and the subsequent restructuring that resulted in (a) the Chinese shareholders reducing their ownership interest to 40 percent and (b) the corporate restructuring associated with the re-listing of Pirelli Italy on the

Milan Stock Exchange.  Pirelli Tyre's SRA set forth the following key facts and documentation:

### 1. Pirelli Transformation Between 2015 and 2017

In 2015, two Chinese state-owned companies, Chem China, and the Silk Road Fund (collectively "Chinese shareholders") undertook a majority ownership investment in Pirelli Italy.  Since the very beginning, however, the parties envisaged a reorganization of the Pirelli aimed at enhancing the value of the latter through the delisting of Pirelli Italy at the end of 2015, followed by the <u>subsequent relisting of Pirelli Italy on the Milan Stock Exchange</u> as a pure consumer company a couple of years later.  The original investment documents make clear the expectation that Pirelli Italy would be re-listed on the Milan Stock Exchange in the near-term with a multiplied value.  Such expectation demonstrated that the original plan was for the Chinese shareholders to reap reward from the later enhanced valuation of the group as a whole.

The primary documentation detailing the Chinese investment in the Pirelli Italy in 2015 and establishing the relationship of the Chinese shareholders consists of the following:

- Sales Purchase Agreement, dated March 22, 2015 (Appx0567-0594)
- Shareholders Agreement, dated March 2015 (Appx0595-0636)
- Articles of Association of Pirelli Italy (Appx0717-0810)

- Board of Directors' Meeting Minutes of Italy dated October 2015 (Appx0811-0816).

Each of these documents was provided to Commerce in Pirelli Tyre's SRA.

These documents demonstrated that following the acquisition of the indirect majority interest in Pirelli Italy by the Chinese shareholders, Pirelli Italy and the other Pirelli companies would continue to operate with no change in management or strategy. Indeed, the agreements contained explicit contractual provisions that ensured that Pirelli Italy's majority Chinese shareholders were effectively precluded from influencing management of Pirelli Italy. These written agreements confirm that strong written protections were specifically negotiated and designed to ensure independence and continuing operation as a profit-making enterprise.

Some of these provisions included the following:

Article 3.1 of the 2015 Shareholders Agreement clarifies that the success of Pirelli Italy was tied to the role of the Italian national CEO (Mr. Tronchetti Provera) as the leader of top management, Pirelli Group's future and culture.

Article 2 of Pirelli Italy's Articles of Association explicitly maintain Milan as the headquarters of Pirelli Italy.

Article 9 of Pirelli Italy's Articles of Association strictly protects Pirelli Italy's proprietary know-how by requiring that any transfer and/or disposal of the "know-how" owned by Pirelli, shall be approved by the shareholders' meeting with the favorable vote of at least 90% of the outstanding share capital of Pirelli Italy.[2]

---

[2] In light of this protection, the Chinese shareholders (through its indirect ownership of 40% alone) cannot change or dispose of certain Pirelli's core values.

All of the above were provisions in those documents establishing the 2015 investment by Chinese shareholders.

### 2. Reduction of Chinese Ownership Interest and Re-Listing on the Milan Stock Exchange in 2017

In 2017, the shareholders decided to complete the final steps of the overall transaction described above by proceeding to the planned re-listing of Pirelli Italy at the Milan Stock Exchange.

The relisting of Pirelli Italy at the Milan Stock Exchange, which took place on October 4, 2017, resulted in a decrease of the combined indirect ownership interests held by the Chinese shareholders in Pirelli Italy to [ # ]% and consequently to [    #    ] in Pirelli Tyre—the SRA applicant.

The primary documents detailing the reorganization are as follows:

- New Shareholders Agreement, dated July 2017 and amendment thereto (Appx1087-1203)

- New By-Laws of Pirelli Italy, adopted 1 August 2017 and effective from 4 October 2017 (Appx1204-1217)

- The Pirelli Group 2017 Annual Report (Appx0817-1085)

These documents were also provided to Commerce as part of Pirelli Tyre's SRA. And, again, these documents contained explicit provisions noting the complete lack of influence the Chinese shareholders could exercise over Pirelli Italy's management activities.

For example, the 2017 Annual Report explicitly noted (inter alia) as follows:

"{f}rom the First Trading Day {4 October 2017}, **Pirelli is no longer subject to any management and coordination** activities considered typical, neither by Marco Polo nor by other companies or entities (including CNRC and Chem China) and therefore, by way of example:"

- Pirelli conducts relations with customers and suppliers in full autonomy without any external interference;

- Pirelli prepares the strategic, industrial, financial and/or budget plans of the Company or the Group independently;

- no organisational-functional links exist between Pirelli on the one hand and Marco Polo, CNRC and/or Chem China on the other;

- Marco Polo, CNRC and/or Chem China do not make any crucial decisions regarding the operating strategies of Pirelli.

See 2017 Annual Report, Appx0917.

**Commerce's AD review for POR3 - Commerce's Preliminary and Final Determination**

In October 2019, Commerce rendered its preliminary determination in the challenged review, concluding that the Pirelli Tyre had not demonstrated the absence of *de facto* government control with respect to its export activities. Appx1603-1604.  Commerce's preliminary decision set forth the following rationale:

- Pirelli Italy's board is composed of 15 members, eight of whom are to be chosen by China National Tire & Rubber Corporation, Ltd. (CNRC), which is 100 percent owned by SASAC entity China Chem.

- Ren Jianxin (the Chairman of the Board of Pirelli Italy) is also the Chairman and President of China Chem.

- And therefore "*de facto* and *de jure* control over Pirelli's selection of management exists through SASAC entity CNRC.

In response, Pirelli submitted a detailed case brief arguing that the Commerce's preliminary determination was based on an unlawful analytic approach and was also the result of an incorrect understanding and appreciation of all of the factual evidence and documentation submitted by Pirelli.  Appx1609-1664.

In April 2020, Commerce rendered its final results in which Commerce affirmed its preliminary conclusion that the Pirelli Tyre had not demonstrated an absence of government control with respect to its export activities.  Appx0170-0173.  Like its preliminary conclusion, Commerce's final results rested on its conclusion that, as of July 2018 (even after the re-listing of Pirelli Italy on the Milan Stock Exchange), the Chinese shareholders had the ability to control Pirelli Italy's Board of Directors and that through this also controlled the export activities of Pirelli Tyre, the actual separate rate applicant, which was several corporate levels below Pirelli Italy.  Appx0148-0152.

**Pirelli appeal to Trade Court**

In May 2020, the Plaintiffs-Appellants initiated an appeal to the Trade Court challenging Commerce POR3 final AD review results.  In June 2023, the Trade Court rendered its final judgment that affirmed Commerce's POR3 AD review

results.  It is this Trade Court final judgment that is the subject of the instant appeal.  Appx0003-0052.

## SUMMARY OF THE ARGUMENT

This Court should not uphold Commerce's final results because they are not supported by substantial evidence and nor otherwise in accordance with law.

In Section I, we demonstrate how this Court can find that Commerce's conclusion regarding Pirelli Tyre's eligibility for a separate rate is "otherwise unlawful" even before addressing the record evidence.  Commerce's approach and analysis of the core issue of government control failed to apply the applicable legal criteria for analyzing separate rate eligibility with regard to Pirelli Tyre.  Specifically, Commerce's application of the practice described in its own Policy Bulletin 05.1 was flawed and Commerce failed to link it's finding of management control to Pirelli Tyre's export activities.

Moreover, Commerce adopted an unlawful interpretation and application of the rebuttable presumption that undergirds its separate rate analysis practice.  Commerce continued to rely on the presumption for its conclusion even after Pirelli Tyre had produced voluminous evidence rebutting the factual premise that Commerce ultimately relied on.  As a result, it is unclear what standard of proof Commerce applied in this case and whether it analyzed Pirelli Tyre's separate rate application through the lens of substantial evidence or some other standard.

In Section II, we explain in great detail why Commerce's conclusion that the Chinese government controls Pirelli Tyre's export activities is just not true.

Indeed, the record evidence on this point leads to the exact opposite conclusion and Commerce's failure to address contrary evidence means its determination cannot be supported by substantial evidence.

In particular, we demonstrate that the very different evidentiary record for the POR3 AD review proved as follows:

- Pirelli Tyre, the separate rate applicant, was a separate corporate entity from Pirelli Italy;

- The Chinese government shareholders only had minority indirect ownership of Pirelli Italy;

- The majority of the Board of Directors of Pirelli Italy were <u>independent</u> directors having therefore special legal obligations and constraints under Italian law;

- Pursuant to an agreement signed by Chinese government shareholders, Pirelli Italy's Italian national CEO, Mr. Marco Tronchetti Provera was granted with the exclusive responsibility of day-to-day management of the Pirelli Group;

- Upon the relisting of Pirelli Italy (which occurred in October 2017), Chinese state-owned shareholders ceased to have management and coordination activity over Pirelli Italy and, consequently, over the entire Pirelli Group which was independently managed by the CEO, Mr. Marco Tronchetti Provera;

- According to Italian law, as a publicly listed company, Pirelli Italy had to adopt and implement procedures to prevent the very type of undue influence that Commerce has inferred;

- There is no evidence whatsoever that the Chinese Government exercised *de facto* control over Pirelli Tyre's <u>export activities</u>; in fact, all the record evidence demonstrates the contrary.

All the foregoing, demonstrates that Commerce's determination that Pirelli Tyre failed to rebut the presumption of Chinese Government control is not supported by substantial evidence.

**ARGUMENT**

## I.    COMMERCE'S APPROACH TO ANALYZING WHETHER PIRELLI ITALY WAS CONTROLLED BY THE CHINESE GOVERNMENT WAS UNLAWFUL

Commerce's separate rate methodology applies a rebuttable presumption that any company in a non-market economy that has a state-owned entity in its corporate tree must be dumping and the company's exports should therefore be subject to the adverse country-wide rate.  In the case now before the Court, Commerce has applied that presumption to an icon of Italian motorsports, the Pirelli Group.  This case – and the robust record before the Court – illustrates the flaws in Commerce's methodology.

The first legal flaw is that Commerce ignored its own framework for linking evidentiary findings to conduct that is relevant to antidumping proceedings.  In the context of non-market economy proceedings, Commerce examines whether an individual company is free of both *de jure* and *de facto* government control.  This analysis has evolved over time and Commerce's practice is currently described in Policy Bulletin 05.1.  The key point of the Policy Bulletin is its explicit focus and emphasis on "export functions", and not business operations more generally.

The second legal flaw is that the so-called "rebuttable" presumption has morphed from a reasonable tool of administrative efficiency when there is only a limited record to an unlawful *per se* evidentiary assumption that substitutes for

substantial evidence.  As applied in this case, the presumption is untethered to any statutory authority or reasonable review of the record.  In effect, Commerce is unlawfully applying an evidentiary assumption to parties that actually produced extensive relevant evidence that Commerce should have carefully assessed.

Commerce's decision at issue here intertwined these two legal errors. Perhaps recognizing that the record evidence on "export functions" provided little basis for its desired conclusion, Commerce used the presumption as an excuse to ignore the record evidence.  By combining a few random points disconnected from any assessment of "export functions" and using the presumption to create a near impossible hurdle to overcome, Commerce essentially rewrote Policy Bulletin 05.1 and ignored the statutory standard of "substantial evidence." That approach was contrary to law.

## A.    Commerce Did Not Properly Apply The Applicable Legal Criteria for Analyzing Separate Rate Eligibility

Commerce's application of the test announced in Policy Bulletin 05.1 was legally flawed and failed to link Commerce's theory of control to export activities. The language of the test and the structure of the bulletin explicitly focuses on "export functions" and the practices from which the test emerged confirm that Commerce must link each of the *de facto* criteria to the export activities of the responding company.  Of particular importance in this case is the need to establish

the factual basis for linking management control, the third factor, to an ability to influence export activities. Commerce's own past decisions upon which the test is based show that export activities were a key area of focus in making that determination. Yet, Commerce and the Trade Court largely ignored this important focus on the "export functions" of the respondent in the AD review results and the subsequent judicial review.

The language and structure of Policy Bulletin 05.1 is crucially important in understanding where the focus of the inquiry must lie. With respect to the *de facto* analysis, which is relevant to the proceeding at issue here, the bulletin states that:

> Typically, the Department considers four factors in evaluating whether each respondent is subject to *de facto* governmental control of its export functions:
>
> 1)  whether the export prices are set by, or subject to the approval of, a governmental authority;
> 2)  whether the respondent has authority to negotiate and sign contracts and other agreements;
> 3)  whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and
> 4)  whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

Policy Bulletin 05.1.

Additionally, Commerce will seek "additional indicia of control" in the situation where the state-owned entity holds only a minority share. Final IDM,

Appx0150 (citations omitted).  For the reasons described below, Commerce has

used a legally flawed approach in applying this policy to this case.  Even in the

face of specific and compelling record evidence about "export functions,"

Commerce largely dismissed the very evidence on which the Policy Bulletin 05.1

directed Commerce to focus.

The enunciation of the *de facto* test begins with a chapeau – applicable to the

detailed discussion below – that  "{Commerce} considers four factors in evaluating

whether each respondent is subject to *de facto* governmental control of its <u>export</u>

<u>functions</u>."  Policy Bulletin 05.1 (emphasis supplied).  In other words, the

discussion to follow is about establishing control over export functions, not some

more generic or unspecified form of general control.  The test has an explicit focus

that is firmly grounded in the purpose of an antidumping inquiry, namely whether

export prices to the United States are fair.

This statement of purpose is followed by four specific factors, one of which

is "whether the respondent has autonomy from the central, provincial and local

governments in making decisions regarding the selection of its management."

Policy Bulletin 05.1.  Due to that language and structure, it is clear that the test

elaborates four factors that relate to the core question of whether a separate rate

applicant has control over its export functions such that its data would actually

show whether or not it is dumping and, if so, at what level.

- 23 -

In the underlying proceeding Commerce acknowledged the same proposition, noting "{a}n exporter will receive the country-wide rate by default unless it affirmatively demonstrates that it enjoys both *de jure* and *de facto* independence from the government over its <u>export activities</u>." Final IDM, Appx0148 (emphasis supplied). <u>By Commerce's own admission, the focus is properly on export functions and activities</u>. Ultimately, Commerce found that "Pirelli has not demonstrated on this record that Chem China no longer retains actual or potential control and influence throughout the Pirelli companies' ownership structure (*i.e.*, {Pirelli Italy} and Pirelli China) and management, including Pirelli China's board and management." Final IDM, Appx0152-0153 (Commerce uses Pirelli China to refer to Pirelli Tyre). Ostensibly, Commerce was focusing on the management of Pirelli Tyre, the separate rate applicant, in reaching this conclusion, but as discussed more fully below in Section II, a conclusion on that basis was not supported by the record.

The Trade Court found that no link to export functions was necessary with respect to the third factor of Commerce's policy bulletin. Specifically, the Trade Court found that the first and fourth factors mention a variety of export functions and thus the absence of any mention of exports in the second and third factor means that those elements need not be linked to export functions. *Pirelli Tyre Co. v. United States*, 638 F. Supp. 3d 1361 (Ct. Int'l Trade 2023) ("Slip Op. 23-86"),

Appx0036. On that basis, the Trade Court "decline{d} to adopt the approach

asserted by Plaintiffs and alter the third factor of the de facto control test to read an

additional requirement for Commerce to assess whether respondent has autonomy

from government control in respondent's export activities or export functions."

Slip Op. 23-86, Appx0037. This Trade Court finding, however, is wrong for two

reasons.

First, as a matter of the language and structure of the Policy Bulletin 05.1

test, the express mention of "exports" in some specific factors does not eliminate

the overall focus on "export functions" set forth in the chapeau. Indeed, the

language in chapeau confirms just the opposite, and shows that Commerce's

treatment of factor three lacks the necessary precision to survive judicial review.

Second, there is ample evidence in Commerce's prior rulings, that form the

basis for the test recorded in Policy Bulleting 05.1, that export functions are, or at

least were, the locus of Commerce's review when the test was conceived.

Commerce has stated that it performs the "*de facto* government control over its

export activities under a test established in *Sparklers* as amplified by *Silicon*

*Carbide*, and further refined in *Diamond Sawblades*." Final IDM, Appx0148-0149

(internal citations omitted). A review of those underlying decisions reveals that

Commerce was specifically focused on how each of the factors that are now

identified in Policy Bulletin 05.1 impacted production and export pricing, the key

concerns in AD proceedings.  Further, two decisions by the Trade Court show that the analysis of factor three, "whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management" requires actual evidence that the person controlled has the authority to impact export functions.

In *Sparklers from China*, the final decision examines whether export prices were set independently and whether each exporter keeps the proceeds of those sales.  *Sparklers From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 56 Fed. Reg. 20,588, 20589 (May 6, 1991).  After examining those factors, Commerce found that there was nothing "that could be construed as specific central control of pricing or production." *Id.* (emphasis supplied).  In the context of a non-market economy proceeding, the only pricing and production analyzed by Commerce are exports to the United States.

In *Silicon Carbide*, Commerce applied a *de facto* control test that is very similar to the one in Policy Bulletin 05.1.  *Silicon Carbide From the People's Republic of China: Notice of Final Determination of Sales at Less Than Fair Value*, 59 Fed. Reg. 22,585, 22,587 (May 2, 1994).  There, Commerce added the criteria regarding management and, focusing on the specific respondent found no evidence of government intervention in management decisions based on "examination of management election/evaluation forms completed by employees."

*Id.* The decision memorandum in the *Diamond Sawblades* case is more clear and states that Commerce examines the four factors to determine "government control of an enterprise's <u>export functions</u>." *Diamond Sawblades and Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011–2012*, 79 Fed. Reg. 35,723 (June 24, 2014) an accompanying decision memorandum at Comment 1.

As these cases show, quite apart from the Trade Court's narrow reading of the Policy Bulletin test, Commerce's practice has always been focused on how the four factors of the *de facto* control test bear on a respondents' export activities. This is a logical focus given that dumping is an allegation that export sales made to the United States are unfair. The dumping laws are designed to reveal and discipline behavior of that nature and are not a license to act as a "roving commission to inquire into evils and upon discovery correct them." *A. L. A. Schecther Poultry Corp. v. United States*, 295 U.S. 495, 551 (1935) (Cardozo J., concurring). Commerce's analysis must comport with its stated method of analysis.

Here, Commerce has found, contrary to evidence submitted by the Pirelli Tyre, that Chem China can control the board of Pirelli Italy and thus has plenary authority to impact the selection of the management of Pirelli Tyre, despite the provisions of the various corporate controls that state it cannot. Final IDM,

Appx0152. Commerce's general turn of phrase is only that "we are not convinced that China Chem, through {Pirelli Italy} does not control Pirelli China." *Id.* There is no attempt, however, to link this broader conclusion to the export functions of the applicant. Importantly, the record could not support such a conclusion because Pirelli Tyre does not set the price of the exported merchandise - the price for sale of products within the USA is, instead, set by Pirelli USA. *See* Section II below. This fact is crucially important for rendering an accurate determination and underlines why it is important for Commerce to ensure that it is closely adhering to its own practice of establishing a link between control of management selection and the ability to influence the export activities of the applicant. By failing to properly analyze whether there was a link between Commerce's theory of government control and export activities, Commerce rendered a legally flawed determination that must be remanded.

The Trade Court dismissed this aspect of the Pirelli's arguments below by observing that "Plaintiffs have not cited any authority that would support a requirement in the third factor for Commerce to connect an exporter's autonomy in selecting management with specific export activities or export functions." Slip Op. 23-86, Appx0036. Prior decisions by the Trade Court have, however, probed whether Commerce established a link between management selection and export activities in the context of analyzing the third factor of Policy Bulleting 05.1. The

jurisprudence reveals that, in situations where there is minority ownership by a government controlled entity, Commerce must show a linkage between the rights that a state-owned shareholder can exercise and the employment of the individuals responsible for export activities at the respondent entity.

For example, in *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, the Trade Court affirmed Commerce's findings because it had closely examined which actual management employees had been put forward by which shareholders and what duties the management employees would perform. *Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317, 1348 (Ct. Int'l Trade 2014). Specifically, the Trade Court upheld Commerce's grant of a separate rate after a voluntary remand on the basis of evidence that

> management personnel selections — and in particular the selection of personnel with primary control over {the respondent's} <u>production and business operations</u> — were not in any way influenced by the government. Specifically, the record indicates that, with the exception of the chairman, all of {the respondent's} board members, including the board's first vice director, were recommended by shareholders other than the state-owned entity, and appointed by a vote of all of the shareholders

*Id.* at 1270 (emphasis supplied). Further, the focus on export activities in Commerce's analysis is clear. The Trade Court's affirmance notes that "the individual who was {the respondent's} second largest shareholder, first vice director of the board, and general manager during the period of investigation held no apparent ties to the government, and wielded at least some amount of control

over the company's <u>production and export operations</u>." *Id.* at 1271 (emphasis supplied).

Similarly, in *An Giang Fisheries v. United States*, the Trade Court affirmed Commerce's denial of a separate rate on remand based on a highly specific factual showing that linked a specific individual that was beholden to a minority government shareholder to the day-to-day operations of the respondent company. *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1350, 1362-1363 (Ct. Int'l Trade 2017). Initially, the Trade Court remanded Commerce's separate rate denial because the record did not support "a reasonable inference that the government directly or indirectly selected management where the government's representative did not control sufficient shares to approve management and directors." *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1290-1291 (Ct. Int'l Trade 2017). It was only after establishing the link to the government shareholder through a specific individual, Mr. X, with the authority to impact export activities, that Commerce's separate rate denial was affirmed.

Commerce has not met that burden in this case. <u>In fact, the record shows that the type of direct line between the government shareholder and the day-to-day management at Pirelli Tyre does not exist</u>. Commerce did not, however, analyze this aspect of the record because it did not apply the test announced in Policy

Bulletin 05.1 consistent with its own practice and its determination is thus unlawful. As a result, this Court must remand Commerce's determination for further proceedings consistent with the test described above.

### B.    Commerce Adopted an Unlawful Interpretation and Application of "Rebuttable Presumption"

Commerce has treated its separate rate analysis as a binary test. Either (1) a respondent rebuts the presumption of control and receives a separate rate or (2) the presumption stands and the respondent is treated as an arm of the government of the country where it is located, in this case China. This approach is legally flawed and treats the presumption as a new standard of evidence rather than a tool for gauging whether the burden of substantial evidence has been met.

At the outset, it is important to recall what a presumption is in a common law system. A presumption is "{a} legal device which operates in the absence of other proof . . . a presumption is not evidence." Black's Law Dictionary at 1185 (6th Ed.). A rebuttable presumption is "{a} species of legal presumption which holds good until evidence contrary to it is introduced." *Id.* at 1267. In line with these black letter law precepts, the Federal Circuit has found that rebutting a "presumption compels the production of this minimum quantum of evidence from the party against whom it operates, nothing more" and that once that evidence is proffered "a presumption is not merely rebuttable but completely vanishes upon

the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact." *A. C. Aukerman Co. v. R. L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992). A Fifth Circuit case considering administrative disputes flowing from the Natural Gas Policy Act of 1978 noted the bursting bubble theory of presumptions where "the *only* effect of a presumption is to shift the burden of producing evidence with regard to the presumed fact. If the party against whom the presumption operates produces evidence challenging the presumed fact, the presumption simply disappears from the case." *Pennzoil Co. v. Federal Energy Regulatory Comm'n.*, 789 F.2d 1128, 1136-1137 (5th Cir. 1986) (emphasis in original).

Commerce does not apply its presumption in this manner. Instead, Commerce requires a respondent to prove that the presumption is affirmatively wrong to win separate rate eligibility. According to the cited jurisprudence, the correct standard required to rebut a presumption is, however, much lower, and all that is required to rebut a presumption is for a litigant to produce some evidence that is contrary to the fact for which the presumption initially substitutes. To the extent that Commerce's practice diverges from that standard, it is unlawful and has the effect of replacing the substantial evidence standard with some other standard of evidence not contemplated by the statute.

With respect to Pirelli Tyre's separate rate application, Commerce found that the company had not rebutted the presumption of government control because it failed to demonstrate independence in the selection of management and thus failed on the third factor of the test in Policy Bulletin 05.1. Final IDM, Appx0152-0153. Commerce noted that Pirelli Tyre had only minority state-ownership in its corporate tree but Commerce did not specifically describe what additional indicia of control it relied on in making the finding that the presumption of government control had not been rebutted. Final IDM, Appx0149-0150. Commerce's analysis largely focused on the fact that certain members of Pirelli Italy's board of directors held or had held positions at Chem China, the state-controlled entity that held an indirect minority stake in Pirelli Italy. Final IDM, Appx0150-0152.

For its part, Pirelli Tyre demonstrated in its separate rate application that the majority of the directors of Pirelli Italy were either not appointed by Chem China or were independent directors that were required, by law, to act independently from the shareholder that appointed them and in the sole interests of the company. Notably, this was a fundamental change in corporate structure from the prior administrative review where Commerce had also denied Pirelli separate rate status. Pirelli Tyre presented evidence of, *inter alia*, a significant number of independent directors, the obligations of those directors, the enhanced control of Marco Tronchetti Provera over day-to-day management under the shareholders agreement

signed at the time of the relisting, and the controls that Italian corporate law place on Pirelli Italy, its directors, and management employees.  Appx917-922.  All of these facts, that show an inability for the Government of China to control management selection at Pirelli Tyre, were presented to Commerce.  At that juncture, Pirelli Tyre had produced much more than the minimum quantum of evidence required to burst the bubble of the presumption of government control.  Yet, Commerce continued to rely heavily on the presumption of state-control for its findings.  *See, e.g.*, Final IDM, Appx0153.

In its decision memorandum, Commerce stated that the presumption of state control had not been rebutted and went on to explain those elements of the record that supported its position regarding Pirelli Tyre's separate rate eligibility.  Final IDM, Appx0148.  Commerce's reliance on the presumption as the basis for its determination was unlawful because there is evidence contrary to the assumed fact embodied in the presumption, *i.e.* whether Pirelli Tyre's management is influenced by the Chinese shareholder with respect to export activities.  As soon as Commerce starts to weigh evidence, its decision cannot be based on a presumption and the characterization of this analytical methodology as a rebuttable presumption frustrates the ability of litigants and the Courts to ensure that Commerce adheres to its obligation to support its findings with substantial evidence because it is unclear what standard Commerce is actually using.  Once Pirelli Tyre presented evidence

that the government was not able to influence its management selection, as it did, it was unlawful for Commerce to continue to base its decision on a rebuttable presumption that had been rebutted.

It was only lawful for Commerce to analyze the Pirelli Tyre's separate rate eligibility on the basis of the statutorily mandated standard of substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i).  Commerce's decision memorandum is, however, very clear that the basis for its decision was "that Pirelli China has <u>failed to rebut the presumption</u> of *de facto* government control" and not the more comprehensive review of the record required by law.  Final IDM, Appx0153 (emphasis supplied). To the extent that the rebuttable presumption, as applied in this case, is simply an excuse to ignore or short-change the analysis that Commerce is required to perform, the continued use of the presumption is unlawful.

It is important to clarify that the framework Pirelli describe here allows for the possibility that a respondent might rebut the presumption of government control and still be found to be ineligible for a separate rate based on a more complete review of the record based on substantial evidence standard.  The rebuttable presumption cannot, however, become an excuse to supplant the second part of Commerce's obligation, that is to examine evidence related to separate rate eligibility through the same lens that it views other types of evidentiary questions, substantial evidence.  Pirelli does not, here, contest the legal basis for Commerce's

assumption in the first instance that a company with a state-owned entity in its

ownership tree is not eligible for a separate rate but the balance of Commerce's

analysis of these questions must not supplant the substantial evidence standard.

The Trade Court found that Pirelli's argument in this respect failed because

"{Pirelli} had the burden of rebutting the presumption of government control

through proffered evidence, and there is no indication that Commerce imposed a

higher burden upon Pirelli."  Slip Op. 23-86, Appx0030.  That conclusion misses

the important distinction that the Pirelli's arguments draw above.  A rebuttable

presumption cannot continue to act as the basis for an evidentiary conclusion in the

face of a complete factual record on the relevant issue.  A finder of fact might

weigh evidence and conclude that a party has failed to prove an underlying point

but the basis for the conclusion cannot lawfully be a presumption if there is

actually evidence on the record that speaks to the issue.  The force of the

presumption is removed once the required evidence has been submitted.  "A

presumption is not evidence" and only acts in the absence of other facts.  Black's

Law Dictionary at 1185 (6th Ed.).  As soon as a finder of fact is weighing two sets

of contrary evidence relevant to a disputed factual point, a presumption, rebuttable

or otherwise, has no place.  Yet, Commerce expressly relied on the presumption

for its findings, Final IDM, Appx0153, even after considering evidence presented

by Pirelli Tyre and identifying aspects of the record that, in its view, detracted

from that evidence.  As a result, it is entirely unclear what standard of evidence Commerce applied in its review and, to the extent it was applying a presumption despite contrary evidence, the evidentiary burden imposed on the Pirelli exceeded the one that prevails in this circuit.

When reviewing agency actions, the court "must judge the propriety of such action solely by the grounds invoked by the agency." *Securities Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (holding that a court is obligated to review a decision of an administrative agency according to the reasoning the agency puts forth).  Here, the legal basis for the agency's conclusion regarding Pirelli Tyre's separate rate eligibility is a presumption of a specific factual conclusion for which Pirelli Tyre provided extensive contrary evidence.  In the face of that evidence, Commerce continued to rely on the presumption as the legal basis for its conclusion rather than performing the statutorily mandated analysis and determining whether the record contained substantial evidence that supported its conclusion.  That legal position is inconsistent with the general principles of law discussed above and the jurisprudence of this Court and must be remanded for further analysis based on the applicable burden of proof by the agency and how the application of that burden comports with the statute.

## II.    COMMERCE'S DETERMINATION THAT PIRELLI FAILED TO REBUT THE PRESUMPTION OF GOVERNMENT CONTROL IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

In the final decision memorandum, Commerce states that "{w}e have not granted a separate rate to Pirelli Tyre for these final results because it has not rebutted the presumption of *de facto* government control."  Final IDM at 13, Appx0148.  This Commerce conclusion relies exclusively on the "*de facto* criterion (3), *i.e.*, that control over Pirelli Tyre's selection of management exists through SASAC entity CNRC." Final IDM, Appx0149.  Commerce's analysis purportedly supporting this conclusion was set forth in Commerce's Final SRA Memo.  Appx1686-1688.

Consistent with the jurisprudence in this circuit, Commerce continued reliance on the presumption is only appropriate if the Pirelli Tyre truly failed to adduce the "minimum quantum of evidence" demonstrating that Pirelli Italy was not controlled by the Government of China.  *See* Section I.B.  But, as Pirelli details more fully below, the administrative record in fact contains such evidence to rebut the presumption and thus the presumption has "completely vanishe{d}." *Id.*

The key facts that this Court must consider in analyzing whether the presumption has been extinguished and whether Commerce's decision rests on "substantial evidence" are as follows:

- Pirelli Tyre, the China-based applicant, was a separate corporate entity from Pirelli Italy;

- 38 -

- The Chinese state-owned indirect shareholders only had minority ownership of Pirelli Italy during the POR;

- The majority of the Board of Directors of Pirelli Italy were <u>independent</u> directors with the obligations of independence that come with that legal designation;

- The 2017 Shareholder Agreement among Pirelli Italy shareholders, including the Chinese state-owned shareholders, ensured that the Italian national CEO, Mr. Marco Tronchetti Provera, had exclusive authority over the selection of day-to-day management personnel;

- The relisting of Pirelli Italy with the Milan Stock Exchange subjected the board and the other functions of the company and its subsidiaries to Italian corporate law that legally precluded granting the largest shareholder any special preferences;

- the Chinese Government did not have the ability to exercise any *de facto* control over Pirelli Tyre's export activities, which were and are totally independent given that all U.S. sales prices negotiations were handled by Pirelli USA, a separate U.S. company.

Taken together, these facts demonstrate that Pirelli Tyre operates independently. Crucially, the record shows that Pirelli Tyre's export prices are free from distortions and/or influences imposed by any arm of the Government of China. The independence of Pirelli Italy as the parent of Pirelli Tyre and Pirelli USA as the setter of export prices to the United States ensured that the legally relevant "export functions" were not distorted. Commerce did not seriously address this evidence and instead simply relied heavily on the presumption of state control in spite of a well-developed record.

**A.    Commerce's Finding that Pirelli's Shareholding Structure Allowed Chinese Owned Companies to Control Pirelli Tyre's Operational Activities Is Not Supported By Substantial Evidence**

In rendering its ultimate conclusion, Commerce ignored that Pirelli Tyre is a Sino-foreign joint venture established in China; and Pirelli Italy, one of Pirelli Tyre's indirect shareholders, is a separate Italian company.

The evidentiary record makes clear that Pirelli Tyre and Pirelli Italy remained separate legal entities during POR3.  *See, e.g.*, Pirelli's SRA, Appx0220-0234.  The following Pirelli Corporate Organization was presented to Commerce as part of Pirelli Tyre's SRA:

**Pirelli Tyre Corporate Organization Chart**

CORPORATE COMPOSURE

*See* Pirelli SRA, Appx0558.

Such fact—that Pirelli Tyre and its parents were separate corporate entities—is particularly important for the POR3 AD review given that, unlike in the POR1 AD review, Chinese state-owned companies did not have majority ownership of any Pirelli entity.  Indeed, in its Final Results, Commerce itself fully acknowledged that during the majority of POR3, Chem China and the Silk Road Fund, the two SASAC-supervised entities that were the source of Commerce's control theory, only had a minority shareholding in Pirelli Italy.  Final IDM, Appx0149.  Commerce, however, fails to actually integrate this key fact into its analysis stating only that "{a} minority indirect ownership does not in and of itself mean an absence of government control."  Final IDM, Appx0150.  Rather than recognize and address the importance of this key fact, Commerce essentially noted and then ignored it.

The evidentiary record shows that the Chinese shareholders had a combined [ _#_ ] percent indirect ownership interest in Pirelli Tyre.  *See* Pirelli's SRA, Appx0558.  Even at the level of Pirelli Italy, Pirelli Tyre's publicly listed Italian indirect parent company, Chem China and the Silk Road Fund held only a [ _#_ ] percent share.  Pirelli's SRA, Appx0220, Appx0558.  Thus, it is undisputed that the Chinese shareholders did <u>not</u> have majority ownership of Pirelli Tyre.  Pirelli's SRA, Appx0220.

The change in shareholding was a crucial difference from the record in

POR1 where Commerce initially applied the China-wide rate to the Pirelli Tyre.

As discussed above, during POR1, the Chinese Shareholder had a majority

ownership interest for most of the POR.[3]  In assessing Commerce's POR1

redetermination, the Trade Court paid particular attention to the ownership

structure stating that "Pirelli China was controlled and majority owned by Chinese

government-owned entities; the acquisition of Pirelli's companies in Italy by

{Chem China} gave rise to the presumption of government control of Pirelli

China; and Chinese government-owned entities." *Shandong Yongtai Grp. Co.,* 487

F. Supp. 3d at 1346.  Later, in assessing Commerce's Remand Redetermination in

POR1, the Court again noted Commerce's basis for rejecting the application of a

separate rate to Pirelli Tyre was the majority government shareholding.  *See*

*Qingdao Sentury Tire Co. v. United States*, 539 F. Supp. 3d 1278, 1281 (Ct. Int'l

---

[3]  Final Results of Redetermination Pursuant to Court Order, *Qingdao Sentury Tire Co., Ltd., Sentury Tire USA Inc., Sentury (Hong Kong) Trade Co., Limited, and Pirelli Tyre Co., Ltd., Pirelli Tyre S.p.A., and Pirelli Tire LLC v. United States*, Court No. 18-00079, Slip Op. 21-128 (September 24, 2021) (finding the Pirelli Tyre free from government control during the period preceding the acquisition of shares by Chem China) ("POR1 Remand Redetermination"), at 5-6 ("Consistent with the Court's remand order, our analysis for purposes of this final determination concerns Pirelli's separate rate eligibility during the period January 27, 2015, through October 19, 2015. . . Pirelli Tyre Co. was not wholly foreign owned during the period at issue. Therefore, Pirelli Tyre Co. is properly subject to a separate rate analysis.")

Trade 2021) ("Commerce examined the record and noted that Chinese

government-owned entities had majority ownership of Pirelli.").

Despite Commerce placing significant emphasis on majority shareholding

during the POR1 AD review, in this POR3 AD review Commerce placed very little

importance on the fact that the Chinese shareholders only held a minority share.

Commerce did not adequately explain why the change in shareholding between

POR1 and POR3 was immaterial to its factual analysis.  Because the POR3 AD

review facts about ownership were so different—a switch from majority to

minority ownership—Commerce was under the obligation to perform a more

probing review of the shareholding situation to ensure that its determination was

supported by substantial evidence.  Although Commerce acknowledges the

minority stake held by the Chinese shareholders in Pirelli Italy in its Final Results,

Commerce's analysis treats this fact as inconsequential.  Commerce, however, was

required to weigh this as a key fact in its analysis and its failure to do so renders its

determination unsupported by substantial evidence.

Like Commerce, the Trade Court effectively ignored the significance of

minority ownership by the Chinese shareholders.  Although the Trade Court did

recognize that, in situations of minority government ownership, Commerce needed

to find "additional indicia of control," the Trade Court simply asserted that

Commerce had identified such additional indicia.  Slip Op. 23-86, Appx0040.  The

Trade Court's opinion reveals no analysis of whether the record supported

Commerce's identification of the additional indicia or whether Commerce's

analysis of that additional indicia was reasonable.

### B.    Contrary To Commerce's Implicit Finding, The Majority Of Members Of Pirelli Italy's Board Of Directors Are Independent From The Chinese Shareholders

Commerce's determination regarding Pirelli Tyre's separate rate eligibility

relies entirely on its findings regarding the ability of the Chinese shareholders to

influence decisions made by the board of directors of Pirelli Italy.  Final IDM,

Appx0150.  Commerce notes that "Pirelli's board is composed of 15 members,

eight of whom are to be chosen by China National Tire & Rubber Corporation,

Ltd."  Final Separate Rate, Appx1687.  In addition, Commerce noted that Mr. Ren

Jianxin was Chairman of the Board at both Chem China and Pirelli Italy.  Final

IDM, Appx0150-0151.  Commerce's statements convey the impression that the

Chinese shareholders constituted and actively controlled the majority of Pirelli

Italy's board members and thus had the ability to manipulate the business activities

of Pirelli Tyre, three rungs down the corporate chart.  That theory is contrary to

law and contradicted by the record and thus cannot be sustained.

According to the 2017 Shareholder Agreement, that was concluded prior to

the re-listing of Pirelli Italy on the Milan Stock Exchange, the board consisted of

15 directors, as follows:

CNRC {Chinese state-owned company} designates 8 directors – but 4 of whom must be <u>independent</u> directors;

MTP designates 4 directors including Marco Tronchetti Provera as Vice Chairman and CEO and 1 of whom must also be an <u>independent</u> director;

CNRC {Chinese state-owned company} and MTP shall jointly designate two <u>independent</u> directors (the "Jointly Appointed Directors"), of female gender, taking into account the indications of the respective Joint Global Coordinators appointed in the context of the IPO, subject to any indication of Borsa Italiana and CONSOB.

Pirelli Italy's First Shareholder Meetings after the company is listed designates 1 <u>independent</u> director.

*See* Pirelli's 2017 Shareholder Agreement, Appx1102-1103; *see also* Pirelli 2017 Annual Report Appx920.

In total, the board had 15 members during the POR, <u>8 of whom are independent directors</u>.    *See* Pirelli's SRA, Appx1407.  To be clear, there is no factual dispute that 8 of the 15 members of the Board of Directors are "independent directors."  By definition an "independent director" is one that is not beholden to a particular shareholder.

In addition, and importantly, the meaning of "independent" is explained in Italian law, and it specifically requires that members of the Board of Directors have no relationship with any shareholder, whether professional (self-employment or employee), economic or personal that might compromise their independence.

*See* Italian Finance Code,[4] Article 148, par 3, ("TUF").  Moreover, under Italian

law, the independence of the independent directors is evaluated pursuant to Italian

law requirements and must be re-assessed on an annual basis. *See* Article 3

Principle 3.P.2 of Italian Code of Corporate Governance[5].  This fact was made

clear in Pirelli Italy's 2017 Annual Report:

> At the Report Date, 50% of the Board of Directors consists of
> directors who satisfy the requirements for identification as
> independent: . . . The existence of their independence requirements
> has been evaluated in the context of the Board meeting held on 31
> August 2017, on the basis of the information provided by them at the
> time of their appointment, the information available to the Company
> and the requirements established in the TUF and recommended by the
> Corporate Governance Code.
>
> At the same time of the assessment made by the Board of Directors,
> the Board of Statutory Auditors confirmed that it had verified, in line
> with the recommendations of the Corporate Governance Code, the
> proper application of the assessment criteria and procedures adopted
> by the Board of Directors to verify the independence of its Directors.
>
> Following their appointment, the satisfaction of the independence
> requirements is assessed at least on an annual basis (for 2018, this
> activity was carried out during the Board meeting held on 26 February
> 2018).

Pirelli 2017 Annual Report, Appx0922.

---

[4] Decreto Legislativo n. 58 del 24 febbraio 1998 - Testo unico delle disposizioni in
materia di intermediazione finanziaria, ai sensi degli articoli 8 e 21 della legge 6
febbraio 1996, n. 52, (hereinafter "Italian Finance Code").
[5] Codice di Autodisciplina, Comitato per la Corporate Governance (Luglio 2018);
(hereinafter "Italian Code of Corporate Governance").

According to Italian Law, however, absence of independence does not entail that directors are entitled to act in the interest of the shareholders. All directors shall in fact act strictly in the sole interest of the company regardless of their independence or not.  And so, the evidentiary record of this proceeding therefore makes crystal clear that:

- a majority (8 out of 15) of Pirelli Italy's board members are independent directors [6]

- only 4 out of 15 board members are non-independent directors designated by the Chinese shareholders, but absence of independence does not entail that they are entitled to act in the interest of the Chinese shareholders;

- a majority (11 out of 15) of board members do not hold any positions with the Chinese shareholders;

- none of the independent directors hold any positions with the Chinese shareholders; and

- only 6 out of 15 board members are Chinese nationals.

Pirelli 2017 Annual Report, Appx922.

As such, Pirelli Italy's board membership <u>does not</u> support, but actually rebuts, Commerce's conclusion that the Chinese shareholders controlled the board.

---

[6] This structure is far beyond the requirements under Italian law, which directs companies to appoint at least "two" independent members of the Board of Directors in instances where it is composed by more than seven members. *See* Article 147-ter, par. 4 TUF. In addition, obligation of independence from the appointing shareholder is governed by Italian law concerning publicly listed companies. In case of not complying with the requirement of independence, the member of the Board is required to step down. *See* Article 148, par. 3 TUF.)

Like Commerce, the Trade Court also failed to understand the importance of the fact that the Chinese shareholders did not control a majority of Pirelli Italy's Board of Directors. The Trade Court rendered two conclusions about the independent directors that contributed to the erroneous result below.

The Trade Court first concluded that Commerce was reasonable to reject the importance of the fact of independent directors because, supposedly, there was other evidence of Chinese Government control. Appx0041-0042. Such evidence consisted only of a single sentence in Pirelli Italy's 2017 Annual Report that had nothing to do with the Board of Directors. *Id*.

Specifically, like Commerce, the Trade Court references the following statement in the 2017 Annual Report: "The Company is indirectly controlled, pursuant to art. 93 TUF, by Chem China via CNRC and certain of its subsidiaries, including Marco Polo." Appx0917.

However, this statement was simply included to ensure ChemChina's right to consolidate financial accounting, but in no way undermined management independence guaranteed by the company agreements.

In this regard, ChemChina's right to consolidate financial accounting does not create presumption of management and coordination, in light of the contrary evidence (*i.e.* specific company agreements and factual elements related to the absence of an influence over the decisions taken by the company). *See* Article

2497-sexies of Italian Civil Code[7].  Indeed, as detailed extensively herein, and as explicitly noted in the same Pirelli annual report, in fact, specific agreements between the shareholders were limiting the shareholders' influence over management.

Moreover, that very same document – the 2017 Annual Report -- explicitly stated that "the Board of Directors of Pirelli has determined that, from the First Trading Day {4 October 2017}, **Pirelli is no longer subject to any management and coordination** activities by Chinese shareholders."  Appx0917.  And the very same 2017 Annual Report also notes that that (a) 8 of the 15 members of the Board of Directors were "independent directors " and (b) the Board of Statutory Auditors had confirmed that Pirelli Italy had satisfied the "independence requirements" of Italian law.  Appx0920, Appx0922.  In the face of this robust contrary documentation, an allegedly inconsistent single sentence that refers to an accounting concept cannot constitute "substantial evidence."

The Trade Court's second conclusion was as follows:

Plaintiffs' argument that Italian law requires individuals designated as "independent" to not be linked to Pirelli or its parent companies misses the mark. . . . The provisions of Italian law cited by Plaintiffs would not prevent a government-controlled shareholder from appointing an individual that was independent of both the shareholder and Pirelli but still beholden to the interests or control of the Chinese Government."

---

[7] Codice civile (approvato con Regio Decreto del 16 marzo 1942, n. 262) (hereinafter "Italian Civil Code").

Appx0050-0051 (emphasis supplied).

There is no factual support in the record for the conclusion that any of the independent directors was somehow beholden to the Chinese Government. Notably, the Trade Court's opinion cites no record evidence on this point. Further, no such factual claim was never made by Commerce in the Final Results. Rather, Commerce's decision completely ignored the issue of the independent directors. Appx1686-1688. Commerce's final decision simply stated that the Chinese shareholders designated 8 members of the Board of Directors, but failed to acknowledge the undisputed fact that 4 of those 8 were independent directors with the legal obligation of independence attendant to that designation. *Id.*

Finally, the Trade Court's interpretation of Italian law was flawed. It is not lawful under Italian law for a public company to have an independent director that is beholden to another interest as provided for by Article 148, par. 3 TUF and all directors, regardless of their independence, are called to act strictly in the sole interest of the company (Article 2391 of Italian Civil Code). The Trade Court's analysis of the record based on that premise cannot be sustained.

C.    **Commerce's Conclusion That Chinese State-Owned Shareholders Exercised *De Facto* Operational Control Over Pirelli Ignores Substantial Evidence That Pirelli's Day-To-Day Management Was Insulated From Chinese Shareholder's Control**

As explained above, Pirelli Italy, the indirect majority parent company of Pirelli Tyre, the separate rate applicant, is based in Italy and is publicly listed on the Milan Stock Exchange.  Commerce's ultimate decision denying Pirelli Tyre's separate rate application is premised upon Commerce's finding that the Chinese Government through the Chinese shareholders controls Pirelli Italy's Board of Directors, thus controlling Pirelli Tyre's day-to-day operations.  However, this finding is contradicted by substantial evidence.  In fact, there is substantial evidence that the Chinese shareholders had no ability – and had expressly accepted terms proscribing the ability – to control day-to-day management of Pirelli Italy or Pirelli Italy's subsidiary, Pirelli Tyre.  Appx0595-0636.  The 2017 Shareholders Agreement established specific mechanisms governing the relationship among the shareholders and the operations of Pirelli Italy and other Pirelli entities. Appx1087-1203.

Before going into the details of the specific mechanisms, we note some important historical context.  When Chem China carried out its investment in Pirelli Italy back in 2015, it did so within a larger context that envisaged a reorganization of the Pirelli Group aimed at enhancing the value of the group through the de-listing of Pirelli Italy at the end of 2015 and subsequently relisting

the company as a pure consumer company.  *See* Pirelli's SRA, 2015 Sales

Purchase Agreement and Shareholder Agreement, Appx0568-0636.  There is no

question that there was the expectation—which existed at the outset of the Chem

China investment—of performing the relisting in the near term.  *See* Section 6

(IPO), Appx0626-0627.   Such expectation demonstrates that the entire plan was

for the shareholders', including Chem China, to reap financial rewards from the

enhanced valuation of the Pirelli Group, rather than some attempt to derive value

from increased operational control.  Indeed, the qualification of the Chem China

acquisition as a financial investment aiming at enhancing the value of the Pirelli

Group is further demonstrated by the fact that, following the acquisition of the

majority interest in Pirelli Italy by Chem China, the Pirelli Group continued to

operate with no change in management and strategy.  Section 3.8, Appx0619 ("The

parties agree that the current Target's top managers, to be identified by Target,

including Mr. Marco Tronchetti Provera … shall be in charge of the day to day

management of Target, the implementation of the business plan and the

recruitment and promotion of key personnel of Target and its group in line with the

procedure *currently in place* in Target . . ." ) Appx0619.

       In short, the 2015 Sales Purchase Agreement demonstrates that Pirelli Italy

would continue to operate as an Italian company independent of the Chinese

investors.  The Chinese shareholders had no interest in exercising, and actually did

not exercise, any influence in the management and operations of Pirelli Italy or any entity within the broader group.  *See* Pirelli SRA, Appx0220.  Although some of these facts may be unchanged from POR1, the circumstances for the POR3 AD review time period changed significantly.  Because Chem China is now only a minority shareholder, the powers of independent management and direction should have been duly considered in Commerce's decision, while they were not.

> **1.    Contrary to Commerce's conclusion, substantial evidence demonstrates that Pirelli Italy's CEO, Mr. Marco Tronchetti Provera, had exclusive day-to-day management authority**

Perhaps the most egregious part of Commerce's analysis was the failure to appreciate the significance of the fact that the Italian national CEO, Mr. Marco Tronchetti Provera, had full authority to appoint all operational management of Pirelli Italy and Pirelli Tyre.  While Commerce duly notes that the Board of Directors "delegated' authority to Mr. Tronchetti Provera in the management of {Pirelli Italy}," *see* Final IDM, Appx0152, and that "Mr. Provera is charged with implementing {Pirelli Italy's} business plan and budget, " Appx0152, Commerce completely fails to understand the significance of these undisputed facts to its SRA analysis.  Rather, Commerce summarily dismisses Mr. Tronchetti Provera's role by stating as follows:

> Pirelli's reliance on the 2017 Shareholder Agreement to show that Mr. Marco Tronchetti Provera has the exclusive authority to select {Pirelli

Italy's}management, thereby preventing board members from influencing the company's day-to-day operations, is misplaced. Information on the record indicates that Pirelli & C .S.p.A. shall be managed by a Board of Directors composed of up to fifteen members. The 2017 Shareholder Agreement also makes clear that Mr. Provera reports directly to {Pirelli Italy's} board and that the board "delegated" authority to Mr. Provera in the management of {Pirelli Italy}. In particular, the 2017 Shareholder Agreement shows that Mr. Provera is charged with implementing {Pirelli Italy's} business plan and budget which are approved by {Pirelli Italy's} board of directors.  As such, we are not convinced that Mr. Tronchetti Provera has exclusive authority to select {Pirelli Italy's} management, thereby preventing board members from influencing the company's day-to-day operations.

Final IDM, Appx0152.

Commerce's conclusion makes no sense.  Quite literally, at the same time, Commerce both (a) admits that, according to the 2017 Shareholder Agreement, "Mr. Marco Tronchetti Provera has the exclusive authority to select {Pirelli Italy's} management" but (b) also concludes that "we are not convinced that Mr. Tronchetti Provera has exclusive authority to select {Pirelli Italy's} management."  Appx0152. Commerce's conclusion is inconsistent with its admission of  Mr. Tronchetti Provera's authority.  From the evidentiary record, it is an undisputed fact that Mr. Marco Tronchetti Provera had the exclusive authority to select the management of Pirelli Italy and Pirelli Tyre.  The fact that the power is "delegated" does not rob it of any force any more than the fact that Commerce is implementing delegated authority from the United States Congress over international trade diminishes its power in implementing the AD laws.

Indeed, the evidentiary record demonstrates that there are multiple provisions in the <u>2015 Shareholder Agreement</u> that were added precisely for the purpose of preventing the Chem China shareholders from influencing day-to-day operations, and instead ensuring that Mr. Marco Tronchetti Provera had complete control thereon.  We set forth below these critical provisions; all of which Commerce largely ignored.

<u>Section 3.1:</u>

> The parties acknowledge the pivotal role of the current top management of Target, {Pirelli Italy}  to direct and manage the company. . . In this respect, the Parties acknowledge the fundamental role of Mr. Marco Tronchetti Provera, in his office as chief executive officer of Target, in leading the top management and ensuring the continuity on the target's business culture." Appx0613.

<u>Section 3.5</u>

> "The Parties agree that Mr. Marco Tronchetti Provera shall be the Target CEO and Executive Chairman. The Target CEO and Executive Vice Chairman shall be **delegated the exclusive power and authority concerning the ordinary management** of the Target and of the Target Group consistently with the power and authority **currently attributed** to Mr. Marco Tronchetti Provera in his capacity as current Chairman and chief executive officer of Target." Appx0617.

<u>Section 3.8</u>

> "The parties also agree that { Mr. Marco Tronchetti Provera in his capacity as Target CEO} shall be in charge of the **day to day management of Target**, **the implementation of the business plan and the recruitment of key personnel of Target**." Appx0619.

The autonomy of leadership of Mr. Marco Tronchetti Provera is further confirmed in the 2017 Shareholder Agreement. The relevant terms of this 2017 Shareholder Agreement mirror the terms above, as evidenced by the following:

- The 2017 Shareholders Agreement, recognized the pivotal role of Mr. Tronchetti Provera as chief executive officer and Vice Chairman of Pirelli Italy, and acknowledged its quality prerogatives to direct and the business, as conditions essential for preserving the Pirelli Group's industrial history. Section 4.2, Appx1102-1103.

- The 2017 Shareholders Agreement provided that Mr. Tronchetti Provera participated in the appointment of up to 7 members of the board of Directors of Pirelli Italy and that one of the members is Mr. Tronchetti Provera himself. *Id.*, Appx1102-1103.

- The 2017 Shareholders Agreement established that **Mr. Tronchetti Provera "shall be delegated the *exclusive* power and authority concerning the ordinary management of Pirelli Italy. and of the Pirelli group"**. Section 4.4, Appx1103.

- The 2017 Shareholders Agreement granted Mr. Tronchetti Provera the power to propose to the Board of Directors resolutions on significant matters, including; (i) approval of the business plan and annual budget of entities within the Pirelli Group, as well as any material amendments thereto; (ii) approval of industrial partnerships or strategic joint ventures. *Id.*, Appx1103-1104.

- The 2017 Shareholders Agreement require that any possible decision taken by Pirelli Italy's Board of Directors against the relevant proposal submitted by Mr. Tronchetti Provera shall be motivated and in any case take into account "the best interests of Pirelli". *Id.*, Appx1104.

- Under the 2017 Shareholders Agreement Mr. Tronchetti Provera will identify and appoint Pirelli Italy's top managers. In addition, Mr. Tronchetti Provera will be in charge of the day-to-day management of Pirelli Italy and the implementation of the business plan and the recruitment and promotion of key personnel. Section 4.7, Appx1104.

- Pirelli Italy's management during POR consisted of eight members, all Italian nationals selected and appointed by Mr. Tronchetti Provera to carry out business operations. Pirelli SRA, Appx1407.

- The Chinese shareholders agreed to each of these limitations. *Id*.

As demonstrated above, the key governing documents authorized Mr. Marco Tronchetti Provera to exclusively select the company management, preventing the Chinese shareholders from influencing the company's day-to-day operations. And, in fact, during POR3, Pirelli Italy's management consisted of eight members. *See* Pirelli SRA, Appx1407.

These senior managers were all Italian nationals who were selected by Mr. Tronchetti Provera. Mr. Tronchetti Provera also has the power to decide over "significant matters", including approval of the annual budget, business plan and any resolution concerning industrial partnerships or strategic joint ventures. Commerce should have taken into account that by granting Mr. Tronchetti Provera—the CEO of Pirelli Italy —the power over the approval and implementation of the budget, and by providing the Board of Directors—with a majority of independent members—authority to modify the budget and business plan, Pirelli Italy made sure there was absolutely no possibility for the Chinese Shareholder to influence business activities at any level of the corporate tree. 2017 New Shareholder Agreement, Section 4.4, Appx1103-1104.

In short, the record unequivocally confirms Mr. Tronchetti Provera's independent authority over management of the Pirelli Group.  That authority is exclusive and ensures that the Chinese shareholders and their four representatives in the Board of Directors cannot encroach on management of the company.  Commerce points to no evidence that these controls were ineffective during the period of review.  Accordingly, Commerce's contrary conclusion is not supported by substantial evidence.

In its decision, the Trade Court likewise failed to appreciate the significance of all of the provisions establishing Mr. Marco Tronchetti Provera's exclusive authority over the management of Pirelli Italy and its subsidiaries.  Indeed, the Trade Court did not even attempt to address the specific evidence granting such authority but rather simply concluded that Commerce was correct to ignore such evidence.  Appx0042-0043.  That conclusion and reasoning does not satisfy the substantial evidence requirement of addressing all contrary evidence with a well-reasoned explanation.

**2.    Upon the relisting of Pirelli Italy, Chinese state-owned shareholders ceased to have management and coordination activity over the company**

Commerce's Final Results also fail to recognize the legal importance of the re-listing of Pirelli Italy as a public company on the Milan Stock Exchange.

Commerce's determination ignores the legal significance of the re-listing because the relevant Italian law provisions were not included in the record *in toto*. Appx00150-00151.  The Trade Court, however, did analyze those provision under USCIT R. 44.1 and made certain legal conclusions as a result of that analysis.

Importantly, the evidentiary record before Commerce contained documentation that detailed the legal significance of Pirelli Italy's re-listing on the Milan Stock Exchange.  Specifically the 2017 Annual Report makes very clear that:

> {T}he Board of Directors of Pirelli has determined that, from the First Trading Day {4 October 2017}, **Pirelli is no longer subject to any management and coordination** activities considered typical, neither by Marco Polo nor by other companies or entities (including CNRC and Chem China) and therefore, by way of example:
>
> 1.    Pirelli conducts relations with customers and suppliers in full autonomy without any external interference;
>
> 2.    Pirelli prepares the strategic, industrial, financial and/or budget plans of the Company or the Group independently;
>
> 3.    Pirelli is not subject to any group regulations;
>
> 4.    No organizational-functional links exist between Pirelli on the one hand and Marco Polo, CNRC and/or ChemChina on the other;

5.    Marco Polo, CNRC and/or ChemChina have not carried out any deeds, adopted any resolutions or made any communications that might cause reasonable belief that the decisions of Pirelli are in some way imposed or required by Marco Polo, CNRC and/or ChemChina;

6.    Marco Polo, CNRC and/or ChemChina do not centralise treasury management activities or other financial support or coordination functions;

7.    Marco Polo, CNRC and/or ChemChina do not issue directives or instructions – and in any case would not coordinate initiatives – concerning the financial and borrowing decisions of Pirelli;

8.    Marco Polo, CNRC and/or ChemChina do not issue directives regarding any special transactions carried out by Pirelli including, for example, the listing of financial instruments, acquisitions, disposals, concentrations, contributions, mergers, spin-offs etc.;

9.    Marco Polo, CNRC and/or ChemChina do not make any crucial decisions regarding the operating strategies of Pirelli.

2017 Annual Report, Appx0917; August 2017 Press Release, Appx1219-1222 (noting lack of influence of shareholders over business operations); s*ee also* Pirelli's SRA, Appx1458-1461 (excerpt from the Board of Directors' Meeting Minutes for Pirelli Italy of July 2017).

According to Italian law, when a company is no longer subject to "management and coordination" of another company (as it was in the case of Pirelli Italy starting from October 4, 2017) such company and its subsidiaries are totally independent and autonomous from its shareholders and not subject to any instructions or guidelines or policies deriving thereby.  *See* Article 2497-*sexies*, Article 2497-*septies* and Article 2359 of the Italian Civil Code.

In its Final Determination, Commerce refused to consider this substantial evidence.

### 3. As a publicly listed company, Pirelli Italy was legally required under Italian law to maintain relative independence from its largest shareholders in order to protect the interest of minority shareholders

During the underlying AD review, the Pirelli explained in detail to Commerce that, as a listed company, Pirelli Italy had to be compliant with all related applicable Italian laws and regulations. Pirelli's SRA, Appx0227; Pirelli's Case Brief, Appx1658-1659. And of particular importance was the fact that, from its relisting in 2017, Pirelli Italy (once again) became subject to several Italian law constraints aimed to protect the interests of the minority shareholders and interests of the market more broadly.

In its Final Results, Commerce declined to even consider these important Italian law provisions that actually limited the ability of Pirelli Italy's shareholders, Chinese state-owned share-holders or otherwise, to undertake the very control that Commerce found. Appx0150. The relevant Italian law provisions were dutifully submitted to the Trade Court and the Trade Court accepted them and included them in its analysis. Appx0044-0051. The Trade Court's analysis of those provisions is, therefore, properly before this Court. A review of the relevant Italian law provisions confirms that the Chinese shareholders could not exercise the type

of operational control over Pirelli Italy or Pirelli Tyre that is central to Commerce's findings.

As a listed company Pirelli Italy had to be compliant with all related applicable Italian laws and regulations.  In particular, as from its re-listing, the company was subject to several constraints. For example, the TUF provides for specific obligations on the part of listed issuers to make disclosures to the public (Article 113-*ter*TUF and Article 114) and grants to the Market Supervisory Authority ("CONSOB") broad powers of control over such entities, including the power to request information (Article 114, par. 3 TUF), to verify the transparency of data meant for disclosure to the market, to conduct inspections and to impose sanctions in the event of failure to honor the obligations imposed. *See* TUF, Article 113-*ter*, par. 9, Article 147-*ter*, par. 1-*ter*, Article 148, par. 1-bis.

This legal framework also governs related party transactions – *e.g.* any transaction between a shareholder of Pirelli Italy and any company of the Pirelli group – and aims at ensuring transparency and substantive and procedural fairness of transactions between related parties either conducted directly by the listed company or through its subsidiaries.  *See* Pirelli's Case Brief, Appx1660. Specifically, the related parties' regulation under Italian law provides that the approval of related party transactions (including those between Chem China and Pirelli Italy or other companies of the Pirelli group) must be granted in advance in

accordance with specific procedures adopted by the board of directors of Pirelli

Italy.  *See* CONSOB Regulation no. 17221/2010,[8] Article 4.

> **D.**    **Commerce's Conclusion That The Minority Chinese State-Owned Shareholder Could Influence Pirelli's *Export Activities* Is Completely Unsupported by Substantial Evidence**

In this section we demonstrate that, contrary to Commerce's insinuation in

its Final Results, there is no evidence whatsoever that the Chinese Government

exercised *de facto* control over Pirelli Tyre's export activities.  In fact, all the

record evidence demonstrates the opposite conclusion.

Specifically, the evidentiary record makes crystal clear that Pirelli USA – a

separately incorporated U.S. company that is not in any way controlled by Pirelli

Tyre – is the Pirelli entity involved in price setting and engaging in negotiation

with U.S. customers regarding exports prices for U.S. shipments from China.  *See*

Appx1321-1372 (detailing price negotiations for a representative sale).  Pirelli

Tyre, the entity in China, has no role in price negotiations.   Pirelli submitted

documentation to Commerce that left no doubt that only Pirelli USA undertook

negotiations with U.S. customers about price and therefore Pirelli USA was the

entity that determined U.S. selling prices.  U.S. selling prices are, of course, the

---

[8] Regolamento recante disposizioni in materia di operazioni con parti correlate (adottato dalla Consob con delibera n. 17221 del 12 marzo 2010) (hereinafter, "CONSOB Regulation no. 17221/2010").

relevant gauge for whether dumping has occurred and the inability of Commerce's locus of Chinese Government control to influence those decisions is proof positive that a separate rate should have been granted in this situation.

There is simply no evidence that the Chinese shareholders can somehow control the price negotiations performed by a U.S. company, Pirelli USA. Rather, it is undisputed that Pirelli USA was responsible for all price negotiations for Pirelli Tyre's U.S. exports and sales imported into the United States.

As such, there is not substantial evidence that Pirelli Italy's Chinese shareholders could influence Pirelli Tyre's export activities.

## CONCLUSION AND RECOMMENDED APPELLATE REMEDY

For the reasons set forth above, Pirelli Tyre Co., Ltd., Pirelli Tyre S.P.A. and Pirelli Tire LLC, respectfully request that this Court hold Commerce's determination unlawful and otherwise inconsistent with the record, reverse the Trade Court's decision affirming the determination, and remand the matter to the Trade Court for further proceedings consistent with this court's decision.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
James C. Beaty
Katherine R. Afzal

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

*Counsel for Pirelli Tyre Co. Ltd., Pirelli Tyre S.p.A, and Pirelli Tire LLC*

*Pirelli Tyre Co., Ltd. v. US*, CAFC Ct. No. 2023-2266

## Addenda of Documents required by the CAFC Rules

| **Document Title** | **Appx Range** |
|---|---|
| Judgement pursuant to Pirelli Tyre Co., Ltd. et al v. United States, Ct. No. 20-00115, Slip Op. 23-86 | Appx0001-0002 |
| Pirelli Tyre Co., Ltd. et al v. United States, Ct. No. 20-00115, Slip Op. 23-86 | Appx0003-0052 |
| Judgement pursuant to Pirelli Tyre Co., Ltd. et al v. United States, Ct. No. 20-00115, Slip Op. 23-38 | Appx0053-0054 |
| Pirelli Tyre Co., Ltd. et al v. United States, Ct. No. 20-00115, Slip Op. 23-38 | Appx0055-0096 |
| Dept. of Commerce's Remand Redetermination pursuant to Remand Order Pirelli Tyre Co., Ltd. et al v. United States, Ct. No. 20-00115, Slip Op. 21-122 (September 20, 2021) ECF Nos. 55, 56 | Appx0097-0122 |
| Pirelli Tyre Co., Ltd. et al v. United States, Ct. No. 20-00115, Slip Op. 21-122 (September 20, 2021) | Appx0123-0135 |
| Dept. of Commerce's Issues and Decision Memorandum for the Final Determination Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China | Appx0136-0169 |
| Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018, 85 Fed. Reg. 22,396 (Dep't of Commerce Apr. 22, 2020) | Appx0170-0173 |

## **FRAP 28(F) Statutes and Regulations**

| Policy Bulletin 05.1, International Trade Administration | | |
|---|---|---|
| | **Italian Provision** | **English Translation** |
| Codice Civile

(Italian Civil Code) | Articolo 2359 | Article 2359 |
| | Articolo 2391 | Article 2391 |
| | Articolo 2497-sexies | Article 2497-sexies |
| | Articolo 2497-septies | Article 2497-septies |
| Decreto Legislativo n. 58/1998 (TUF)

(Italian Finance Code) | Articolo 93 | Article 93. |
| | Articolo 113-ter | Article 113-ter |
| | Articolo 114 | Article 114 |
| | Articolo 147-ter | Article 147-ter |
| | Articolo 148 | Article 148 |
| Regolamento Consob n. 17221/2010

(CONSOB Regulation no. 17221/2010) | Articolo 4 | Article 4. |
| Codice di Autodisciplina

(Corporate Governance Code) | Articolo 3, Principio 2. | Article 3, Principle 2. |

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PIRELLI TYRE CO., LTD., PIRELLI TYRE S.P.A., and PIRELLI TIRE LLC,<br><br>     **Plaintiffs,**<br><br>**and**<br><br>SHANDONG NEW CONTINENT TIRE CO., LTD.,<br><br>     **Plaintiff-Intervenor,**<br><br>**v.**<br><br>UNITED STATES,<br><br>     **Defendant,**<br><br>**and**<br><br>THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,<br><br>     **Defendant-Intervenor.** | **Before: Jennifer Choe-Groves, Judge**<br><br>**Court No. 20-00115** |

## JUDGMENT

This case having been duly submitted for decision, and the Court, after due deliberation, having rendered a decision; now therefore, in conformity with said decision, it is hereby

**ORDERED** that the U.S. Department of Commerce's final results in Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China, 85 Fed. Reg. 22,396 (Dep't of Commerce Apr. 22, 2020) (final results of antidumping duty admin. review; 2017–2018), as

Court No. 20-00115                                                    Page 2

amended, Redetermination Pursuant to Court Remand Order, ECF Nos. 55, 56, are sustained and

judgment is entered for Defendant.

                                                          /s/ Jennifer Choe-Groves
                                                          Jennifer Choe-Groves, Judge

Dated:      June 9, 2023
            New York, New York

Slip Op. 23-86

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PIRELLI TYRE CO., LTD., PIRELLI TYRE S.P.A., and PIRELLI TIRE LLC,** | |
| Plaintiffs, | |
| and | |
| **SHANDONG NEW CONTINENT TIRE CO., LTD.,** | |
| Plaintiff-Intervenor, | **Before: Jennifer Choe-Groves, Judge** |
| v. | **Court No. 20-00115** |
| **UNITED STATES,** | |
| Defendant, | |
| and | |
| **THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,** | |
| Defendant-Intervenor. | |

## AMENDED OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's remand results and final results in the antidumping duty administrative review of certain passenger vehicle and light truck tires from the People's Republic of China.]

Dated: June 9, 2023

Daniel L. Porter, James P. Durling, James C. Beaty, and Ana M. Amador Gil, Curtis, Mallet-Prevost, Colt & Mosle, LLP, of Washington, D.C., for Plaintiffs Pirelli Tyre Co., Ltd., Pirelli Tyre S.p.A., and Pirelli Tire LLC.

Ned H. Marshak, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, N.Y., and Andrew T. Schutz, Brandon M. Petelin, and Jordan C. Kahn, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for Plaintiff-Intervenor Shandong New Continent Tire Co., Ltd.

Sosun Bae, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director. Of Counsel on the brief was Ayat Mujais, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Nicholas J. Birch and Roger B. Schagrin, Schragrin Associates, of Washington, D.C., for Defendant-Intervenors United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.

Choe-Groves, Judge: This action arises from the results of the U.S.

Department of Commerce ("Commerce") in the antidumping administrative review

of certain passenger vehicle and light truck tires from the People's Republic of

China ("China") for the period of August 1, 2017 through July 31, 2018 ("Period

of Review 3"). Compl. at 1, ECF No. 6. Plaintiffs Pirelli Tyre Co., Ltd. ("Pirelli

China"), Pirelli Tyre S.p.A., and Pirelli Tire LLC ("Pirelli USA") (collectively,

"Plaintiffs" or "Pirelli") filed this action pursuant to 28 U.S.C. § 1581(c) contesting

Commerce's final results in <u>Certain Passenger Vehicle and Light Truck Tires from

the People's Republic of China</u> ("<u>Final Results</u>"), 85 Fed. Reg. 22,396 (Dep't of

Commerce Apr. 22, 2020) (final results of antidumping duty admin. review; 2017–

2018).  <u>See</u> <u>id.</u>  Plaintiffs bring this suit to challenge: (1) whether Commerce had

statutory authority to issue a China-wide entity rate; (2) whether Commerce

properly applied the applicable legal criteria for analyzing Plaintiffs' separate rate

eligibility; and (3) Commerce's determination that Plaintiffs were controlled by the

Chinese government through the ownership of China National Chemical

Corporation ("Chem China").  <u>See</u> <u>id.</u> at 5–7.

     Before the Court is Plaintiffs' Rule 56.2 Motion for Judgment on the Agency

Record.  Pls.' R. 56 Mot. J. Agency R. ("Plaintiffs' Motion" or "Pls.' Mot."), ECF

Nos. 65, 66.  Defendant United States ("Defendant") and Defendant-Intervenor the

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial

and Service Workers International Union, AFL-CIO, CLC ("Defendant-

Intervenor" or "Def.-Interv.") filed Defendant's Response to Plaintiffs' Rule 56.2

Motion for Judgment on the Agency Record and the Response Brief of Defendant-

Intervenor.  Def.-Interv.'s Resp. Br. ("Def.-Interv.'s Resp."), ECF Nos. 71, 72;

Def.'s Resp. Pls.' R. 56.2 Mot. J. Agency R. ("Def.'s Resp."), ECF Nos. 74, 75.

Plaintiffs filed Plaintiffs' Reply Brief in Support of Motion for Judgment on the

Agency Record. Pls.' Reply Br. Supp. Mot. J. Agency R. ("Pls.' Reply"), ECF

Nos. 79, 80.

 Also before the Court are Defendant-Intervenor's Comments in Opposition

to Remand Results. Def.-Interv.'s Cmts. Opp'n Remand Results ("Defendant-

Intervenor's Comments" or "Def.-Interv.'s Cmts."), ECF Nos. 62, 63. Defendant-

Intervenor opposes Commerce's redetermination on remand in the <u>Final Results of</u>

<u>Redetermination Pursuant to Court Remand</u> ("<u>Remand Results</u>"), ECF Nos. 55-1,

56-1, determining that the sole mandatory respondent in Commerce's review,

Shandong New Continent Tire Co., Ltd. ("New Continent"), reported sales

information accurately and was not involved in fraud. <u>Id.</u> at 18–26. Defendant and

Plaintiff-Intervenor New Continent filed Defendant's Response to Comments on

Remand Redetermination and Plaintiff-Intervenor's Comments in Support of

Remand Redetermination supporting the <u>Remand Results</u>. Def.'s Resp. Cmts.

Remand Redetermination ("Defendant's Comments" or "Def.'s Cmts."), ECF Nos.

69, 70; Pl.-Interv.'s Cmts. Remand Results ("Plaintiff-Intervenor's Comments" or

"Pl.-Interv.'s Cmts."), ECF Nos. 73, 76.

 The Court entered an Opinion and Order on March 20, 2023 sustaining

Commerce's <u>Remand Results</u> and <u>Final Results</u>. Slip Op. 23-38, ECF No. 88.

Plaintiffs have filed Plaintiffs' Motion to Alter or Amend Judgment asking the

Court to address arguments raised based on provisions of Italian law.  Pls.' Mot. Alter Amend J., ECF No. 90.  The Court grants Plaintiffs' Motion to Alter or Amend Judgment and sets aside Slip Opinion 23-38, ECF No. 88, and the accompanying Judgment, ECF No. 89.  This Amended Opinion and Order more thoroughly addresses Plaintiffs' arguments concerning Italian law.  All other sections remain substantively unchanged from Slip Opinion 23-38.  For the following reasons, the Court sustains Commerce's <u>Final Results</u> and <u>Remand Results</u>.

## ISSUES PRESENTED

The Court reviews the following issues:

1. Whether Commerce's determination that New Continent provided accurate information during the administrative review was supported by substantial evidence;

2. Whether Plaintiffs have waived their challenge to Commerce's authority to impose a China-wide entity antidumping duty rate by not raising the issue in Plaintiffs' Motion;

3. Whether Commerce's determination that Pirelli failed to rebut the presumption of de facto government control was in accordance with the law and supported by substantial evidence; and

4. Whether provisions of Italian law concerning the independence of

directors and the influence of shareholders rebut the presumption of de

facto government control.

## BACKGROUND

In June 2015, Commerce issued an antidumping duty order covering certain

passenger vehicle and light truck tires from China. See Antidumping Duty

Investigation of Certain Passenger Vehicle and Light Truck Tires from the

People's Republic of China, 80 Fed. Reg. 34,893 (Dep't of Commerce Jun. 18,

2015) (final determination of sales at less than fair value and final affirmative

determination of critical circumstances, in part). Commerce initiated an

administrative review on October 4, 2018 of multiple companies, including Pirelli

China. See Initiation of Antidumping and Countervailing Duty Administrative

Reviews, 83 Fed. Reg. 50,077, 50,081 (Dep't of Commerce Oct. 4, 2018).

Pirelli China and Pirelli USA filed a separate rate application with

Commerce. Pls.' Separate Rate App., PJA 3, CJA 1.[1] In its Preliminary Results,

Commerce determined that Pirelli China had not demonstrated an absence of de

jure and de facto government control and denied Pirelli's Separate Rate

---

[1] Citations to the administrative record reflect the public joint appendix ("PJA")
and confidential joint appendix ("CJA") tab numbers filed in this case, ECF Nos.
81, 82.

Application.  See Certain Passenger Vehicle and Light Truck Tires from the

People's Republic of China ("Prelim. Results"), 84 Fed. Reg. 55,909, 55,912

(Dep't of Commerce Oct. 18, 2019) (preliminary results of antidumping duty

admin. review and rescission, in part; 2017–2018), and accompanying Issues and

Decisions Memorandum ("Preliminary IDM" or "Prelim. IDM") at 13, 15, PJA 13.

Pirelli China was assigned the China-wide antidumping margin of 87.99 percent.

Prelim. IDM at 13.  Pirelli China and Pirelli USA filed an administrative case brief

("Pirelli's Administrative Case Brief") with Commerce requesting that Commerce

reverse the Preliminary Results and grant Pirelli China separate rate status.  Pls.'

Admin. Case Br., PJA 15, CJA 10.

        Commerce published on April 15, 2020 the Final Results and accompanying

Issues and Decision Memorandum ("Final IDM"), PJA 17.  In the Final Results,

Commerce assigned mandatory respondent New Continent a zero percent

weighted-average dumping margin, which was used as the basis for assigning

dumping margins to non-individually examined respondents that qualified for

separate rate status.  Final Results, 85 Fed. Reg. at 22,397.  Commerce also

continued to determine that Pirelli China had not rebutted the presumption of de

facto government control and was not entitled to a separate rate.  Id. at 22,399;

Final IDM at 13.  Commerce determined that Pirelli China did not establish its

"autonomy from the [Chinese] government in making decisions regarding the selection of management."  Final IDM at 14–18.

Pirelli commenced this action on May 21, 2020.  Summons, ECF No. 1; Compl.  After initiating this case, Plaintiffs filed Plaintiffs' Unopposed Motion to Stay the Proceedings pending the final determination by the United States Court of Appeals for the Federal Circuit ("CAFC") in China Manufacturers Alliance, LLC v. United States, 1 F.4th 1028 (Fed. Cir. 2021).  Pls.' Unopposed Mot. Stay Proceedings, ECF No. 23.  The Court granted the motion and stayed the case. Order (Aug. 6, 2020), ECF No. 25.

On May 20, 2021, prior to the CAFC's decision in China Manufacturers Alliance, U.S. Customs and Border Protection ("Customs") notified Commerce that it had observed inconsistencies between the Section A Questionnaire Responses submitted by New Continent to Commerce and the corresponding prices reported to Customs at the time of entry that resulted in an undervaluation of approximately $2.6 million.  Def.'s Mot. Lift Stay Voluntary Remand ("Defendant's Remand Motion" or "Def.'s Remand Mot.") at Att. 1 ("Customs' Referral Letter"), ECF No. 29.  Defendant requested that the Court remand the administrative review results to Commerce for further examination.  Id. at 3–4. The Court remanded the case on September 20, 2021 to Commerce.  Pirelli Tyre Co. v. United States, 45 CIT __, 539 F. Supp. 3d 1257 (2021).

Commerce published on October 27, 2021 a notice of remand proceedings

and reopened the administrative record of the 2017–2018 antidumping

administrative review.  Remand Results at 3; Certain Passenger Vehicle and Light

Truck Tires From the People's Republic of China ("Notice of Remand"), 86 Fed.

Reg. 59,367 (Dep't of Commerce Oct. 27, 2021) (notice of remand proceeding and

reopening of 2017–2018 antidumping duty admin. review record).  Commerce

placed Customs' Referral Letter on the record and provided interested parties with

an opportunity to submit factual information and comments.  Remand Results at 3;

Notice of Remand, 86 Fed. Reg. at 59,368.  Commerce received comments from

interested parties and solicited supplemental questionnaire responses from New

Continent and NBR Wheels and Tires LLC.  Remand Results at 3–4.

Commerce issued its Remand Results on April 28, 2022, in which

Commerce determined that export price and constructed export price information

reported by New Continent in the administrative review was accurate.  Id. at

11–22.  Commerce also determined that the record did not support that New

Continent was affiliated with two other companies considered in the review.  Id. at

22–23.  Commerce did not adjust New Continent's antidumping margin, the rate

for individually examined respondents, or Pirelli's separate rate status.  See id. at

24.  Plaintiffs filed their Rule 56.2 Motion for Judgment on the Agency Record on

July 11, 2022.  See Pls.' Mot. J. Agency R.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c). The Court will hold unlawful any determination found to be unsupported by substantial evidence on the record or otherwise not in accordance with the law.  19 U.S.C. § 1516a(b)(1)(B)(i).  The Court also reviews determinations made on remand for compliance with the Court's remand order.  Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT 727, 730, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I.     Remand Results

The Court remanded the Final Results to Commerce to address new information provided to Commerce by Customs regarding inaccuracies in the reported sales prices on imports of passenger vehicle tires from China during Period of Review 3.  Pirelli Tire Co., 45 CIT at __, 539 F. Supp. 3d at 1261–62. Specifically, Customs compared the Section A Questionnaire Responses provided by New Continent to Commerce in the underlying investigation with Customs' import records and found a potential undervaluation of approximately $2.6 million. See Notice of Remand, 86 Fed. Reg. at 59,368.  This information raised concerns regarding the accuracy of New Continent's reporting to Commerce.  Id.

On remand, Commerce issued supplemental questionnaires to New

Continent and NBR Wheels and Tires LLC seeking clarification of information on

the administrative record.  See Remand Results at 4; Commerce's Supp.

Questionnaire New Continent, PJA 27, CJA 18; Commerce's Second Supp.

Questionnaire New Continent, PJA 30, CJA 21.  In response, New Continent

provided more than 20,000 pages of information.  Remand Results at 4–5; New

Continent's Supp. Questionnaire Resp., PJA 28, CJA 19; New Continent's Second

Supp. Questionnaire Resp., PJA 31, CJA 22.

In the Remand Results, Commerce focused its analysis on the invoices

submitted to Commerce rather than the invoices submitted to Customs in weighing

the accuracy of the U.S. sales information provided by New Continent during the

administrative review.  Remand Results at 5–7, 15.  Commerce considered the

invoices provided to Customs relevant only to the extent that they prompted the

remand.  Id. at 20.  Commerce analyzed information on the record pertaining to

almost all of the transactions identified by Customs and determined that payment

amounts were tied to the U.S. sales values reported by New Continent in the

administrative review.  Id. at 7–8, 19–20.  Commerce was also able to match price

and quantity data between invoices under consideration and corresponding

invoices in New Continent's Section C database.  Id. at 8.  Based on its review of

record evidence, Commerce determined that New Continent accurately reported

export price and constructed export price sales during the administrative review.
Id. at 8, 23–24.  Commerce also determined that New Continent was not affiliated
with the entities responsible for providing the allegedly inaccurate information to
Customs.  Id. at 10–11, 23–24.

Defendant-Intervenor asserts that Commerce failed to consider contradictory
record evidence that called into question the accuracy of New Continent's
reporting and failed to address the relevance of the alleged fraud on Customs.
Def.-Interv.'s Cmts. at 18–23.  Defendant and Plaintiff-Intervenor support
Commerce's Remand Results.  See Def.'s Cmts.; Pl.-Interv.'s Cmts.

Commerce analyzed documents relating to nearly all of the transactions
identified by Customs and expressed that it was:

> able to tie the payment amounts to the U.S. sales value reported by New
> Continent in its U.S. sales database from the underlying review as well
> as New Continent's financial statements [for most of the sales].  More
> specifically, we compared the prices and quantities of the invoices
> under question to those same invoices in the section C database and
> were able to fully match the values.

Remand Results at 7–8.  In its Supplemental Questionnaire Response, New
Continent explained that for the majority of its submitted invoices, it was not
possible to make a one-to-one link between the payment and the invoice because
New Continent's accounting was based on a running debt and credit balance that
was reconciled annually.  New Continent's Supp. Questionnaire Resp. at 21–22.

Defendant-Intervenor contends that Commerce must provide an explanation of its methodology for assigning payments to sales information in its analysis.  Def.-Interv.'s Cmts. at 18−20.

Commerce's analysis did not rely solely on New Continent's Supplemental Questionnaire Response, and Commerce cited to record documents containing payment information for invoices and accounting subledgers.  Remand Results at 19; see also New Continent's Sub. New Factual Info. at Exs. 18 (worksheet linking Section C database invoice values with invoice values submitted by New Continent), 19 (invoices contained in Section C database), PJA 23, CJA 15; New Continent's Supp. Questionnaire Resp. at Ex. S-9 ("New Continent's Payment Package").  Commerce also noted that its review during the remand covered significantly more transactions than were considered during Commerce's standard verification.  Remand Results at 19−20.  Commerce's remand analysis covered most of the invoices identified by Customs, and Commerce explained that it compared "prices and quantities of the invoices under question to those same invoices in the section C database."  Id. at 7–8.

Defendant-Intervenor asserts that Commerce disregarded the argument that certain record information was inaccurate and contradicted by other record documents.  Def.-Interv.'s Cmts. at 20−21.  Though Commerce did not directly address inconsistencies between specific documents, the Remand Results make

clear that Commerce considered information covering most of the relevant transactions. See Remand Results at 19; see also New Continent's Sub. New Factual Info. at Exs. 18, 19; New Continent's Payment Package. Commerce focused on the accuracy of the information submitted in the administrative review in order to calculate the antidumping margin, not inconsistencies with information submitted to Customs. Remand Results at 20–21. Based on record evidence, Commerce determined that the U.S. price information reported to Commerce by New Continent was accurate. Id. at 21.

In its review, Commerce compared invoices submitted by New Continent during the administrative review and corresponding invoices submitted during the remand. Id. at 15. Commerce determined that relevant information, including sales price, quantity, and U.S. sales values, were consistent between the invoices. Id. Defendant-Intervenor contends that the record does not support Commerce's determination regarding New Continent's reproduction of invoices and includes examples of inconsistent information. Def.-Interv.'s Cmts. at 21–23. In comparing invoices submitted in both the administrative review and remand, Commerce determined that the consistency of the relevant information:

> supports New Continent's claim that while electronic versions of its sales documents cannot be reproduced exactly, the differences between the reproduced documents for this remand and the documents submitted during the administrative review are superficial. New Continent is an experienced exporter having participated in the

> underlying administrative review as a mandatory respondent. We note
> that in an ongoing administrative review or investigation, we would
> expect an experienced exporter like New Continent to provide original
> sales documentation, as it did during the underlying administrative
> review. However, New Continent was not aware of the [Customs]
> Referral until May 2021, nor involved in litigation for this
> administrative review until September 2021. Thus, we are not
> persuaded by the petitioner's claim that New Continent would have
> known that "Commerce would call upon it in a review to produce
> information such as original copies of invoices," because it is unclear
> how New Continent could have anticipated that Commerce would
> request for a remand to reexamine its U.S. sales information some
> seventeen months after previously uncontested final results, or that the
> Court would grant that request. Therefore, we find there is no
> evidentiary basis to conclude that the quantity and value
> information . . . have been modified.

Remand Results at 18.

Defendant-Intervenor contends that Commerce did not address a specific

example raised during the remand in which multiple versions of an invoice were

included on the record reflecting different information. Def.-Interv.'s Cmts. at 22.

The Remand Results do not directly address this example; however, in relation to

the number of transactions considered in Commerce's review, it is reasonable to

conclude that potentially inconsistent details in a single set of invoices does not

undermine the accuracy of the greater body of information reviewed by

Commerce. It is clear from the Remand Results that Commerce considered a large

volume of record submissions, including over 20,000 pages of documents from

New Continent, and determined that any inconsistencies were minor and did not

significantly impact the calculation of the antidumping duty. The Court agrees that Commerce's review of a voluminous number of record documents was reasonable and accounted for any potential inconsistencies in a few invoices.

Defendant-Intervenor argues that Commerce did not properly consider the issue of potential fraud in its determination. Def-Interv.'s Cmts. at 23–26. Defendant-Intervenor contends that the record contained evidence that New Continent was aware of the inaccurate information submitted to Customs because a certain nomenclature was used in both the challenged invoices and documents prepared by New Continent. Id. at 23. Commerce addressed this issue in the Remand Results by discussing New Continent's explanation that the numbers were inadvertently copied by a manager working with information provided by an affiliate in preparing the Section C database. Remand Results at 17–18. Commerce determined this explanation to be consistent with the steps taken by New Continent to ensure that material information in finalized invoices was not changed after issuance, which included sales managers creating a commercial invoice using Excel with information downloaded from a sales system. Id. Commerce also determined that New Continent's explanation was supported by Commerce's comparison of invoices between the administrative review and remand. Id. at 18.

The issue before Commerce on remand was whether the information submitted by New Continent in the administrative review was accurate, while the issue of fraudulent representations to Customs was within Customs' statutory authority. 19 U.S.C. § 1592. The Court concludes that Commerce was reasonable in limiting its determination to the accuracy of New Continent's information submitted during the administrative review. See Remand Results at 11–22.

In the Remand Results, Commerce addressed whether New Continent was affiliated with the entities that made alleged misrepresentations to Customs. Id. at 22–23. Upon consideration of record documents, including declarations from a New Continent employee, Commerce determined that New Continent did not satisfy the requirements for affiliation under 19 U.S.C. § 1677(33) and 19 C.F.R. § 351.102(b)(3). Id. at 23. Commerce also determined that the record did not show that the considered entities had a relationship that might impact relevant decision making. Id. Commerce determined that New Continent was not affiliated with the considered entities. Id. at 23–24. No Party opposes this determination before the Court.

The arguments raised by Defendant-Intervenor are unavailing. Because Commerce conducted a review of the voluminous record evidence presented and verified the accuracy of the relevant information submitted by New Continent during the administrative review, the Court concludes that Commerce's

determination that the information submitted by New Continent was accurate is supported by substantial record evidence.

## II.    Commerce's Authority to Issue a China-Wide Entity Rate

Defendant-Intervenor argues that Plaintiffs abandoned and waived Count I of their Complaint. Def.-Interv.'s Resp. at 7–8. In Count I of the Complaint, Pirelli argued that Commerce lacked the statutory authority to impose a China-wide entity antidumping duty rate. Compl. at 5. Pirelli did not renew this argument in its motion for judgment on the agency record and conceded that "the Federal Circuit has recently ruled that Commerce does in fact have the authority to apply a 'China-Wide Rate' under the statute." Pls.' Mot. J. Agency R. at 13–14 (citing <u>China Mfrs. All.</u>, 1 F.4th at 1039). Pirelli also does not address Defendant-Intervenor's waiver assertion in its reply. <u>See</u> Pls.' Reply. Because Pirelli failed to raise its argument regarding Commerce's authority to impose a China-wide entity rate in its opening brief and did not meaningfully assert the argument in its reply, the argument is waived. <u>See</u> <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").

## III.   Pirelli's Separate Rate Status

The Court previously considered Pirelli's separate rate status in an earlier administrative review that covered the period from January 27, 2015 to July 31,

2016 ("Period of Review 1").  See Shandong Yongtai Grp. Co. v. United States

("Shandong Yongtai I"), 43 CIT __, __, 415 F. Supp. 3d 1303, 1315−18 (2019);

Shandong Yongtai Grp. Co. v. United States ("Shandong Yongtai II"),44 CIT __,

__, 487 F. Supp. 3d 1335, 1344−46 (2020); Qingdao Sentury Tire Co. v. United

States ("Qingdao Sentury I"), 45 CIT __, __, 539 F. Supp. 3d 1278, 1282−85

(2021); Qingdao Sentury Tire Co. v. United States ("Qingdao Sentury II"), 46 CIT

__, __, 577 F. Supp. 3d 1343, 1347−49 (2022).  Pirelli China was established as a

Sino-foreign joint venture between the Dutch subsidiary of Pirelli & C. S.p.A.

("Pirelli Italy") and Hixih Group in 2005.  Shandong Yongtai I, 43 CIT at __, 415

F. Supp. 3d at 1315−16.  Chem China, a company owned by the Chinese

government, acquired Pirelli S.p.A. in October 2015.  Id. at __, 415 F. Supp. 3d at

1316.  Following the acquisition, Pirelli Italy was delisted from the Milan Stock

Exchange.  Id.

     Before this Court, Pirelli challenged Commerce's determination that Pirelli

was ineligible for separate rate status during Period of Review 1 for both the

periods before and after Pirelli S.p.A.'s acquisition by Chem China.  See Shandong

Yongtai II,44 CIT at __, 487 F. Supp. 3d at 1344−46; Qingdao Sentury II, 46 CIT

at __, 577 F. Supp. 3d at 1347−49.  Commerce considered record documents,

including Pirelli's articles of association, purchase agreements, Board of Directors

meeting minutes, resolutions, and company financial statements, and concluded

that Chem China and the Silk Road Fund, both Chinese government-controlled

entities, owned a majority of Pirelli China and exercised control through Pirelli's

Board of Directors and ownership structure.  Shandong Yongtai II, 44 CIT at __,

487 F. Supp. 3d at 1346.  Commerce determined that for the period following

Pirelli S.p.A.'s acquisition by Chem China, Pirelli did not have autonomy from the

Chinese government in its decision making and was unable to demonstrate a lack

of de facto government control.  Id.  The Court sustained Commerce's

determination.  Id.

It is unclear from the record whether Pirelli applied for separate rate status

during Commerce's administrative review for the period of August 1, 2016

through July 31, 2017 ("Period of Review 2").  See Antidumping or

Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to

Request Administrative Review, 82 Fed. Reg. 35,754, 35,755 (Dep't of Commerce

Aug. 1, 2017).  Relevant to this case, Pirelli applied for separate rate status for

Period of Review 3, which covered August 1, 2017 through July 31, 2018.  See

Pls.' Separate Rate App.

Pirelli's Separate Rate Application reflected certain changes in Pirelli's

ownership and management structure between the end of Period of Review 1 and

the end of Period of Review 3.  For example, Pirelli Italy relisted on the Milan

Stock Exchange on October 4, 2017. Id. at 18. At the time of relisting, Chem China and the Silk Road Fund had decreased their combined indirect majority ownership in Pirelli Italy and Pirelli China to indirect minority ownership. Id. at 13–14, 18–19. Commensurate with the relisting on the Milan Stock Exchange, Pirelli ceased public management and coordination activities with its holding company, Marco Polo International Italy S.p.A. ("Marco Polo"), and all other companies, including Chem China. Id. at 19–20; Pls.' Separate Rate App. at Ex. 9.1 ("Pirelli Group's 2017 Annual Report") at 205, PJA 6, CJA 4; Pls.' Separate Rate App. at Ex. 11 ("Pirelli Italy's August 2017 Press Release"), PJA 8, CJA 6. Pirelli Italy also altered the composition of its Board of Directors to require a majority of directors to be designated as "independent." Pls.' Separate Rate App. at Ex. 10 ("Pirelli's 2017 Shareholders Agreement") § 4.2.2, PJA 8, CJA 6. Despite these changes to Pirelli's ownership and management structures, Commerce determined that Pirelli did not demonstrate "autonomy from the [Chinese] government in making decisions regarding the selection of management" and did not rebut the presumption of de facto government control. Final Results, 85 Fed. Reg. at 22,399; Final IDM at 13–18. Commerce denied Pirelli's Separate Rate Application. Final Results, 85 Fed. Reg. at 22,399.

Plaintiffs raise two primary arguments challenging Commerce's denial of Pirelli's Separate Rate Application. First, Plaintiffs contend that Commerce's

determination was unlawful because Commerce failed to apply the proper standard

of review for a company that is minority-owned by a government-controlled entity,

failed to connect suspected government control to Pirelli's export activities, and

did not apply relevant provisions of Italian law.  Pls.' Br. at 12–22.  Second,

Plaintiffs argue that Commerce's determination that Pirelli failed to rebut the

presumption of de facto government control was unsupported by record evidence

because Commerce failed to appreciate that changes to Pirelli's ownership and

management structure purportedly insulated Pirelli from external influences of

Chinese government control.  Id. at 23–49.

## A.    Legal Framework

Commerce has the authority to designate a country as a nonmarket economy

pursuant to 19 U.S.C. § 1677(18).  19 U.S.C. § 1677(18).  Commerce employs a

rebuttable presumption that all companies within a nonmarket economy country

are subject to government control and should be assigned a single, country-wide

rate by default, unless the exporter requests an individualized antidumping margin

and demonstrates affirmatively that the exporter maintains both de facto and de

jure independence from the government.  Sigma Corp. v. United States, 117 F.3d

1401, 1405 (Fed. Cir. 1997).  The burden of proving the absence of government

control rests with the exporter.  Id. at 1405–06.  Exporters that are unable to

demonstrate both de facto and de jure independence from government control do

not qualify for a separate rate.  <u>China Mfrs. All.</u>, 1 F.4th at 1032; <u>Transcom, Inc. v. United States</u>, 294 F.3d 1371, 1373 (Fed. Cir. 2002).

Commerce has identified three factors that it considers when determining whether an exporter enjoys independence from de jure government control: (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) any other formal measures by the government decentralizing control of companies.  <u>See</u> <u>Ad Hoc Shrimp Trade Action Comm. v. United States</u>, 37 CIT 1085, 1090 n.21, 925 F. Supp. 2d 1315, 1320 n.21 (2013) (citation omitted).

Commerce considers four factors in determining whether an exporter is free of de facto government control: (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.  <u>See</u> <u>id.</u>; Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market

Economy Countries (Apr. 5, 2005) ("Policy Bulletin 05.1" or "Policy Bull. 05.1")
at 2.

The CAFC has sustained Commerce's application of the rebuttable
presumption of government control for nonmarket economies.  Diamond
Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1311 (Fed. Cir. 2017); see
also Changzhou Hawd Flooring Co. v. United States, 848 F.3d 1006, 1009 (Fed.
Cir. 2017).  All four factors of the de facto test must be satisfied to rebut the
presumption of government control.  See Yantai CMC Bearing Co. v. United
States, 41 CIT __, __, 203 F. Supp. 3d 1317, 1325–26 (2017).  The de facto test is
therefore conjunctive, and an exporter must satisfy all four factors to rebut the
presumption of government control.  See Zhejiang Quzhou Lianzhou Refrigerants
Co. v. United States, 42 CIT __, __, 350 F. Supp. 3d 1308, 1321 (2018).
Commerce determined in the Final Results that Pirelli failed to satisfy the third
criterion of the de facto test, whether the respondent has autonomy from the
government in making decisions regarding the selection of management.  Final
Results, 85 Fed. Reg. at 22,399; Final IDM at 13–18; see also Prelim. IDM at 13;
Commerce's Prelim. Separate Rate Mem. ("Preliminary Separate Rate Memo" or
"Prelim. Separate Rate Mem.") at 2–3, PJA 14, CJA 9.

### B.    Lawfulness of Commerce's Analysis

Plaintiffs contend that Commerce's analysis of Pirelli's separate rate eligibility was unlawful because Commerce failed to apply a lesser burden of proof for a minority foreign-owned company, failed to require actual, rather than potential control, and failed to link its findings to Pirelli's export activities. Pls.' Br. at 12–22. Specifically, Plaintiffs argue that Commerce's past practice and the precedent of this Court reflect that a lower burden of proof should be required in instances in which government-controlled entities hold only a minority interest in the respondent exporter. Id. at 14–15. Plaintiffs contend that Commerce failed to make this distinction in practice and held Pirelli to the higher standard applicable to a majority government-owned company. Id. Defendant-Intervenor contends that Plaintiffs are incorrect in their assertion that a lower burden of proof is applicable to rebut the presumption of government control when the government is a minority owner. Def.-Interv.'s Resp. at 10–17. Defendant-Intervenor also asserts that Plaintiffs' argument has been waived because Pirelli did not raise it before Commerce. Id. at 10–11. Defendant contends that the standard applied by Commerce in this case was not higher than the standard normally applied in instances of minority government ownership. Def.'s Resp. at 10–17.

Plaintiffs offer three cases in support of the position that Commerce may impose a higher burden of proof on exporters seeking a separate rate when a

government-controlled entity has a direct or indirect majority interest in the exporter: <u>Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States</u>, 42 CIT __, 350 F. Supp. 3d 1308 (2018), <u>Shandong Rongxin Import & Export Co. v. United States</u>, 43 CIT __, 415 F. Supp. 3d 1319 (2019), and <u>Yantai CMC Bearing Co. v. United States</u>, 41 CIT __, 203 F. Supp. 3d 1317 (2017). Pls.' Br. at 14–15. Plaintiffs ask the Court to recognize as a corollary to this rule that "minority ownership by a government-controlled entity, as is the case here, requires a lower burden of proof and it should be more likely that Commerce will grant a separate rate in those situations." <u>Id.</u> at 15 (emphasis in original).

In <u>Zhejiang Quzhou Lianzhou Refrigerants Company</u>, the Court recognized that though evidence of legal separation between an exporter and its government-controlled parent may rebut the presumption of de facto government control when the government holds a minority stake in the exporter, such separation would not rebut the presumption when the government holds a majority stake in the exporter "because of the ever-present potential for the government to exert de facto control over the exporter's operations and management selection, and the expectation that it would do so." <u>Zhejiang Quzhou Lianzhou Refrigerants Co.</u>, 42 CIT at __, 350 F. Supp. 3d at 1318. Similarly, in <u>Shandong Rongxin Import & Export Company</u>, the Court noted that "the presumption of de facto government control is quite strong for respondents with a government majority shareholder." <u>Shandong Rongxin</u>

Imp. & Exp. Co., 43 CIT at __, 415 F. Supp. 3d at 1323–25.  Finally, in Yantai

CMC Bearing Company, the Court observed that particular facts, such as majority

ownership, may be sufficient to support a determination of de facto government

control, but the fact alone does not make the presumption of control irrebuttable.

Yantai CMC Bearing Co., 41 CIT at __, 203 F. Supp. 3d at 1325–26.

   The Court does not agree with Plaintiffs' assertion that there is a different

standard of proof based on the degree of the government's ownership stake in a

respondent exporter.  Commerce employs a rebuttable presumption that all

companies within a nonmarket economy country are subject to government control

and should be assigned a single, country-wide entity rate by default, unless the

exporter requests an individualized antidumping margin and demonstrates

affirmatively that the exporter maintains both de facto and de jure independence

from the government.  19 U.S.C. § 1677(18); Sigma Corp., 117 F.3d at 1405.  As

an exporter from China, Pirelli had the burden of rebutting the presumption of

Chinese government control.  Sigma Corp., 117 F.3d at 1405.  The cases cited by

Plaintiffs recognize that Commerce may consider evidence of majority government

ownership as strong support for the presumption, but the cases do not alter the

exporter's burden of proof.

   In this case, Commerce acknowledged that Pirelli had a minority indirect

ownership by government-controlled entities and explained that Commerce would

consider additional facts relating to Pirelli's independence. Final IDM at 15.
Commerce reviewed record evidence showing Pirelli's organization, ownership,
and Board of Directors. Id. at 14–18. Commerce also addressed arguments raised
by Pirelli based on Italian law, the degree of authority held by Pirelli's CEO, and
the transfer and disposal of proprietary know-how. Id. at 15–17.

    Because Plaintiffs had the burden of rebutting the presumption of
government control through proffered evidence, and there is no indication that
Commerce imposed a higher burden upon Pirelli nor legal support for a lesser
burden to be imposed, the Court concludes that Commerce's application of the
burden of proof was in accordance with the law.

    Plaintiffs argue further that Commerce's determination was unlawful
because it was based on the presumption of theoretical potential government
control rather than evidence of actual government control, resulting in an unlawful
irrebuttable presumption. Pls.' Br. at 16–19. Neither Defendant nor Defendant-
Intervenor directly respond to the merits of Plaintiffs' argument regarding
Commerce's theory of control. But see Def.'s Resp. at 15 n.6 (summarily arguing
that if the argument is not deemed waived, it should be rejected). Defendant-
Intervenor contends that Commerce properly considered the ability of government-
controlled entities to influence Pirelli's management and operations in denying
Pirelli's Separate Rate Application. Def.-Interv.'s Resp. at 12–17. Defendants

argue that Plaintiffs are foreclosed from raising this issue before the Court because

Pirelli failed to exhaust available administrative remedies by first raising the issue

before Commerce.  Def.'s Resp. at 13–15.

The Court first addresses Defendant's failure to exhaust argument.  Congress

has directed that this Court "shall, where appropriate, require the exhaustion of

administrative remedies."  28 U.S.C. § 2637(d).  The statute "indicates a

congressional intent that, absent a strong contrary reason, the court should insist

that parties exhaust their remedies before the pertinent administrative agencies."

Boomerang Tube LLC v. United States, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing

Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).

Commerce's regulations specifically require that a party raise all arguments in a

timely manner before the agency.  Corus Staal, 502 F.3d at 1379 (citing 19 C.F.R.

§ 351.309(c)(2)).  "[G]eneral policies underlying the exhaustion requirement—

protecting administrative agency authority and promoting judicial efficiency"—

would be vitiated if the court were to consider arguments raised for the first time in

judicial proceedings.  See id. (internal quotation and citation omitted); see also

Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States, 41 CIT __, __,

277 F. Supp. 3d 1346, 1353 (2017).  The exhaustion requirement is not absolute

and the Court has recognized limited exceptions to the doctrine: (1) futility in

raising the issue; (2) a subsequent court decision that may impact the agency's

decision; (3) a pure question of law; or (4) when plaintiff had no reason to believe the agency would not follow established precedent.  See Luoyang Bearing Factory v. United States, 26 CIT 1156, 1186 n.26, 240 F. Supp. 2d 1268, 1297 n.26 (2002) (citing authorities).  Defendant asserts that Pirelli did not raise the issue of potential and actual control before Commerce and cannot assert any of the recognized exceptions to the exhaustion requirement.  Def.'s Resp. at 13–15.  Plaintiffs did not respond to Defendant's exhaustion argument.  See Pls.' Reply at 5.

When considering the exhaustion requirement, the determinative question for the Court is whether Commerce was put on notice of the argument.  See Trust Chem. Co. v. United States, 35 CIT 1012, 1023 n.27, 791 F. Supp. 2d 1257, 1268 n.27 (2011).  Commerce gave no indication prior to the Final Results that its analysis would consider potential, rather than actual control.  Despite this, Pirelli made numerous arguments in Pirelli's Administrative Case Brief addressing Pirelli China's independence from the actual control of Pirelli Italy and the minority owners.  See Pls.' Admin. Case Br. at 32–43.  Because Commerce should have been aware that Pirelli was arguing that actual control was absent, Plaintiffs' arguments are not now barred.

In antidumping proceedings involving a nonmarket economy, Commerce presumes that all respondents are government-controlled and subject to a single

country-wide antidumping rate.  Diamond Sawblades Mfrs. Coal., 866 F.3d at

1311.  The percentage of government ownership of a responding company is

relevant to Commerce's analysis because majority ownership is viewed as actual

control, regardless of whether such control is actually exercised.  See Can Tho

Imp.-Exp. Joint Stock Co. v. United States, 44 CIT __, __, 435 F. Supp. 3d 1300,

1305–06 (2020); An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States,

42 CIT __, __, 284 F. Supp. 3d 1350, 1359 (2018).  When a respondent company

is minority government owned, potential control does not necessarily equate to

actual control.  See Zhejiang Quzhou Lianzhou Refrigerants Co., 42 CIT at __, 350

F. Supp. 3d at 1318; An Giang Fisheries Imp. & Exp. Joint Stock Co., 42 CIT at

__, 284 F. Supp. 3d at 1359.  In such situations, "Commerce has required

additional indicia of control prior to concluding that a respondent company could

not rebut the presumption of de facto government control where the government

owns, either directly or indirectly, only a minority of shares in the respondent

company."  An Giang Fisheries Imp. & Exp. Joint Stock Co., 42 CIT at __, 284 F.

Supp. 3d at 1359.

> In its determination, Commerce explained:
>
> When conducting a separate rate analysis for a company with less than
> a majority of [state owned enterprise] ownership, Commerce has
> considered whether the record contains additional indicia of control
> sufficient to demonstrate that the company lacks independence and
> therefore should receive the China-wide rate.  Commerce's practice is

> to examine whether the government might also be able to exercise, or
> have the potential to exercise, control of a company's general
> operations through minority government ownership under certain
> factual scenarios.

Final IDM at 15.  Though Commerce's use of the term "potential" in explaining its

practice might arguably create some ambiguity in what degree of government

control Commerce is considering, see An Giang Fisheries Imp. & Exp. Joint Stock

Co., 42 CIT at __, 284 F. Supp. 3d at 1359, Commerce recognized the need in a

case of minority government ownership, such as this, for additional indicia of

control.  Final IDM at 15.  This need is further supported by Commerce's

subsequent consideration and discussion of Pirelli's ownership, the composition

and independence of Pirelli's Board of Directors, common board members

between Pirelli entities and government-controlled entities, statements in Pirelli's

2017 Annual Report, the authority of Pirelli's CEO, Marco Tronchetti Provera, and

the transfer and/or disposal of proprietary know-how.  Id. at 15–18.  The Court

concludes that it was reasonable for Commerce to consider the potential for control

together with additional indicia, and its analysis was in accordance with the law.

Plaintiffs argue that Commerce's determination was not in accordance with

the law because Commerce failed to link Pirelli's export activities or export

functions with the separate rate analysis.  Pls.' Br. at 19–21.  Defendant argues that

Commerce is not required to specifically discuss export activities or export

functions in the context of the third factor of the de facto control analysis, which asks whether a respondent has autonomy in making decisions regarding the selection of its management.  Def.'s Resp. at 15–17.  Defendant-Intervenor similarly argues that the de facto control analysis does not require consideration of export activities or export functions in addition to the factors enumerated in Policy Bulletin 05.1.  Def.-Interv.'s Resp. at 25–26.

Policy Bulletin 05.1 states that the purpose of Commerce's control analysis is "[t]o establish whether a firm is sufficiently independent from governmental control in its export activities to be eligible for separate rate status."  Policy Bulletin 05.1 at 2.  Separate rate status is granted "only if an exporter can demonstrate the absence of both de jure and de facto governmental control over its *export activities*."  Id. (emphasis added).  Policy Bulletin 05.1 further provides that:

> [Commerce] considers four factors in evaluating whether each respondent is subject to de facto governmental control *of its export functions*: 1) whether the export prices are set by, or subject to the approval of, a governmental authority; 2) whether the respondent has authority to negotiate and sign contracts and other agreements; 3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and 4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

Id. at 2 (emphasis added).

Plaintiffs assert that "[t]he Court has consistently ruled that Commerce must give meaning to the words 'export activities' in Commerce's discussion of its separate rate test." Pls.' Br. at 19. The only case offered by Plaintiffs in support of this contention, however, is <u>Guizhou Tyre Co., Ltd. v. United States</u>, 46 CIT __, 557 F. Supp. 3d 1302 (2022), an ongoing litigation. <u>Id.</u> at 20. Plaintiffs have not cited any authority that would support a requirement in the third factor for Commerce to connect an exporter's autonomy in selecting management with specific export activities or export functions.

Separate rate status is granted if an exporter can demonstrate the absence of de facto governmental control according to the four-factor test. The Court notes that the first factor examines whether "export prices" are set by or are subject to government approval, and the fourth factor examines whether the respondent retains the proceeds of its "export sales" and makes independent financial decisions. Policy Bull. 05.1 at 2. In contrast, the Court observes that neither the second nor third factors mention export activities or export functions. <u>Id.</u> Specifically the third factor of the de facto control analysis relevant to this case— "3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management"— does not mention export activities or export functions. <u>Id.</u> The Court declines to adopt the approach asserted by Plaintiffs and alter the third factor of the de facto

control test to read an additional requirement for Commerce to assess whether respondent has autonomy from government control in respondent's export activities or export functions.

Plaintiffs argue also that Commerce's determination is unlawful because Commerce refused to consider provisions of Italian law on which Pirelli relied. Pls.' Br. at 44–46. Commerce rejected Pirelli's argument that Italian law requires that certain directors be independent of shareholders, concluding that "[t]he [Italian Finance Code] is not on the record of this review. As such, we are not convinced that the majority of Pirelli [Italy's] board are 'independent directors' who are part of the legal structure aimed to protect the interests of the minority shareholders [of] Pirelli [Italy]." Final IDM at 15. Commerce used similar language in considering Pirelli's argument that Italian law required Pirelli Italy to acknowledge indirect control by Chem China in Pirelli's 2017 Annual Report:

> Neither the Italian Finance Code (Art. 93 TUF) or the dictates of Italian Finance Code (TUF D. Lgs. 58/1998) are on the record of this review. As such, we are not convinced that Pirelli [Italy] must report that it is controlled by Chem China mainly for accounting purposes pursuant to the Italian Finance Code (Art. 93 TUF) or the dictates of Italian Finance Code (TUF D. Lgs. 58/1998).

Id. at 16. In both instances, Commerce refused to consider Pirelli's arguments based on provisions of Italian law that were not included on the record.

Commerce has discretion in the manner in which it conducts its administrative proceedings.  See PSC VSMPO-Avisma Corp. v. United States, 688 F.3d 751, 760 (Fed. Cir. 2012); see also Yantai Timken Co., Ltd. v. United States, 31 CIT 1741, 1755, 521 F. Supp. 2d 1356, 1370 (2007) ("Commerce has broad discretion to establish its own rules governing administrative procedures . . ."). "Commerce's role in an administrative proceeding is to weigh the evidence established in the record." Yantai CMC Bearing Co., 41 CIT at __, 203 F. Supp. 3d at 1324.  The respondent bears the burden of creating the record for Commerce's review.  Id.  Pirelli did not provide to Commerce the relevant portions of Italian law on which its arguments relied.  In this case, the Court concludes that Commerce's rejection of Pirelli's unsupported interpretations of Italian law was reasonable.

### C.    Whether Commerce's Determination was Supported by Substantial Evidence

Plaintiffs argue that Commerce's determination that Pirelli failed to rebut the presumption of de facto government control is not supported by substantial evidence.  Pls.' Br. at 23–49.  Specifically, Plaintiffs contend that Commerce's determination that the Pirelli Group's shareholder structure allowed the government-controlled minority owners to assert control over Pirelli China's operational activities was not supported by substantial evidence.  Pls.' Br. at 25–

31.  Plaintiffs argue that Commerce's determination that government-controlled minority shareholders were able to influence Pirelli China's export activities was unsupported by substantial evidence.  Id. at 46–49.  In addition, Plaintiffs argue that Commerce ignored contrary record evidence that Pirelli China's day-to-day operations were insulated from shareholder control.  Id. at 32–44.  Plaintiffs contend that Commerce unreasonably ignored provisions of Italian law in reaching its determination.  Id. at 44–46.

Because China is a nonmarket economy, Commerce employs a rebuttable presumption that all companies operating in China are subject to government control unless an individual exporter can demonstrate its de facto and de jure independence from the government.  19 U.S.C. § 1677(18); Sigma Corp., 117 F.3d at 1405.  As discussed above, Commerce denied Pirelli separate rate status based on the third factor of the de facto government test and determined that Pirelli had not rebutted the presumption as to its autonomy from government control over the selection of management.  Final IDM at 13–18.

Based on a review of Pirelli's Corporate Organization Chart in evidence, Commerce determined that under Pirelli's organizational structure for most of Period of Review 3, Chem China and the Silk Road Fund, two Chinese government-owned entities, jointly controlled 36.9 percent of Pirelli China.  Id. at 14; Pls.' Separate Rate App. at Ex. 5 ("Pirelli's Corporate Organization Chart"),

PJA 4, CJA 2.  Because these state-owned entities accounted for only minority indirect ownership of Pirelli China, Commerce looked for additional indicia of government control.  Final IDM at 15; see An Giang Fisheries Imp. & Exp. Joint Stock Co., 42 CIT at __, 284 F. Supp. 3d at 1359.

Commerce examined Pirelli's Separate Rate Application on the record as additional indicia of government control and determined based on this evidence that Pirelli Italy was the indirect majority shareholder of Pirelli China and selected members of Pirelli China's Board of Directors.  Final IDM at 15, 17; Pls.' Separate Rate App. at 23–24.  Based on a review of Plaintiffs' separate rate application, Commerce also determined that during Period of Review 3, Pirelli Italy and Chem China shared a common chairperson.  Final IDM at 15; Pls.' Separate Rate App. at Ex. 16D ("Pirelli Italy's Board of Directors and Key Managers Info."), PJA 10, CJA 8.  Citing the Pirelli Group's 2017 Annual Report, Commerce determined that Chem China was the largest individual shareholder of Pirelli Italy and the only party to hold more than three percent of Pirelli Italy's shares.  Final IDM at 15–16; Pirelli Group's 2017 Annual Report at 231.  Despite Pirelli's argument that a majority of Pirelli Italy's Board of Directors members held no office with Chem China or China National Tire & Rubber Corporation, Ltd. and that a minority of Pirelli Italy's Board of Directors members were Chinese nationals, Commerce determined that Pirelli's corporate documents demonstrated to the contrary that

China National Tire & Rubber Corporation, Ltd. (a Chinese government-controlled

entity) was involved in the selection of a majority of Pirelli Italy's Board of

Director's members.  Final IDM at 16–17; Pirelli's 2017 Shareholders Agreement

§ 4.2.2.

        Pirelli contends that certain Board of Directors members were free from

government influence because they were designated as "independent" under

provisions of Italian corporate law, which Commerce noted were not submitted on

the administrative record.  Pls.' Br. at 28–31, 44; Final IDM at 17.

Notwithstanding whether Plaintiffs should have been required to place the Italian

law provisions on the record, the Court concludes that Commerce's rejection of

Pirelli's argument that Pirelli Italy's directors should be deemed "independent"

under Italian law was reasonable, particularly because such designation as

"independent" under Italian law would not be dispositive in this case, and because

Commerce sufficiently cited substantial evidence on the record such as the separate

rate application, the 2017 Annual Report, and the 2017 corporate by-laws to

support Commerce's determination that Pirelli Italy was still under Chinese-

government control.  For example, citing language in the Pirelli Group's 2017

Annual Report, Commerce determined that Pirelli Italy had not established its

independence from government-controlled entities.  Id. at16.  Commerce quoted

the 2017 Annual Report that stated: "[Pirelli Italy was] directly controlled by

Marco Polo International Italy S.p.A. . . . and [was] in turn therefore indirectly

controlled by [Chem China], a state-owned enterprise [] governed by Chinese law

with registered office in Beijing, and which report[ed] to the Central Government

of the People's Republic of China."  Id. at 16 (quoting Pirelli Group's 2017 Annual

Report at 300).  The Pirelli Group's 2017 Annual Report also stated that Pirelli

Italy was "indirectly controlled, pursuant to art. 93 [Italian Finance Code], by

Chem China via [China National Tire & Rubber Corporation, Ltd.] and certain of

its subsidiaries, including Marco Polo."  Id. (quoting Pirelli Group's 2017 Annual

Report at 205).  The Court observes that because Pirelli's own 2017 Annual Report

confirmed that Pirelli Italy was indirectly controlled by Chem China, a Chinese

government-controlled entity, via China National Tire & Rubber Corporation,

another Chinese government-controlled entity, Commerce's determination that

Pirelli Italy was indirectly controlled by Chinese government entities is supported

by substantial evidence.

Commerce rejected Plaintiffs' argument that Pirelli Italy's CEO, Marco

Tronchetti Provera, had exclusive authority to select Pirelli Italy's management

and was insulated from the influence of Board of Directors members.  Final IDM

at 17; Pls.' Br. at 34–37.  Rather, Commerce determined based on a review of

Pirelli's 2017 By-laws on the record that Pirelli Italy was managed by its Board of

Directors and that Provera reported to the Board of Directors and derived his

authority from the Board of Directors.  Final IDM at 17; Pirelli's 2017

Shareholders' Agreement § 4.4 ("The Pirelli CEO and Executive Chairman shall

be *delegated* the exclusive power and authority concerning the ordinary

management of Pirelli and of the Pirelli Group"); Pls.' Separate Rate App. at Ex.

10B ("Pirelli's 2017 By-laws") § 10.1, PJA 8, CJA 6 ("The Company shall be

managed by a Board of Directors composed of up to fifteen members who shall

remain in office for three financial years and may be re-elected."); see also Pirelli's

2017 Shareholders' Agreement § 4.7.  The Court also notes that based on Pirelli's

Separate Rate Application and a Letter of Appointment of Pirelli China's

Directors, Commerce determined that Pirelli Italy indirectly owned shares of Pirelli

China and that Pirelli Italy had the ability to appoint members of Pirelli China's

Board of Directors.  Final IDM at 17; Pls.' Separate Rate App. at 24; Pls.' Separate

Rate App. at Ex. 16A ("Pirelli's Letter of Appointment of Pirelli China's

Directors"), PJA 9, CJA 7.  The Court agrees that Commerce's determination was

reasonable because these documents established that the Board of Directors could

be appointed by entities within Chinese government control.

    The Court concludes that substantial evidence supports Commerce's

determination that Pirelli failed to rebut the presumption of de facto government

control.  The Court sustains Commerce's assignment of the China-wide entity rate

to Pirelli.

## IV.    Italian Law

The Court amends its previous opinion to address Plaintiffs' arguments regarding provisions of Italian law.  Plaintiffs have invoked USCIT Rule 44.1 to "present[] certain provisions of Italian Law on the record of this proceeding for judicial review."  USCIT Rule 44.1 provides:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing.  In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law.

USCIT R. 44.1.  This rule permits, but does not require, the Court to opine on the meaning of a foreign law when relevant to the resolution of a case.  It is not a backdoor for parties to supplement the record that existed before the agency.  Because the provisions of Italian law cited by Plaintiffs were not on the record before Commerce, interpretation of the provisions is not dispositive to this case.  Even if Italian law had been on the record before Commerce, it would not have rebutted the presumption of de facto government control.

Plaintiffs argue that various provisions of the Codice Civile Italiano ("Italian Civil Code") and Testo Unico Delle Disposizioni in Materia Di Intermediazione Finanziaria ("Italian Consolidated Law on Financial Intermediation") and Commissione Nazionale per le Societa e la Borsa

("CONSOB") regulations required Pirelli Italy and its directors to be independent of major shareholders and other corporate controls. Pls.' Br. at 23–25, 28–29, 37–41; Pls.' Mot. Alter Amend J. at 2–3. In support of their argument that Pirelli Italy ceased "management and coordination" by its Chinese state-owned shareholders, Plaintiffs contend that "management and coordination" under Italian law should be understood as "a concept that consists in giving a unitary operational direction to different companies, by applying a common financial policy and strategy and managing them as a unique enterprise, with a view to a better achievement of the goals pursued by the whole group." Pls.' Br. at 39. Plaintiffs further explain that:

> [t]his happens when there exists a constant flow of instructions relating to the management, the collection of financial resources, the financial statements, policies, etc., from the company exercising management and coordination activities to the company submitted to these management and coordination activities, i.e., in many multinational companies. From a practical perspective, these instructions should be reflected in all decisions of the company that receives them, including in both the board of directors and shareholders' meeting resolutions, which must be properly grounded and explain the reasons and interests that led to that decision.

Id. Plaintiffs base this definition on Article 2497 of the Italian Civil Code and specifically focus on Articles 2497-ter and 2497-sexies. Id. Article 2497-ter of the Italian Civil Code reads:

> Any decisions made by a company that is subject to management and coordination activities, if influenced by said activities, must be analytically justified and clear indication must be provided of the

reasons and interests which were weighed up when making said decisions. The report required by Article 2428 shall take these decisions into adequate consideration.

Art. 2497-ter C.c. (It.). Article 2497-sexies reads:

For the purposes of the provisions contained in this section, unless proven otherwise, it is assumed that companies are managed and coordinated by the company or entity that is obliged to consolidate their financial statements or that in any case controls them pursuant to Article 2359.

Art. 2497-sexies C.c. (It.).

Article 2497-sexies creates a legal presumption that coordination and control are exercised by a company that is obligated to consolidate the financial statements of another company or may control another company pursuant to Article 2359 of the Italian Civil Code. Id. Article 2359 provides three situations in which companies are considered controlled: 1) companies in which another company controls a majority of votes able to be exercised in an ordinary shareholders' meeting, 2) companies in which another company has sufficient votes to exercise a dominant influence in an ordinary shareholders' meeting, and 3) companies that are under the dominant influence of another company pursuant to a contractual relationship. Art. 2359 C.c. (It.); see also Testo Unico Delle Disposizioni in Materia Di Intermediazione Finanziaria ("Consolidated Law on Financial Intermediation") Decreto Legislativo 24 Febbraio 1998, No. 58, art. 92 (It.)

(expanding the types of companies considered controlled). As discussed above,
Plaintiffs' claims that Pirelli Italy was not managed or controlled by other entities
is contradicted by other statements on the record conceding that Chem China had
indirect control over Pirelli Italy. See Pirelli Group's 2017 Annual Report at 205.
The record also evidences that China National Tire & Rubber Corporation, Ltd.
was involved in the selection of a majority of Pirelli Italy's Board of Director's
members and that Chem China and the Silk Road Fund were Pirelli Italy's largest
individual shareholders. See Pirelli's 2017 Shareholders Agreement § 4.2.2; Pls.'
Separate Rate App. at Ex. 5; Pirelli Group's 2017 Annual Report at 231. These
facts, demonstrated by record evidence, are more persuasive than Plaintiff's
argument that Italian law created a presumption that Pirelli Italy was not subject to
control during the Period of Review.

Plaintiffs contend that Italian law also imposed constraints intended to
protect the interests of minority shareholders and the market in general. Pls.' Br. at
40. Specifically, Plaintiffs cite to Article 113-ter of the Italian Consolidated Law
on Financial Intermediation as imposing public disclosure requirements and
granting to CONSOB "broad powers of control" over publicly listed companies,
"including the power to request information, to verify the transparency of data
meant for disclosure to the market, to conduct inspections and to impose sanctions
in the event of failure to honor the obligations imposed." Id. Plaintiffs assert that

this legal framework extends to related party transactions "to ensure transparency and substantive and procedural properness of transactions with related parties conducted directly by the listed company or through its subsidiaries." Id. at 40–41.

Plaintiffs posit that Article 113-ter of the Italian Consolidated Law on Financial Intermediation:

> provides for specific obligations on the part of listed issuers to make disclosures to the public and grants to CONSOB broad powers of control over such entities, including the power to request information, to verify the transparency of data meant for disclosure to the market, to conduct inspections and to impose sanctions in the event of failure to honor the obligations imposed.

Id. at 40.

Article 113-ter requires publicly traded companies to issue a prospectus containing sufficient information to enable potential investors to make an informed choice on an investment regarding the nature and risks of investing in a company. Italian Consolidated Law on Financial Intermediation arts. 98-ter, 113-ter.  Under Article 113-ter, disclosures are filed with CONSOB, which establishes the method and technical requirements for disclosure.  Id. art. 113-ter.  Plaintiffs also cite to CONSOB Regulation 17221 as imposing transparency requirements on corporate transactions.  Pls.' Br. at 40–41; see CONSOB Regolamento 10 marzo 2010, no. 17221, G.U. Mar. 25, 2010, n. 70, arts 4, 7, 8, amended by delibera n. 22144 def 22 dicembre 2021.  Though Article 113-ter and CONSOB Regulation 17221 impose

standards that promote transparency, they do not impose any type of requirement or limitation on influence by a government-controlled shareholder.  See id. Plaintiffs' obligation to meet these Italian corporate law requirements as a publicly traded company does not rebut the presumption of government control.

Plaintiffs also argue that Pirelli Italy's Board of Directors was insulated from influence by the Chinese state-controlled shareholders because several directors were required to be "independent" under Italian law.  Plaintiffs cite to Articles 147-ter and 148 of the Italian Consolidated Law on Financial Intermediation in support of their argument.  Pls.' Br. at 4, 24, 30.  Article 147-ter of the Italian Consolidated Law on Financial Intermediation concerns the election and composition of boards of directors and provides, in relevant part:

> In addition to what is provided for in paragraph 3, at least one of the members of the Board of Directors, or two if the Board of Directors is composed of more than seven members, should satisfy the independence requirements established for members of the board of auditors in Article 148(3) and, if provided for in the Articles of Association, the additional requirements established in codes of conduct drawn up by regulated stock exchange companies or by trade associations.  This paragraph shall not apply to the boards of directors of companies organized under the one-tier system, which shall continue to be subject to the second paragraph of Article 2409-septiesdecies of the Civil Code.  The independent director who, following his or her nomination, loses those requisites of independence should immediately inform the Board of Directors about this and, in any case falls from his/her office.

Italian Consolidated Law on Financial Intermediation art. 147-ter(4). Article 148(3) enumerates the following categories of individuals that do not qualify as independent:

a) persons who are in the conditions referred to in Article 2382 of the Civil Code;

b) spouses, relatives and the like up to the fourth degree of kinship of the directors of the company, spouses, relatives and the like up to the fourth degree of kinship of the directors of the companies it controls, the companies it is controlled by and those subject to common control;

c) persons who are linked to the company, the companies it controls, the companies it is controlled by and those subject to common control or to directors of the company or persons referred to in paragraph b) by self-employment or employee relationships or by other relationships of an economic or professional nature that might compromise their independence.

Id. art. 148(3).

Plaintiffs' argument that Italian law requires individuals designated as "independent" to not be linked to Pirelli or its parent companies misses the mark. The relevant question for Commerce was whether Plaintiffs successfully rebutted the presumption of Chinese government control, not control by another company. The provisions of Italian law cited by Plaintiffs would not prevent a government-controlled shareholder from appointing an individual that was independent of both the shareholder and Pirelli but still beholden to the interests or control of the

Chinese government.  The mere fact that members of Pirelli Italy's board of directors were designated as independent under Italian law is not enough to demonstrate an absence of Chinese government control, particularly in light of record evidence that Chem China had indirect control over Pirelli Italy, that China National Tire & Rubber Corporation, Ltd. was involved in the selection of a majority of Pirelli Italy's Board of Director's members, and that Chem China and the Silk Road Fund were Pirelli Italy's largest individual shareholders.  For these reasons, the relevant provisions of Italian law do not rebut the presumption of de facto government control.

## CONCLUSION

For the foregoing reasons, the Court concludes that Commerce's determination that New Continent provided accurate information during the administrative review was supported by substantial record evidence.  The Court also concludes that Commerce's assignment of the China-wide entity rate to Pirelli was in accordance with the law and supported by substantial record evidence.

It is hereby:

**ORDERED** that Plaintiffs' Motion to Alter or Amend Judgment, ECF No. 90, is granted; and it is further

**ORDERED** that Slip Opinion 23-38, ECF No. 88, and the accompanying Judgement, ECF No. 89, are set aside.

The Court sustains the <u>Final Results</u> and <u>Remand Results</u>.  In accordance with this opinion, judgment will be entered.

<div align="right">

__/s/ Jennifer Choe-Groves__

Jennifer Choe-Groves, Judge

</div>

Dated: __June 9, 2023__
          New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

PIRELLI TYRE CO., LTD., PIRELLI
TYRE S.P.A., and PIRELLI TIRE
LLC,

     Plaintiffs,

and

SHANDONG NEW CONTINENT
TIRE CO., LTD.,

     Plaintiff-Intervenor,

v.

UNITED STATES,

     Defendant,

and

THE UNITED STEEL, PAPER AND
FORESTRY, RUBBER,
MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND
SERVICE WORKERS
INTERNATIONAL UNION, AFL-CIO,
CLC,

     Defendant-Intervenor.

Before: Jennifer Choe-Groves, Judge

Court No. 20-00115

## JUDGMENT

    This case having been duly submitted for decision, and the Court, after due

deliberation, having rendered a decision; now therefore, in conformity with said

decision, it is hereby

  **ORDERED** that the U.S. Department of Commerce's final results in <u>Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China</u>, 85 Fed. Reg. 22,396 (Dep't of Commerce Apr. 22, 2020) (final results of antidumping duty admin. review; 2017–2018), <u>as amended</u>, Redetermination Pursuant to Court Remand Order, ECF Nos. 55, 56, are sustained and judgment is entered for Defendant.

               <u>/s/ Jennifer Choe-Groves</u>
               Jennifer Choe-Groves, Judge

Dated:  <u>March 20, 2023</u>
    New York, New York

Slip Op. 23-38

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PIRELLI TYRE CO., LTD., PIRELLI TYRE S.P.A., and PIRELLI TIRE LLC,** | |
| **Plaintiffs,** | |
| **and** | |
| **SHANDONG NEW CONTINENT TIRE CO., LTD.,** | |
| **Plaintiff-Intervenor,** | **Before: Jennifer Choe-Groves, Judge** |
| **v.** | **Court No. 20-00115** |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,** | |
| **Defendant-Intervenor.** | |

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's remand results and final results in the antidumping duty administrative review of certain passenger vehicle and light truck tires from the People's Republic of China.]

Dated: March 20, 2023

Daniel L. Porter, James P. Durling, James C. Beaty, and Ana M. Amador Gil, Curtis, Mallet-Prevost, Colt & Mosle, LLP, of Washington, D.C., for Plaintiffs Pirelli Tyre Co., Ltd., Pirelli Tyre S.p.A., and Pirelli Tire LLC.

Ned H. Marshak, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, N.Y., and Andrew T. Schutz, Brandon M. Petelin, and Jordan C. Kahn, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for Plaintiff-Intervenor Shandong New Continent Tire Co., Ltd.

Sosun Bae, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director. Of Counsel on the brief was Ayat Mujais, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Nicholas J. Birch and Roger B. Schagrin, Schragrin Associates, of Washington, D.C., for Defendant-Intervenors United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.

Choe-Groves, Judge: This action arises from the results of the U.S.

Department of Commerce ("Commerce") in the antidumping administrative review

of certain passenger vehicle and light truck tires from the People's Republic of

China ("China") for the period of August 1, 2017 through July 31, 2018 ("Period

of Review 3"). Compl. at 1, ECF No. 6. Plaintiffs Pirelli Tyre Co., Ltd. ("Pirelli

China"), Pirelli Tyre S.p.A., and Pirelli Tire LLC ("Pirelli USA") (collectively,

"Plaintiffs" or "Pirelli") filed this action pursuant to 28 U.S.C. § 1581(c) contesting

Commerce's final results in <u>Certain Passenger Vehicle and Light Truck Tires from</u>

<u>the People's Republic of China</u> ("<u>Final Results</u>"), 85 Fed. Reg. 22,396 (Dep't of

Commerce Apr. 22, 2020) (final results of antidumping duty admin. review; 2017–

2018).  <u>See id.</u>  Plaintiffs bring this suit to challenge: (1) whether Commerce had

statutory authority to issue a China-wide entity rate; (2) whether Commerce

properly applied the applicable legal criteria for analyzing Plaintiffs' separate rate

eligibility; and (3) Commerce's determination that Plaintiffs were controlled by the

Chinese government through the ownership of China National Chemical

Corporation ("Chem China").  <u>See id.</u> at 5–7.

      Before the Court is Plaintiffs' Rule 56.2 Motion for Judgment on the Agency

Record.  Pls.' R. 56 Mot. J. Agency R. ("Plaintiffs' Motion" or "Pls.' Mot."), ECF

Nos. 65, 66.  Defendant United States ("Defendant") and Defendant-Intervenor the

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial

and Service Workers International Union, AFL-CIO, CLC ("Defendant-

Intervenor" or "Def.-Interv.") filed Defendant's Response to Plaintiffs' Rule 56.2

Motion for Judgment on the Agency Record and the Response Brief of Defendant-

Intervenor.  Def.-Interv.'s Resp. Br. ("Def.-Interv.'s Resp."), ECF Nos. 71, 72;

Def.'s Resp. Pls.' R. 56.2 Mot. J. Agency R. ("Def.'s Resp."), ECF Nos. 74, 75.

Plaintiffs filed Plaintiffs' Reply Brief in Support of Motion for Judgment on the

Agency Record.  Pls.' Reply Br. Supp. Mot. J. Agency R. ("Pls.' Reply"), ECF

Nos. 79, 80.

    Also before the Court are Defendant-Intervenor's Comments in Opposition

to Remand Results.  Def.-Interv.'s Cmts. Opp'n Remand Results ("Defendant-

Intervenor's Comments" or "Def.-Interv.'s Cmts."), ECF Nos. 62, 63.  Defendant-

Intervenor opposes Commerce's redetermination on remand in the Final Results of

Redetermination Pursuant to Court Remand ("Remand Results"), ECF Nos. 55-1,

56-1, determining that the sole mandatory respondent in Commerce's review,

Shandong New Continent Tire Co., Ltd. ("New Continent"), reported sales

information accurately and was not involved in fraud.  Id. at 18–26.  Defendant and

Plaintiff-Intervenor New Continent filed Defendant's Response to Comments on

Remand Redetermination and Plaintiff-Intervenor's Comments in Support of

Remand Redetermination supporting the Remand Results.  Def.'s Resp. Cmts.

Remand Redetermination ("Defendant's Comments" or "Def.'s Cmts."), ECF Nos.

69, 70; Pl.-Interv.'s Cmts. Remand Results ("Plaintiff-Intervenor's Comments" or

"Pl.-Interv.'s Cmts."), ECF Nos. 73, 76.

    For the following reasons, the Court sustains Commerce's Final Results and

Remand Results.

## ISSUES PRESENTED

The Court reviews the following issues:

1.  Whether Commerce's determination that New Continent provided accurate information during the administrative review was supported by substantial evidence;

2.  Whether Plaintiffs have waived their challenge to Commerce's authority to impose a China-wide entity antidumping duty rate by not raising the issue in Plaintiffs' Motion; and

3.  Whether Commerce's determination that Pirelli failed to rebut the presumption of *de facto* government control was in accordance with the law and supported by substantial evidence.

## BACKGROUND

In June 2015, Commerce issued an antidumping duty order covering certain passenger vehicle and light truck tires from China.  See Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China, 80 Fed. Reg. 34,893 (Dep't of Commerce Jun. 18, 2015) (final determination of sales at less than fair value and final affirmative determination of critical circumstances, in part).  Commerce initiated an administrative review on October 4, 2018 of multiple companies, including Pirelli

China.  See Initiation of Antidumping and Countervailing Duty Administrative

Reviews, 83 Fed. Reg. 50,077, 50,081 (Dep't of Commerce Oct. 4, 2018).

Pirelli China and Pirelli USA filed a separate rate application with

Commerce.  Pls.' Separate Rate App., PJA 3, CJA 1.[1]  In its Preliminary Results,

Commerce determined that Pirelli China had not demonstrated an absence of *de*

*jure* and *de facto* government control and denied Pirelli's Separate Rate

Application.  See Certain Passenger Vehicle and Light Truck Tires from the

People's Republic of China ("Prelim. Results"), 84 Fed. Reg. 55,909, 55,912

(Dep't of Commerce Oct. 18, 2019) (preliminary results of antidumping duty

admin. review and rescission, in part; 2017–2018), and accompanying Issues and

Decisions Memorandum ("Preliminary IDM" or "Prelim. IDM") at 13, 15, PJA 13.

Pirelli China was assigned the China-wide antidumping margin of 87.99 percent.

Prelim. IDM at 13.  Pirelli China and Pirelli USA filed an administrative case brief

("Pirelli's Administrative Case Brief") with Commerce requesting that Commerce

reverse the Preliminary Results and grant Pirelli China separate rate status.  Pls.'

Admin. Case Br., PJA 15, CJA 10.

---

[1]  Citations to the administrative record reflect the public joint appendix ("PJA")
and confidential joint appendix ("CJA") tab numbers filed in this case, ECF Nos.
81, 82.

Commerce published on April 15, 2020 the <u>Final Results</u> and accompanying

Issues and Decision Memorandum ("Final IDM"), PJA 17.  In the <u>Final Results</u>,

Commerce assigned mandatory respondent New Continent a zero percent

weighted-average dumping margin, which was used as the basis for assigning

dumping margins to non-individually examined respondents that qualified for

separate rate status.  <u>Final Results</u>, 85 Fed. Reg. at 22,397.  Commerce also

continued to determine that Pirelli China had not rebutted the presumption of *de*

*facto* government control and was not entitled to a separate rate.  <u>Id.</u> at 22,399;

Final IDM at 13.  Commerce determined that Pirelli China did not establish its

"autonomy from the [Chinese] government in making decisions regarding the

selection of management."  Final IDM at 14–18.

Pirelli commenced this action on May 21, 2020.  Summons, ECF No. 1;

Compl.  After initiating this case, Plaintiffs filed Plaintiffs' Unopposed Motion to

Stay the Proceedings pending the final determination by the United States Court of

Appeals for the Federal Circuit ("CAFC") in <u>China Manufacturers Alliance, LLC</u>

<u>v. United States</u>, 1 F.4th 1028 (Fed. Cir. 2021).  Pls.' Unopposed Mot. Stay

Proceedings, ECF No. 23.  The Court granted the motion and stayed the case.

Order (Aug. 6, 2020), ECF No. 25.

On May 20, 2021, prior to the CAFC's decision in <u>China Manufacturers</u>

<u>Alliance</u>, U.S. Customs and Border Protection ("Customs") notified Commerce

that it had observed inconsistencies between the Section A Questionnaire

Responses submitted by New Continent to Commerce and the corresponding

prices reported to Customs at the time of entry that resulted in an undervaluation of

approximately $2.6 million.  Def.'s Mot. Lift Stay Voluntary Remand

("Defendant's Remand Motion" or "Def.'s Remand Mot.") at Att. 1 ("Customs'

Referral Letter"), ECF No. 29.  Defendant requested that the Court remand the

administrative review results to Commerce for further examination.  Id. at 3–4.

The Court remanded the case on September 20, 2021 to Commerce.  Pirelli Tyre

Co. v. United States, 45 CIT __, 539 F. Supp. 3d 1257 (2021).

Commerce published on October 27, 2021 a notice of remand proceedings

and reopened the administrative record of the 2017–2018 antidumping

administrative review.  Remand Results at 3; Certain Passenger Vehicle and Light

Truck Tires From the People's Republic of China ("Notice of Remand"), 86 Fed.

Reg. 59,367 (Dep't of Commerce Oct. 27, 2021) (notice of remand proceeding and

reopening of 2017–2018 antidumping duty admin. review record).  Commerce

placed Customs' Referral Letter on the record and provided interested parties with

an opportunity to submit factual information and comments.  Remand Results at 3;

Notice of Remand, 86 Fed. Reg. at 59,368.  Commerce received comments from

interested parties and solicited supplemental questionnaire responses from New

Continent and NBR Wheels and Tires LLC.  Remand Results at 3–4.

Commerce issued its <u>Remand Results</u> on April 28, 2022, in which

Commerce determined that export price and constructed export price information

reported by New Continent in the administrative review was accurate.  <u>Id.</u> at

11–22.  Commerce also determined that the record did not support that New

Continent was affiliated with two other companies considered in the review.  <u>Id.</u> at

22–23.  Commerce did not adjust New Continent's antidumping margin, the rate

for individually examined respondents, or Pirelli's separate rate status.  <u>See</u> <u>id.</u> at

24.  Plaintiffs filed their Rule 56.2 Motion for Judgment on the Agency Record on

July 11, 2022.  <u>See</u> Pls.' Mot. J. Agency R.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c).

The Court will hold unlawful any determination found to be unsupported by

substantial evidence on the record or otherwise not in accordance with the law.  19

U.S.C. § 1516a(b)(1)(B)(i).  The Court also reviews determinations made on

remand for compliance with the Court's remand order.  <u>Ad Hoc Shrimp Trade</u>

<u>Action Comm. v. United States</u>, 38 CIT 727, 730, 992 F. Supp. 2d 1285, 1290

(2014), <u>aff'd</u>, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I.      Remand Results

The Court remanded the <u>Final Results</u> to Commerce to address new

information provided to Commerce by Customs regarding inaccuracies in the

reported sales prices on imports of passenger vehicle tires from China during

Period of Review 3.  <u>Pirelli Tire Co.</u>, 45 CIT at __, 539 F. Supp. 3d at 1261−62.

Specifically, Customs compared the Section A Questionnaire Responses provided

by New Continent to Commerce in the underlying investigation with Customs'

import records and found a potential undervaluation of approximately $2.6 million.

<u>See</u> <u>Notice of Remand</u>, 86 Fed. Reg. at 59,368.  This information raised concerns

regarding the accuracy of New Continent's reporting to Commerce.  <u>Id.</u>

On remand, Commerce issued supplemental questionnaires to New

Continent and NBR Wheels and Tires LLC seeking clarification of information on

the administrative record.  <u>See</u> <u>Remand Results</u> at 4; Commerce's Supp.

Questionnaire New Continent, PJA 27, CJA 18; Commerce's Second Supp.

Questionnaire New Continent, PJA 30, CJA 21.  In response, New Continent

provided more than 20,000 pages of information.  <u>Remand Results</u> at 4−5; New

Continent's Supp. Questionnaire Resp., PJA 28, CJA 19; New Continent's Second

Supp. Questionnaire Resp., PJA 31, CJA 22.

In the <u>Remand Results</u>, Commerce focused its analysis on the invoices submitted to Commerce rather than the invoices submitted to Customs in weighing the accuracy of the U.S. sales information provided by New Continent during the administrative review.  <u>Remand Results</u> at 5–7, 15.  Commerce considered the invoices provided to Customs relevant only to the extent that they prompted the remand.  <u>Id.</u> at 20.  Commerce analyzed information on the record pertaining to almost all of the transactions identified by Customs and determined that payment amounts were tied to the U.S. sales values reported by New Continent in the administrative review.  <u>Id.</u> at 7–8, 19–20.  Commerce was also able to match price and quantity data between invoices under consideration and corresponding invoices in New Continent's Section C database.  <u>Id.</u> at 8.  Based on its review of record evidence, Commerce determined that New Continent accurately reported export price and constructed export price sales during the administrative review.  <u>Id.</u> at 8, 23–24.  Commerce also determined that New Continent was not affiliated with the entities responsible for providing the allegedly inaccurate information to Customs.  <u>Id.</u> at 10–11, 23–24.

Defendant-Intervenor asserts that Commerce failed to consider contradictory record evidence that called into question the accuracy of New Continent's reporting and failed to address the relevance of the alleged fraud on Customs.

Def.-Interv.'s Cmts. at 18–23.  Defendant and Plaintiff-Intervenor support

Commerce's <u>Remand Results</u>.  <u>See</u> Def.'s Cmts.; Pl.-Interv.'s Cmts.

Commerce analyzed documents relating to nearly all of the transactions

identified by Customs and expressed that it was:

> able to tie the payment amounts to the U.S. sales value reported by New
> Continent in its U.S. sales database from the underlying review as well
> as New Continent's financial statements [for most of the sales].  More
> specifically, we compared the prices and quantities of the invoices
> under question to those same invoices in the section C database and
> were able to fully match the values.

<u>Remand Results</u> at 7–8.  In its Supplemental Questionnaire Response, New

Continent explained that for the majority of its submitted invoices, it was not

possible to a make a one-to-one link between the payment and the invoice because

New Continent's accounting was based on a running debt and credit balance that

was reconciled annually.  New Continent's Supp. Questionnaire Resp. at 21–22.

Defendant-Intervenor contends that Commerce must provide an explanation of its

methodology for assigning payments to sales information in its analysis.  Def.-

Interv.'s Cmts. at 18–20.

Commerce's analysis did not rely solely on New Continent's Supplemental

Questionnaire Response, and Commerce cited to record documents containing

payment information for invoices and accounting subledgers.  <u>Remand Results</u> at

19; <u>see also</u> New Continent's Sub. New Factual Info. at Exs. 18 (worksheet linking

Section C database invoice values with invoice values submitted by New

Continent), 19 (invoices contained in Section C database), PJA 23, CJA 15; New

Continent's Supp. Questionnaire Resp. at Ex. S-9 ("New Continent's Payment

Package"). Commerce also noted that its review during the remand covered

significantly more transactions than were considered during Commerce's standard

verification. Remand Results at 19–20. Commerce's remand analysis covered

most of the invoices identified by Customs, and Commerce explained that it

compared "prices and quantities of the invoices under question to those same

invoices in the section C database." Id. at 7–8.

Defendant-Intervenor asserts that Commerce disregarded the argument that

certain record information was inaccurate and contradicted by other record

documents. Def.-Interv.'s Cmts. at 20–21. Though Commerce did not directly

address inconsistencies between specific documents, the Remand Results make

clear that Commerce considered information covering most of the relevant

transactions. See Remand Results at 19; see also New Continent's Sub. New

Factual Info. at Exs. 18, 19; New Continent's Payment Package. Commerce

focused on the accuracy of the information submitted in the administrative review

in order to calculate the antidumping margin, not inconsistencies with information

submitted to Customs. Remand Results at 20–21. Based on record evidence,

Commerce determined that the U.S. price information reported to Commerce by New Continent was accurate.  Id. at 21.

In its review, Commerce compared invoices submitted by New Continent during the administrative review and corresponding invoices submitted during the remand.  Id. at 15.  Commerce determined that relevant information, including sales price, quantity, and U.S. sales values, were consistent between the invoices.  Id.  Defendant-Intervenor contends that the record does not support Commerce's determination regarding New Continent's reproduction of invoices and includes examples of inconsistent information.  Def.-Interv.'s Cmts. at 21–23.  In comparing invoices submitted in both the administrative review and remand, Commerce determined that the consistency of the relevant information:

> supports New Continent's claim that while electronic versions of its sales documents cannot be reproduced exactly, the differences between the reproduced documents for this remand and the documents submitted during the administrative review are superficial.  New Continent is an experienced exporter having participated in the underlying administrative review as a mandatory respondent.  We note that in an ongoing administrative review or investigation, we would expect an experienced exporter like New Continent to provide original sales documentation, as it did during the underlying administrative review.  However, New Continent was not aware of the [Customs] Referral until May 2021, nor involved in litigation for this administrative review until September 2021.  Thus, we are not persuaded by the petitioner's claim that New Continent would have known that "Commerce would call upon it in a review to produce information such as original copies of invoices," because it is unclear how New Continent could have anticipated that Commerce would

request for a remand to reexamine its U.S. sales information some
seventeen months after previously uncontested final results, or that the
Court would grant that request. Therefore, we find there is no
evidentiary basis to conclude that the quantity and value
information . . . have been modified.

Remand Results at 18.

Defendant-Intervenor contends that Commerce did not address a specific

example raised during the remand in which multiple versions of an invoice were

included on the record reflecting different information. Def.-Interv.'s Cmts. at 22.

The Remand Results do not directly address this example; however, in relation to

the number of transactions considered in Commerce's review, it is reasonable to

conclude that potentially inconsistent details in a single set of invoices does not

undermine the accuracy of the greater body of information reviewed by

Commerce. It is clear from the Remand Results that Commerce considered a large

volume of record submissions, including over 20,000 pages of documents from

New Continent, and determined that any inconsistencies were minor and did not

significantly impact the calculation of the antidumping duty. The Court agrees that

Commerce's review of a voluminous number of record documents was reasonable

and accounted for any potential inconsistencies in a few invoices.

Defendant-Intervenor argues that Commerce did not properly consider the

issue of potential fraud in its determination. Def-Interv.'s Cmts. at 23–26.

Defendant-Intervenor contends that the record contained evidence that New

Continent was aware of the inaccurate information submitted to Customs because a certain nomenclature was used in both the challenged invoices and documents prepared by New Continent.  Id. at 23.  Commerce addressed this issue in the Remand Results by discussing New Continent's explanation that the numbers were inadvertently copied by a manager working with information provided by an affiliate in preparing the Section C database.  Remand Results at 17–18. Commerce determined this explanation to be consistent with the steps taken by New Continent to ensure that material information in finalized invoices was not changed after issuance, which included sales managers creating a commercial invoice using Excel with information downloaded from a sales system.  Id. Commerce also determined that New Continent's explanation was supported by Commerce's comparison of invoices between the administrative review and remand.  Id. at 18.

The issue before Commerce on remand was whether the information submitted by New Continent in the administrative review was accurate, while the issue of fraudulent representations to Customs was within Customs' statutory authority.  19 U.S.C. § 1592.  The Court concludes that Commerce was reasonable in limiting its determination to the accuracy of New Continent's information submitted during the administrative review.  See Remand Results at 11–22.

In the <u>Remand Results</u>, Commerce addressed whether New Continent was affiliated with the entities that made alleged misrepresentations to Customs.  <u>Id.</u> at 22–23.  Upon consideration of record documents, including declarations from a New Continent employee, Commerce determined that New Continent did not satisfy the requirements for affiliation under 19 U.S.C. § 1677(33) and 19 C.F.R. § 351.102(b)(3).  <u>Id.</u> at 23.  Commerce also determined that the record did not show that the considered entities had a relationship that might impact relevant decision making.  <u>Id.</u>  Commerce determined that New Continent was not affiliated with the considered entities.  <u>Id.</u> at 23–24.  No Party opposes this determination before the Court.

The arguments raised by Defendant-Intervenor are unavailing.  Because Commerce conducted a review of the voluminous record evidence presented and verified the accuracy of the relevant information submitted by New Continent during the administrative review, the Court concludes that Commerce's determination that the information submitted by New Continent was accurate is supported by substantial record evidence.

## II.   Commerce's Authority to Issue a China-Wide Entity Rate

Defendant-Intervenor argues that Plaintiffs abandoned and waived Count I of their Complaint.  Def.-Interv.'s Resp. at 7–8.  In Count I of the Complaint, Pirelli argued that Commerce lacked the statutory authority to impose a China-

wide entity antidumping duty rate.  Compl. at 5.  Pirelli did not renew this

argument in its motion for judgment on the agency record and conceded that "the

Federal Circuit has recently ruled that Commerce does in fact have the authority to

apply a 'China-Wide Rate' under the statute."  Pls.' Mot. J. Agency R. at 13–14

(citing <u>China Mfrs. All.</u>, 1 F.4th at 1039).  Pirelli also does not address Defendant-

Intervenor's waiver assertion in its reply.  <u>See</u> Pls.' Reply.  Because Pirelli failed to

raise its argument regarding Commerce's authority to impose a China-wide entity

rate in its opening brief and did not meaningfully assert the argument in its reply,

the argument is waived.  <u>See</u> <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 439

F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not

raised in the opening brief are waived.").

### III.    Pirelli's Separate Rate Status

The Court previously considered Pirelli's separate rate status in an earlier

administrative review that covered the period from January 27, 2015 to July 31,

2016 ("Period of Review 1").  <u>See</u> <u>Shandong Yongtai Grp. Co. v. United States</u>

("<u>Shandong Yongtai I</u>"), 43 CIT __, __, 415 F. Supp. 3d 1303, 1315–18 (2019);

<u>Shandong Yongtai Grp. Co. v. United States</u> ("<u>Shandong Yongtai II</u>"),44 CIT __,

__, 487 F. Supp. 3d 1335, 1344–46 (2020); <u>Qingdao Sentury Tire Co. v. United</u>

<u>States</u> ("<u>Qingdao Sentury I</u>"), 45 CIT __, __, 539 F. Supp. 3d 1278, 1282–85

(2021); <u>Qingdao Sentury Tire Co. v. United States</u> ("<u>Qingdao Sentury II</u>"), 46 CIT

__, __, 577 F. Supp. 3d 1343, 1347–49 (2022). Pirelli China was established as a Sino-foreign joint venture between the Dutch subsidiary of Pirelli & C. S.p.A. ("Pirelli Italy") and Hixih Group in 2005. Shandong Yongtai I, 43 CIT at __, 415 F. Supp. 3d at 1315–16. Chem China, a company owned by the Chinese government, acquired Pirelli S.p.A. in October 2015. Id. at __, 415 F. Supp. 3d at 1316. Following the acquisition, Pirelli Italy was delisted from the Milan Stock Exchange. Id.

Before this Court, Pirelli challenged Commerce's determination that Pirelli was ineligible for separate rate status during Period of Review 1 for both the periods before and after Pirelli S.p.A.'s acquisition by Chem China. See Shandong Yongtai II, 44 CIT at __, 487 F. Supp. 3d at 1344–46; Qingdao Sentury II, 46 CIT at __, 577 F. Supp. 3d at 1347–49. Commerce considered record documents, including Pirelli's articles of association, purchase agreements, Board of Directors meeting minutes, resolutions, and company financial statements, and concluded that Chem China and the Silk Road Fund, both Chinese government-controlled entities, owned a majority of Pirelli China and exercised control through Pirelli's Board of Directors and ownership structure. Shandong Yongtai II, 44 CIT at __, 487 F. Supp. 3d at 1346. Commerce determined that for the period following Pirelli S.p.A.'s acquisition by Chem China, Pirelli did not have autonomy from the Chinese government in its decision making and was unable to demonstrate a lack

of *de facto* government control.  Id.  The Court sustained Commerce's

determination.  Id.

It is unclear from the record whether Pirelli applied for separate rate status

during Commerce's administrative review for the period of August 1, 2016

through July 31, 2017 ("Period of Review 2").  See Antidumping or

Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to

Request Administrative Review, 82 Fed. Reg. 35,754, 35,755 (Dep't of Commerce

Aug. 1, 2017).  Relevant to this case, Pirelli applied for separate rate status for

Period of Review 3, which covered August 1, 2017 through July 31, 2018.  See

Pls.' Separate Rate App.

Pirelli's Separate Rate Application reflected certain changes in Pirelli's

ownership and management structure between the end of Period of Review 1 and

the end of Period of Review 3.  For example, Pirelli Italy relisted on the Milan

Stock Exchange on October 4, 2017.  Id. at 18.  At the time of relisting, Chem

China and the Silk Road Fund had decreased their combined indirect majority

ownership in Pirelli Italy and Pirelli China to indirect minority ownership.  Id. at

13–14, 18–19.  Commensurate with the relisting on the Milan Stock Exchange,

Pirelli ceased public management and coordination activities with its holding

company, Marco Polo International Italy S.p.A. ("Marco Polo"), and all other

companies, including Chem China.  Id. at 19–20; Pls.' Separate Rate App. at Ex.

9.1 ("Pirelli Group's 2017 Annual Report") at 205, PJA 6, CJA 4; Pls.' Separate

Rate App. at Ex. 11 ("Pirelli Italy's August 2017 Press Release"), PJA 8, CJA 6.

Pirelli Italy also altered the composition of its Board of Directors to require a

majority of directors to be designated as "independent." Pls.' Separate Rate App.

at Ex. 10 ("Pirelli's 2017 Shareholders Agreement") § 4.2.2, PJA 8, CJA 6.

Despite these changes to Pirelli's ownership and management structures,

Commerce determined that Pirelli did not demonstrate "autonomy from the

[Chinese] government in making decisions regarding the selection of management"

and did not rebut the presumption of *de facto* government control. Final Results,

85 Fed. Reg. at 22,399; Final IDM at 13–18. Commerce denied Pirelli's Separate

Rate Application. Final Results, 85 Fed. Reg. at 22,399.

Plaintiffs raise two primary arguments challenging Commerce's denial of

Pirelli's Separate Rate Application. First, Plaintiffs contend that Commerce's

determination was unlawful because Commerce failed to apply the proper standard

of review for a company that is minority-owned by a government-controlled entity,

failed to connect suspected government control to Pirelli's export activities, and

did not apply relevant provisions of Italian law. Pls.' Br. at 12–22. Second,

Plaintiffs argue that Commerce's determination that Pirelli failed to rebut the

presumption of *de facto* government control was unsupported by record evidence

because Commerce failed to appreciate that changes to Pirelli's ownership and

management structure purportedly insulated Pirelli from external influences of Chinese government control.  Id. at 23–49.

### A.   Legal Framework

Commerce has the authority to designate a country as a nonmarket economy pursuant to 19 U.S.C. § 1677(18).  19 U.S.C. § 1677(18).  Commerce employs a rebuttable presumption that all companies within a nonmarket economy country are subject to government control and should be assigned a single, country-wide rate by default, unless the exporter requests an individualized antidumping margin and demonstrates affirmatively that the exporter maintains both *de facto* and *de jure* independence from the government.  Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997).  The burden of proving the absence of government control rests with the exporter.  Id. at 1405–06.  Exporters that are unable to demonstrate both *de facto* and *de jure* independence from government control do not qualify for a separate rate.  China Mfrs. All., 1 F.4th at 1032; Transcom, Inc. v. United States, 294 F.3d 1371, 1373 (Fed. Cir. 2002).

Commerce has identified three factors that it considers when determining whether an exporter enjoys independence from *de jure* government control: (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) any other formal measures by the government decentralizing

control of companies.  See Ad Hoc Shrimp Trade Action Comm. v. United States,

37 CIT 1085, 1090 n.21, 925 F. Supp. 2d 1315, 1320 n.21 (2013) (citation

omitted).

Commerce considers four factors in determining whether an exporter is free

of *de facto* government control: (1) whether the export prices are set by or are

subject to the approval of a government authority; (2) whether the respondent has

authority to negotiate and sign contracts and other agreements; (3) whether the

respondent has autonomy from the government in making decisions regarding the

selection of management; and (4) whether the respondent retains the proceeds of

its export sales and makes independent decisions regarding disposition of profits or

financing of losses.  See id.; Separate-Rates Practice and Application of

Combination Rates in Antidumping Investigations Involving Non-Market

Economy Countries (Apr. 5, 2005) ("Policy Bulletin 05.1" or "Policy Bull. 05.1")

at 2.

The CAFC has sustained Commerce's application of the rebuttable

presumption of government control for nonmarket economies.  Diamond

Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1311 (Fed. Cir. 2017); see

also Changzhou Hawd Flooring Co. v. United States, 848 F.3d 1006, 1009 (Fed.

Cir. 2017).  All four factors of the *de facto* test must be satisfied to rebut the

presumption of government control.  See Yantai CMC Bearing Co. v. United

<u>States</u>, 41 CIT __, __, 203 F. Supp. 3d 1317, 1325–26 (2017).  The *de facto* test is

therefore conjunctive, and an exporter must satisfy all four factors to rebut the

presumption of government control.  See <u>Zhejiang Quzhou Lianzhou Refrigerants</u>

<u>Co. v. United States</u>, 42 CIT __, __, 350 F. Supp. 3d 1308, 1321 (2018).

Commerce determined in the <u>Final Results</u> that Pirelli failed to satisfy the third

criterion of the *de facto* test, whether the respondent has autonomy from the

government in making decisions regarding the selection of management.  <u>Final</u>

<u>Results</u>, 85 Fed. Reg. at 22,399; Final IDM at 13−18; <u>see also</u> Prelim. IDM at 13;

Commerce's Prelim. Separate Rate Mem. ("Preliminary Separate Rate Memo" or

"Prelim. Separate Rate Mem.") at 2–3, PJA 14, CJA 9.

### B.    Lawfulness of Commerce's Analysis

Plaintiffs contend that Commerce's analysis of Pirelli's separate rate

eligibility was unlawful because Commerce failed to apply a lesser burden of proof

for a minority foreign-owned company, failed to require actual, rather than

potential control, and failed to link its findings to Pirelli's export activities.  Pls.'

Br. at 12–22.  Specifically, Plaintiffs argue that Commerce's past practice and the

precedent of this Court reflect that a lower burden of proof should be required in

instances in which government-controlled entities hold only a minority interest in

the respondent exporter.  <u>Id.</u> at 14–15.  Plaintiffs contend that Commerce failed to

make this distinction in practice and held Pirelli to the higher standard applicable

to a majority government-owned company.  Id.  Defendant-Intervenor contends

that Plaintiffs are incorrect in their assertion that a lower burden of proof is

applicable to rebut the presumption of government control when the government is

a minority owner.  Def.-Interv.'s Resp. at 10–17.  Defendant-Intervenor also

asserts that Plaintiffs' argument has been waived because Pirelli did not raise it

before Commerce.  Id. at 10–11.  Defendant contends that the standard applied by

Commerce in this case was not higher than the standard normally applied in

instances of minority government ownership.  Def.'s Resp. at 10–17.

Plaintiffs offer three cases in support of the position that Commerce may

impose a higher burden of proof on exporters seeking a separate rate when a

government-controlled entity has a direct or indirect majority interest in the

exporter: Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States, 42 CIT __,

350 F. Supp. 3d 1308 (2018), Shandong Rongxin Import & Export Co. v. United

States, 43 CIT __, 415 F. Supp. 3d 1319 (2019), and Yantai CMC Bearing Co. v.

United States, 41 CIT __, 203 F. Supp. 3d 1317 (2017).  Pls.' Br. at 14–15.

Plaintiffs ask the Court to recognize as a corollary to this rule that "minority

ownership by a government-controlled entity, as is the case here, requires a lower

burden of proof and it should be more likely that Commerce will grant a separate

rate in those situations."  Id. at 15 (emphasis in original).

In *Zhejiang Quzhou Lianzhou Refrigerants Company*, the Court recognized that though evidence of legal separation between an exporter and its government-controlled parent may rebut the presumption of *de facto* government-control when the government holds a minority stake in the exporter, such separation would not rebut the presumption when the government holds a majority stake in the exporter "because of the ever-present potential for the government to exert *de facto* control over the exporter's operations and management selection, and the expectation that it would do so." *Zhejiang Quzhou Lianzhou Refrigerants Co.*, 42 CIT at __, 350 F. Supp. 3d at 1318. Similarly, in *Shandong Rongxin Import & Export Company*, the Court noted that "the presumption of *de facto* government control is quite strong for respondents with a government majority shareholder." *Shandong Rongxin Imp. & Exp. Co.*, 43 CIT at __, 415 F. Supp. 3d at 1323–25. Finally, in *Yantai CMC Bearing Company*, the Court observed that particular facts, such as majority ownership, may be sufficient to support a determination of *de facto* government control, but the fact alone does not make the presumption of control irrebuttable. *Yantai CMC Bearing Co.*, 41 CIT at __, 203 F. Supp. 3d at 1325–26.

The Court does not agree with Plaintiffs' assertion that there is a different standard of proof based on the degree of the government's ownership stake in a respondent exporter. Commerce employs a rebuttable presumption that all companies within a nonmarket economy country are subject to government control

and should be assigned a single, country-wide entity rate by default, unless the exporter requests an individualized antidumping margin and demonstrates affirmatively that the exporter maintains both *de facto* and *de jure* independence from the government.  19 U.S.C. § 1677(18); <u>Sigma Corp.</u>, 117 F.3d at 1405.  As an exporter from China, Pirelli had the burden of rebutting the presumption of Chinese government control.  <u>Sigma Corp.</u>, 117 F.3d at 1405.  The cases cited by Plaintiffs recognize that Commerce may consider evidence of majority government ownership as strong support for the presumption, but the cases do not alter the exporter's burden of proof.

In this case, Commerce acknowledged that Pirelli had a minority indirect ownership by government-controlled entities and explained that Commerce would consider additional facts relating to Pirelli's independence.  Final IDM at 15.  Commerce reviewed record evidence showing Pirelli's organization, ownership, and Board of Directors.  <u>Id.</u> at 14–18.  Commerce also addressed arguments raised by Pirelli based on Italian law, the degree of authority held by Pirelli's CEO, and the transfer and disposal of proprietary know-how.  <u>Id.</u> at 15–17.

Because Plaintiffs had the burden of rebutting the presumption of government-control through proffered evidence, and there is no indication that Commerce imposed a higher burden upon Pirelli nor legal support for a lesser

burden to be imposed, the Court concludes that Commerce's application of the burden of proof was in accordance with the law.

Plaintiffs argue further that Commerce's determination was unlawful because it was based on the presumption of theoretical potential government control rather than evidence of actual government control, resulting in an unlawful irrebuttable presumption. Pls.' Br. at 16–19. Neither Defendant nor Defendant-Intervenor directly respond to the merits of Plaintiffs' argument regarding Commerce's theory of control. But see Def.'s Resp. at 15 n.6 (summarily arguing that if the argument is not deemed waived, it should be rejected). Defendant-Intervenor contends that Commerce properly considered the ability of government-controlled entities to influence Pirelli's management and operations in denying Pirelli's Separate Rate Application. Def.-Interv.'s Resp. at 12–17. Defendants argue that Plaintiffs are foreclosed from raising this issue before the Court because Pirelli failed to exhaust available administrative remedies by first raising the issue before Commerce. Def.'s Resp. at 13–15.

The Court first addresses Defendant's failure to exhaust argument. Congress has directed that this Court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). The statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."

Boomerang Tube LLC v. United States, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing

Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).

Commerce's regulations specifically require that a party raise all arguments in a

timely manner before the agency.  Corus Staal, 502 F.3d at 1379 (citing 19 C.F.R.

§ 351.309(c)(2)).  "[G]eneral policies underlying the exhaustion requirement—

protecting administrative agency authority and promoting judicial efficiency"—

would be vitiated if the court were to consider arguments raised for the first time in

judicial proceedings.  See id. (internal quotation and citation omitted); see also

Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States, 41 CIT __, __,

277 F. Supp. 3d 1346, 1353 (2017).  The exhaustion requirement is not absolute

and the Court has recognized limited exceptions to the doctrine: (1) futility in

raising the issue; (2) a subsequent court decision that may impact the agency's

decision; (3) a pure question of law; or (4) when plaintiff had no reason to believe

the agency would not follow established precedent.  See Luoyang Bearing Factory

v. United States, 26 CIT 1156, 1186 n.26, 240 F. Supp. 2d 1268, 1297 n.26 (2002)

(citing authorities).  Defendant asserts that Pirelli did not raise the issue of

potential and actual control before Commerce and cannot assert any of the

recognized exceptions to the exhaustion requirement.  Def.'s Resp. at 13–15.

Plaintiffs did not respond to Defendant's exhaustion argument.  See Pls.' Reply at

5.

When considering the exhaustion requirement, the determinative question for the Court is whether Commerce was put on notice of the argument. See Trust Chem. Co. v. United States, 35 CIT 1012, 1023 n.27, 791 F. Supp. 2d 1257, 1268 n.27 (2011). Commerce gave no indication prior to the Final Results that its analysis would consider potential, rather than actual control. Despite this, Pirelli made numerous arguments in Pirelli's Administrative Case Brief addressing Pirelli China's independence from the actual control of Pirelli Italy and the minority owners. See Pls.' Admin. Case Br. at 32–43. Because Commerce should have been aware that Pirelli was arguing that actual control was absent, Plaintiffs' arguments are not now barred.

In antidumping proceedings involving a nonmarket economy, Commerce presumes that all respondents are government-controlled and subject to a single country-wide antidumping rate. Diamond Sawblades Mfrs. Coal., 866 F.3d at 1311. The percentage of government ownership of a responding company is relevant to Commerce's analysis because majority ownership is viewed as actual control, regardless of whether such control is actually exercised. See Can Tho Imp.-Exp. Joint Stock Co. v. United States, 44 CIT __, __, 435 F. Supp. 3d 1300, 1305–06 (2020); An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States, 42 CIT __, __, 284 F. Supp. 3d 1350, 1359 (2018). When a respondent company is minority government owned, potential control does not necessarily equate to

actual control.  See Zhejiang Quzhou Lianzhou Refrigerants Co., 42 CIT at __, 350

F. Supp. 3d at 1318; An Giang Fisheries Imp. & Exp. Joint Stock Co., 42 CIT at

__, 284 F. Supp. 3d at 1359.  In such situations, "Commerce has required

additional indicia of control prior to concluding that a respondent company could

not rebut the presumption of *de facto* government control where the government

owns, either directly or indirectly, only a minority of shares in the respondent

company."  An Giang Fisheries Imp. & Exp. Joint Stock Co., 42 CIT at __, 284 F.

Supp. 3d at 1359.

> In its determination, Commerce explained:

>> When conducting a separate rate analysis for a company with less than
>> a majority of [state owned enterprise] ownership, Commerce has
>> considered whether the record contains additional indicia of control
>> sufficient to demonstrate that the company lacks independence and
>> therefore should receive the China-wide rate.  Commerce's practice is
>> to examine whether the government might also be able to exercise, or
>> have the potential to exercise, control of a company's general
>> operations through minority government ownership under certain
>> factual scenarios.

Final IDM at 15.  Though Commerce's use of the term "potential" in explaining its

practice might arguably create some ambiguity in what degree of government

control Commerce is considering, see An Giang Fisheries Imp. & Exp. Joint Stock

Co., 42 CIT at __, 284 F. Supp. 3d at 1359, Commerce recognized the need in a

case of minority government ownership, such as this, for additional indicia of

control.  Final IDM at 15.  This need is further supported by Commerce's

subsequent consideration and discussion of Pirelli's ownership, the composition

and independence of Pirelli's Board of Directors, common board members

between Pirelli entities and government-controlled entities, statements in Pirelli's

2017 Annual Report, the authority of Pirelli's CEO, Marco Tronchetti Provera, and

the transfer and/or disposal of proprietary know-how. Id. at 15−18. The Court

concludes that it was reasonable for Commerce to consider the potential for control

together with additional indicia, and its analysis was in accordance with the law.

Plaintiffs argue that Commerce's determination was not in accordance with

the law because Commerce failed to link Pirelli's export activities or export

functions with the separate rate analysis. Pls.' Br. at 19–21. Defendant argues that

Commerce is not required to specifically discuss export activities or export

functions in the context of the third factor of the *de facto* control analysis, which

asks whether a respondent has autonomy in making decisions regarding the

selection of its management. Def.'s Resp. at 15–17. Defendant-Intervenor

similarly argues that the *de facto* control analysis does not require consideration of

export activities or export functions in addition to the factors enumerated in Policy

Bulletin 05.1. Def.-Interv.'s Resp. at 25–26.

Policy Bulletin 05.1 states that the purpose of Commerce's control analysis

is "[t]o establish whether a firm is sufficiently independent from governmental

control in its export activities to be eligible for separate rate status." Policy

Bulletin 05.1 at 2.  Separate rate status is granted "only if an exporter can

demonstrate the absence of both *de jure* and *de facto* governmental control over its

*export activities*."  Id. (emphasis added).  Policy Bulletin 05.1 further provides

that:

> [Commerce] considers four factors in evaluating whether each
> respondent is subject to *de facto* governmental control *of its export
> functions*: 1) whether the export prices are set by, or subject to the
> approval of, a governmental authority; 2) whether the respondent has
> authority to negotiate and sign contracts and other agreements;
> 3) whether the respondent has autonomy from the central, provincial
> and local governments in making decisions regarding the selection of
> its management; and 4) whether the respondent retains the proceeds of
> its export sales and makes independent decisions regarding disposition
> of profits or financing of losses.

Id. at 2 (emphasis added).

Plaintiffs assert that "[t]he Court has consistently ruled that Commerce must

give meaning to the words 'export activities' in Commerce's discussion of its

separate rate test."  Pls.' Br. at 19.  The only case offered by Plaintiffs in support of

this contention, however, is Guizhou Tyre Co., Ltd. v. United States, 46 CIT __,

557 F. Supp. 3d 1302 (2022), an ongoing litigation.  Id. at 20.  Plaintiffs have not

cited any authority that would support a requirement in the third factor for

Commerce to connect an exporter's autonomy in selecting management with

specific export activities or export functions.

Separate rate status is granted if an exporter can demonstrate the absence of *de facto* governmental control according to the four-factor test. The Court notes that the first factor examines whether "export prices" are set by or are subject to government approval, and the fourth factor examines whether the respondent retains the proceeds of its "export sales" and makes independent financial decisions. Policy Bull. 05.1 at 2. In contrast, the Court observes that neither the second nor third factors mention export activities or export functions. Id. Specifically the third factor of the *de facto* control analysis relevant to this case— "3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management"— does not mention export activities or export functions. Id. The Court declines to adopt the approach asserted by Plaintiffs and alter the third factor of the *de facto* control test to read an additional requirement for Commerce to assess whether respondent has autonomy from government control in respondent's export activities or export functions.

Plaintiffs argue also that Commerce's determination is unlawful because Commerce refused to consider provisions of Italian law on which Pirelli relied. Pls.' Br. at 44–46. Commerce rejected Pirelli's argument that Italian law requires that certain directors be independent of shareholders, concluding that "[t]he [Italian Finance Code] is not on the record of this review. As such, we are not convinced

that the majority of Pirelli [Italy's] board are 'independent directors' who are part

of the legal structure aimed to protect the interests of the minority shareholders [of]

Pirelli [Italy]."  Final IDM at 15.  Commerce used similar language in considering

Pirelli's argument that Italian law required Pirelli Italy to acknowledge indirect

control by Chem China in Pirelli's 2017 Annual Report:

> Neither the Italian Finance Code (Art. 93 TUF) or the dictates of Italian
> Finance Code (TUF D. Lgs. 58/1998) are on the record of this review.
> As such, we are not convinced that Pirelli [Italy] must report that it is
> controlled by Chem China mainly for accounting purposes pursuant to
> the Italian Finance Code (Art. 93 TUF) or the dictates of Italian Finance
> Code (TUF D. Lgs. 58/1998).

Id. at 16.  In both instances, Commerce refused to consider Pirelli's arguments

based on provisions of Italian law that were not included on the record.

Commerce has discretion in the manner in which it conducts its

administrative proceedings.  See PSC VSMPO-Avisma Corp. v. United States, 688

F.3d 751, 760 (Fed. Cir. 2012); see also Yantai Timken Co., Ltd. v. United States,

31 CIT 1741, 1755, 521 F. Supp. 2d 1356, 1370 (2007) ("Commerce has broad

discretion to establish its own rules governing administrative procedures . . .").

"Commerce's role in an administrative proceeding is to weigh the evidence

established in the record."  Yantai CMC Bearing Co., 41 CIT at __, 203 F. Supp.

3d at 1324.  The respondent bears the burden of creating the record for

Commerce's review.  Id.  Pirelli did not provide to Commerce the relevant portions

of Italian law on which its arguments relied. In this case, the Court concludes that

Commerce's rejection of Pirelli's unsupported interpretations of Italian law was

reasonable.

**II.    Whether Commerce's Determination was Supported by Substantial Evidence**

Plaintiffs argue that Commerce's determination that Pirelli failed to rebut the

presumption of *de facto* government-control is not supported by substantial

evidence. Pls.' Br. at 23–49. Specifically, Plaintiffs contend that Commerce's

determination that the Pirelli Group's shareholder structure allowed the

government-controlled minority owners to assert control over Pirelli China's

operational activities was not supported by substantial evidence. Pls.' Br. at 25–

31. Plaintiffs argue that Commerce's determination that government-controlled

minority shareholders were able to influence Pirelli China's export activities was

unsupported by substantial evidence. Id. at 46–49. In addition, Plaintiffs argue

that Commerce ignored contrary record evidence that Pirelli China's day-to-day

operations were insulated from shareholder control. Id. at 32–44. Plaintiffs

contend that Commerce unreasonably ignored provisions of Italian law in reaching

its determination. Id. at 44–46.

Because China is a nonmarket economy, Commerce employs a rebuttable

presumption that all companies operating in China are subject to government-

control unless an individual exporter can demonstrate its *de facto* and *de jure*

independence from the government.  19 U.S.C. § 1677(18); <u>Sigma Corp.</u>, 117 F.3d

at 1405.  As discussed above, Commerce denied Pirelli separate rate status based

on the third factor of the *de facto* government test and determined that Pirelli had

not rebutted the presumption as to its autonomy from government control over the

selection of management.  Final IDM at 13–18.

Based on a review of Pirelli's Corporate Organization Chart in evidence,

Commerce determined that under Pirelli's organizational structure for most of

Period of Review 3, Chem China and the Silk Road Fund, two Chinese

government-owned entities, jointly controlled 36.9 percent of Pirelli China.  <u>Id.</u> at

14; Pls.' Separate Rate App. at Ex. 5 ("Pirelli's Corporate Organization Chart"),

PJA 4, CJA 2.  Because these state-owned entities accounted for only minority

indirect ownership of Pirelli China, Commerce looked for additional indicia of

government-control.  Final IDM at 15; <u>see</u> <u>An Giang Fisheries Imp. & Exp. Joint</u>

<u>Stock Co.</u>, 42 CIT at __, 284 F. Supp. 3d at 1359.

Commerce examined Pirelli's Separate Rate Application on the record as

additional indicia of government-control and determined based on this evidence

that Pirelli Italy was the indirect majority shareholder of Pirelli China and selected

members of Pirelli China's Board of Directors.  Final IDM at 15, 17; Pls.' Separate

Rate App. at 23–24.  Based on a review of Plaintiffs' separate rate application,

Commerce also determined that during Period of Review 3, Pirelli Italy and Chem China shared a common chairperson.  Final IDM at 15; Pls' Separate Rate App. at Ex. 16D ("Pirelli Italy's Board of Directors and Key Managers Info."), PJA 10, CJA 8.  Citing the Pirelli Group's 2017 Annual Report, Commerce determined that Chem China was the largest individual shareholder of Pirelli Italy and the only party to hold more than three percent of Pirelli Italy's shares.  Final IDM at 15–16; Pirelli Group's 2017 Annual Report at 231.  Despite Pirelli's argument that a majority of Pirelli Italy's Board of Directors members held no office with Chem China or China National Tire & Rubber Corporation, Ltd. and that a minority of Pirelli Italy's Board of Directors members were Chinese nationals, Commerce determined that Pirelli's corporate documents demonstrated to the contrary that China National Tire & Rubber Corporation, Ltd. (a Chinese government-controlled entity) was involved in the selection of a majority of Pirelli Italy's Board of Director's members.  Final IDM at 16–17; Pirelli's 2017 Shareholders Agreement § 4.2.2.

Pirelli contends that certain Board of Directors members were free from government influence because they were designated as "independent" under provisions of Italian corporate law, which Commerce noted were not submitted on the administrative record.  Pls.' Br. at 28–31, 44; Final IDM at 17. Notwithstanding whether Plaintiff should have been required to place the Italian

law provisions on the record, the Court concludes that Commerce's rejection of Pirelli's argument that Pirelli Italy's directors should be deemed "independent" under Italian law was reasonable, particularly because such designation as "independent" under Italian law would not be dispositive in this case, and because Commerce sufficiently cited substantial evidence on the record such as the separate rate application, the 2017 Annual Report, and the 2017 corporate by-laws to support Commerce's determination that Pirelli Italy was still under Chinese-government control.  For example, citing language in the Pirelli Group's 2017 Annual Report, Commerce determined that Pirelli Italy had not established its independence from government-controlled entities.  Id. at16.  Commerce quoted the 2017 Annual Report that stated: "[Pirelli Italy was] directly controlled by Marco Polo International Italy S.p.A. . . . and [was] in turn therefore indirectly controlled by [Chem China], a state-owned enterprise [] governed by Chinese law with registered office in Beijing, and which report[ed] to the Central Government of the People's Republic of China."  Id. at 16 (quoting Pirelli Group's 2017 Annual Report at 300).  The Pirelli Group's 2017 Annual Report also stated that Pirelli Italy was "indirectly controlled, pursuant to art. 93 [Italian Finance Code], by Chem China via [China National Tire & Rubber Corporation, Ltd.] and certain of its subsidiaries, including Marco Polo."  Id. (quoting Pirelli Group's 2017 Annual Report at 205).  The Court observes that because Pirelli's own 2017 Annual Report

confirmed that Pirelli Italy was indirectly controlled by Chem China, a Chinese

government-controlled entity, via China National Tire & Rubber Corporation,

another Chinese government-controlled entity, Commerce's determination that

Pirelli Italy was indirectly controlled by Chinese government entities is supported

by substantial evidence.

Commerce rejected Plaintiffs' argument that Pirelli Italy's CEO, Marco

Tronchetti Provera, had exclusive authority to select Pirelli Italy's management

and was insulated from the influence of Board of Directors members.  Final IDM

at 17; Pls.' Br. at 34–37.  Rather, Commerce determined based on a review of

Pirelli's 2017 By-laws on the record that Pirelli Italy was managed by its Board of

Directors and that Provera reported to the Board of Directors and derived his

authority from the Board of Directors.  Final IDM at 17; Pirelli's 2017

Shareholders' Agreement § 4.4 ("The Pirelli CEO and Executive Chairman shall

be *delegated* the exclusive power and authority concerning the ordinary

management of Pirelli and of the Pirelli Group"); Pls.' Separate Rate App. at Ex.

10B ("Pirelli's 2017 By-laws") § 10.1, PJA 8, CJA 6 ("The Company shall be

managed by a Board of Directors composed of up to fifteen members who shall

remain in office for three financial years and may be re-elected."); see also Pirelli's

2017 Shareholders' Agreement § 4.7.  The Court also notes that based on Pirelli's

Separate Rate Application and a Letter of Appointment of Pirelli China's

Directors, Commerce determined that Pirelli Italy indirectly owned shares of Pirelli China and that Pirelli Italy had the ability to appoint members of Pirelli China's Board of Directors. Final IDM at 17; Pls.' Separate Rate App. at 24; Pls.' Separate Rate App. at Ex. 16A ("Pirelli's Letter of Appointment of Pirelli China's Directors"), PJA 9, CJA 7. The Court agrees that Commerce's determination was reasonable because these documents established that the Board of Directors could be appointed by entities within Chinese government control.

The Court concludes that substantial evidence supports Commerce's determination that Pirelli failed to rebut the presumption of *de facto* government control. The Court sustains Commerce's assignment of the China-wide entity rate to Pirelli.

## CONCLUSION

For the foregoing reasons, the Court concludes that Commerce's determination that New Continent provided accurate information during the administrative review was supported by substantial record evidence. The Court also concludes that Commerce's assignment of the China-wide entity rate to Pirelli was in accordance with the law and supported by substantial record evidence. The

Court sustains the <u>Final Results</u> and <u>Remand Results</u>.  In accordance with this opinion, judgment will be entered.

<div align="right">

  /s/ Jennifer Choe-Groves  
Jennifer Choe-Groves, Judge

</div>

Dated:   March 20, 2023  
     New York, New York

**UNITED STATES DEPARTMENT OF COMMERCE**
**Office of the General Counsel**
OFFICE OF THE CHIEF COUNSEL FOR TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C.  20230

April 28, 2022

**FILED ELECTRONICALLY VIA CM/ECF**

Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY  10278-0001

Re:     Redetermination Pursuant to Court Remand Order in
         *Pirelli Tyre Co., Ltd., et al v. United States*, Court No. 20-00115

Dear Mr. Toscano:

Pursuant to the Court's Order of September 20, 2021, please find attached the U.S. Department of Commerce's Redetermination Pursuant to Court Remand in the above-captioned action.  The Department's remand redetermination is a proprietary document.  A public version is also being filed with the Court.

In accordance with Court Rule 56.2(h)(1), filing of the administrative record index for the remand proceeding will follow under separate cover.  Should you have any questions concerning the matter, please contact me at (202) 482-1439.

Respectfully submitted,


/s Ayat Mujais
Ayat Mujais
Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance


Attachment

Mr. Mario Toscano
April 28, 2022
Page 2


cc:

Sosun Bae
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 305-7568
Email: sosun.bae@usdoj.gov

Roger B. Schagrin
Schagrin Associates
900 Seventh St., NW
Suite 500
Washington, DC 20001
(202) 223-1700
Email: rschagrin@schagrinassociates.com

Ned H. Marshak
Grunfeld Desiderio Lebowitz Silvermans & Klestadt, LLP
599 Lexington Ave., 36th Floor
New York, NY 10022
(212) 557-4415
Email: nmarshak@gdlsk.com

Daniel L. Porter
Curtis, Mallet-Prevost, Cold & Mosle LLP
1717 Pennsylvania Ave., NW Suite 1300
Washington, DC 20006
(202) 452-7340
Email: dporter@curtis.com

A-570-016
Remand
Slip Op. 21-122
POR:  08/01/2017 – 07/31/2018
**Public Version**
E&C/OVII:  CD

<div align="center">

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**
**Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China**
*Pirelli Tyre Co., Ltd., et al v. United States*
**Court No. 20-00115, Slip Op. 21-122 (September 20, 2021)**

</div>

## I.     SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the

Court or CIT) on September 20, 2021.[1]  This *Passenger Tires Remand Order* pertains to the

2017-2018 administrative review of the antidumping duty (AD) order covering certain

passenger vehicles and light truck tires (passenger tires) from the People's Republic of China

(China).  In the *Passenger Tires Remand Order*, the Court granted Commerce's request for

voluntary remand to further examine the issue of whether Shandong New Continent Tire Co.,

Ltd. (New Continent) accurately reported its U.S. sales prices and affiliated parties in the

underlying review in light of information presented to Commerce by the U.S. Customs and

Border Protection (CBP).

Commerce has examined the information on the record and has determined that New

Continent accurately reported its sales information to Commerce during the 2017-2018

administrative review and that New Continent is not affiliated with certain of its U.S.

customers.

---

[1] *See Pirelli Tyre Co., Ltd., v. United States*, Court No. 20-00115, Slip Op. 21-122  (September 20, 2021) (*Passenger Tires Remand Order*).

## II.     BACKGROUND

On April 22, 2020, Commerce published in the *Federal Register* the final results of the administrative review of the AD order on passenger tires from China covering the period August 1, 2017, through July 31, 2018.[2]  Pirelli Tyre Co., Ltd., Pirelli Tyre S.p.A, and Pirelli Tire LLC (collectively, Pirelli), a non-individually examined company eligible for a separate rate, challenged the *2017-2018 Final Results* and sought review before the Court.[3]

On May 20, 2021, CBP notified Commerce that it had identified inaccuracies in the sales prices on imports of passenger tires from China reported by mandatory respondent New Continent to Commerce during the 2017-2018 administrative review.[4]  Specifically, CBP compared the prices reported by New Continent to Commerce with those reported to CBP at time of entry and found significant undervaluation with regard to the information provided to CBP.[5]  According to the CBP Referral Memorandum, the values submitted to CBP were approximately $2.6 million lower than the values submitted to Commerce.[6]

The information in the CBP Referral Memorandum raised serious concerns and questions regarding the U.S. sales information reported by New Continent to Commerce during the 2017-2018 administrative review.  Commerce used New Continent's U.S. sales information to calculate its company-specific weighted-average dumping margin, and New Continent's margin served as the basis for the rate assigned to the non-individually examined respondents eligible for

---

[2] *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 22396 (April 22, 2020) (*2017-2018 Final Results*), and accompanying Issues and Decision Memorandum (IDM).

[3] On August 6, 2020, the CIT stayed this proceeding pending the outcome of *China Manufacturers Alliance, LLC v. United States.*

[4] *See* Memorandum, "Referral Memorandum from U.S. Customs and Border Protection on the Misreporting of Sales Information for Entries Covered in the 2017-2018 Antidumping Duty Administrative Review," dated October 29, 2021 (CBP Referral Memorandum).

[5] *Id*. at 1.

[6] *Id*.

a separate rate.[7]  As a result, on August 9, 2021, Commerce requested that the Court remand the administrative review to evaluate the information provided by CBP and further examine the issue.  On September 20, 2021, the Court granted the United States' motion for remand.[8]

On October 27, 2021, Commerce published in the *Federal Register* a notice of remand proceeding and reopening the record of the 2017-2018 AD administrative review.[9]  On October 29, 2021, Commerce placed the CBP Referral Memorandum on the record and provided parties an opportunity to submit factual information and comments to rebut, clarify, or correct the information on the record.[10]  On November 23, 2021, New Continent, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (USW),[11] and NBR Wheels and Tires LLC (NBR),[12] submitted comments regarding the CBP Referral Memorandum.[13]  On December 13, 2021, New Continent, USW, NBR, and Hankook Tire China Co., Ltd. and Jiangsu Hankook Tire Co., Ltd. (Hankook) submitted rebuttal comments.[14]  However, New Continent's rebuttal comments contained

---

[7] *See 2017-2018 Final Results*.  This separate rate is relevant to the other issues in litigation not remanded in this proceeding, which are currently stayed pending the outcome of this remand.

[8] *See Passenger Tires Remand Order*.

[9] *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Notice of Remand Proceeding and Reopening of 2017– 2018 Antidumping Duty Administrative Review Record*, 86 FR 59367 (October 27, 2021) (*Notice of Remand*).

[10] *See* CBP Referral Memorandum.

[11] USW is the petitioner in the underlying investigation.

[12] NBR is [                                                    ].

[13] *See* New Continent's Letter, "New Continent Submission of New Factual Information:  2017 2018 Antidumping Duty Administrative Review of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China (Remand)," dated November 23, 2021 (New Continent's NFI Submission); *see also* USW's Letter, "Passenger Vehicle and Light Truck Tires from China:  Comments on CBP Information," dated November 23, 2021; and NBR's Letter, "Administrative Review of the Antidumping Duty Order on Passenger Vehicle And Light Truck Tires from the People's Republic of China - NBR Wheels and Tires, LLC Response to Commerce Request for Comments," dated November 23, 2021 (NBR's NFI Submission).

[14] *See* USW's Letter, "Passenger Vehicle and Light Truck Tires from China:  Rebuttal Comments on New Continent Submission," dated December 13, 2021; *see also* NBR's Letter, "Administrative Review of the Antidumping Duty Order on Passenger Vehicle And Light Truck Tires from the People's Republic of China - NBR Wheels and Tires, LLC Rebuttal Comments," dated December 13, 2021; New Continent's Letter, "Passenger Vehicle and Light Truck Tires from China:  Rebuttal Comments," dated December 13, 2021; and Hankook's Letter, "Passenger Vehicle and Light Truck Tires from China:  Rebuttal Comments," dated December 13, 2021.

**Appx0101**

untimely unsolicited new factual information, and as such, Commerce rejected the rebuttal comments and required that New Continent resubmit its rebuttal comments absent the untimely new factual information.[15]

On January 4, 2022, Commerce issued supplemental questionnaires to NBR and New Continent.[16] On January 11, 2022, NBR submitted a letter in lieu of a supplemental questionnaire response.[17] New Continent submitted its supplemental questionnaire response on January 24, 2022, which consisted of over 20 thousand pages of new factual information.[18] On January 28, 2022, Commerce placed a memorandum on the record regarding a discussion with CBP about prior disclosures.[19] CBP was able to acknowledge receipt of a prior disclosure package but was unable to comment on whether it has accepted, rejected, or is still investigating the information submitted by [

]. On February 2, 2022, USW submitted rebuttal comments on New Continent's supplemental questionnaire response.[20] On February 23, 2022, Commerce

---

[15] See Commerce's Letter, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Rejection of New Continent's Rebuttal Comments Submission Containing Untimely New Factual Information," dated December 21, 2021; see also Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Rejection Memo," dated December 21, 2021; and New Continent's Letter, "Resubmission of New Continent Rebuttal Comments: 2017-2018 Antidumping Duty Administrative Review of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China (Remand)," dated December 22, 2021 (New Continent's Rebuttal Comments).

[16] See Commerce's Letters, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Supplemental Questionnaire," dated January 4, 2022; and "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Supplemental Questionnaire," dated January 4, 2022 (January 4, 2022 Supplemental Questionnaire).

[17] See NBR's Letter, "NBR Wheels and Tires, LLC Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Supplemental Questionnaire," dated January 11, 2022 (January 11, 2022 Supplemental Questionnaire).

[18] See New Continent's Letter, "New Continent Supplemental Questionnaire Response: 2017-2018 Antidumping Duty Administrative Review of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China (Remand)," dated January 24, 2022 (New Continent's Supplemental Response).

[19] See Memorandum, "Passenger Vehicle and Light Truck Tires from People's Republic of China; Discussion with U.S. Customs and Border Protection (CBP)," dated January 28, 2022. A valid prior disclosure discloses the circumstances of a violation of 19 U.S.C. 1592 to CBP before, or without knowledge of, the commencement of a formal investigation of that violation by CBP and includes a tender of any actual loss of duties associated with the violation.

[20] See USW's Letter, "Passenger Vehicle and Light Truck Tires from China: Comments on CBP Information," dated February 2, 2022.

issued a second supplemental questionnaire to New Continent.[21]  On March 4, 2022, New

Continent submitted its response to the second supplemental questionnaire.[22]

## III.    ANALYSIS

As stated in the CBP Referral Memorandum, CBP identified inconsistencies in the sales

information reported by certain parties to Commerce and CBP.  Specifically, CBP compared the

questionnaire responses submitted by New Continent to Commerce in the 2017-2018

administrative review to CBP importation records and found that the values submitted to CBP

were approximately $2.6 million lower than the values that were submitted to Commerce.

Further, CBP received documentation that indicates an affiliation between [    ] and Comforser,

which would result in [    ] being affiliated with New Continent.

### Issue 1:  Whether New Continent Reported Accurate Sales Prices during the 2017-2018 Administrative Review

According to the CBP Referral Memorandum, certain entries covering New Continent's

passenger tires had undervalued import values of approximately $2.6 million.[23]  Throughout this

remand, New Continent claimed that its affiliated importer, Comforser, submitted [

].[24]  In addition, New Continent and NBR each claimed that NBR also submitted a

[                                                              ].[25]

In New Continent's NFI Submission, New Continent provided [                              ].

---

[21] See Commerce's Letter, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Second Supplemental Questionnaire," dated February 23, 2022.
[22] See New Continent's Letter, "New Continent Second Supplemental Questionnaire Response:  2017-2018 Antidumping Duty Administrative Review of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China (Remand)," dated March 4, 2022 (New Continent's Second Supplemental Response).
[23] See CBP Referral Memorandum at Attachment 2.
[24] See New Continent's NFI Submission at 11 and Exhibits 2-3.
[25] Id. at 15; see also NBR's NFI Submission at 2.

5

It claimed that [ ][26] [

][27] [

]. New Continent has claimed that [

].[28] New Continent maintains that [ ][29] [

].[30]

[ ] correspond with the information in CBP's referral letter and presents [

]. In addition, [ ] brings into question whether New Continent [

].

However, New Continent claimed that [

].[31] Furthermore, New Continent claimed [

].[32]

New Continent also explains [

---

[26] *See* New Continent's NFI Submission at Exhibit 10.
[27] [ ].
[28] *See* New Continent's NFI Submission at 29.
[29] *Id*. at Exhibit 19
[30] *See* New Continent's Supplemental Response at 14 and 16.
[31] *See* New Continent's NFI Submission at 29; *see also* New Continent's Supplemental Response at 9, 11-12, and 14.
[32] *See* New Continent's Rebuttal Comments at 7.

].[33]  New Continent claimed that when preparing the section C database, it was unable to directly match the payment amount with its invoice.  As such, New Continent and [          ] personnel worked together to reconcile payments to invoices.[34]  However, when preparing the section C database, New Continent maintains that its manager mistakenly used [          ] invoice numbers instead of New Continent's own.[35]  New Continent claimed the other information regarding those invoices in question was correct.[36]  New Continent also claimed it accurately reported EP and CEP sales by stating that the reconciliation submitted in the underlying review shows that New Continent accurately reported EP sales and the free on board sales price paid by Comforser to New Continent for CEP sales.[37]  Furthermore, New Continent claimed [



],[38] and that [



].[39]

For purposes of this remand, Commerce focused on the accuracy of [

], and whether that information is consistent with the data provided by New Continent during the review, rather than [

].  We have analyzed the [

---

[33] See New Continent's Second Supplemental Response at 1-5.
[34] Id. at 4.
[35] Id.
[36] Id.
[37] See New Continent's NFI Submission at 9 and Exhibit 5.
[38] Id. at 29; see also New Continent's Supplemental Response at 8.
[39] See New Continent's NFI Submission at 29; see also New Continent's Rebuttal Comments at 10-12; and New Continent's Supplemental Response at Exhibit 1.

] submitted by New Continent for [                    ] identified

in the CBP Referral.[40]  We were able to tie the payment amounts to the U.S. sales value reported

by New Continent in its U.S. sales database from the underlying review as well as New

Continent's financial statements [                    ].[41]  More specifically, we compared

the prices and quantities of the invoices under question to those same invoices in the section C

database and were able to fully match the values.[42]  New Continent's matching prices and

quantities support its claim that [

                    ][43] and that its manager mistakenly used [          ]

invoice numbers instead of its own.[44]  In addition, Commerce analyzed information regarding

whether New Continent accurately reported EP and CEP sales.  More specifically, Commerce

reviewed New Continent's [                    ], the reconciliation documents, and the

second declaration of [          ], sales manager of New Continent,[45] and determined that

New Continent accurately reported its EP and CEP sales.  Therefore, record evidence indicates

that New Continent and Comforser accurately reported information in the underlying review.

**Issue 2:  Whether New Continent is Affiliated with [                    ]**

We note that according to the CBP Referral Memorandum, [

---

[40] *See* New Continent's NFI Submission at Exhibit 19; *see also* New Continent's Supplemental Response at Exhibit S-9; and New Continent's Second Supplemental Response at Exhibit SS-2.
[41] [

                    ].
[42] *See* Memorandum, "Administrative Review of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Analysis Memorandum for Shandong New Continent Tire Co., Ltd.," dated April 15, 2020, and accompanying data.
[43] *See* New Continent's Rebuttal Comments at 7.
[44] *See* New Continent's Second Supplemental Response at 4.
[45] *Id.* at Exhibit S-1.

8

].[46]  In addition, [

].[47]  Furthermore, [

].[48]  New Continent has acknowledged that for certain entries, [

].[49]  New Continent also claimed this [

].[50]  Furthermore, New Continent claimed [

].[51]  Because Comforser was charged with facilitating New Continent sales of passenger tires to the United States, New Continent maintains that Comforser had no reason to refuse the request by [

].[52]  In addition, New Continent claimed they have multiple other customers other than [    ], and [    ] has the right to purchase passenger tires from multiple vendors other than New Continent.[53]  The [

] submitted by [        ] indicate that [

].[54]  In addition, documentation

---

[46] *See* CBP Referral Memorandum at Attachment 2.
[47] *Id*.
[48] *Id*.
[49] *See* New Continent's NFI Submission at 3.
[50] *Id*.
[51] *Id*. at 22.
[52] *Id*. at 16-17.
[53] *Id*. at 5.
[54] *Id*. at Exhibit 10.

9

supports [

].[55]  However, New Continent claimed that [

][56] and provided the same reasons as above with [    ] as to why New

Continent/Comforser and [          ] do not meet any of the criteria for affiliation.[57]

Commerce analyzed the comments and documentation submitted by interested parties on

the record of this remand proceeding, and the evidence does not support a finding that either [

] are affiliated with New Continent pursuant to section 771(33) of the Tariff Act of

1930, as amended (the Act) or 19 CFR 351.102(b)(3).[58]  New Continent provided sufficient

documentation on this record to support its claim that none of the criteria for affiliation are met

between New Continent and [                    ].[59]  More specifically, Commerce analyzed

declarations and information from [                        ] and determined that New

Continent does not share any directors, officers, or employees with [                ], nor do

New Continent's owners have any members of family that are involved in [                ]

operations.[60]  In addition, none of the companies own any stock in each other, have a close

supplier relationship, participate in any franchise or joint venture agreements and debt financing,

and have not entered into an agreement restricting any of the companies' right to buy and sell

---

[55] *Id.* at Exhibit 16b.
[56] *Id.* at 3.
[57] *See* New Continent's Supplemental Response at 13-14 and Exhibit S-1.
[58] Section 771(33) of the Act states that the following persons shall be considered to be "affiliated" or "affiliated persons" as:  (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; (B) Any officer or director of an organization and such organization; (C) Partners; (D) Employer and employee; (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization; (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; or (G) Any person who controls any other person and such other person.  For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.
[59] *See* New Continent's NFI Submission at 16-17, 21-22, and Exhibit 14; *see also* New Continent's Supplemental Response at 13-14 and Exhibit S-1
[60] *Id.*; *see also* 19 CFR 351.102(b)(3); and section 771(33) of the Act.

from other companies.[61]  As a result, Commerce finds that control, within the meaning of

771(33) of the Act and 19 CFR 351.102(b)(3), does not exist.  In addition, the record does not

indicate that there are relationships that have the potential to impact decisions concerning the

production, pricing, or cost of the subject merchandise or foreign like product.

## IV.   COMMENTS ON DRAFT RESULTS OF REDETERMINATION

On March 30, 2022, Commerce released the draft results of redetermination to all

interested parties, and invited parties to comment.[62]  On April 6, 2022, New Continent and

USW filed comments on the Draft Results,[63] which Commerce addresses below.

*New Continent's Comments*

- Commerce's decision is supported by extensive documentation submitted by New
  Continent.[64]
- Because Commerce's draft analysis is supported by substantial evidence and in
  accordance with law, Commerce should affirm this decision.[65]

**Issue 1:  Whether New Continent Reported Accurate Sales Prices during the 2017-2018
Administrative Review**

*USW's Comments*

- New Continent has submitted untrustworthy information and fabricated documentation
  to Commerce.  As such, Commerce should apply adverse facts available (AFA) so that
  New Continent does not benefit from its decision to deceive rather than fully
  cooperate with Commerce.[66]
- New Continent [

                                                                                        ].[67]  For
  example, New Continent claimed [

---

[61] *Id.*

[62] *See* Draft Results of Remand Redetermination, *Pirelli Tyre Co., Ltd., et al v. United States*, Court No. 20-00115, Slip Op. 21-122, dated March 30, 2022 (Draft Results).

[63] *See* New Continent's Letter, "Shandong New Continent's Comments on Draft Results of Redetermination:  2017-2018 Antidumping Duty Administrative Review of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China (Remand)," dated April 6, 2022 (New Continent's Draft Remand Comments); *see also* USW's Letter, "Passenger Vehicle and Light Truck Tires from China:  Comments on CBP Information," dated April 6, 2022 (USW's Draft Remand Comments).

[64] *See* New Continent's Draft Remand Comments at 1.

[65] *Id.* at 1-2.

[66] *See* USW's Draft Remand Comments at 4.

[67] *Id.* at 10.

].[68]

In other words, [

].[69]  Thus, Commerce can have no reasonable confidence in these documents as [

].[70]

- New Continent claims that it maintains and stores documents electronically in excel and that it takes steps to ensure that finalized invoices are not modified and that they did not change invoices after the fact.[71]  However, [

].[72]  In other similar instances where Commerce has found documentation to have been manipulated, it has rejected that type of documentation.[73]  In addition no verification occurred during this review and Commerce has not at any point independently reviewed New Continent's record systems.  Thus, Commerce is wholly dependent on New Continent's submission.

- New Continent's [

] and were submitted contrary to Commerce's instructions.[74]  For example, when questioned [

], New Continent claimed the invoice it had submitted was not the final version but an offer during the negotiations.  However, the documents are [

]  Furthermore, New Continent failed to mention any "negotiation" invoices during this review until attempting to [

].  New Continent instead reported that its "commercial invoice will reflect the final terms of each sale" and "the price and quantity are subject to change until the date the invoice is issued to the customer."[75]

- New Continent's payment information [

---

[68] *Id.* at 10-11.

[69] *Id.* at 11 and 12.

[70] *Id.* at 11.

[71] *Id.* at 7.

[72] *Id.* at 13.

[73] *Id.* at 14-15 (citing *Certain Hardwood Plywood Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 84 FR 65783 (November 29, 2019) (*Hardwood Plywood Circumvention*)).

[74] *Id.* at 7.

[75] *Id.* at 9.

].[76]  In addition, [

].[77]

- New Continent's claims of [

].[78]  New Continent now claims [

] that is, according to New Continent, different from New Continent's "normal nomenclature" [                                        ]. But according to New Continent's section C response, [

].[79]  The Court has explained in *Changbao Steel* that Commerce properly rejects such last-minute attempts to change the record, stating, "the inference that a respondent's failure to disclose willful deception until faced with contradictory evidence implicates the reliability of that respondent's remaining representations is reasonable,"[80] and agreeing that in such cases Commerce should reject a respondent's submissions in full as none could be verified or used without undue difficulties.[81]
- The Court has held that Commerce is not required to accept unsupported explanations offered by a respondent for why its reporting to Commerce is inconsistent with information that has been supplied to CBP.  In such a case, the Court agreed that "it was appropriate for Commerce to skeptically consider {the} explanation because it was only provided after Commerce discovered the entry document inconsistencies, through its own investigation."[82]  The Court agreed that the legal standards to apply AFA are met "where a respondent purposefully withholds, and provides misleading, information" in this way and cannot "credibly explain the inconsistencies" between entry documentation and information supplied to Commerce.[83]

**Commerce's Position:**  As detailed below, Commerce is not persuaded by the petitioner's arguments that New Continent submitted unreliable information and fabricated U.S. sales information to Commerce during the underlying administrative review.  The petitioner is

---

[76] *Id.* at 18-19.
[77] *Id.* at 19.
[78] *Id.* at 23.
[79] *Id.* at 22.
[80] *Id.* (citing *Jiangsu Changbao Steel Tube Co. v. United States*, 36 CIT 1431, 1442-44 (2012) (*Changbao Steel*)).
[81] *Id.*
[82] *Id.* at 25 (citing *Shanghai Taoen Int'l Co. v. United States*, 29 CIT 189, 195 (2005)).
[83] *Id.*

13

correct that New Continent's counsel [                                    ] on the record of this

remand.  Given that the basis of this remand was to address the significant differences

between U.S. prices reported to CBP at time of entry and those reported by New Continent to

Commerce during the administrative review,[84] it is not surprising that there are [

                ] on the record of this remand, as discussed below.  However, the fact that there are

[                        ] on the record of this remand is not *prima facie* evidence that New

Continent submitted unreliable U.S. sales information and fabricated documentation to

Commerce during the underlying administrative review.

    As noted above, New Continent maintains that the [                    ] were

those submitted to CBP [        ] at the time of entry.  Theses [          ] were not on the

record of the underlying review and the U.S. sales values of these [        ] do not

correspond with the relevant U.S. sales values reported to Commerce during the underlying

review.  During the instant remand, New Continent stated that its counsel obtained them from

[      ] and maintained that it had no knowledge of the first set of invoices stating that [

                                ]" and that

"[

                ]."[85]  Commerce issued a questionnaire asking [

                ].[86]  NBR did not respond to our questionnaire.[87]  While New Continent's

claim that [    ] provided the [                ] at time of entry is not fully supported by

---

[84] *See* CBP Referral Memorandum at 1.
[85] *See* New Continent NFI Submission at 29.
[86] *See* January 4, 2022 Supplemental Questionnaire.
[87] *See* January 11, 2022 Supplemental Questionnaire.

information on the record, [    ] did not avail itself of the opportunity address or rebut New

Continent's claim.  Accordingly, the record of this remand does not establish which party

created or prepared the [                         ].

Nevertheless, the [                              ] is not the focus of

this remand proceeding.  As stated above, Commerce focused on whether documentation in

[                                              ],[88] supported the accuracy

of the U.S. sales information that New Continent reported to Commerce in the underlying

administrative review.  In doing so, Commerce compared the prices and quantities reported in

the section C database in the underlying review to the prices and quantities of the [

] and was able to fully match the U.S. sales values.[89]  In its case brief, the

petitioner continued to argue that there are inconsistencies between the [        ] submitted

by New Continent in the underlying review and those in the [                        ]

submitted by New Continent on the record of this remand.  We note that [                   ]

were submitted by New Continent to Commerce during the administrative review record and

this remand proceeding.  These [          ] are [

].[90]  The U.S. sales price and quantity shown on [                  ] on each

record are identical (*i.e.*, $[          ] pcs).  The respective U.S sales values and quantities

shown on [                                       ] are also identical.  Thus,

we disagree with the petitioner that there are inconsistencies among the [        ] submitted

in the administrative review record and this remand proceeding, and as a result, Commerce

---

[88] *See* Draft Results at 7.
[89] *Id*. at 8.
[90] *See* New Continent's Letter, "Supplemental Questionnaire Responses for Shandong New Continent Tire Co., Ltd.: Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China; 2017-18 AD Administrative Review," dated August 27, 2019, at Exhibit SC-1 and SC-2; *see also* New Continent's Supplemental Response at Exhibit S-9.

**Appx0113**

continues to determine that New Continent reported accurate U.S. sales information during

the underlying administrative review.  As noted above, we utilized the [          ] and

supporting documentation submitted in the [                    ] during of this remand

proceeding to substantiate the U.S sales information submitted by New Continent during the

underlying administrative review.  We have continued to rely on the U.S. sales information

submitted by New Continent during the underlying administrative review as the basis of its

weighted-average AD margin.

     Although the petitioner relies on *Hardwood Plywood Circumvention*, we find that

Commerce's determinations regarding the reliability of information submitted during that

circumvention proceeding are not probative, as the final affirmative circumvention

determination was appealed, and amended on remand based on additional information

submitted during the remand proceeding pursuant to the CIT's remand order.[91]  Furthermore,

the petitioner's reliance on *Brake Rotors from China* is also misplaced.[92]  In *Brake Rotors*

*from China*, the respondents provided re-created and altered documents at verification to

conceal its actual sales as well as supplier and production arrangements.  Unlike the situation

in *Brake Rotors from China*, New Continent reported accurate sales information and provided

Commerce with all requested information during the underlying administrative review.

     The petitioner is correct that certain invoice numbers in New Continent's section C

database were numbered with the nomenclature [        ], rather than following New

Continent's normal nomenclature [              ].  In addition, the petitioner contends that

---

[91] *See Certain Hardwood Plywood Products from the People's Republic of China:  Notice of Court Decision Not in Harmony With Final Circumvention Determination and Notice of Amended Final Circumvention Determination Pursuant to Court Decision*, 86 FR 43187 (July 31, 2021).

[92] *See Brake Rotors from the People's Republic of China:  Final Results and Partial Rescission of the 2004/2005 Administrative Review and Notice of Rescission of 2004/2005 New Shipper Review*, 71 FR 66304 (November 14, 2006), and accompanying IDM at Comment 10.

16

**Appx0114**

[

                                          ].  However, New Continent provided sufficient information,

discussed below, to support its claim that it was not aware of the incorrect information in the

[                                    ] and that it takes steps to ensure finalized invoices are not

modified after issuance.  Additionally, the petitioner has not identified any evidence on the

record to demonstrate that [

                                          ].

    New Continent claims that when New Continent received payment, it was unable to

directly match the payment amounts with its invoice.  As such, New Continent and

[          ] personnel worked together to reconcile payments to the appropriate invoice by

using an invoice list to conduct the check, and they were able to confirm that invoices

included the same merchandise sold and that the correct amounts were paid.[93]  New Continent

claims that when preparing the section C database, New Continent's manager mistakenly used

the invoice nomenclature [        ] rather than [                    ].[94]  New Continent's

explanation of how invoice numbers [        ] were present in the section C database

corresponds to New Continent's explanation of the steps it takes to ensure finalized invoices

are not modified after issuance, which is described further below.

    New Continent explained that each of New Continent's sales were associated with an

with an "Inventory Out Bill" that has a unique Inventory Out Bill number and bill of lading

number.[95]  Once the information was entered into the sales system, the sales manager creates

---

[93] *See* New Continent's Second Supplemental Response at 4.
[94] *Id*.
[95] *Id*. at 7; *see also* New Continent's Letter, "Supplemental Questionnaire Responses for Shandong New Continent Tire Co., Ltd.:  Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China; 2017-18 AD Administrative Review, dated August 27, 2019, at Exhibit SC-2.

a commercial invoice in Excel using the quantity, value, and product code data downloaded directly from the sales system associated with the corresponding Inventory Out Bill, while the commercial invoice number is manually added to this data.[96]  In other words, once the quantity and value of the product sold is entered in the sales system and an Inventory Out Bill is generated, the material information does not change.  Furthermore, as discussed above, New Continent submitted [                    ] that are on both the administrative review record and the record of this remand.  The U.S. sales price and quantity of these [                    ] match identically.  As a result, these [            ] support New Continent's claim that although its sales manager may make errors when preparing commercial invoices, the clerical errors have no material impact on the quantity and value of the reported sales.  Moreover, this also supports New Continent's claim that while electronic versions of its sales documents cannot be reproduced exactly, the differences between the reproduced documents for this remand and the documents submitted during the administrative review are superficial.  New Continent is an experienced exporter having participated in the underlying administrative review as a mandatory respondent.  We note that in an ongoing administrative review or investigation, we would expect an experienced exporter like New Continent to provide original sales documentation, as it did during the underlying administrative review.  However, New Continent was not aware of the CBP Referral until May 2021, nor involved in litigation for this administrative review until September 2021.  Thus, we are not persuaded by the petitioner's claim that New Continent would have known that "Commerce would call upon it in a review to produce information such as original copies of invoices," because it is unclear how New Continent could have anticipated that Commerce would request for a remand to

---

[96] *See* New Continent's Second Supplemental Response at 7.

**Appx0116**

reexamine its U.S. sales information some seventeen months after previously uncontested

final results, or that the Court would grant that request.  Therefore, we find there is no

evidentiary basis to conclude that the quantity and value information in the [

] have been modified.

   As stated in the Draft Results, we analyzed the [


]⁹⁷ submitted by New Continent for [                          ] identified in the CBP

Referral.⁹⁸  Due to this analysis, we were able to tie the individual payment amounts to the U.S.

sales value reported by New Continent in its U.S. sales database from the underlying review as

well as New Continent's financial statements [                          ].⁹⁹  In other words,

Commerce was able to tie the payments for [          ]¹⁰⁰ of the [          ] identified in the

CBP Referral, which is sufficient documentation that New Continent received full payment of

the values reported to Commerce as sales.  Therefore, based on the information on the record, we

continue to determine that New Continent accurately reported its U.S. sales information to

Commerce during the 2017-2018 administrative review.  As a result, we find that there is no

basis to rely on facts available pursuant to section 776(a) of the Act.¹⁰¹  In particular, we find that

the U.S. sales information submitted by New Continent during the underlying administrative

---

⁹⁷ *See* New Continent's NFI Submission at Exhibit 19; *see also* New Continent's Supplemental Response at Exhibit
S-9.
⁹⁸ *See* Draft Results at 8.
⁹⁹ *Id*.
¹⁰⁰ [

                                                                    ].
¹⁰¹ Under section 776(a) of the Act, Commerce will rely on facts available if:  (1) necessary information is not
available on the record; or (2) an interested party or any other person:  (A) withholds information that has been
requested by the administering authority or the Commission under this title; (B) fails to provide such information by
the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1)
and (e) of section 782 of the Act; (C) significantly impedes a proceeding under this title; or (D) provides such
information but the information cannot be verified as provided in section 782(i) of the Act.

19

review is verifiable.  Standard verification practice is to conduct a "sales trace," which is to trace information found in commercial invoices, packing slips, purchase orders, shipment documents, and payment documents (*i.e.*, bank payment slips) to the U.S. sales database submitted by a respondent, as well as to that respondent's financial statements.  As noted above, we conducted a similar exercise here and we were able to tie the individual payment amounts to the U.S. sales value reported by New Continent in its U.S. sales database from the underlying review as well as New Continent's financial statements for nearly [     ] U.S. sales.  To provide some context, in a typical verification, Commerce may conduct five to ten U.S. sales traces.  Thus, while Commerce did not conduct a verification *per se* of New Continent in the underlying review or this remand proceeding, it has thoroughly analyzed the documentation and traced the information for the nearly [     ] U.S. sales at issue in the CBP Referral.

Contrary to the petitioner's claims, Commerce is not relying on [

] for certain entries made during the POR to calculate the weighted-average dumping margin for New Continent.  The documentation provided to CBP is relevant insofar as it is the basis for the CBP Referral and raised concerns as to whether New Continent had accurately reported its sales information during the underlying review.  As a result, on remand, we solicited information from New Continent to evaluate whether its prior reporting was accurate, and our determination here is based on the totality of the information available on the administrative record.  We are continuing to rely on the U.S. sales information submitted by New Continent to Commerce during the underlying administrative review.[102]  In so doing, we are finding only that the information provided to Commerce during the underlying

---

[102] *See* New Continent's Letter, "Section C&D Responses for Shandong New Continent Tire Co., Ltd.:  Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China; 2017-18 AD Administrative Review," dated April 22, 2019.

review is accurate and reliable.  The record does not address, and our findings here do not reach, the provenance of the [                                                    ] or their reliability. The record of this proceeding shows that New Continent and its affiliated U.S. importer, Comforser, submitted a Prior Disclosure to CBP advising that "[

]"[103]  Comforser

[

]."[104]  As noted above, [    ] also claimed to have submitted a Prior Disclosure to CBP but did not submit the relevant documentation on the record.  The instant record is silent as to whether CBP has accepted, rejected, or is still investigating the information.

The petitioner's reliance on *Shanghai Taoen* is misplaced.[105]  Here, unlike *Shanghai Taoen*,[106] the difference between the U.S. prices reported to Commerce during the underlying administrative review and the U.S. prices reported to CBP at the time of entry were identified by CBP rather than Commerce.  Moreover, here we find that existence of invoices submitted to CBP does not in itself demonstrate that New Continent withheld "information necessary to accurately calculate {the} antidumping margin"; we have traced the sales information for nearly

---

[103] *See* New Continent's NFI Submission at Exhibit 2.
[104] *Id.* at Exhibit 3a.
[105] *See* USW's Draft Remand Comments at 25.
[106] *See Shanghai Taoen Int'l Co. v. United States*, 29 CIT 189, 195 (2005).

**Appx0119**

[   ] sales and on the basis of this analysis continue to find that U.S. sales price information reported to Commerce by New Continent during the underlying review to be accurate.

As there is no basis to resort to facts available pursuant to section 776(a) of the Act, the question of whether to apply adverse inferences in selecting from the facts available is moot.[107]  As a result, Commerce is not applying adverse facts available to New Continent and will continue to rely on New Continent's reported sales and cost information to calculate its weighted-average dumping margin for these final results of redetermination.

**Issue 2:  Whether New Continent is Intertwined with [               ]**

*USW's Comments*

- Commerce should also apply AFA and reject New Continent's claims not to [                                        ].  Commerce cannot rely on information and documentation submitted by New Continent and, thus, should apply AFA in determining a margin for New Continent.  Commerce should also apply AFA and reject claims and documentation New Continent submitted in support of its separate rate application, where the applicant additionally had the burden of overcoming a presumption of government control, and should find that New Continent is part of the China-wide entity.[108]

**Commerce's Position:**  We note that the petitioner did not argue that New Continent is affiliated with [                        ] pursuant to section 771(33) of the Act.  Rather, it argued that New Continent [                                        ].  As stated in the Draft Results, New Continent provided sufficient documentation to support its claim that none of the criteria for affiliation are met between New Continent and [                ].[109] Commerce analyzed declarations from [                                ].[110]

---

[107] Under section 776(b) of the Act, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from Commerce, Commerce may, in reaching the applicable determination under this title, use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.

[108] *Id*. at 26-27.

[109] *See* Draft Remand at 10.

[110] *See* New Continent's NFI Submission at Exhibit 14; *see also* New Continent's Supplemental Response at Exhibit S-1.

These declarations state that [                    ] are affiliated with New Continent and outline the specific criteria for affiliation, which [                ] do not meet.  More specifically, we note that the [

] for Comforser to act as an importer of record does not satisfy any criteria for affiliation under section 771(33) of the Act.  In addition, while the petitioner is correct that [

].[111]  However, New Continent states in their response as well as in [

] declaration that New Continent/Comforser did not [

] and, thus, did not provide [

].[112]  The record evidence does not contradict New Continent's claim statement that this [                        ].  Commerce also analyzed [

], which also shows that [              ] are not affiliated with New Continent.[113]

Therefore, based on the information on the record, we continue to determine that affiliation, within the meaning of 771(33) of the Act and 19 CFR 351.102(b)(3), does not exist between New Continent and [              ].  In addition, the record does not include evidence of relationships between these companies that have the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.

---

[111] *See* New Continent's NFI Submission at 3; *see also* New Continent's Supplemental Response at Exhibit 16b.
[112] *See* New Continent's Supplemental Response at 12-13 and Exhibit S-1.
[113] *See* New Continent's NFI Submission at Exhibit 19; *see also* New Continent's Supplemental Response at Exhibit S-9.

Finally, there is no information on the record which calls into question New Continent's separate rate status.

## I.        FINAL RESULTS OF REDETERMINATION

In accordance with the *Passenger Tires Remand Order*, we have further examined the information on the record as well as the information submitted by interested parties, and continue to find that New Continent accurately reported its sales information during the 2017-2018 administrative review.  As such, Commerce will not adjust the weighted-average dumping margin for New Continent or the rate assigned to the non-individually examined respondents eligible for a separate rate, for which New Continent's margin served as the basis.  Furthermore, Commerce continues to find that New Continent's U.S. customers, [

], are not affiliated with New Continent.

4/26/2022

X  _____

Signed by: LISA WANG
_____

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

Slip Op. 21-122

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **PIRELLI TYRE CO., LTD., PIRELLI TYRE S.P.A., and PIRELLI TIRE LLC,**<br><br>    **Plaintiffs,**<br><br>v.<br><br>**UNITED STATES,**<br><br>    **Defendant,**<br><br>**and**<br><br>**THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,**<br><br>    **Defendant-Intervenor.** | Before: Jennifer Choe-Groves, Judge<br><br>Court No. 20-00115 |

## OPINION AND ORDER

[Granting Defendant's Motion to Lift the Stay and Voluntarily Remand to the Department of Commerce and granting the Partial Consent Motion to Intervene as of Right as Plaintiff-Intervenor and Respond to Defendant's Motion to Lift the Stay and Voluntarily Remand to the Department of Commerce.]

Dated: September 20, 2021

Daniel L. Porter and Ana Amador, Curtis Mallet-Prevost, Colt & Mosle LLP, of

Washington, D.C., for Plaintiffs Pirelli Tyre Co., Ltd., Pirelli Tyre S.p.A., and
Pirelli Tire LLC.

Ashley Akers, Trial Attorney, and Patricia M. McCarthy, Assistant Director,
Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of
Washington, D.C., for Defendant United States.  With them on the brief were
Brian M. Boynton, Acting Assistant Attorney General, and Jeanne E. Davidson,
Director.  Of counsel on the brief was Ayat Mujais, Attorney, Office of the Chief
Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Roger B. Schagrin, Geert De Prest, and Nicholas J. Birch, Schagrin Associates, of
Washington, D.C., for Defendant-Intervenor the United Steel, Paper and Forestry,
Rubber, Manufacturing, Energy, Allied Industrial and Service Workers
International Union, AFL-CIO, CLC.

Choe-Groves, Judge:  This action concerns the results of the U.S.

Department of Commerce ("Commerce") in the antidumping administrative review

of certain passenger vehicle and light truck tires from the People's Republic of

China ("China") for the period of August 1, 2017 through July 31, 2018.  Compl.

at 1, ECF No. 6.  Plaintiffs Pirelli Tyre Co., Ltd., Pirelli Tyre S.p.A., and Pirelli

Tire LLC (collectively, "Plaintiffs" or "Pirelli") filed this action pursuant to 28

U.S.C. § 1581(c) contesting Commerce's final results in Certain Passenger Vehicle

and Light Truck Tires from the People's Republic of China ("Final Results"), 85

Fed. Reg. 22,396 (Dep't of Commerce Apr. 22, 2020) (final results of antidumping

duty admin. review; 2017–2018).  See id.  Plaintiffs bring this suit to challenge

(1) whether Commerce had statutory authority to issue a China-wide entity rate,

(2) whether Commerce properly applied the applicable legal criteria for analyzing

Plaintiffs' separate rate eligibility, and (3) Commerce's conclusion that Plaintiffs were controlled by the Chinese government through Chem China's ownership. See id. at 5–7.

Defendant United States ("Defendant") filed Defendant's Motion to Lift the Stay and Voluntarily Remand to the Department of Commerce, ECF No. 29 ("Defendant's Motion" or "Def.'s Mot."). Defendant-Intervenor United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("Defendant-Intervenor") supports Defendant's request to lift the stay and remand. Def.-Interv.'s Resp. Mot. Lift Stay & Voluntarily Remand at 1, ECF No. 35 ("Def.-Interv.'s Resp."). Plaintiffs support Defendant's request to lift the stay and oppose Defendant's request for remand. Pls.' Opp'n Def.'s Mot. Voluntary Remand at 1–2, ECF No. 30 ("Pls.' Resp."). Shandong New Continent Tire Co., Ltd. ("SNC") filed a Partial Consent Motion to Intervene as of Right as Plaintiff-Intervenor and Respond to Defendant's Motion to Lift the Stay and Voluntarily Remand to the Department of Commerce, ECF No. 31 ("Motion to Intervene" and "Mot. Intervene"). Plaintiffs consent to SNC's Motion to Intervene. Mot. Intervene at 3. Defendant-Intervenor opposes SNC's Motion to Intervene. Def.-Interv.'s Opp'n Shandong New Continent's Mot. Intervene at 1, ECF No. 36 ("Def.-Interv.'s Opp'n Mot. Intervene"). For the

following reasons, the Court grants Defendant's Motion and grants SNC's Motion
to Intervene.

## BACKGROUND

Plaintiffs filed their complaint on May 21, 2020.  Before dispositive motions
were filed, Plaintiffs filed an Unopposed Motion to Stay Proceedings, ECF No. 23
("Motion to Stay"), on July 27, 2020.  Defendant consented to Plaintiffs' request to
stay the proceedings until a final decision was rendered in the appeal of <u>China
Manufacturers Alliance, LLC v. United States</u> ("<u>China Manufacturers</u>"), 43 CIT
__, 357 F. Supp. 3d 1364 (2019).  This Court granted the Motion to Stay on
August 6, 2020.  <u>See</u> Order, ECF No. 25.  The U.S. Court of Appeals for the
Federal Circuit issued a decision on June 10, 2021 reversing and remanding <u>China
Manufacturers</u>.  <u>See</u> <u>China Mfrs. All., LLC v. United States</u>, 1 F.4th 1028 (Fed.
Cir. 2021).  A mandate was issued on August 2, 2021, after which Defendant filed
its motion requesting that the Court lift the stay.

## JURISDICTION

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28
U.S.C. § 1581(c), which grant the Court authority to review actions contesting the
final results of an administrative review of an antidumping duty order.

## DISCUSSION

### I.      Lifting the Stay of Proceedings

Defendant's Motion seeks to lift the stay in this action.  <u>See</u> Def.'s Mot. at 4;

<u>see also</u> Order, ECF No. 25.  Plaintiffs and Defendant-Intervenor do not oppose

lifting the stay.  <u>See</u> Pls.' Resp. at 1–2; Def.-Interv.'s Resp. at 7–8.

In light of the U.S. Court of Appeals for the Federal Circuit's decision and

mandate in <u>China Manufacturers Alliance, LLC v. United States</u>, 1 F.4th 1028

(Fed. Cir. 2021), this Court concludes that the stay ordered in Order, ECF No. 25,

is no longer necessary.  The Court grants Defendant's Motion and lifts the stay in

this action.

### II.     Defendant's Request for Remand

Defendant's Motion also seeks a remand to consider new information

regarding SNC's invoices allegedly showing inaccuracies in SNC's reported sales

prices on imports of passenger vehicles and light truck tires from China during the

period of review and significant undervaluation by affiliated companies.  Def.'s

Mot. at 1–2.  Defendant explains in its motion that SNC was the sole mandatory

respondent and received a calculated zero rate, which served as the basis for the

rate assigned to companies eligible for a separate rate.  <u>Id.</u>  Plaintiffs oppose

Defendant's Motion, arguing that SNC's calculated rate is irrelevant and "the

remand request has absolutely nothing to do with Pirelli."  Pls.' Resp. at 2.

Defendant-Intervenor consents to Defendant's Motion.  See Def.-Interv.'s Resp. at

1.

 The Court has considerable discretion in deciding whether to grant a request

by the Government for remand.  See SKF USA, Inc. v. United States, 254 F.3d

1022, 1029 (Fed. Cir. 2001); Home Prods. Int'l, Inc. v. United States, 633 F.3d

1369, 1378 (Fed. Cir. 2011).  If the agency's concern is substantial and legitimate,

a remand may be appropriate.  SKF, 254 F.3d at 1029.  This Court has concluded

that an agency's concern is substantial and legitimate if: (1) the agency has

provided a compelling justification for its remand request, (2) the need for finality

does not outweigh the agency's justification, and (3) the scope of the remand

request is appropriate.  See, e.g., Sea Shepherd N.Z. v. United States, 44 CIT __,

__, 469 F. Supp. 3d 1330, 1335–36 (2020) (quoting Shakeproof Assembly

Components Div. of Ill. Tool Works, Inc. v. United States, 29 CIT 1516, 1522–26,

412 F. Supp. 3d 1330, 1336–39 (2005)).

 Remand is warranted when Commerce establishes an interest in protecting

the integrity of its proceedings, particularly when the agency's determination may

have been tainted by fraud.  See Tokyo Kikai Seisakusho, Ltd. v. United States,

529 F.3d 1352, 1361–62 (Fed. Cir. 2008).  An agency "possesses inherent

authority to protect the integrity of its yearly administrative review decisions, and

to reconsider such decisions on proper notice and within a reasonable time after

learning of information indicating that the decision may have been tainted by fraud." Id.; see also Ad Hoc Shrimp Trade Action Comm. v. United States, 37 CIT 67, 71, 882 F. Supp. 2d 1337, 1381 (2013) (stating that the need for finality does not outweigh a justification seeking to protect an administrative proceeding from fraud or material inaccuracy). Commerce may not reopen an administrative proceeding while an appeal is pending before this Court until the case has been remanded. See Home Prods. Int'l, 633 F.3d at 1377. The U.S. Court of Appeals for the Federal Circuit has held that it was an abuse of discretion to decline to remand a case to allow Commerce to consider reopening proceedings when presented with clear and convincing evidence of fraud, particularly in light of Commerce's inability to reopen a proceeding while an appeal is pending and Commerce's inherent authority to reopen a case to consider new evidence that its proceedings were tainted by fraud. See id.

Defendant seeks a remand based on new information that U.S. Customs and Border Protection provided to Commerce, including inaccuracies in the reported sales prices on imports of passenger vehicles and light truck tires from China during the 2017–2018 period of review, and potential fraud based on significant undervaluation by affiliated companies of approximately $2.6 million lower than values submitted to Commerce. See Def.'s Mot. at 2. The Court notes that while this action is pending, Commerce is unable to reopen the administrative

proceedings to consider evidence of inaccuracies and potential fraud absent a

remand order from the Court.  Because Defendant's remand request is based on

alleged inaccuracies and potential fraud, and the Government has a substantial and

legitimate interest in protecting the integrity of its proceedings from fraud, the

Court concludes that Defendant has provided a compelling justification for its

remand request.

The Court considers whether the scope of Defendant's remand request is

appropriate.  The scope of any litigation is confined to the issues raised in a

plaintiff's complaint.  See Zhaoqing Tifo New Fibre Co. v. United States, 41 CIT

__, __, 256 F. Supp. 3d 1314, 1327 (2017) (citing Vinson v. Washington Gas Light

Co., 321 U.S. 489, 498 (1944)).  Plaintiffs' complaint challenges (1) whether

Commerce had statutory authority to issue a China-wide entity rate, (2) whether

Commerce properly applied the applicable legal criteria for analyzing Plaintiffs'

separate rate eligibility, and (3) Commerce's conclusion that Plaintiffs were

controlled by the Chinese government through Chem China's ownership.  See

Compl. at 5–7.  Plaintiffs oppose Defendant's Motion, arguing that SNC's

calculated rate is irrelevant and "the remand request has absolutely nothing to do

with" Plaintiffs.  Pls.' Resp. at 2.  Plaintiffs maintain that "the instant action . . . is

limited to Pirelli challenging Commerce's refusing to grant Pirelli separate rate

status." Id. at 5.  Defendant-Intervenor argues that Plaintiffs' complaint seeks to

reverse Commerce's determination assigning the China-wide entity rate to

Plaintiffs and to obtain separate rate status for Plaintiffs.  Def.-Interv.'s Resp. at 1–

2.  Defendant-Intervenor argues that the separate rate that Plaintiffs seek would be

based on SNC's calculated rate as the mandatory respondent.  Id.  The Court

agrees that SNC's calculated rate as the sole mandatory respondent could be

relevant if Plaintiffs were to succeed on their separate rate claim.  Because

Defendant has provided a compelling justification for its remand request and the

scope of Defendant's remand request is appropriate, the Court grants Defendant's

remand request.

### III.    Motion to Intervene

SNC filed a Motion to Intervene as Plaintiff-Intervenor on August 9, 2021.

See Mot. Intervene at 1.  SNC moves to intervene as of right out of time under the

good cause exception of USCIT R. 24(a)(3)(ii).  See id. at 2–3.  Plaintiffs consent

to the Motion to Intervene.  Id. at 3.  Defendant-Intervenor opposes the Motion to

Intervene.  See id. at 4; Def.-Interv.'s Opp'n Mot. Intervene at 1.

A party must seek intervention as a matter of right no later than thirty days

after the date of service of the complaint unless the party can show good cause for

the delay.  See USCIT R. 24(a)(3).  To show good cause, a party must show that

the motion was made out of time due to: (1) mistake, inadvertence, surprise or

excusable neglect; or (2) under circumstances in which by due diligence a motion

to intervene under this subsection could not have been made within the thirty-day

period.  Id.

SNC claims that it is both an "interested party," under 19 U.S.C.

§ 1677(9)(A), and a "party to the proceeding" who may intervene as of right under

28 U.S.C. § 2631(j)(1)(B).  See Mot. Intervene at 2.  SNC acknowledges that it did

not move to intervene within the thirty-day period, but asserts that the good cause

exception in USCIT Rule 24(a)(3)(ii) applies to its Motion to Intervene.  See id. at

3.  SNC asserts that its antidumping duty rate was not at issue in this action until

Defendant's Motion was filed and that, even by exercising due diligence, a motion

to intervene could not have been made within the thirty-day period.  Id.  The Court

agrees.

Intervening parties must take a case "as it stands" and are not permitted to

enlarge the issues pending before the court in a proceeding.  Vinson, 321 U.S. at

498.  "The scope of any litigation is confined to the issues raised in the plaintiff's

complaint."  Zhaoqing Tifo New Fibre, 41 CIT at __, 256 F. Supp. 3d at 1327

(citing Vinson, 321 U.S. at 498).  SNC's antidumping duty rate is relevant to the

issues raised in Plaintiffs' complaint because SNC's calculated antidumping duty

rate as the mandatory respondent serves as the basis for the rates assigned to

companies eligible for separate rate status.  SNC has made a sufficient showing

that it would be adversely affected under 28 U.S.C. § 2631(j)(1)(B) if the Court

remands for Commerce to consider new information, including allegations of

fraud, regarding SNC's antidumping duty rate. The Court concludes that SNC

may intervene as of right and has shown good cause to permit its intervention out

of time. The Court therefore grants SNC's Motion to Intervene and deems as filed

Proposed Plaintiff-Intervenor Shandong New Continent Co., Ltd.'s Response to

Defendant's Motion to Lift the Stay and Voluntary Remand to the Department of

Commerce, ECF No. 31-2 ("SNC's Response").

## CONCLUSION

For the foregoing reasons, the Court grants the motion to lift the stay ordered

in Order, ECF No. 25. The Court grants Defendant's request for a remand and

grants SNC's motion to intervene.

Accordingly, it is hereby

**ORDERED** that Defendant's Motion, ECF No. 29, is granted; and it is

further

**ORDERED** that the stay in this action is lifted; and it is further

**ORDERED** that the <u>Final Results</u> are remanded to Commerce for further

consideration; and it is further

**ORDERED** that SNC's Motion to Intervene, ECF No. 31, is granted; and it

is further

ORDERED that SNC be entered as a party to this action as Plaintiff-Intervenor; and it is further

ORDERED that SNC's Response, ECF No. 31-2, is deemed filed; and it is further

ORDERED that this action shall proceed according to the following schedule:

(1) Commerce shall file the remand results on or before January 18, 2022;

(2) Commerce shall file the administrative record on or before February 1, 2022;

(3) Comments in opposition to the remand results shall be filed on or before March 4, 2022;

(4) Comments in support of the remand results shall be filed on or before April 1, 2022;

(5) The joint appendix shall be filed on or before April 15, 2022; and

(6)    Motions for oral argument, if any, shall be filed on or before

April 22, 2022.

<div style="text-align: right;">

/s/   Jennifer Choe-Groves

Jennifer Choe-Groves, Judge

</div>

Dated:  September 20, 2021
New York, New York

Barcode:3965694-01 A-570-016 REV - Admin Review 8/1/17 - 7/31/18

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-016
Administrative Review
POR: 08/01/2017-07/31/2018
**Public Document**
E&C/OVII:  Team

April 15, 2020

**MEMORANDUM TO:**     Jeffrey I. Kessler
                                            Assistant Secretary
                                                for Enforcement and Compliance

**FROM:**                         James Maeder
                                            Deputy Assistant Secretary
                                                for Antidumping and Countervailing Duty Operations

**SUBJECT:**                   Decision Memorandum for the Final Results of the Antidumping
                                            Duty Administrative Review of Certain Passenger Vehicle and
                                            Light Truck Tires from the People's Republic of China and
                                            Rescission, in part; 2017 2018

---

## I.     SUMMARY

The Department of Commerce (Commerce) analyzed the comments submitted by interested parties in this administrative review of the antidumping duty (AD) order on certain passenger vehicle and light truck tires (passenger tires) from the People's Republic of China (China) covering the period of review August 1, 2017 through July 31, 2018.

As a result of this analysis, we have made changes to the *Preliminary Results*.[1]  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.

Below is the list of the issues in this administrative review for which we received comments from interested parties:

Comment 1:  Whether Russia Should be the Primary Surrogate Country
Comment 2:  Whether to Grant a Separate Rate to Haohua
Comment 3:  Whether to Grant Pirelli China a Separate Rate
Comment 4:  Whether Commerce has the Authority to Establish a China-Wide Entity Rate

---

[1] *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review and Rescission, in Part; 2017-2018*, 84 FR 55909 (October 18, 2019) and accompanying Preliminary Decision Memorandum (PDM) (*Preliminary Results*).



Comment 5:  Whether to Correct Alleged Errors in New Continent's Margin Calculations
Comment 6:  Whether to Correct Certain "Importer or Customer" names in New Continent's Draft Liquidation Instructions
Comment 7:  Whether to Continue to Deduct Irrecoverable VAT from New Continent's Gross Unit Price
Comment 8:  Whether to Grant a Double Remedy Adjustment to New Continent
Comment 9:  Whether to Rescind the Administrative Review of Shandong Hengyu Science & Technology Co., Ltd.

## II.    BACKGROUND

Commerce published its *Preliminary Results* on October 18, 2019.[2]  On October 16, 2019, Shandong Hengyu Science & Technology Co., Ltd. (Shandong Hengyu) filed a request that Commerce remove its name from the list of companies which withdrew their administrative review requests in the *Preliminary Results*.[3]

Between December 2 and 3, 2019, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (the petitioners), mandatory respondent Shandong New Continent Tire Co., Ltd. (New Continent), and separate rate respondents, Pirelli Tyre Co., Ltd. (Pirelli China) and Pirelli Tire LLC (Pirelli Tire USA) (collectively, Pirelli), each submitted case briefs.[4]  On December 9, 2019, the mandatory respondent, New Continent, and separate rate respondent, Shandong Haohua Tire Co, Ltd. (Haohua), each submitted rebuttal briefs.[5]

On November 14 and 18, 2019, Pirelli and the petitioners each submitted a hearing request.[6]  On March 16, 2020, Pirelli and the petitioners withdrew their requests for a public hearing.[7]

---

[2] *See Preliminary Results.*
[3] *See* Shandong Hengyu's Letter, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China - Ministerial Error," dated October 16, 2019 (Shandong Hengyu's Case Brief).
[4] *See* Petitioners' Letter, "Case Brief Submitted on Behalf of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC," dated December 2, 2019 (Petitioners' Case Brief); and Shandong New Continent Tire Co., Ltd.'s Letter, "Shandong New Continent Tire Co., Ltd. Case Brief  in the Third Administrative Review of Antidumping Duty Order on Passenger Vehicle and Light Truck Tires from the People's Republic of China," dated December 2, 2019 (New Continent's Case Brief); and Pirelli's Letter, "Pirelli's Case Brief Certain Passenger Vehicle and Light Truck Tires from China," dated December 3, 2019. (Pirelli's Case Brief).
[5] *See* Petitioners' Letter, "Rebuttal Brief Submitted on Behalf of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC," dated December 9, 2019 (Petitioners' Rebuttal Brief); and New Continent's Letter, "Shandong New Continent Tire Co., Ltd. Rebuttal Brief in the Third Administrative Review of Antidumping Duty Order on Passenger Vehicle and Light Truck Tires from the People's Republic of China," dated December 9, 2019 (New Continent's Rebuttal Brief); and Haohua's Letter, "Passenger Vehicle and Light Truck Tires from China- Comments in Lieu of Rebuttal Case Brief," dated December 9, 2019.
[6] *See* Pirelli's Letters, "Pirelli's Request for Hearing  Passenger Vehicle and Light Truck Tires from China," dated November 14, 2019; and November 18, 2019.
[7] *See* Petitioners' Letter, "Passenger Vehicle and Light Truck Tires from China:  Withdrawal of Request for Hearing," dated March 16, 2020; and Pirelli's Letter, "Pirelli's Withdrawal of Request for Hearing  Passenger Vehicle and Light Truck Tires from China," dated March 16, 2020.

Filed By: Toni Page, Filed Date: 4/16/20 1:05 PM, Submission Status: Approved

On February 13, 2020, Commerce fully extended the deadline for the final results until April 15, 2020.[8]

## III.    SCOPE OF THE ORDER

The scope of this order is passenger vehicle and light truck tires.  Passenger vehicle and light truck tires are new pneumatic tires, of rubber, with a passenger vehicle or light truck size designation.  Tires covered by this order may be tube-type, tubeless, radial, or non-radial, and they may be intended for sale to original equipment manufacturers or the replacement market.

Subject tires have, at the time of importation, the symbol "DOT" on the sidewall, certifying that the tire conforms to applicable motor vehicle safety standards.  Subject tires may also have the following prefixes or suffix in their tire size designation, which also appears on the sidewall of the tire:

Prefix designations:

P - Identifies a tire intended primarily for service on passenger cars

LT- Identifies a tire intended primarily for service on light trucks

Suffix letter designations:

LT - Identifies light truck tires for service on trucks, buses, trailers, and multipurpose passenger vehicles used in nominal highway service.

All tires with a "P" or "LT" prefix, and all tires with an "LT" suffix in their sidewall markings are covered by this investigation regardless of their intended use.

In addition, all tires that lack a "P" or "LT" prefix or suffix in their sidewall markings, as well as all tires that include any other prefix or suffix in their sidewall markings, are included in the scope, regardless of their intended use, as long as the tire is of a size that is among the numerical size designations listed in the passenger car section or light truck section of the Tire and Rim Association Year Book, as updated annually, unless the tire falls within one of the specific exclusions set out below.

Passenger vehicle and light truck tires, whether or not attached to wheels or rims, are included in the scope.  However, if a subject tire is imported attached to a wheel or rim, only the tire is covered by the scope.

Specifically excluded from the scope are the following types of tires:

---

[8] See Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Extension of Deadline for Final Results of Antidumping Duty Administrative Review – 2017-2018," dated February 13, 2020.

3

Barcode:3965694-01 A-570-016 REV - Admin Review 8/1/17 - 7/31/18

(1) racing car tires; such tires do not bear the symbol "DOT" on the sidewall and may be marked with "ZR" in size designation;

(2) new pneumatic tires, of rubber, of a size that is not listed in the passenger car section or light truck section of the Tire and Rim Association Year Book;

(3) pneumatic tires, of rubber, that are not new, including recycled and retreaded tires;

(4) non-pneumatic tires, such as solid rubber tires;

(5) tires designed and marketed exclusively as temporary use spare tires for passenger vehicles which, in addition, exhibit each of the following physical characteristics:

(a) the size designation and load index combination molded on the tire's sidewall are listed in Table PCT-1B ("T" Type Spare Tires for Temporary Use on Passenger Vehicles) of the Tire and Rim Association Year Book,

(b) the designation "T" is molded into the tire's sidewall as part of the size designation, and,

(c) the tire's speed rating is molded on the sidewall, indicating the rated speed in MPH or a letter rating as listed by Tire and Rim Association Year Book, and the rated speed is 81 MPH or a "M" rating;

(6) tires designed and marketed exclusively for specialty tire (ST) use which, in addition, exhibit each of the following conditions:

(a) the size designation molded on the tire's sidewall is listed in the ST sections of the Tire and Rim Association Year Book,

(b) the designation "ST" is molded into the tire's sidewall as part of the size designation,

(c) the tire incorporates a warning, prominently molded on the sidewall, that the tire is "For Trailer Service Only" or "For Trailer Use Only",

(d) the load index molded on the tire's sidewall meets or exceeds those load indexes listed in the Tire and Rim Association Year Book for the relevant ST tire size, and

(e) either

 (i) the tire's speed rating is molded on the sidewall, indicating the rated speed in MPH or a letter rating as listed by Tire and Rim Association Year Book, and the rated speed does not exceed 81 MPH or an "M" rating; or

(ii) the tire's speed rating molded on the sidewall is 87 MPH or an "N" rating, and in either case the tire's maximum pressure and maximum load limit are molded on the sidewall and either

4

Appx0139

(1) both exceed the maximum pressure and maximum load limit for any tire of the same size designation in either the passenger car or light truck section of the Tire and Rim Association Year Book; or

(2) if the maximum cold inflation pressure molded on the tire is less than any cold inflation pressure listed for that size designation in either the passenger car or light truck section of the Tire and Rim Association Year Book, the maximum load limit molded on the tire is higher than the maximum load limit listed at that cold inflation pressure for that size designation in either the passenger car or light truck section of the Tire and Rim Association Year Book;

(7) tires designed and marketed exclusively for off-road use and which, in addition, exhibit each of the following physical characteristics:

(a) the size designation and load index combination molded on the tire's sidewall are listed in the off-the-road, agricultural, industrial or ATV section of the Tire and Rim Association Year Book,

(b) in addition to any size designation markings, the tire incorporates a warning, prominently molded on the sidewall, that the tire is "Not For Highway Service" or "Not for Highway Use",

(c) the tire's speed rating is molded on the sidewall, indicating the rated speed in MPH or a letter rating as listed by the Tire and Rim Association Year Book, and the rated speed does not exceed 55 MPH or a "G" rating, and

(d) the tire features a recognizable off-road tread design.

The products covered by this order are currently classified under the following Harmonized Tariff Schedule of the United States (HTSUS) subheadings: 4011.10.10.10, 4011.10.10.20, 4011.10.10.30, 4011.10.10.40, 4011.10.10.50, 4011.10.10.60, 4011.10.10.70, 4011.10.50.00, 4011.20.10.05, and 4011.20.50.10. Tires meeting the scope description may also enter under the following HTSUS subheadings: 4011.99.45.10, 4011.99.45.50, 4011.99.85.10, 4011.99.85.50, 8708.70.45.45, 8708.70.45.60, 8708.70.60.30, 8708.70.60.45, and 8708.70.60.60. While HTSUS subheadings are provided for convenience and for customs purposes, the written description of the subject merchandise is dispositive.

## IV.    DISCUSSION OF THE ISSUES

**Comment 1:  Whether Russia Should be the Primary Surrogate Country**

*Petitioners' Case Brief*

- Russia should be the primary surrogate country as it meets all the statutory requirements and provides the best surrogate value data for all factors of production.[9]

---

[9] *See* Petitioners' Case Brief at 1.

- Commerce's assertion that all of New Continent's natural rubber inputs could not be valued using Russian data is incorrect.[10]  Russian data provides all needed information for natural rubber.[11]

- New Continent's natural rubber inputs are correctly valued using data for technically specified rubber with New Continent's SV data listing two natural rubber inputs: "Natural Rubber SMR20" and "Natural Rubber STR20".[12]  New Continent suggested that both be valued using HTS 400121, which is the classification for natural rubber in smoked sheet.[13]  In addition, both are specified grades of natural rubber and not smoked sheets of natural rubber.[14]

- Commerce previously distinguished technically specified grades from smoke sheet grades.[15]  As a result, both natural inputs are valued based on the import data for technical specified natural rubber (HTS 400122) and not on the import data of smoked sheets.[16]

- Russian data shows imports of natural rubber under HTS 400122 (technically specified natural rubber) from many countries including Belarus, Cameroon, Guatemala, Cote d'Ivoire, Liberia, Malaysia, Nigeria.[17]  As a result, it does not contain the necessary information on all the required natural inputs.[18]

- Voltyre's financial statement is more relevant because it is from a producer of identical merchandise whereas Sun Tyre is not a tire manufacturer but instead focused on re-treading manufacturing.[19]

- The fact that the Voltyre's financial statement is one of a tire manufacturer outweighs the fact that the Sun Tyre's financial statement is more contemporaneous.[20]

*New Continent's Rebuttal Brief*

- New Continent's proposed HTS 400121 in its surrogate value rebuttal submission from June 12, 2019 was not rebutted by the petitioners.[21]

---

[10] *Id.* at 2.

[11] *Id.* at 1.

[12] *Id.* at 2 (citing New Continent's Letter, "New Continent First Surrogate Value Comments:  Third Administrative Review of the Antidumping Duty Order on Passenger Vehicle and Light Truck Tires from the People's Republic of China," dated June 3, 2019 (New Continent's June 3, 2019 SV Comments) at Exhibit 1; and Petitioners' Letter, "Passenger Vehicle and Light Truck Tires from the People's Republic of China–Petitioners' Surrogate Value Information," dated June 3, 2019 (Petitioners' June 3, 2019 SV Comments) at Exhibit 1).

[13] *Id.* at 2 (citing New Continent's June 3, 2019 SV Comments at Exhibits 1 and 2).

[14] *Id.* at 2.

[15] *Id.* at 2.

[16] *Id.* at 2-3.

[17] *Id.* at 3.

[18] *Id.* at 3 (citing New Continent's June 3, 2019 SV Comments).

[19] *Id.* at 3 (citing *Preliminary Results*, PDM at 2); and New Continent's Letter, "New Continent Final Surrogate Value Comments:  Third Administrative Review of the Antidumping Duty Order on Passenger Vehicle and Light Truck Tries from the People's Republic of China," dated August 19, 2019 (New Continent's August 19, 2019 Supplemental SV Comments) at Exhibit 2B.

[20] *Id.* at 4 (citing Petitioners' June 3, 2019 SV Comments at Exhibit 20); and New Continent's August 19, 2019 Supplemental SV Comments at Exhibit 2B.

[21] *See* New Continent's Rebuttal Brief at 1-2.

6

- Malaysian data is superior to the Russian data because with respect to HTSHTS 400122, Malaysia imported 147,069,218 kg of rubber from countries that are market economies that don't provide generally available subsidies whereas Russian imported 21,347,777 kg from such countries.[22]
- The surrogate financial ratios of Sun Tyre are better than Voltyre of Russia.[23]  There is no difference between tire retreading and tire manufacturing.[24]
- Voltyre submitted a financial statement that is only partially translated into English and Commerce has previously determined that translations are required for it to evaluate financial statements.[25]
- Voltyre's financial statements are potentially distorted by countervailable subsidy benefits from state assistance.[26]  Commerce does not utilize data that results from countervailing subsidies when other data is available for calculating surrogate financial ratios.[27]
- Voltyre's financial statement is not contemporaneous because its 2016 financial statement is seven months outside of the POR while the Sun Tyre financial statement is contemporaneous because it overlaps with the POR.[28]

**Commerce Position:**  We have continued to use Malaysia as the primary surrogate country for the final results.  However, we have used Malaysian HTS 400122 values for New Continent's "Natural Rubber SMR20" and "Natural Rubber STR20" inputs instead of HTS 400121.

Section 773(c)(1) of the Tariff Act of 1930 as amended (the Act) directs Commerce to base normal value (NV), in most circumstances, on the non-market economy (NME) producer's factors of production (FOPs), valued in a surrogate market economy (ME) country or countries considered to be appropriate by Commerce.  Specifically, in accordance with section 773(c)(4) of the Act, in valuing the FOPs, Commerce shall utilize, "to the extent possible, the prices or costs of FOPs in ME countries that are:  (A) at a level of economic development comparable to that of the NME country; and (B) significant producers of comparable merchandise."[29]  As noted in the *Preliminary Results*, Commerce identified several countries, including Malaysia and

---

[22] *Id.* at 1-2 (citing Petitioners' June 3, 2019 SV Comments at Exhibit 2).

[23] *Id.* at 4.

[24] *Id.* at 13.

[25] *Id.* at 5 (citing *High Pressure Steel Cylinders from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 77 FR 26739 (May 7, 2012); and *Third Administrative Review of Frozen Warmwater Shrimp from the People's Republic of China:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 74 FR 46565 (September 10, 2009)).

[26] *Id.* at 8 (citing New Continent's August 19, 2019 Supplemental SV Comments at Exhibit 4).

[27] *Id.* at 9-10 (citing *Pure Magnesium from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 73 FR 76336 (December 16, 2008); and *Certain Steel Threaded Rod from the People's Republic of China:  Final Results and Final Partial Rescission of Antidumping Duty Administrative Review; 2010-2011*, 77 FR 67332 (November 9, 2012)).

[28] *Id.* at 10.

[29] *See* Commerce Policy Bulletin No. 04.1:  Non-Market Economy Surrogate Country Selection Process (March 1, 2004) (Policy Bulletin 04.1) available on Commerce's website at http://enforcement.trade.gov/policy/bull04-1.html.

Russia, as countries at the same level of economic development as China.[30]  Section 773(c)(1) of the Act states that "the valuation of the factors of production shall be based on the best available information regarding the values of such factors..."  In the *Preliminary Results*, Commerce determined that data from Malaysia offered the best available surrogate value information and rejected the Russian data because data from Malaysia covered each type of FOP used by New Continent, whereas the Russian data covered only some of the natural rubber used by New Continent.  Commerce also notes that the Global Trade Atlas (GTA) data for Malaysia used to value all of New Continent's factors of production was tax and duty-exclusive.[31]

Even though Commerce continues to find Malaysian FOP data to be the best data for valuing New Continent's FOPs, we agree with the petitioners that Commerce should use a more appropriate HTS number to value certain rubber inputs utilized by New Continent.  The record of this review shows that New Continent used "Natural Rubber SMR20" and "Natural Rubber STR20."[32]  In its surrogate value submission, New Continent averred that Commerce should use HTS 400121 (the classification for natural rubber in smoked sheets).[33]  However, information on the record shows that "Natural Rubber SMR20" and "Natural Rubber STR20" are technically specified rubber properly classified under HTS 400122.[34]  On this basis, we have determined to use HTS 400122 values for New Continent's "Natural Rubber SMR20" and "Natural Rubber STR20" inputs for the final results.  The record contains values for HTS 400122, which covers "Natural Rubber SMR20" and "Natural Rubber STR20" from Malaysia and Russia.  The record also shows that Malaysia and Russia each imported substantial amounts of rubber under HTS 400122 from market economies that do not provide generally available subsidies.

In addition to still finding that Malaysian data for valuing New Continent's FOPs is still the best option, Commerce also continues to find that the Malaysian financial statement for Sun Tyre is still the best for valuing New Continent's factory overhead, selling, general and administrative expenses, and profit, compared to the financial statements from Russia.  In choosing surrogate financial ratios, it is Commerce's practice to use data from market economy surrogate companies based on the "specificity, contemporaneity, and quality of the data."[35]  Further, Commerce has a regulatory preference to "value all factors in a single surrogate country," pursuant to 19 CFR 351.408(c)(2), as well as a practice "to only resort to a secondary surrogate country if data from

---

[30] *See* Commerce's Letter, "Administrative Review of Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," dated April 15, 2019 at the Attachment.

[31] *See* Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Preliminary Surrogate Value Memorandum," dated October 10, 2019 (Preliminary Surrogate Value Memorandum).at Attachment 2; and Memorandum, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Surrogate Value Memorandum," dated concurrently with the instant memorandum at Attachment 1.

[32] *See* New Continent's June 3, 2019 SV Comments at Exhibit 1.

[33] *Id*.

[34] *See* New Continent's Letter, "Supplemental Questionnaire Responses for Shandong New Continent Tire Co., Ltd.: Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China; 2017-18 AD Administrative Review," dated August 27, 2019 at Exhibit SD-1.

[35] *See Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances*, 71 FR 29303 (May 22, 2006), and accompanying IDM at Comment 1.

8

the primary surrogate country are unavailable or unreliable."[36]  Commerce normally will use non-proprietary information gathered from producers of identical or comparable merchandise, in the surrogate country, to value manufacturing overhead, general expenses, and profit.[37]  Additionally, the courts have recognized our discretion when choosing appropriate companies' financial statements to calculate surrogate financial ratios.[38]  Moreover, when selecting among the available surrogate financial ratios, Commerce generally will not consider surrogate financial statements which contain evidence of countervailable subsidies when other useable statements are available.[39]

For the *Preliminary Results*, pursuant to 19 CFR 351.408(c)(4), Commerce valued factory overhead, selling, general and administrative expenses, and profit using non-proprietary information gathered from Sun Tyre, a Malaysian tire retreader, for the fiscal year ending October 31, 2017.[40]  It is our practice in NME proceedings to obtain surrogate financial ratios using, whenever possible, surrogate-country producers of identical or comparable merchandise, provided that the surrogate data are not distorted or otherwise unreliable.[41]  Commerce also selects surrogate financial statements that are publicly available, comparable to the respondent's experience, and contemporaneous with the period being reviewed or investigated.[42]  For these final results, we continue to find Sun Tyre's financial statements to be the best available information on the record of this review.  Specifically, Sun Tyre's financial statement states that the principal activities of the company are "retreading of tyres, dealing in rubber products and investment holding."[43]  Sun Tyre's tire retreading activities indicate that the company has a level of manufacturing capabilities that is similar to tire production.  Thus, the retreaded tires produced by Sun Tyre can be considered merchandise comparable to the merchandise under consideration in accordance with 19 CFR 351.408(c)(4).[44]  In addition, Sun Tyre's 2017 fully translated financial statement is publicly available and contemporaneous with the POR.  Finally, we note that, unlike Voltyre's financial statement, there was no indication in the Sun Tyre's 2017 financial statement that the company received any government subsidies.

---

[36] *See Jiaxing Brother Fastener Co. v. United States*, 961 F. Supp. 2d 1323, 1335 (CIT 2014) (quoting *Sodium Hexametaphosphate from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 77 FR 59375 (September 27, 2012), and accompanying IDM at Comment 1).

[37] *See* 19 CFR 351.408(c)(4).

[38] *See*, *e.g.*, *FMC Corp. v. United States*, 27 CIT 240, 251 (CIT 2003) (holding that Commerce can exercise discretion in choosing between reasonable alternatives), aff'd in *FMC Corp. v. United States*, 87 F. Appx. 753 (Fed. Cir. 2004) and Shandong Huarong, 484, 491–94 (2005); and *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances*, 71 FR 29303 (May 22, 2006), and accompanying IDM at Comment 1.

[39] *See Administrative Review of Certain Frozen Warmwater Shrimp from the People's Republic of China:  Final Results and Partial Recession of Antidumping Duty Administrative Review*, 75 FR 49460 (August 13, 2010), and accompanying IDM at Comment 9.

[40] *See* Preliminary Surrogate Value Memorandum at 3-4.

[41] *Certain Tissue Paper Products from the People's Republic of China:  Final Results and Partial Rescission of the 2007-2008 Antidumping Duty Administrative Review and Determination Not to Revoke in Part*, 74 FR 52176 (October 9, 2009) and accompanying IDM (*Tissue Paper Products from China*) at Comment 5.

[42] *See Tissue Paper Products from China* at Comment 5.

[43] *See* New Continent's August 19, 2019 Supplemental SV Comments at Exhibit 2B.

[44] *Id*.

9

The 2016 financial statements on the record for Voltyre are not contemporaneous with the POR, whereas the period covered by the financial statements for Sun Tyre on the record overlap with the instant POR. Moreover, the Sun Tyre financial statements are fully translated while the Voltyre financial statements are only partially translated.

The record contains a worksheet with Voltyre's profit and loss information on it, including translations of the various line items on the worksheet.[45] However, the majority of the financial statements, including any explanatory notes accompanying these line items, information related to Voltyre's accounting policies, the auditor's opinion, the director's report, the balance sheet, or any other relevant information (including basic, but essential, information, such as the products produced during that fiscal year) were not translated.[46] Given these serious translation deficiencies, Commerce is unable to evaluate the suitability of Voltyre's profit and loss data as a source for the surrogate financial ratios, and we will not rely on these data for purposes of our calculations, consistent with our practice.[47]

Further, even assuming, arguendo, that Voltyre is a producer of identical merchandise, we disagree with the petitioners that it would be appropriate to use their non-contemporaneous financial statements here, given the extremely limited translation provided. Without a complete translation of the financial statements, we are unable to attest to the legitimacy and accuracy of the information that the petitioners used to calculate the ratios proposed in the calculation worksheet. Further, the lack of translation precludes Commerce from assessing other vital information, such as determining if Voltyre received countervailable subsidies, if its statements contain an unqualified auditor's opinion, and whether the petitioners have appropriately categorized, added, and/or removed certain expenses in its calculation worksheet.

In view of these deficiencies, we will not use Voltyre's financial statements to calculate the surrogate financial ratios. Leaving any part of that information untranslated effectively withholds vital information from Commerce and other interested parties. Typically, the footnotes and disclosures included in a company's financial statements are required by generally accepted accounting principles in a company's home country and these disclosures are deemed vital to the users of those financial statements. We equate the leaving of any footnotes or disclosures untranslated to be the same as omitting them completely, leaving them unavailable for the parties to a proceeding to review or comment on them. In this regard, the petitioners have submitted an entirely incomplete and unusable financial statement, lacking the vital information necessary to conduct our analysis.

For the reasons explained above, we have continued to use Malaysia as the primary surrogate country for the final results.

---

[45] *See* Petitioners' June 3, 2019 SV Comments at Exhibit 18.

[46] *Id.*

[47] Commerce has an established practice of rejecting incomplete financial statements for the calculation of surrogate financial ratios. *See, e.g., Seamless Refined Copper Pipe and Tube from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 FR 60725 (October 1, 2010) and accompanying IDM at Comment 2; and *Tissue Paper Products from China*, 74 FR at 52176 and accompanying IDM at Comment 5. This practice has recently been upheld in a case before the Court of Appeals for the Federal Circuit. *See CP Kelco US, Inc., v. United States*, CAFC Court No: 19-1207 (February 10, 2020).

## Comment 2:  Whether to Grant a Separate Rate to Haohua

*Petitioners' Case Brief*

- Shandong Haohua Tire Co., Ltd.  (Haohua) should not be granted a separate rate because Haohua did not demonstrate that it had a suspended entry.[48]  In reviews, Commerce determined that separate rates cannot be assigned to exporters without the submission of a U.S. Customs 7501 Entry Summary showing a suspended entry.[49]

*Haohua's Rebuttal Brief*

- Information on the record shows that Haohua had Type 03 suspended entries during the POR.[50]
- Commerce should continue assigning Haohua a separate rate for the final results.[51]

**Commerce Position:**  Commerce continues to find that Haohua qualifies for a separate rate since information on the record demonstrates that Haohua had Type 03 suspended entries made during the POR which is contrary to the petitioners' argument.[52]  Moreover, as stated in the Separate Rate Application (SRA), Commerce does not require that a separate rate applicant submit a U.S. Customs 7501 Entry Summary as part of its separate rate application as long as suspended entries are submitted in the required time period.[53]

## Comment 3:  Whether to Grant Pirelli China a Separate Rate

*Pirelli's Case Brief*

- Commerce relied on only one of four criteria in determining the absence of *de facto* control of Pirelli China by the Chinese Government.[54]  Commerce is required to consider all four criteria in evaluating whether an exporter is subject to government control.  In particular, Commerce is primarily "concerned with central government control and only

---

[48] *See* Petitioners' Case Brief at 5 (citing Haohua's Letter, "Passenger Vehicle and Light Truck Tires from China: Separate Rate Application," dated November 13, 2018 (Haohua SRA) at 8).

[49] *Id.* at 5 (citing Haohua SRA at 7).

[50] *See* Haohua's Letter, "Passenger Vehicle and Light Truck Tires from China Comments in Lieu of Rebuttal Case Brief," dated December 9, 2019 (Haohua Rebuttal Comments) at 2.

[51] *See* Haohua Rebuttal Comments at 2 (citing section 782(d) of the Act).

[52] *Id.* at 2.

[53] *See* Haohua Rebuttal Comments at 2 (citing Haohua SRA at Appendix B).  Haohua made multiple attempts to request an entry summary from its importer.  As the 7501 contains importer's confidential data, the importer refused.

[54] *See* Pirelli's Case Brief at 23-25 (citing Policy Bulletin 05.1).  The four factors are:  (1) whether the export prices are set by, or subject to the approval of, a governmental authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

11

grants separate rates where an exporter's export activities are shown to be independent of such government control."[55]

- China National Chemical Corporation (Chem China) did not have a majority ownership stake in Pirelli China during most of the POR.[56]

- Chem China did not have a majority indirect ownership in Pirelli China for the majority of the POR. During 10 out of 12 months of the instant POR (*i.e.*, starting from October 4, 2017), Chem China and Silk Road Fund, companies supervised by China's Central State-owned Assets Supervision and Administration Commission of the State Council (SASAC), only had a combined 41.6 percent indirect ownership in Pirelli & C. S.p.A. and 36.9 percent indirect ownership interest in Pirelli China.[57]

- This minority level of ownership of the Chinese state-owned enterprise (SOE) shareholders *per se* does not give rise to the presumption of government control even under Commerce's *Diamond Sawblades* standards.[58]

- The majority of Pirelli & C. S.p.A.'s board (eight out of 15) are independent directors. China National Tire & Rubber Corporation, Ltd. (CNRC) appoints eight directors where four must be independent, Marco Tronchetti Provera & C. S.p.A (MTP) appoints four directors where one must be independent, CNRC and MTP appoint 2 independent directors, and Pirelli & C. S.p.A. appoints on independent director.[59] The independence of these eight directors is evaluated pursuant to Italian law requirements and must be reassessed on an annual basis.[60]

- The majority (11 out of 15) of Pirelli & C. S.p.A.'s board members do not hold any positions with Chem China or the CNRC. Importantly, none of the independent directors hold any positions with Chem China or the CNRC. Moreover, only six out of 15 board members are Chinese nationals.[61]

- There is no evidence that the independent directors violated their duty of independence from the shareholders that appointed them.[62] Thus, Commerce's presumption of Chinese government control of Pirelli China through Pirelli & C. S.p.A.'s board membership is not supported by the record.[63]

- The record makes clear that the Chinese Government did not have the ability to appoint a majority of Pirelli China's Board of Directors during the POR. Pirelli & C. S.p.A. has zero direct involvement in the appointment of Pirelli China's Board of Directors, nor do any of Pirelli China's directors also serve on the Board of Pirelli & C. S.p.A.[64]

---

[55] *See* Pirelli's Case Brief at 47 (citing *Hontex Enters. Inc. v. United States*, 248 F. Supp. 2d 1323, 1337 (Ct. Int'l Trade 2003) (*Hontex*)).

[56] *Id.* at 28 (citing Pirelli's Letter, "Pirelli Tyre Co., Ltd. and Pirelli Tire LLC's Letter, "Pirelli's Separate Rate Application – Certain Passenger Vehicle and Light Truck Tires from China," dated November 14, 2018 (Pirelli SRA) at 13 and Exhibit 5).

[57] *Id.* at 28.

[58] *Id.* at 28 (citing *Final Results of Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof from the People's Republic of China* May 6, 2013 in *Advanced Technology & Materials Co., Ltd. v. United States*, 885 F. Supp. 2d 1343 (CIT 2012)).

[59] *Id.* at 28-29 (citing Pirelli SRA at 16-17 and Exhibit 10).

[60] *Id.* at 30-31.

[61] *Id.* at 32.

[62] *Id.* at 31 (citing Pirelli SRA at Exhibits 9 and 16D).

[63] *Id.* at 31.

[64] *Id.* at 36 (citing Pirelli SRA at Exhibits 5 and 16).

12

- Pirelli & C.S.p.A.'s proprietary know-how is also strictly protected by Pirelli & C. S.p.A.'s Articles of Association (AoA). Article 9 of Pirelli & C. S.p.A.'s AoA requires that any transfer and/or disposal of the "know-how" owned by Pirelli & C.S.p.A., shall be approved by the shareholders' meeting with the favorable vote of at least 90 percent of Pirelli & C.S.p.A.'s outstanding share capital. In light of these protections Chem China, through its indirect ownership alone, cannot change or dispose of certain of Pirelli & C.S.p.A.'s "core values."[65]
- The 2017 Shareholder Agreement further authorizes Mr. Marco Tronchetti Provera to exclusively select Pirelli & C. S.p.A.'s management, preventing the CNRC board members from influencing the company's day-to-day operations.[66]
- As a listed company, Pirelli & C. S.p.A. has to be compliant with all related applicable Italian laws and regulations. In particular, as from its relisting in 2017, the company is no longer subject to the "management and coordination" of the CNRC and is again subject to several constraints aimed to protect the interests of the minority shareholders and to the market.[67]

*Petitioners' Rebuttal Brief*

- Commerce is not required to address all the criteria in Policy Bulletin 05.1 for determining *de jure* and *de facto* governmental contro1.[68]
- Pirelli China is 90 percent owned by the CNRC/Chem China through the ownership of other companies.[69]

**Commerce Position:** We have not granted a separate rate to Pirelli China for these final results because it has not rebutted the presumption of *de facto* government control.

Pursuant to section 771(18) of the Act, Commerce has the authority to determine if a country is an NME. In proceedings involving NME countries, such as China, there is a rebuttable presumption that all companies within the country are subject to government control and should be assigned a single, country-wide antidumping duty rate.[70] An exporter will receive the country-wide rate by default unless it affirmatively demonstrates that it enjoys both *de jure* and *de facto* independence from the government over its export activities. Commerce will assign a separate rate in NME proceedings if a respondent can demonstrate the absence of both *de jure* and *de facto* government control over its export activities under a test established in *Sparklers* as

---

[65] *Id.* at 38.

[66] *Id.* at 42.

[67] Pirelli claims that, pursuant to Italian law, "management and coordination" is a concept that consists in giving a unitary operational direction to different companies, by applying a common financial policy and strategy and managing them as a unique enterprise, with a view to a better achievement of the goals pursued by the whole group. This happens when there exists a constant flow of instructions relating to the management, the collection of financial resources, the financial statements policies, *etc.*, from the company exercising management and coordination activities to the company submitted to these management and coordination activities, *i.e.*, in many multinational companies. From a practical perspective, these instructions should be reflected in all decisions of the company that receives them, including in both the board of directors and shareholders. *See* Pirelli's Case Brief at 45.

[68] *See* Petitioners' Rebuttal Brief at 10 (citing Policy Bulletin 05.1 at 2).

[69] *Id.* at 27 (citing Pirelli SRA at 2).

[70] *See Sigma Corp. v. United States*, 117 F. 3d 1401, 1405 (Fed. Cir. 1997) (*Sigma Corp.*).

13

amplified by *Silicon Carbide*, and further refined in *Diamond Sawblades*.[71] The burden of rebutting the presumption of government control rests with the exporter.[72] The *de jure* criteria are:  (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) any other formal measures by the government decentralizing control of companies.[73] The *de facto* criteria are:  (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.[74]

We preliminary denied Pirelli China a separate rate based on the *de facto* criterion (3), *i.e.*, that control over Pirelli's selection of management exists through SASAC entity CNRC.  Pirelli's reliance on *Hontex* focuses mainly on *de facto* criterion (1), *i.e.*, Pirelli China's ability to set export prices. Such reliance is misplaced in that it ignores that a company must also demonstrate that it selects its management autonomously.

As an initial matter, we disagree with Pirelli that Commerce is required to consider all four criteria in evaluating whether an exporter is subject to *de facto* government control.  Commerce "requires that exporters satisfy all four factors of the *de facto* control test in order to qualify for separate rate status."[75]  As explained below, given that Pirelli China has not rebutted the presumption as to its autonomy from government control over the selection of management, we find it unnecessary to consider the other *de facto* criteria.[76]

As noted in the company's organization chart submitted with its SRA, Pirelli China is ultimately 36.9 percent indirectly owned by China Chem and the Silk Road Fund, two state-owned enterprises in China supervised by the Central State-owned Assets Supervision and Administration Commission of the State Council (SASAC).[77]

---

[71] *See, e.g.*, *Final Determination of Sales at Less than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588, 20589 (May 6, 1991) (*Sparklers*); *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994) (*Silicon Carbide*); and *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 77098 (December 20, 2013), and accompanying PDM at 7, unchanged in *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014), and accompanying IDM at Comment 1.
[72] *See Sigma Corp.*, 117 F. 3d at 1405.
[73] *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1320 n. 21 (CIT 2013) (*Ad Hoc Shrimp Trade Action Comm.*); and *Sparklers*, 56 FR at 20589.
[74] *See Ad Hoc Shrimp Action Trade Comm.*, 925 F. Supp. 2d at 1320 n.21; and *Silicon Carbide*.
[75] *See Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States*, Slip Op. 18-107, at 19, 23 (CIT August 29, 2018) ("a respondent must demonstrate that it meets each criterion of the analysis in order to be considered de facto independent of the government").
[76] *See, e.g.*, *Polytetrafluoroethylene Resin from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 48590 (September 26, 2018), and accompanying IDM at Comment 2.
[77] *See* Pirelli SRA at 13 and Exhibit 5.  Pirelli's ownership is discussed publicly in the public version of Pirelli's Case Brief at 28.  For a complete business proprietary discussion of the Pirelli organization structure see Memorandum, "Antidumping Duty Administrative Review of Certain Passenger Vehicle and Light Truck Tires

14

A minority indirect ownership does not in and of itself mean an absence of government control over company in an NME. When conducting a separate rate analysis for a company with less than a majority of SOE ownership, Commerce has considered whether the record contains additional indicia of control sufficient to demonstrate that the company lacks independence and therefore should receive the China-wide rate. Commerce's practice is to examine whether the government might also be able to exercise, or have the potential to exercise, control of a company's general operations through minority government ownership under certain factual scenarios.[78]

The record of this review shows that Pirelli & C.S.p.A. is the indirect majority shareholder of Pirelli China and it selects most of its board members.[79] Moreover, as Commerce stated in its initial decision to deny separate rate status to Pirelli China, the Pirelli entities share common board membership and management.[80] Specifically, during the POR Mr. Ren Jianxin was the Chairman and President of SASAC-owned China Chem and the Chairman of the Board of Pirelli & C. S.p.A, which is the 100 percent owner of Pirelli Tyre S.p.A.[81]

Pirelli points to the requirement laid out in Italian laws to support its contention that Pirelli & C.S.p.A. and its subsidiary, Pirelli China, are not subject control by the Chinese government.[82] However, Pirelli's argument that, pursuant to Article 2497 of the Italian Civil Code, Pirelli & C.S.p.A. was no longer subject to the "management and coordination" of the CNRC starting from October 4, 2017, meaning that the company and its subsidiaries are "totally independent and autonomous from its shareholders and not subject to any instructions or guidelines or policies deriving thereby" is unsupported by the record.[83] Article 2497 of the Italian Civil Code is not on the record of this review. Similarly, Pirelli's argument that, pursuant to the Italian Finance Code (TUF), the majority of Pirelli & C. S.p.A.'s board (eight out of fifteen members) are unrelated "independent directors" who are part of the legal structure aimed to protect the interests of the minority shareholders is unsupported by the record.[84] The TUF is not on the record of this review. As such, we are not convinced that the majority of Pirelli & C. S.p.A.'s board are "independent directors" who are part of the legal structure aimed to protect the interests of the minority shareholdersPirelli & C.S.p.A.

---

[78] *See Certain Steel Wheels from the People's Republic of China: Preliminary Determination of Sales at Less-Than-Fair-Value*, 83 51568 (October 30, 2018), and accompanying IDM at 6 (unchanged in *Certain Steel Wheels from the People's Republic of China: Final Determination of Sales at Less-Than-Fair Value*, 84 FR 11746 (March 28, 2019).

[79] *See* Pirelli SRA at 24.

[80] *See* Memorandum, "Antidumping Duty Administrative Review of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Preliminary Separate Rate Status," dated October 10, 2019 (Preliminary SRA Memorandum) at 2.

[81] *See* Preliminary SRA Memorandum at Exhibit 16D (Pirelli & C. S.p.A's Board of Directors and Key Managers Information).

[82] *See* Pirelli SRA at 43-46.

[83] *See* Pirelli's Case Brief at 29.

[84] *Id.* at 29.

Filed By: Toni Page, Filed Date: 4/16/20 1:05 PM, Submission Status: Approved

The record of this review shows that China Chem is the single largest indirect shareholder in Pirelli & C.S.p.A.[85]  Pirelli Group's 2017 annual report states that China National Chemical Corporation is the only party to directly or indirectly hold more than 3 percent of Pirelli & C.S.p.A.'s shares.[86]  The explanatory notes of the same financial statements report that:

> Pirelli & C. S.p.A. is directly controlled by Marco Polo International Italy S.p.A. - following the merger which occurred during June 2017 with its subsidiary Marco Polo International Holding Italy S.p.A. - and is in turn therefore indirectly controlled by China National Chemical Corporation ("ChemChina"), a state-owned enterprise (SOE) governed by Chinese law with registered office in Beijing, and which reports to the Central Government of the People's Republic of China.

> On February 26, 2018 the Board of Directors authorized the publication of these consolidated Financial Statements.[87]

Also in its 2017 Annual Report, Pirelli & C.S.p.A. stated that the company is "indirectly controlled, pursuant to art. 93 TUF, by ChemChina via CNRC and certain of its subsidiaries, including Marco Polo."[88]  Pirelli claims that the "explicit reference to Italian Finance Code (Art. 93 TUF) reflects strict compliance with the dictates of Italian Finance Code (TUF D. Lgs. 58/1998) which identifies from a corporate perspective the controlling shareholder even if such control derives from a shareholders' agreement or is mainly required for consolidation (and therefore accounting) purposes only,[89] as it is the case for Pirelli & C. S.p.A. and Chem China, where, as thoroughly explained above, the latter does not and did not exercise any influence in the management or business of the Pirelli Group as a whole."[90]  However, Pirelli's claim that, pursuant to that Article 93 of the Italian Finance Code and Italian Finance Code (TUF D. Lgs. 58/1998), Pirelli & C.S.p.A. must report that it is controlled by Chem China "mainly for consolidation" (*i.e.*, accounting purposes) is unsupported by the record.  Neither the Italian Finance Code (Art. 93 TUF) or the dictates of Italian Finance Code (TUF D. Lgs. 58/1998) are on the record of this review.  As such, we are not convinced that Pirelli & C.S.p.A. must report that it is controlled by Chem China mainly for accounting purposes pursuant to the Italian Finance Code (Art. 93 TUF) or the dictates of Italian Finance Code (TUF D. Lgs. 58/1998).

Notwithstanding Pirelli's argument that the majority (11 out of 15) of Pirelli & C. S.p.A.'s board members do not hold any positions with Chem China or the CNRC and that only six of the board members are Chinese nationals, the record shows that the CNRC appointed the majority of

---

[85] *See* Pirelli SRA at Exhibit 9 (Pirelli Group's 2017 Annual Report at 231).

[86] *Id.* at Exhibit 9 (Pirelli Group's 2017 Annual Report at 231).

[87] *Id.* at Exhibit 9 (Pirelli Group's 2017 Annual Report at 300).

[88] *Id.* at Exhibit 9 (Pirelli Group's 2017 Annual Report at 205).

[89] For example, the Statutory Auditors Report section of the Pirelli & C.S.p.A.'s 2017 Annual Report states that with "with the start of trading all management and coordination activities by Marco Polo International Italy S.p.A. ceased.  *See* page 450 of Pirelli & C.S.p.A.'s 2017 Annual Report in Pirelli's SRA at Exhibit 9. The Statutory Auditors Report section of the Pirelli & C.S.p.A.'s 2017 Annual Report also states Marco Polo ended its management and coordination activities on the initial date of trading, without prejudice to the right of CNRC to consolidate Pirelli.  *See* Pirelli SRA at Exhibit 9 (Pirelli Group's 2017 Annual Report at 456).

[90] *See* Pirelli SRA at 19-20.

Pirelli & C. S.p.A.'s board.[91]  The relevance of the nationalities of the individual board members is unclear.  Moreover, Pirelli's claim that there is no evidence that the "independent directors" violated their duty of independence from the shareholders that appointed them is unpersuasive given that the Italian laws and regulations that define the duties of "independent directors" are not on the record.  As such, we are not convinced that those members are free from control from China Chem.  The SRA fails to adequately explain how the Italian law prohibits a board member's ability to influence decisions regarding management, especially board members appointed by China Chem.

Pirelli's reliance on the 2017 Shareholder Agreement to show that Mr. Marco Tronchetti Provera has the exclusive authority to select Pirelli & C. S.p.A.'s management, thereby preventing board members from influencing the company's day-to-day operations, is misplaced.  Information on the record indicates that Pirelli & C.S.p.A. shall be managed by a Board of Directors composed of up to fifteen members.[92]  The 2017 Shareholder Agreement also makes clear that Mr. Provera reports directly to Pirelli & C. S.p.A.'s board and that the board "delegated" authority to Mr. Provera in the management of Pirelli & C.S.p.A.  In particular, the 2017 Shareholder Agreement shows that Mr. Provera is charged with implementing Pirelli & C.S.p.A.'s business plan and budget which are approved by Pirelli & C.S.p.A.'s board of directors.[93]  As such, we are not convinced that Mr. Provera has exclusive authority to select Pirelli & C. S.p.A.'s management, thereby preventing board members from influencing the company's day-to-day operations.

The record supports Pirelli's argument that Pirelli & C.S.p.A.'s proprietary know-how is protected by Pirelli & C. S.p.A.'s 2017 By-laws in that any transfer and/or disposal of the "know-how" owned by Pirelli, shall be approved by the shareholders' meeting with the favorable vote of at least 90 percent of the Pirelli's outstanding share capital.[94]  However, it is unclear how this fact alone is a sufficient basis to rebut the presumption of government control of Pirelli China's day-to-day operations or core values.

Notwithstanding Pirelli's claims that Pirelli China operates independently from Pirelli & C. S.p.A. and that Pirelli & C. S.p.A. has zero involvement in the appointment of the Pirelli China Board, the record shows that Pirelli & C. S.p.A. indirectly owned several shares of Pirelli China and had the ability to appoint members of Pirelli China's Board of Directors.[95]  As such, we are not convinced that China Chem, through Pirelli & C.S.p.A., does not control Pirelli China.

Thus, we find that Pirelli has not demonstrated on this record that Chem China no longer retains actual or potential control and influence throughout the Pirelli companies' ownership structure (*i.e.*, Pirelli & C.S.p.A. and Pirelli China) and management, including Pirelli China's board and

---

[91] *Id.* at Exhibit 10B (Pirelli & C.S.p.A By-Laws at Article 4.2.2).

[92] *Id.* at Exhibit 10B (Pirelli & C.S.p.A By-Laws at Article 10.1).

[93] *Id.* at Exhibit 10B (Pirelli & C.S.p.A By-Laws at Articles 4.4 and 4.7).

[94] *Id.* at Exhibit 10B (Pirelli & C.S.p.A By-Laws at Article 8.2); and Final Separate Rate Memorandum at "Pirelli Tyre Co., Ltd. (Pirelli)."

[95] *Id.* at 24 and Exhibit 16A (Letter of Appointment of Pirelli China's Directors); and Final Separate Rate Memorandum at "Pirelli Tyre Co., Ltd. (Pirelli)".

17

management.  On this basis, we continue to find that Pirelli China has failed to rebut the presumption of *de facto* government control.[96]

## Comment 4:  Whether Commerce has the Authority to Establish a China-Wide Entity Rate

*Pirelli's Case Brief*

- Commerce lacks any statutory authority to issue a "China-wide NME entity" rate in this review.[97]  The only rates Commerce can issue are (1) a specific rate for those companies actually investigated, and (2) a specific rate for all those other companies *not* investigated.[98]
- The China-wide entity rate cannot be an "individually investigated" rate as defined in section 735(c)(1)(B)(i)(I) of the Act.[99]  The China-wide entity rate also cannot be an "all others" rate for companies not investigated.[100]
- Commerce cannot determine that a China-wide entity rate stems from its statutory authority to use "facts available" or "adverse inferences" to determine a rate for one or more companies.[101]
- The courts have not approved that Commerce has the authority to issue a China-wide entity rate.[102]
- The *Chevron* defense ("when Congress has spoken, the issue has been resolved, and there is no deference to the agency") does not apply to the China-wide entity rate.[103]  In addition, the China-wide entity rate fails the *Chevron* step zero threshold ("*Chevron* does not apply when the agency informally creates a rule out of whole cloth that exceeds the scope of its delegated authority") because the rate is not based on law but instead an informal "policy statement."[104]
- The China-wide entity rate fails the *Chevron* step one threshold.[105]  Commerce has no legal basis to apply the country-wide rate concept of the countervailing duty statute to the antidumping statute.[106]

---

[96] *See* Final Separate Rate Memorandum at "Pirelli Tyre Co., Ltd. (Pirelli)."
[97] *See* Pirelli's Case Brief at 2.
[98] *Id.* at 2.
[99] *Id.* at 10.
[100] *Id.* at 11 (citing section 735(c)(1)(B)(i)(II) of the Act).
[101] *Id.* at 13 (citing sections 735(c)(1)(B)(i)(I) and 735(c)(1)(B)(i)(II) of the Act).
[102] *Id.* at 15-16 (citing *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997) and *Transcom Inc. v. United States*, 294 F.3d 1371, 1373 (Fed. Cir. 2002) (*Transcom*)).
[103] *Id.* at 17-18 (citing *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984)).
[104] *Id.* at 19.
[105] *Id.* at 21.
[106] *Id.* at 22 (citing *Click-To-Call Techs., LP v. Ingenio, Inc.*, 2018 U.S. App. LEXIS 22839 at 17-18 (Fed. Cir. 2018)).

*Petitioners' Rebuttal Brief*

- Commerce previously rejected Pirelli's argument that Commerce has no statutory authority to issue a China-wide NME rate and can only determine a margin for each individually investigated exporter and producer and an estimated all other margin.[107]

**Commerce Position:**  Commerce has both statutory and regulatory authority to issue a China-wide rate.  Commerce's NME practice has been upheld in the courts on multiple occasions, including its application of a single rate for all NME exporters who do not qualify for a separate rate.[108]  Pursuant to section 735(c)(1)(B)(i) of the Act, Commerce may issue (1) a specific rate for those companies actually investigated and (2) a specific rate for all those other companies not investigated.  In *Thuan An v. United States*, the CIT held that characterizing an NME-wide rate as an individually investigated rate "reasonably grounds Commerce's determination in its statutory authority."[109]  Therefore, as discussed below, Commerce considers the China-wide NME rate as an individually investigated rate pursuant to the Act, and thus within its statutory authority.

Under section 771(18) of the Act, Commerce considers China to be an NME,[110] and in AD proceedings, Commerce has a long-standing rebuttable presumption that, unless otherwise demonstrated, the export activities of all firms in China are subject to government control and influence.  As a result, we apply a rate individually established pursuant to section 735(c)(1)(B)(i) of the Act for the China-wide entity to all imports from exporters who have not established eligibility for a separate rate.[111]  In NME proceedings, Commerce places the burden on the exporters to demonstrate eligibility for a separate rate via independence from government control.  It is within our authority to employ a presumption of state control in an NME country and place the burden on the exporters to demonstrate an absence of central government control.[112]  Under section 771(18)(B)(iv)-(v) of the Act, this burden is reasonable, as it

---

[107] *See* Petitioners' Rebuttal Brief at 9 (citing *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and New Shipper Review; 2015-2016,* 83 FR 16829 (April 17, 2018) and accompanying IDM at 7-9 and 11-12; and *Truck and Bus Tires from the People's Republic of China, Final Determination of Sales at Less Than Fair Value*, 82 FR 8599 (January 27, 2017) and accompanying IDM at 13-15).

[108] *See, e.g.*, *Sigma Corp, 117 F.3d* at 1405; and *1,1,1,2-Tetrafluoroethane from the People's Republic of China: Final Determination of Sales at Less Than Fair Value Antidumping Duty Investigation*, 79 FR 62597 (October 20, 2014), and accompanying IDM at Comment 1.

[109] *See Thuan An Production Trading and Service Co., LTD. v. United States*, 396 F. Supp. 3d 1310, 1316 (CIT 2019) (*Thuan An*).

[110] *See Antidumping Duty Investigation of Certain Aluminum Foil from the People's Republic of China:  Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination*, 82 FR 50858, 50861 (November 2, 2017) and accompanying PDM at "China's Status as a Non-Market Economy" (unchanged in *Certain Aluminum Foil from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 83 FR 9282 (March 5, 2018)).

[111] *See* 19 CFR 351.107(d) ("in an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers").

[112] *See Sigma Corp*, 117 F.3d at 1405-06 ("We agree with the government that it was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control.  The antidumping statute recognizes a close correlation between a nonmarket economy and government control of prices, output decisions, and the allocation of

19

recognizes the correlation between NME economies and government price control, resource allocation, and production decisions.[113] *Transcom* upheld the application of a China-wide rate to all parties not eligible for a separate rate and the use of a rate based on best information available (BIA) as non-punitive.[114] Contrary to Pirelli's assertion, the courts have consistently upheld our authority to apply a presumption of state control in NME countries and to apply a single rate to all exporters that fail to rebut that presumption. The courts have agreed that, once a respondent has been determined to be part of the NME-wide entity, inquiring into said respondent's separate sales behavior ceases to be meaningful.[115]

**Comment 5:  Whether to Correct Alleged Errors in New Continent's Margin Calculations**

*New Continent's Case Brief*[116]

- Commerce committed two programming errors:  (1) double-counting the irrecoverable VAT deduction from New Continent's U.S. net prices; and (2) deducting international ocean freight expenses from not only New Continent's CEP sales, but also from its EP sales.

---

resources. Moreover, because exporters have the best access to information pertinent to the 'state control' issue, Commerce is justified in placing on them the burden of showing a lack of state control.") (internal citations omitted).

[113] *See Coalition for the Preservation of American Brake Drum and Rotor Aftermarket Manufacturers v. United States*, 44 F.Supp.2d 229, 243 (CIT 1999), quoting Sigma Corp., 117 F.3d at 1405 ("Under the broad authority delegated to it from Congress, Commerce has employed 'a presumption of state control for exporters in a nonmarket economy'…. Under this presumption, all exporters receive one non-market economy country rate, or country-wide rate, unless an exporter can 'affirmatively demonstrate' its entitlement to a separate, company specific margin by showing 'an absence of central government control, both in law and in fact, with respect to exports."); and *Michaels Stores, Inc. v. United States*, 931 F. Supp. 2d 1308. 1315 (CIT 2013), quoting *SKF USA Inc. v. United States*, 254 F.3d 1022, 1030 (Fed. Cir. 2001) ("The regulations clarify, however, that for nonmarket economies, 'rates may consist of a single dumping margin applicable to all exporters and producers.' Moreover, whenever the statute is silent on a particular issue, it is well-settled that Commerce may 'formulate policy' and make rules 'to fill any gap left, implicitly or explicitly, by Congress.'") (internal citations omitted).

[114] *See Transcom* at 1381-83, "The China-wide rate, and its adverse inference are applicable to all companies which were initiated on yet failed to show their entitlement to a separate rate. "Accordingly, while Section 1677e provides that Commerce may not assign a BIA-based rate to a particular party unless that party has failed to provide information to Commerce or otherwise failed to cooperate, the statute says nothing about whether Commerce may presume that parties are entitled to independent treatment under 1677e in the first place." Id. at 1376. "Instead, the objective of BIA is to aid Commerce in determining dumping margins as accurately as possible." Id. The litigation in *Transcom* covered three periods of review between June 1990 and May 1993. *See Transcom* at 1374-75 and *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China; Final Results of Antidumping Duty Administrative Reviews*, 61 FR 65527 (December 13, 1996). BIA is the precursor to facts available and AFA under the current statute. *See, e.g., Transcom* at 1376.

[115] *See Advanced Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1351 (CIT 2013) (*Advanced Technology II*), citing *Watanabe Group v. United States*, 34 CIT 1545, 1551 (2010) ("Commerce's permissible determination that {a respondent} is part of the {China}-wide entity means that inquiring into {that respondent}'s separate sales behavior ceases to be meaningful.") and *Jiangsu Changbao Steel Tube Co., Ltd. v. United States,* 884 F. Supp. 2d 1295, 1312 n.21 (CIT 2012) ("losing all entitlement to an individualized inquiry appears to be a necessary consequence of the way in which Commerce applies the presumption of government control, … applying a countrywide AFA rate without individualized findings of failure to cooperate is no different from applying such a countrywide AFA rate without individualized corroboration").

[116] *See* New Continent's Case Brief at 2-5.

Filed By: Toni Page, Filed Date: 4/16/20 1:05 PM, Submission Status: Approved

- Commerce should correct both of these errors in the final results calculation.

*The petitioners did not comment on this issue.*

**Commerce Position:**  Commerce has revised its margin calculations for New Continent with respect to the double-deduction of irrecoverable VAT and the deduction of international ocean freight expenses from New Continent's EP sales in the final results. [117]

**Comment 6:  Whether to Correct Certain "Importer or Customer" names in New Continent's Draft Liquidation Instructions**

*New Continent's Case Brief* [118]

- Commerce should correct certain "importer or customer" names in the final customs instructions.

*The petitioners did not comment on this issue.*

**Commerce Position:**  We agree with New Continent's argument.  Commerce will  correct the "importer or customer" names identified by New Continent in the final liquidation instructions.

**Comment 7:  Whether to Continue to Deduct Irrecoverable VAT from New Continent's Gross Unit Price**

*New Continent's Case Brief* [119]

- Commerce's decision to deduct eight percent of the gross unit sales price of each of New Continent's reported U.S. sales in order to adjust the U.S. price for the value added tax (VAT) that allegedly had not been refunded at the time of exportation is contrary to the plain language of the statute and is unsupported by record evidence.
- The courts have repeatedly found that Commerce's irrecoverable VAT deduction is not authorized by the plain language of the statute, pursuant to section 772(c)(2)(B) of the Act. [120]
- The purpose of Irrecoverable VAT under Circular 39 is to enable exporters to report a higher cost of production for exported goods. [121]  Thus, pursuant to Circular 39, exports

---

[117] *See* Memorandum, "Administrative Review of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Preliminary Analysis Memorandum for Shandong New Continent Tire Co., Ltd.," dated October 10, 2019 (New Continent's Preliminary Analysis Memorandum) at Attachment 1.
[118] *See* New Continent's Case Brief at 5-6.
[119] *Id.* at 6-29.
[120] *Id.* at 9-19 (citing *Qihang Tyre Co., Ltd. v. United States*, 308 F. Supp. 3d 1329 (CIT April 4, 2018) (*Qingdao Qihang*.); *Qingdao Qihang and Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1350 (Ct. Int'l Trade May 24, 2019) (*Guizhou Tyre*); *China Mfrs. Alliance, LLC v. United States*, 205 F. Supp. 3d 1325, 1344-1351 (CIT Feb. 6, 2017) (China Mfrs. Alliance); and *Fine Furniture (Shanghai), Ltd. v. United States*, 182 F. Supp. 3d 1350 (CIT Sept. 9, 2016)).
[121] *Id.* at 19-20 (citing *Bridgestone Ams., Inc. v. United States*, 33 CIT 1040, 1048-50 (2009)).

trigger a refund of certain VAT amounts previously paid on input purchases when an exporter files its income tax return.[122]

- The methodology used by Commerce for its irrecoverable VAT deduction is unreasonable and contrary to record evidence – any adjustment for export taxes must be based upon the amount of the irrecoverable VAT tax rather than the irrecoverable VAT rate.[123]

*Petitioners' Rebuttal Brief*[124]

- Commerce's practice of deducting irrecoverable VAT is lawful and New Continent's arguments to the contrary have been rejected many times.  No modification of New Continent's margin calculations is required.
- As New Continent itself recognized, Commerce's practice has been affirmed in other CIT decisions.[125]  Moreover, Commerce has consistently continued to apply its previous practice.[126]

**Commerce Position:**  New Continent's arguments that our treatment of irrecoverable VAT is both contrary to the plain language of the statute and unsupported by the instant record evidence are misplaced.

Specifically, pursuant to section 772(c)(2)(B) of the Act, Commerce must reduce the export price (EP) and constructed export price (CEP) of subject merchandise by "the amount, if included in

---

[122] *Id.* at 10.

[123] *Id.* at 20-29 (citing *Federal Mogul v. United States*, 63 F.3d 1572 (Fed. Cir. 1995);  *E. I. du Pont de Nemours & Co. v. United States*, 20 C.I.T. 373, 381 (1996); *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 C.I.T. 1185, 1193-95 (2004); *Fine Furniture (Shanghai), Ltd. v. United States*, 2016 Ct. Intl. Trade LEXIS 85, 11-15 (Ct. Int'l Trade Sept. 9, 2016); *Jacobi Carbons AB v. United States*, Slip Op. 18-47, 2018 Ct. Intl. Trade LEXIS 51, \*51-52; *Aristocraft of Am. v. United States*, Slip Op. 18-97, 2018 Ct. Intl. Trade LEXIS 108, \*7-9; and *China Mfrs. Alliance, LLC v. United States*, 205 F. Supp. 3d 1325, 1350).

[124] *See* Petitioners' Rebuttal Brief at 3-6.

[125] *Id.* at 4 (citing *Diamond Sawblades Mfrs.' Coal. v. United States*, 301 F. Supp. 3d 1326, 1331-1339 (CIT March 22, 2018) (*Diamond Sawblades 2018*); *Aristocraft of Am., LLC v. United States*, 269 F. Supp. 3d 1316, 1321-26 (CIT September 28, 2017) (*Aristocraft I*); *Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1183-88 (CIT April 7, 2017) (*Jacobi Carbons I*); *Juancheng Kangtai Chem. Co. v. United States*, 2017 Ct. Intl. Trade LEXIS 3, Slip Op. 2017- 3, pages 25-31 (Jan. 19, 2017) (*Juancheng Kangtai*); and *Fushun Jinly Petrochemical Carbon Co. v. United States*, 2016 Ct. Intl. Trade LEXIS 25, Slip Op. 2016-25, pages 20-25 (Mar. 23, 2016) (*Fushun Jinly*)).

[126] *Id.* at 4-5 (citing *Certain Steel Racks and Parts Thereof from the People's Republic of China*:  *Final Affirmative Determination of Sales at Less Than Fair Value*, 84 FR 35595 (July 24, 2019) (*Steel Racks from China 2019*); *Certain Steel Nails from the People's Republic of China*:  *Final Results of Antidumping Duty Administrative Review, and Final Determination of No Shipments*; 2016-2017 84 FR 17134 (April 24, 2019) (*Steel Nails from China 2019*); *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 6132 (February 26, 2019) (*TRBs from China 2019*); *Certain Plastic Decorative Ribbon from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 84 FR 1055 (February 1, 2019) (*Ribbons from China 2019*); *Cast Iron Soil Pipe Fittings from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part*, 83 FR 3205 (July 17, 2018); and *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 44283 (August 23, 2019) (*OTR Tires from China 2019*), (unchanged in the *Final Results, Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2017–2018*, 84 FR 59770 (November 6, 2019)).

22

such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States." Also, in accordance with section 772(c)(2)(B) of the Act, Commerce will reduce the EP in nonmarket economy (NME) dumping margin calculations by "the amount of export taxes and similar charges, including {VATs} not rebated upon export."[127]

With regard to deducting irrecoverable VAT under this statutory provision, Commerce's current methodology has been in place since 2012, when Commerce announced it would begin adjusting for irrecoverable VAT under section 772(c)(2)(B) of the Act.[128] In this announcement, Commerce stated that the statute provides that, when an NME government imposes an export tax, duty, or other charge on subject merchandise or on inputs used to produce it, from which the respondent was not exempted, Commerce will reduce the respondent's U.S. price by the amount of the tax, duty or charge paid, but not rebated.[129]

We also find it reasonable to interpret these terms as encompassing irrecoverable VAT because the irrecoverable VAT is a cost that arises as a result of export sales. Specifically, VAT is an indirect, *ad valorem* consumption tax imposed on the purchase (sale) of goods. It is levied on the purchase (sale) price of the good, *i.e.*, it is paid by the buyer and collected by the seller. For example, if the purchase price is $100 and the VAT rate is 15 percent, the buyer pays $115 to the seller, which consists of $100 for the good and $15 in VAT. VAT is typically imposed at every stage of production. Thus, under a typical VAT system, firms: (1) pay VAT on their purchases of production inputs and raw materials (input VAT); as well as (2) collect VAT on sales of their output (output VAT). Thus, this indirect consumption tax is passed through each party in the chain of commerce and paid by the ultimate consumer of the goods. This ultimate consumer is the party which ends, or breaks, the repetitive chain of: (1) pay the (input) VAT; (2) pass through the VAT to the next party in the chain of commerce; and (3) collect the (output) VAT on behalf of the government. Further, in a typical VAT system, output VAT is fully refunded or not collected by reason of exportation of the merchandise.

Firms calculate input VAT and output VAT for tax purposes on a company-wide (not transaction-specific) basis, *i.e.*, in the case of input VAT, on the basis of all input purchases regardless of whether used in the production of goods for export or domestic consumption, and in the case of output VAT, on the basis of all sales to all markets, foreign and domestic. Thus, a firm might pay the equivalent of $60 million in total input VAT across all input purchases and collect $100 million in total output VAT across all sales. In this situation, however, the firm would remit to the government only $40 million of the $100 million in output VAT collected on its sales because of a $60 million credit for input VAT paid that the firm can claim against output VAT. As a result, the firm bears no "VAT burden (cost);" the firm, through the credit, is refunded or recovers all of the $60 million in input VAT it paid, and the $40 million remittance to the government is simply a transfer to the government of VAT paid by (collected from) the

---

[127] *See Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 FR 36481 (June 19, 2012) (*Methodological Change*).
[128] *Id.* at 77 FR at 36482.
[129] *Id.* at 77 FR at 36483; and *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 4875 (January 30, 2014), and accompanying IDM at Comment 5.

23

buyer with the firm acting only as an intermediary.  Thus, the cost of output VAT falls on the buyer of the good, not on the firm.

This would describe the situation under Chinese law except that producers in China, in most cases, do not recover (*i.e.*, are not refunded) the total input VAT they paid.  The Chinese VAT system is governed by the 2008 Chinese VAT Regulation and 2012 VAT Circular.[130]  Article 1 of the 2008 Chinese VAT Regulation states that "{e}ntities and individuals engaged in the sales of goods, supply of processing, repair and replacement services, and the import of goods within the territory of {China} are taxpayers of value added tax … and shall pay VAT in accordance with this Regulation."  Article 5 states that "The VAT tax amount that a taxpayer selling goods or supplying taxable service calculates on the basis of the sales amount and at the tax rate as prescribed in Article 2 of this Regulation and collects from the buyer is the output tax amount."  Article 2.1 establishes that for most goods that the VAT rate shall be 17 percent, and Article 2.3 adds "For taxpayers exporting goods, the tax rate shall be zero, except as otherwise prescribed by the State Council."[131]  Thus, the Chinese VAT system is consistent with the general description of the VAT tax system above – Entities and individuals …. within the territory of {China} …. shall pay VAT …. at the tax rate as prescribed in Article 2.

Consistent with the general description of a VAT system above, Article 5 further provides that the amount of the VAT shall be:

$$\text{"output tax = sales amount * tax rate"}^{132}$$

The term "output tax" (*i.e.*, VAT-out) in this formula refers to any transaction between the "taxpayer" (*i.e.*, a company) and its customer, and represents an amount of VAT collected by the taxpayer from the customer on behalf of the government.  The tax amount for the transaction between a supplier and a company (*i.e.*, VAT-in) represents the amount of VAT paid by the company to its supplier, as also calculated by this formula (in other words, it is the "output tax" from the supplier's point of view).  Article 4 of the *2008 Chinese VAT Regulation* states: "the payable tax amount = the output tax amount for the current period – the input tax amount for the current period."[133]  Thus, a taxpayer's obligation to the government of China is to remit an amount equal to the total amount of VAT-out collected on the government's behalf less the total amount of VAT-in that the taxpayer has paid on its purchases.

Lastly, Article 25 of the 2008 Chinese VAT Regulation addresses exportation of merchandise which is eligible for a rebate for, or exemption from, VAT.  Article 25 states that "concrete measures shall be formulated by the finance or taxation administrative department of the State Council."  These further instructions are provided in the *2012 VAT Circular*.[134]

On May 25, 2012, the Chinese government promulgated the *2012 VAT Circular*:

---

[130] *See* New Continent's April 22, 2019 Section C Questionnaire Response at 35-36 and Exhibits C-7A (2008 GOC VAT Regulation) and C-7B (2012 GOC VAT Circular) (New Continent's April 22, 2019 CQR).
[131] *Id.* at Exhibit C-7A (2008 GOC VAT Regulation).
[132] *Id.*
[133] *Id.*
[134] *Id.* at Exhibit C-7B (2012 GOC VAT Circular).

For the purposes of making it easier for tax authorities and taxpayers to understand and implement the export taxation policies systemically and accurately, the Ministry of Finance and State Administration of Taxation has sorted out and classified the VAT policies and consumption tax policies on exported goods and foreign-oriented processing, repair and fitting services (hereafter referred to as the "exported goods and services," including the "goods deemed as exported goods") which were enacted successively in the recent years, and clarified the several problems reflected in the actual implementation.[135]

Article 1 defines the "export enterprises," "manufacturing enterprises" and "export goods" that "the policies concerning the exemption and refund of Value-added Tax (hereafter referred to as the 'VAT refund (exemption)') shall be applied."[136]  Article 2 provides for the "exemption, offset and refund" of VAT and Article 3 defines the VAT refund rate for exported goods.  Article 3.1, consistent with Article 2.3 of the *2008 Chinese VAT Regulation*, states:

> Except for the export VAT refund rate (hereafter referred to as the "tax refund rate") otherwise provided for by the Ministry of Finance and the State Administration of Taxation according to the decision of the State Council, the tax refund rate for exported goods shall be the applicable tax rate.  The State Administration of Taxation shall promulgate the tax refund rate through the Tax Refund Rate Catalogue of Exported Goods and Services according to the aforesaid provisions for the implementation of the tax authorities and taxpayers.[137]

Thus, unless otherwise defined, the VAT refund rate will be the applicable VAT rate for the exported goods, and, consequently, as stated in Article 2.3 of the *2008 Chinese VAT Regulation*, "the {net} tax rate shall be zero."  Further, the Chinese tax authorities will publish the applicable VAT refund rates in the "Tax Refund Rate Catalogue of Exported Goods and Services."

Article 4.1 provides for the calculation of the amount of the VAT refund because of exportation and the basis on which this amount is calculated.  The basis for the VAT refund "shall be the actual FOB price, of exported goods and services"[138] or "shall be determined based on the FOB price of the exported goods after having deducted the amount of customs bonded imported materials and parts as included in the exported goods."[139]  Consistent with Article 4, Article 5.1 then provides the following formula for the amount of the "Tax which may not be exempted or offset," *i.e.*, the irrecoverable VAT:[140]

$$\text{Reduction/Offset} = (P - c) \times (T1 - T2),$$
where,

$P$ = (VAT-free) FOB value of export sales;
$c$ = value of bonded (duty- and VAT-free) imports of inputs used in the production of goods for export;

---

[135] *Id.*
[136] *Id.*
[137] *Id.* at Exhibit C-7A (2008 GOC VAT Regulation).
[138] *Id.*
[139] *Id.*
[140] *Id.*

T1 = VAT rate; and
T2 = refund rate specific to the export good.

This formula can be applied on a shipment-specific basis as well as to accumulated values over a defined period of time. This amount, the irrecoverable VAT, cannot be exempted or offset by reason of exportation of the goods, and thus must be passed on by the company exporting the goods to its customer. It represents the amount of input VAT paid by the exporter to its supplier and which must be borne by the exporter's customer, *i.e.*, implicitly embedded in the export price charged to the exporter's customer.

Lastly, Article 5.3 provides that if "the tax refund rate is lower than the applicable tax rate, the corresponding differential sum calculated shall be included into the cost of the exported goods and services." The amount of irrecoverable VAT must be borne by the exporter just as the VAT must be borne by the ultimate consumer of the goods. In essence, the exporter is the ultimate consumer of the goods in the VAT chain.. The exporter breaks that chain of commerce along which the indirect consumption tax is passed through to the ultimate consumer, but unlike an ultimate consumer inside the domestic market, the exporter has the benefit that some or all of the VAT is refunded or exempted by the Chinese government.

Using the example above, if P = \$200 million, c = 0, T1 = 17% and T2 = 10%, then the reduction/offset = (\$200 million - \$0) x (17% - 10%) = \$200 million x 7% = \$14 million. This amount, \$14 million, must also be remitted to the Chinese government, and be recorded as a cost of the export sales in the company's books and records. Thus, the exporter incurs a cost equal to \$14 million, which is calculated on the basis of FOB export value at the *ad valorem* rate of $T_1 - T_2$. This cost would not be incurred but for the exportation of the goods, and, therefore, functions as an "export tax, duty, or other charge" and is covered by the price of the exported goods. It is for this "export tax, duty, or other charge" that Commerce makes a downward adjustment to U.S. price under section 772(c) of the Act.

New Continent argued that Commerce's VAT deduction methodology is unlawful on account of a flawed computation of the amount of irrecoverable VAT. We disagree with New Continent. It is important to note that Commerce, in its analysis, has viewed the amount of irrecoverable VAT as a reduction in the amount of creditable input VAT. This amount of creditable VAT is offset against the amount of output VAT collected by the company to reduce the net VAT liability which the company must remit to the Chinese government. Thus, reducing the offset for input VAT will increase the amount which the company must remit. Under Chinese law the reduction in creditable input VAT and determination of the net VAT liability is defined in terms of, and applies to, the company as a whole across all purchases and sales. This company-wide accounting of VAT does not distinguish the VAT treatment of export sales from the VAT treatment of domestic sales from an input VAT recovery standpoint, not specific products, markets or sales.

We also note that New Continent's argument that there is no evidence that the amount of irrecoverable VAT has anything to do with its export prices is illogical. We note that under a normal business model, companies set their sales prices such that they cover their costs and generate profit. There is no evidence on the record that New Continent operates on a different business model (*i.e.*, one that does not seek to generate a profit). We also note that the ability of exporters like New Continent, under Circular 39, to offset income by an amount of irrecoverable

26

VAT on exports, thereby enabling them to reduce their overall income tax liability, confirms that the irrecoverable VAT at issue is tied to exports.

We note as well that Commerce's irrecoverable VAT calculation is based on established practice as upheld by the CIT. Specifically, the CIT has repeatedly held that Commerce's adjustment to U.S. price for irrecoverable VAT upon export of subject merchandise to the United States is a reasonable interpretation of section 772(c)(2)(B) of the Act.[141] In *Jacobi Carbons I*, the CIT considered the statute's directive that deductions to export and constructed export price shall be in the amount of any export tax, duty, or other charge.[142] The CIT held that although Commerce did not specifically label the irrecoverable Chinese VAT at issue in the underlying proceeding as a tax, duty, or other charge, that its interpretation was still a permissible construction. Specifically, the CIT stated that:

> {T}he catchall phrase "other charge" captures any financial obligation provided it is "imposed by the exporting country on the exportation of the subject merchandise," regardless of whether the imposing country explicitly labels the charge as one pertaining to exports. Commerce's interpretation of Chinese VAT as, if not an "export tax," an "other charge," is a permissible construction of those statutory terms.[143]

Similarly, the CIT in *Juancheng Kangtai* concluded that the statute does not define the terms "export tax, duty, or other charge imposed" and concluded that Commerce reasonably interpreted "other charge imposed" to include costs such as irrecoverable VAT.[144] The CIT has also repeatedly held that irrecoverable VAT is "imposed by the exporting country on the exportation of the subject merchandise" within the meaning section 772(c)(2)(B) of the Act. In *Juancheng Kangtai,* the CIT accepted Commerce's explanation that, in a typical VAT regime, there is a mechanism for companies to recoup VAT paid on inputs, either through the exportation or sale of merchandise in domestic markets.[145] The CIT recognized that under these regimes, companies either receive a full refund of input VAT upon export, or in the case of domestic sales, recover the input VAT by crediting it against output VAT collected from customers.[146]

The CIT has further recognized in J*uancheng Kangtai* that, in contrast to a typical VAT regime, Chinese law does not grant companies a full refund of input VAT upon exportation of merchandise because a portion of the VAT paid on inputs is not refunded.[147] The CIT therefore concluded that "{b}ecause this irrecoverable VAT is a charge imposed only on exports,

---

[141] *See, e.g., Fushun Jinly Petrochemical Carbon Co., Ltd. v. United States*, No. 14-00287, 2016 WL 1170876, (CIT 2016) at *11; *Juancheng Kangtai Chem. Co., Ltd. v. United States*, Slip Op. 17-3, (CIT 2017) at 25-27 (*Juancheng Kangtai*); *Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1186-1188 (CIT 2017) (*Jacobi Carbons I*); *Aristocraft of America, LLC v. United States*, 269 F. Supp. 3d 1316, 1324-25 (CIT 2017) (*Aristocraft I*); *Diamond Sawblades Mfrs. Coal. v. United States*, 301 F. Supp. 3d 1326, 1331-35 (CIT 2018); *Jacobi Carbons, AB v. United States*, 365 F. Supp. 3d 1323 (CIT 2019); *Jacobi Carbons, AB v. United States*, 365 F.Supp.3d 1344 (CIT 2019); and *Aristocraft of America, LLC v. United States*, No. 15-00307, 2019 WL 1945553, at *1 (CIT 2019).
[142] *See Jacobi Carbons I*, 222 F. Supp. 3d at 1186-87 (citing section 772 (c)(2)(B) of the Act (emphasis added)).
[143] *Id.,* 222 F. Supp. 3d at 1186-87.
[144] *See Juancheng Kangtai* at 26.
[145] *Id.* at 26-27.
[146] *Id.* at 26-27.
[147] *Id.* at 26-27.

Commerce reasonably concluded that it is a cost imposed 'on the exportation of the subject merchandise'" within the meaning of section 772(c)(2)(B) of the Act.[148]   The CIT further reasoned that "the 'irrecoverable' portion of the VAT is perfected by exportation," and "there does not appear to be any practical difference between a new charge imposed at the time of exportation versus a refund that is withheld at the time of exportation."[149]   Consequently, Commerce's interpretation of irrevocable VAT as a cost imposed upon exportation of subject merchandise constitutes a reasonable interpretation of section 772(c)(2)(B) of the Act.

We disagree with New Continent that, under Chinese laws, no VAT was imposed on exports of goods (including subject merchandise).   As to the record evidence, the reduction/offset description discussed above is defined in terms of, and applies to, total (company-wide) input VAT across purchases of all inputs, whether used in the production of goods for export or domestic consumption.   The reduction/offset does not distinguish the VAT treatment of export sales from the VAT treatment of domestic sales from an input VAT recovery standpoint for the simple reason that such treatment under Chinese law applies to the company as a whole, not specific markets or sales.[150]   At the same time, however, the reduction/offset is calculated on the basis of the FOB value of exported goods, so it can be thought of as a tax on the company (*i.e.*, a reduction in the input VAT credit) that the company would not incur but for the export sales it makes, a tax fully allocable to export sales because the firm under Chinese law must book it as a cost of exported goods.

New Continent reported that the official VAT rate for exports of subject merchandise was 17 percent from August 1, 2017 to April 30, 2018, and 16 percent from May 1, 2018 to July 31, 2018.[151]   The refund rate was nine percent during the POR, under the applicable Chinese regulations.[152]   Thus, New Continent incurred an effective VAT rate of eight percent on exports of domestically-produced passenger tires before the change in the VAT rate, and an effective VAT rate of seven percent after the change in the VAT rate.   As explained in the *Preliminary Results*, because New Continent paid VAT associated with subject merchandise and it is not refunded at these effective VAT rates, Commerce adjusted New Continent's net price for the un-refunded VAT to calculate EP and CEP net of VAT.[153]

New Continent's reliance on *Qingdao Qihang, Guizhou Tyre, and China Manufacturers Alliance II* to argue that Commerce does not have the authority to deduct irrecoverable VAT from U.S. price under section 772(c)(2)(B) of the Act ignores the fact that the CIT has affirmed Commerce's treatment of VAT in multiple cases.   Moreover, New Continent offers no argument as to why Commerce should follow this CIT's rulings in *Qingdao Qihang*, *Guizhou Tyre*, and *China Manufacturer's Alliance* and disregard the decisions affirming Commerce's adjustment for irrecoverable VAT.   Indeed, New Continent has failed to establish that the CIT's evaluation of section 772(c)(2)(B) of the Act in *Fushun Jinly*, *Juancheng Kangtai*, *Jacobi Carbons I*, *Aristocraft I*, and *Diamond Sawblades* was incomplete or contrary to principles of statutory interpretation.   In the absence of any demonstration of error by New Continent, we have

---

[148] *Id.* at 27.

[149] *Id.* at 27.

[150] *See* New Continent's April 22, 2019 CQR at Exhibit C-7B (2012 GOC VAT Circular).

[151] *Id.* at 35 and Exhibit C-1.

[152] *Id.* at 36 and Exhibit C-7C.

[153] *See Preliminary Results*, PDM at "Value Added Tax."

continued to follow the CIT's precedent holding that Commerce has reasonably interpreted the statute as permitting a deduction of irrecoverable VAT to U.S. price for the final results.

New Continent's argument that Commerce's methodology of deriving the amount of irrecoverable VAT rate using the difference between the 17 percent VAT on subject merchandise and nine percent rebate (*i.e.*, eight percent) applied to the FOB value of exported goods is without merit. The CIT considered a similar argument in *Juancheng Kangtai,* in which plaintiffs argued that because the value of raw materials and the FOB value of finished goods were different amounts, Commerce purportedly erred in calculating irrecoverable VAT by simply subtracting a nine percent rebate rate from the 17 percent standard VAT rate.[154] The CIT upheld Commerce's irrecoverable VAT calculation based on a standard VAT rate of 17 percent and nine percent rebate rate on exported goods, explaining that: "Commerce's conclusion that the amount of 'irrecoverable' VAT is properly determined by reference to the VAT refund rate that pertains to the exported product in accordance with {respondent's} submitted tax information does not appear to be an unreasonable interpretation of the available evidence of record, and therefore the court cannot conclude that Commerce's deduction of that 'irrecoverable' amount from the export price was unreasonable."[155]

Similarly, in *Diamond Sawblades,* the CIT held that Commerce's methodology of calculating irrecoverable VAT by deducting a nine percent rebate rate from a 17 percent VAT applied to subject merchandise was reasonable and based on record evidence.[156] The CIT concluded that because Commerce's methodology was based on a reasonable application of Chinese laws and regulations, it would be inappropriate for the CIT "to conclude otherwise . . . {and offer a} substitution of judgment on a conclusion or finding from the record that is within Commerce's domain, which is outside the standard of judicial review."[157] In *Diamond Sawblades*, the CIT also dismissed an argument that Commerce must calculate a tax based on an amount, rather than a rate. As the CIT explained in *Diamond Sawblades*:

> The parties try to make further hay over whether Commerce's methodology was based on the "amount" or a "ratio", . . . but the amount of any tax that is expressed by law as a fractional term will necessarily involve application of the relevant ratio (*i.e.,* by and through calculation) to determine the relevant "amount" of the tax. Indeed, it is difficult to conceive of how one could be expected to arrive at "the amount" of VAT applicable to a particular transaction otherwise than through application of "the formula" that a particular VAT tax would call for.[158]

Consistent with its practice, as upheld by the CIT, Commerce properly used an eight percent rate in this case to determine the amount of irrevocable VAT adjustment to apply to New Continent's U.S. price. Simply put, Commerce's methodology, as applied in the *Preliminary Result*s and which we continue to apply for the final results, is the same that has been previously sustained by the CIT in *Juancheng Kangtai* and *Diamond Sawblades,* and Commerce's calculation of New Continent's irrecoverable VAT is based on record evidence. Specifically, Commerce removed

---

[154] *See Juancheng Kangtai* at 12-13.
[155] *Id.* at 13.
[156] *See Diamond Sawblades at* 1336-39.
[157] *Id.* at 1336-39.
[158] *Id.* at 1337.

from the price of each U.S. sale (*i.e.*, on a transaction basis) the amount calculated based on the difference between the standard VAT rate and the VAT rebate rate for exports of subject merchandise (*i.e.*, eight percent), applied to the FOB export sales value reported by New Continent. Furthermore, "{{China}'s VAT regime is product-specific, with VAT schedules that vary by industry and even across products within the same industry. These are product-specific export taxes, duties, or other charges that are incurred on the exportation of subject merchandise."[159]  Commerce analyzed the Chinese tax laws and regulations on the record and determined that the standard VAT levy on exports of subject merchandise is 17 percent and the rebate rate for exports of subject merchandise is nine percent.[160]  By analyzing the information on the product-specific VAT regime placed on the record, Commerce fulfilled the regulatory requirement that price adjustments it makes on exports of subject merchandise are "reasonably attributable to the subject merchandise."[161]

As such, the record shows that the Chinese government did not refund eight percent of the FOB value of the exported tires to producers during the POR. There is no information on the record to suggest that the government of China maintained a different VAT rebate rate for New Continent. The irrecoverable VAT expense is a liability calculated based on the VAT rate and the refund rate specific to the exported good, in this situation nine percent. On this basis, we have continued to use the same methodology for calculating New Continent's irrevocable VAT as a downward adjustment to U.S. price under section 772(c)(2)(B) of the Act.[162]

**Comment 8:  Whether to Grant a Double Remedy Adjustment to New Continent**

*New Continent's Case Brief*

- In accordance with the statute, Commerce's regulations, and Commerce's prior practice in this proceeding (as well as others), New Continent undoubtedly qualifies for an offset for the double-remedies adjustment in this proceeding.[163]  Commerce should correct this error in the Final Results.

---

[159] *Id.* at 1337.

[160] *See* New Continent's April 22, 2019 CQR at Exhibit C-7B (2012 GOC VAT Circular).

[161] *See* 19 CFR 351.401(c).

[162] *See Methodological Change* (citing *Antidumping Duties; Countervailing Duties*, 62 FR 27296, 27369 (May 19, 1997) and SAA at 827); and *Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China:  Preliminary Results of Antidumping Administrative Review; 2011-2012*, 78 FR 78333 (December 26, 2013) and accompanying PDM at Issue 9, unchanged in *Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 37715 (July 2, 2014).

[163] *See* New Continent's Case Brief at 31 (citing *Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission, in Part; 2016–2017*, 83 FR 45,893 (September 11, 2018); and *Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015–2016*, 83 FR 11,690 (March 16, 2018)).

*Petitioners' Rebuttal Brief*

- Commerce's preliminary denial is consistent with prior practice and the record; New Continent's argument should be rejected.[164]
- Commerce's decision is consistent with other recent decisions of the agency which, in accordance with the requirement of section 777A(f)(1)(B), have examined whether average import prices decreased or not and have disallowed the adjustment if they did not. Further, Commerce examined only whether average import prices had decreased, not whether any increase had been less than it otherwise would have been, as proposed by the respondent.[165]

**Commerce Position:** Commerce continues to find that New Continent does not qualify for a double-remedy adjustment. Section 777A(f)(1)(B) of the Act requires Commerce to determine whether such countervailable subsidies have been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period. To make this determination, we examined International Trade Commission (ITC) import data for the POR.[166] Based on this information, we found that import prices of the class or kind of merchandise at issue during that relevant period increased.[167] As there was no general decrease in the U.S. average import price during the relevant period, we found that the requirement under section 777A(f)(1)(B) of the Act has not been met, and hence we did not make an adjustment under section 777A(f) of the Act.

The POR import price information New Continent placed on the record did not demonstrate a consistent decrease for its purchases of natural rubber, synthetic rubber, and nylon cord.[168] New Continent argued that the fact the import prices did not decrease does eliminate the possibility that the subsidies caused import prices to be lower than they would have been but for the subsidies. Moreover, New Continent argued that Commerce should have examined its prices, which it claims show a reduction. However, as noted by the petitioners, Commerce's

---

[164] *See* Petitioners' Rebuttal Brief at 6.

[165] *Id.* at 7-8 (citing *Ceramic Tile from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value, Preliminary Negative Critical Circumstances Determination, and Postponement of Final Determination,* 84 FR 61877 (November 24, 2019) (*Ceramic Tile from China 2019*); *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China, Preliminary Affirmative Determination of Sales at Less than Fair Value,* 84 FR 54106 (October 9 2019) (*Wooden Cabinets from China 2019*); *Alloy and Certain Carbon Steel Threaded Rod from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures,* 83 FR 50379 (September 25, 2019) (*Threaded Rod from China 2019*); *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review; 2017- 2018,* 84 FR 44283 (August 23, 2019) (*OTR Tires from China 2019*); *Steel Racks from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value,* 84 FR 7326 (March 4, 2019) (*Steel Racks from China 2019*); and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017,* 83 FR 67222 (December 28, 2018) (*Photo Cells from China 2018*)).

[166] *See* New Continent's Preliminary Analysis Memorandum at Attachment III.

[167] *Id.*

[168] *See* New Continent's Letter, "Double Remedies Response for Shandong New Continent Tire Co., Ltd.: Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China; 2017-18 AD Administrative Review," dated April 25, 2019 at Exhibit DR-3.

31

preliminary decision is consistent with other recent practices and the requirement of section 777A(f)(1)(B) of the Act that we have examined whether average import prices decreased or not and have disallowed the adjustment if they did not. Also, as in previous determinations, Commerce examined only whether average import prices had decreased, not whether any increase had been less than it otherwise would have been, as proposed by the respondent.[169]

Specifically, as noted in the *Preliminary Results*, Commerce has not found a general decrease in the U.S. average import price during the relevant period. Section 777A(f)(1)(B) of the Act requires Commerce to determine whether such countervailable subsidies have been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period. To make this determination, we examined ITC import data for the POR. Based on this information, Commerce continues to find that import prices of the class or kind of merchandise at issue during that relevant period increased. As there was no general decrease in the U.S. average import price during the relevant period, and the requirement under section 777A(f)(1)(B) of the Act has not been met, we will not make an adjustment under section 777A(f) of the Act for these final results.

**Comment 9:  Whether to Rescind the Administrative Review of Shandong Hengyu Science & Technology Co., Ltd.**

*Shandong Hengyu's Case Brief*

- Commerce incorrectly stated in the *Preliminary Results* that Shandong Hengyu withdrew its respective request for an administrative review. Shandong Hengyu did not withdraw its self-request for an administrative review and Commerce should not rescind its review of Shandong Hengyu.[170]

*The petitioners did not comment on this issue.*

**Commerce Position:**  In the *Preliminary Results*, we noted that an administrative review was requested for Shandong Hengyu by the company itself and by American Pacific Industries, Inc. (API), a U.S. importer of subject merchandise.[171] Subsequent to the administrative review requests and initiation, API filed a withdrawal requests with respect to Shandong Hengyu and numerous other producers/exporters of passenger tires from China.[172] Also in the interim, Shandong Hengyu filed a separate rate certification (SRC).[173]

Shandong Hengyu did not withdraw its request for self-examination during the instant administrative review. Therefore, for these final results, we will not rescind the administrative

---

[169] *See, e.g.*, *Ceramic Tile from China 2019*; *Wooden Cabinets from China 2019*; *Threaded Rod from China 2019*; *OTR Tires from China 2019*; *Steel Racks from China 2019*; and *Photo Cells from China 2018*.

[170] *See* Shandong Hengyu's Case Brief at 1.

[171] *See Preliminary Results*, PDM at 2.

[172] *See* API's Letter, "Passenger Vehicle and Light Truck Tires from People's Republic of China:  Withdrawal of Request for Administrative Review," dated October 31, 2018.

[173] *See* Shandong Hengyu's Letter, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China – Separate Rate Certification," dated October 19, 2018 (Shandong Hengyu SRC).

review with respect to Shandong Hengyu.  In addition, because Shandong Hengyu was previously granted a separate rate, it was entitled to file an SRC.[174]  In its SRC, Shandong Hengyu certified that there was still an absence of *de jure* control of its operations because the same ownership structure exists in the current POR as existed when it was originally granted separate rate status; there were no extra governmental laws (national, provincial, or local) that impeded the company's export activities; and there were no changes to any Chinese government laws during the current POR from the prior POR where it was granted separate rate status that changed the company's operational functions.[175]  Shandong Hengyu also certified the continued absence of *de facto* control by the Chinese government by noting that its owners continued to have no significant relationships with any level of the Chinese government; the company was still able to negotiate export contracts without government approval; it still maintained independent control over the selection of its management and board of directors; and the company was still able to retain the proceeds of its export sales.[176]  Given that there is no conflicting information with respect to Shandong Hengyu's SRC, we have determined that Shandong Hengyu continues to demonstrate the absence of both *de jure* and *de facto* control over its operations by the government and/or governmental agencies of China.  Thus, we are granting Shandong Hengyu a separate rate for these final results.

---

[174] *See* Shandong Hengyu SRC at 6 (citing *Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015–2016*, 83 FR 11690 (March 16, 2018)).
[175] *Id.* at 7-8 and Exhibit 1.
[176] *Id.* at 8-9 and Exhibit 2.

## V.    RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting all of the above positions.  If accepted, we will publish the final results of review in the *Federal Register*.

☐                    ☐


____X_____        _____
Agree                Disagree




4/15/2020

X  ⟨signature⟩
_____

Signed by: JEFFREY KESSLER
_____
Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

34

Case: 23-2266    Document: 13    Page: 247    Filed: 10/24/2023

**22396**  Barcode:3967176-01 A-570-016 REV - Admin Review 8/1/17 - 7/31/18
**Federal Register** / Vol. 85, No. 78 / Wednesday, April 22, 2020 / Notices

investigations to determine whether increased imports into the United States of articles like or directly competitive with those produced by each of the

firms contributed importantly to the total or partial separation of the firms' workers, or threat thereof, and to a

decrease in sales or production of each petitioning firm.

**SUPPLEMENTARY INFORMATION:**

### LIST OF PETITIONS RECEIVED BY EDA FOR CERTIFICATION OF ELIGIBILITY TO APPLY FOR TRADE ADJUSTMENT ASSISTANCE

[4/8/2020 through 4/14/2020]

| Firm name | Firm address | Date accepted for investigation | Product(s) |
|---|---|---|---|
| Technology For Humankind, LLC d/b/a Filimin. | 3913 North Rushwood Street, Wichita, KS 67226. | 4/10/2020 | The firm manufactures lamps. |
| Zip Products, Inc | 565 Blossom Road, Rochester, NY 14610. | 4/10/2020 | The firm manufactures metal parts. |
| International Cordage East, Ltd | 226 Upton Road, Colchester, CT 06415 | 4/14/2020 | The firm manufactures nets and rope. |

Any party having a substantial interest in these proceedings may request a public hearing on the matter. A written request for a hearing must be submitted to the Trade Adjustment Assistance Division, Room 71030, Economic Development Administration, U.S. Department of Commerce, Washington, DC 20230, no later than ten (10) calendar days following publication of this notice. These petitions are received pursuant to section 251 of the Trade Act of 1974, as amended.

Please follow the requirements set forth in EDA's regulations at 13 CFR 315.9 for procedures to request a public hearing. The Catalog of Federal Domestic Assistance official number and title for the program under which these petitions are submitted is 11.313, Trade Adjustment Assistance for Firms.

**Irette Patterson,**

*Program Analyst.*

[FR Doc. 2020–08514 Filed 4–21–20; 8:45 am]

**BILLING CODE 3510–WH–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–016]**

### Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017–2018

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) finds that certain producers and exporters of passenger vehicle and light truck tires (passenger tires) from the People's Republic of China (China) did not make sales of subject merchandise at prices below normal value (NV) during the period of review

(POR) August 1, 2017 through July 31, 2018.

**DATES:** Applicable April 22, 2020.

**FOR FURTHER INFORMATION CONTACT:** Toni Page, AD/CVD Operations, Office VII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–1398.

**SUPPLEMENTARY INFORMATION:**

### Background

On October 18, 2019, the Department of Commerce (Commerce) published its Preliminary Results of the administrative review of the antidumping duty order on passenger tires from the China.[1] The petitioners in this case are United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC (collectively, the petitioners). The mandatory respondents in this administrative review are Shandong New Continent Tire Co., Ltd. (New Continent) and Qingdao Odyking Tyre Co., Ltd. (Odyking).

We invited interested parties to comment on the *Preliminary Results*. Subsequent to the *Preliminary Results*, the petitioners; New Continent (mandatory respondent); and various separate rate entities submitted case and rebuttal briefs.[2]

[1] *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Rescission, in Part; 2017–2018,* 84 FR 55909 (October 18, 2019), and accompanying Preliminary Decision Memorandum (*Preliminary Results*).

[2] *See* Shandong Hengyu's Letter, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China—Ministerial Error," dated October 16, 2019; Petitioners' Case Brief, "Case Brief Submitted on Behalf of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC," dated December 2, 2019; Shandong New Continent Tire

A complete summary of the events that occurred since publication of the *Preliminary Results,* as well as a full discussion of the issues raised by parties for these final results, may be found in the Issues and Decision Memorandum.[3] The Issues and Decision Memorandum is a public document and is available electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed at *http://enforcement.trade.gov/frn/.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

### Scope of the Order

The products covered by the order are certain passenger vehicle and light truck tires from China. A full description of

Co., Ltd.'s Case Brief, "Shandong New Continent Tire Co., Ltd. Case Brief in the Third Administrative Review of Antidumping Duty Order on Passenger Vehicle and Light Truck Tires from the People's Republic of China," dated December 2, 2019; Pirelli Tyre Co., Ltd. and Pirelli's Case Brief, "Pirelli's Case Brief Certain Passenger Vehicle and Light Truck Tires from China," dated December 3, 2019; Petitioners' Rebuttal Brief, "Rebuttal Brief Submitted on Behalf of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC," dated December 9, 2019; New Continent's Rebuttal Brief, "Shandong New Continent Tire Co., Ltd. Rebuttal Brief in the Third Administrative Review of Antidumping Duty Order on Passenger Vehicle and Light Truck Tires from the People's Republic of China," dated December 9, 2019; and Haohua's Comments in Lieu of Rebuttal Brief, "Passenger Vehicle and Light Truck Tires from China- Comments in Lieu of Rebuttal Case Brief," dated December 9, 2019.

[3] *See* Memorandum, "Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China and Rescission, in part; 2017 2018," issued concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

the scope of the order is contained in the Issues and Decision Memorandum.[4]

**Separate Rates**

In the *Preliminary Results,* we found that evidence provided by New Continent and other separate rate candidates supported finding an absence of both *de jure* and *de facto* government control, and, therefore, we preliminarily granted a separate rate to each of these companies.[5] We received no information since the issuance of the *Preliminary Results* that provides a basis for reconsidering these determinations with respect to New Continent and to the other separate rate candidates.

Subsequent to the *Preliminary Results,* Shandong Hengyu Science & Technology Co., Ltd. (Shandong Hengyu), informed Commerce that it did not withdraw its request for self-examination during the instant administrative review. Therefore, for these final results, we will not rescind the administrative review with respect to Shandong Hengyu. In addition, based on our examination of Shandong Hengyu's Separate Rate Certification, we

determine that it demonstrated the absence of both *de jure* and *de facto* control over its operations by the government and/or governmental agencies of China.

Therefore, for the final results, we continue to find that New Continent and the other exporters listed below under "Final Results of Review" are eligible for separate rates.

In addition, Commerce continues to find that certain companies have not demonstrated their entitlement to separate rate status because: (1) They withdrew their participation from the administrative review; (2) they did not rebut the presumption of *de jure* or *de facto* government control of their operations; or (3) did not timely file their separate rate application and/or certification.[6] *See* Appendix II of this **Federal Register** notice for a complete list of companies not receiving a separate rate.

**Analysis of Comments Received**

All issues raised in the case and rebuttal briefs filed by parties in this review are addressed in the Issues and

Decision Memorandum, which is hereby adopted by this notice. A list of the issues that parties raised and to which we responded in the Issues and Decision Memorandum follows as an appendix to this notice.

**Adjustments for Export Subsidies**

Commerce continues to adjust New Continent's U.S. price for export subsidies, pursuant to 772(c)(1)(C) of the Act for the final results.

**Changes Since the Preliminary Results**

Based on a review of the record and comments received from interested parties regarding our *Preliminary Results,* we made certain changes for these final results. Specifically, we have made adjustments to the calculation of the antidumping margin for New Continent,[7] and granted separate rate status to Shandong Hengyu.[8]

**Final Results of Review**

Commerce finds that the following weighted-average dumping margins exist for the POR:

| Exporter | Weighted-average dumping margin (percent) |
|---|---|
| Shandong New Continent Tire Co., Ltd | 0.00 |
| Anhui Jichi Tire Co., Ltd | 0.00 |
| Crown International Corporation | 0.00 |
| Hankook Tire China Co., Ltd | 0.00 |
| Jingsu Hankook Tire Co., Ltd | 0.00 |
| Kenda Rubber (China) Co., Ltd | 0.00 |
| Kinforest Tyre Co., Ltd | 0.00 |
| Mayrun Tyre (Hong Kong) Limited | 0.00 |
| Qingdao Fullrun Tyre Corp., Ltd | 0.00 |
| Qingdao Sunfulcess Tyre Co., Ltd | 0.00 |
| Qingdao Transamerica Tire Industrial Co., Ltd | 0.00 |
| Shandong Anchi Tyres Co., Ltd | 0.00 |
| Shandong Duratti Rubber Corporation Co., Ltd | 0.00 |
| Shandong Haohua Tire Co., Ltd | 0.00 |
| Shandong Hengyu Science & Technology Co., Ltd | 0.00 |
| Shandong Hongsheng Rubber Technology Co., Ltd | 0.00 |
| Shandong Longyue Rubber Co., Ltd | 0.00 |
| Shandong Province Sanli Tire Manufactured Co., Ltd | 0.00 |
| Winrun Tyre Co., Ltd | 0.00 |

---

[4] *See* Issues and Decision Memorandum at "Scope of the Order."

[5] *See Preliminary Results* 84 FR 55909 at 55911.

[6] *See* Memorandum, "Antidumping Duty Administrative Review of Certain Passenger Vehicle and Light Truck Tires from the People's Republic

of China: Final Separate Rate Status," dated concurrently with the instant notice.

[7] *See* Issues and Decision Memorandum at comments 1 and 5; and Memorandum, "Administrative Review of Certain Passenger Vehicle and Light Truck Tires from the People's

Republic of China: Final Analysis Memorandum for Shandong New Continent Tire Co., Ltd.," dated concurrently with the instant memorandum.

[8] *See* Issues and Decision Memorandum at comment 9.

## Assessment Rates

Pursuant to section 751(a)(2)(C) of the Act, and 19 CFR 351.212(b), Commerce has determined, and U.S. Customs and Border Protection (CBP) shall assess, antidumping duties on all appropriate entries of subject merchandise in accordance with the final results of this review. Commerce intends to issue assessment instructions to CBP 15 days after the publication date of the final results of this review.

For each individually examined respondent in this review whose weighted-average dumping margin in the final results of review is not zero or *de minimis* (*i.e.,* less than 0.5 percent), Commerce intends to calculate importer-specific assessment rates, in accordance with 19 CFR 351.212(b)(1).[9] Where the respondent reported reliable entered values, Commerce intends to calculate importer-specific *ad valorem* assessment rates by aggregating the amount of dumping calculated for all U.S. sales to the importer, and dividing this amount by the total entered value of the sales to the importer.[10] Where the importer did not report entered values, Commerce intends to calculate an importer-specific assessment rate by dividing the amount of dumping for reviewed sales to the importer by the total sales quantity associated with those transactions. Where an importer-specific *ad valorem* assessment rate is not zero or *de minimis*, Commerce will instruct CBP to collect the appropriate duties at the time of liquidation. Where either the respondent's weighted average dumping margin is zero or *de minimis*, or an importer-specific *ad valorem* assessment rate is zero or *de minimis*, Commerce will instruct CBP to liquidate appropriate entries without regard to antidumping duties.[11]

Pursuant to Commerce practice, for entries that were not reported in the U.S. sales database submitted by an exporter individually examined during this review, Commerce will instruct CBP to liquidate such entries at the rate for the China-wide entity.[12] Additionally, if Commerce determines that an exporter under review had no shipments of the subject merchandise, any suspended entries that entered under that exporter's CBP case number will be liquidated at the rate for the China-wide entity.

For the companies for which this review is rescinded, antidumping duties will be assessed at rates equal to the cash deposit of estimated antidumping duties required at the time of entry, or withdrawal from warehouse, for consumption, in accordance with 19 CFR 351.212(c)(1)(i). Commerce will issue appropriate assessment instructions with respect to the companies for which this review is rescinded to CBP 15 days after the publication of this notice.

In accordance with section 751(a)(2)(C) of the Act, the final results of this review shall be the basis for the assessment of antidumping duties on POR entries, and for future deposits of estimated antidumping duties, where applicable.

## Cash Deposit Requirements

Commerce will instruct CBP to require a cash deposit for antidumping duties equal to the weighted-average amount by which NV exceeds U.S. price. The following cash deposit requirements will be effective upon publication of the final results of this administrative review for shipments of the subject merchandise from China entered, or withdrawn from warehouse, for consumption on or after the publication date of this notice, as provided by section 751(a)(2)(C) of the Act: (1) For the exporters listed above, the cash deposit rate will be equal to the weighted-average dumping margin established in the final results of this review (except that, if the rate is *de minimis* (*i.e.,* less than 0.5 percent), then the cash deposit rate will be zero for that exporter); (2) for previously investigated or reviewed China and non-China exporters not listed above that have separate rates, the cash deposit rate will continue to be the exporter-specific rate published for the most recently completed segment of this proceeding; (3) for all China exporters of subject merchandise which have not been found to be entitled to a separate rate, the cash deposit rate will be the rate for the China-wide entity (*i.e.,* 76.46 percent);[13] and (4) for all non-China exporters of subject merchandise that have not received their own rate, the cash deposit rate will be the rate applicable to the China exporter that supplied that non-China exporter. These deposit requirements, when imposed, shall remain in effect until further notice.

## Notification to Importers

This notice also serves as a reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties and/or countervailing duties prior to liquidation of the relevant entries during this POR. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping duties and/or countervailing duties has occurred, and the subsequent assessment of double antidumping duties and/or an increase in the amount of antidumping duties by the amount of the countervailing duties.

## Notification to Interested Parties

This notice serves as the only reminder to parties subject to administrative protective order (APO) of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of return or destruction of APO materials, or conversion to judicial protective order, is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

We are issuing and publishing these results in accordance with sections 751(a)(1) and 777(i)(1) of the Act.

Dated: April 15, 2020.

**Jeffrey I. Kessler,**
*Assistant Secretary for Enforcement and Compliance.*

## Appendix I

**List of Topics Discussed in the Issues and Decision Memorandum**

I. Summary
II. Background
III. Scope of the Order
IV. Discussion of the Issues
  Comment 1: Whether Russia Should be the Primary Surrogate Country
  Comment 2: Whether to Grant a Separate Rate to Haohua
  Comment 3: Whether to Grant Pirelli China a Separate Rate
  Comment 4: Whether Commerce has the Authority to Establish a China-Wide Entity Rate
  Comment 5: Whether to Correct Alleged Errors in New Continent's Margin Calculations
  Comment 6: Whether to Correct Certain "Importer or Customer" names in New Continent's Draft Liquidation Instructions
  Comment 7: Whether to Continue to Deduct Irrecoverable VAT from New Continent's Gross Unit Price
  Comment 8: Whether to Grant a Double Remedy Adjustment to New Continent

---

[9] *See Antidumping Proceedings: Calculation of the Weighted Average Dumping Margin and Assessment Rate in Certain Antidumping Proceedings: Final Modification,* 77 FR 8101 (February 14, 2012) (*Final Modification*).

[10] *See* 19 CFR 351.212(b)(1).

[11] *See Final Modification,* 77 FR at 8103.

[12] *See Non-Market Economy Antidumping Proceedings: Assessment of Antidumping Duties,* 76 FR 65694 (October 24, 2011), for a full discussion of this practice.

[13] *See AD Order,* 80 FR at 47904.

Comment 9: Whether to Rescind the Administrative Review of Shandong Hengyu Science & Technology Co., Ltd.
V. Recommendation

### Appendix II

**List of Companies Not Receiving Separate Rate Status**

1. Pirelli Tyre Co., Ltd.
2. Qingdao Odyking Tyre Co., Ltd.
3. Tianjin Wanda Tyre Group Co., Ltd.

[FR Doc. 2020–08540 Filed 4–21–20; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–909]

### Certain Steel Nails From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that certain steel nails (nails) from the People's Republic of China (China) were sold in the United States at less than normal value (NV) during the period of review (POR) August 1, 2017 through July 31, 2018.

**DATES:** Applicable April 22, 2020.

**FOR FURTHER INFORMATION CONTACT:** Annathea Cook or Benito Ballesteros, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0250 or (202) 482–7425, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On October 18, 2019, Commerce published in the **Federal Register** the *Preliminary Results* of the administrative review of the antidumping duty order on nails from China.[1]

In accordance with 19 CFR 351.309, we invited parties to comment on our *Preliminary Results.* On November 25, 2019, Shanxi Pioneer Hardware Industrial Co., Ltd. (Pioneer), Shanxi Hairui Trade Co., Ltd., SDC

[1] *See Certain Steel Nails from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017–2018,* 84 FR 55906 (October 18, 2019) (*Preliminary Results*) and accompanying Preliminary Decision Memorandum.

International Aust. Pty. Ltd., and S-Mart (Tianjin) Technology Development Co., Ltd. (collectively, Pioneer *et al.*),[2] Mid Continent Steel & Wire, Inc. (the petitioner),[3] The Stanley Works (Langfang) Fastening Systems Co., Ltd. and Stanley Black & Decker, Inc. (Stanley B&D) (collectively, Stanley),[4] and Building Material Distributors, Inc., Qingdao D&L Group Ltd., Shandong Qingyun Hongyi Hardware Products Co., Ltd., Dezhou Hualude Hardware Products Co., Ltd., and Mingguang Ruifeng Hardware Products Co., Ltd. (collectively Building Material Distributors *et al.*),[5] submitted timely-filed case briefs. On December 9, 2019, Pioneer,[6] the petitioner,[7] and Stanley,[8] submitted timely-filed rebuttal briefs.

### Scope of the Order

The merchandise covered by the order is nails from China. For a complete description of the scope of this order, *see* the Issues and Decision Memorandum.[9]

### Analysis of Comments Received

We addressed all issues raised in the case and rebuttal briefs filed by interested parties in the Issues and Decision Memorandum. Attached to this notice, in Appendix II, is a list of the issues which parties raised. The Issues and Decision Memorandum is a public document and is on file in the Central Records Unit (CRU), Room B8024 of the main Department of Commerce building, as well as electronically via Enforcement and Compliance's

[2] *See* Pioneer *et al.*'s Letter, "Certain Steel Nails from the People's Republic of China: Case Brief," dated November 25, 2019.

[3] *See* Petitioner's Letter, "Certain Steel Nails from the People's Republic of China: Case Brief, dated November 25, 2019.

[4] *See* Stanley's Letter, "Certain Steel Nails from the People's Republic of China; Tenth Administrative Review; Case Brief of The Stanley Works (Langfang) Fastening Systems Co., Ltd and Stanley Black & Decker, Inc.," dated November 25, 2019 .

[5] *See* Building Material Distributors *et al.*'s Letter, "Certain Steel Nails from the People's Republic of China, 10th Administrative Review; Administrative Case Brief," dated November 25, 2019.

[6] *See* Pioneer's Letter, "Certain Steel Nails from the People's Republic of China: Rebuttal Case Brief," dated December 9, 2019 (Pioneer Rebuttal).

[7] *See* Petitioner's Letter, "Certain Steel Nails from the People's Republic of China: Rebuttal Brief," dated December 9, 2019 (Petitioner Rebuttal).

[8] *See* Stanley's Letter, "Certain Steel Nails from the People's Republic of China; Tenth Administrative Review; Rebuttal Brief of The Stanley Works (Langfang) Fastening Systems Co., Ltd and Stanley Black & Decker, Inc.," dated December 9, 2019 (Stanley Rebuttal).

[9] *See* Memorandum, "Certain Steel Nails from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the 2017–18 Antidumping Duty Administrative Review," dated April 15, 2020 (Issues and Decision Memorandum) which is hereby adopted by this notice.

Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov*. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly on the internet at *http://enforcement.trade.gov/frn/index.html*. The signed Issues and Decision Memorandum and the electronic versions of the Issues and Decision Memorandum are identical in content.

### Changes Since the Preliminary Results

Based on a review of the record and comments received from interested parties, and for the reasons explained in the Issues and Decision Memorandum, we are revising the margin calculations for Stanley and Pioneer. Accordingly, for these final results, Commerce updated the rate assigned to the non-selected companies, which is based on an average of the rates for the three mandatory respondents, Stanley, Pioneer, and Tianjin Universal Machinery Imp. & Exp. Corporation (Universal), as discussed in the Issues and Decision Memorandum. For a discussion of these changes, *see* the "Changes Since the Preliminary Results" section of the Issues and Decision Memorandum.

### Final Determination of No Shipments

In the *Preliminary Results,* Commerce preliminarily determined that eleven companies did not have any reviewable transactions during the POR: Astrotech Steels Pvt. Ltd.; Geeky Wires Limited; Hebei Minmetals Co., Ltd.; Jinhai Hardware Co., Ltd.; Nanjing Yuechang Hardware Co., Ltd.; Region Industries Co., Ltd.; Region System Sdn. Bhd.; Shandong Oriental Cherry Hardware Group Co., Ltd.; Shandong Oriental Cherry Hardware Import & Export Co., Ltd.; Shanghai Jade Shuttle Hardware Tools Co., Ltd.; and Zhangjiagang Lianfeng Metals Products Co., Ltd. Following the publication of the *Preliminary Results,* we received no comments from interested parties regarding these companies, nor has any party submitted record evidence which would call our preliminary determination into question. Therefore, for these final results, we continue to find that these eleven companies did not have any reviewable transactions during the POR. Consistent with our practice, we will issue appropriate instructions to U.S. Customs and Border Protection (CBP) based on our final results.

Import Administration Policy Bulletin

Number: 05.1
Topic: Separate-Rates Practice and Application of Combination Rates in Antidumping
Investigations involving Non-Market Economy Countries

Signed
Approved: _____
Joseph A. Spetrini
Acting Assistant Secretary
for Import Administration

4-5-05
_____
Date

Statement of Issue

This policy bulletin describes the Department's application process for separate rates status in non-market economy ("NME") investigations and explains the Department's policy of assigning specific exporter-producer "combination rates" to both mandatory respondents and non-investigated NME exporters that meet the Department's criteria for separate rate status in investigations.

Background

In an NME antidumping investigation, the Department presumes that all companies within the NME country are subject to governmental control and should be assigned a single antidumping duty rate unless an exporter demonstrates the absence of both *de jure* and *de facto* governmental control over its export activities. See *e.g.,* Final Determination of Sales at Less Than Fair Value: Bicycles from the People's Republic of China, 61 FR 19026, 19027 (April 30, 1996). If an NME entity demonstrates this independence with respect to its export activities, it is eligible for a rate that is separate from the NME-wide rate. This separate rate is usually either an individually calculated rate or a weighted-average rate based on the rates of the investigated companies, excluding any rates that are zero, *de minimis*, or based entirely on facts available. The Department's separate rates test is not concerned, in general, with macroeconomic border-type controls (*e.g.*, export licenses, quotas, and minimum export prices). Rather, the test focuses on controls over the decision-making process on export-related investment, pricing, and output decisions at the individual firm level. See, *e.g.*, Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate from Ukraine, 62 FR 61754, 61757 (November 19, 1997); and Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 62 FR

61276, 61279 (November 17, 1997).

To establish whether a firm is sufficiently independent from governmental control in its export activities to be eligible for separate rate status, the Department analyzes each exporting entity under a test arising from the <u>Final Determination of Sales at Less Than Fair Value: Sparklers from the People's Republic of China</u>, 56 FR 20588 (May 6, 1991), as modified in the <u>Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China</u>, 59 FR 22585, 22587 (May 2, 1994) (<u>Silicon Carbide</u>).  Under this test, the Department assigns separate rate status in NME cases only if an exporter can demonstrate the absence of both *de jure* and *de facto* governmental control over its export activities.  See <u>Silicon Carbide</u> and <u>Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol from the People's Republic of China</u>, 60 FR 22544, 22545 (May 8, 1995).  In order to request and qualify for separate rate status in an investigation, a company must have exported the subject merchandise[1] to the United States during the period of investigation, and it must provide information responsive to the following considerations:

1. Absence of *De Jure* Control:  The Department considers the following *de jure* criteria in determining whether an individual company may qualify for a separate rate: 1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; 2) any legislative enactments decentralizing control of companies; and 3) any other formal measures by the government decentralizing control of companies.

2. Absence of *De Facto* Control:  Typically, the Department considers four factors in evaluating whether each respondent is subject to *de facto* governmental control of its export functions: 1) whether the export prices are set by, or subject to the approval of, a governmental authority; 2) whether the respondent has authority to negotiate and sign contracts and other agreements; 3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and 4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

In an antidumping investigation, the Department previously has assigned a weighted-average of the rates individually calculated for the mandatory respondents, excluding any rates that were zero, *de minimis*, or based entirely on facts available, to exporters who or which have requested a separate rate but who (or which) have not been selected as mandatory respondents. In order to qualify for this rate, they were previously required to fulfill two requirements.  First, they had to submit a request for separate rates treatment, along with a timely response to section A of the Department's questionnaire.  Second, the Department had to have determined, after reviewing the requesting companies' submissions, that separate rates treatment was warranted. See, *e.g.*, <u>Final Determination of Sales at Less Than Fair Value: Certain Circular Welded Carbon-Quality Steel Pipe from the People's Republic of China</u>, 67 FR 36570, 36571 (May 24, 2002).

The Department has faced a  growing administrative burden in analyzing requests for

---

[1]For purposes of this document, the term "subject merchandise" refers to the merchandise described in the petition of the investigation.  This shorthand term is not intended to make any conclusions as to the definition of the final scope of the order.

2

separate rate status (especially inadequate submissions requesting separate rates treatment).  For example, the Department has faced a large number of separate rate requests in three recent investigations involving two NME countries.  See Notice of Final Determination of Sales at Less Than Fair Value: Wooden Bedroom Furniture from the People's Republic of China, 69 FR 67313 (November 17, 2004) (PRC Furniture); Notice of Final Determination of Sales at Less Than Fair Value: Certain Frozen and Canned Warmwater Shrimp from the People's Republic of China, 69 FR 70997 (December 8, 2004) (PRC Shrimp); and Notice of Final Determination of Sales at Less Than Fair Value: Certain Frozen and Canned Warmwater Shrimp from the Socialist Republic of Vietnam, 69 FR 71005 (December 8, 2004) (Vietnam Shrimp).

While the Department analyzed the large number of separate rate requests in these three investigations, it has become clear that these requests consume an inordinate amount of the Department's resources.  The Department also has concerns regarding the effectiveness of its current test in determining whether a company is properly eligible for separate rate status.  Various parties have questioned whether the Department's separate rates test, as currently constructed, offers the most effective means of determining whether exporters act independently of the government.  Some parties have argued that the current separate rates test does not go far enough in analyzing whether a firm acts both *de jure* and *de facto* independently of the government in its export activities, whereas others have argued that the test already goes beyond what is necessary and poses an unnecessary burden on respondents and on the Department.

Another issue that has been raised concerns the potential evasion of duties.  Under current practice, separate rates are assigned only to exporters, and this assigned rate applies to all of the firm's exports regardless of the entity that produces the subject merchandise.  Various interested parties argued that this practice is unfair, because while the margins the Department calculates are based on information from certain individual producers, the cash deposit rate applies to subject merchandise exported by the exporter in question, regardless of whether it was produced by the same producers whose information was submitted in the investigation.  Those arguing in favor of revising the Department's methodology contend that this is a shortcoming of the current practice, since entities not eligible for a separate rate of their own can simply "funnel" their merchandise through those firms that have received a separate rate.  Advocates of revising the Department's methodology in this area argue further that the current practice of accounting for any shifts in sourcing patterns in administrative reviews that are conducted subsequent to the issuance of the order is unsuitable for industries that see rapid shifts in production and where producers can easily enter and depart the industry.  Finally, in certain instances where the antidumping duty rates the Department assigns vary widely from exporter to exporter, exporters assigned high rates can easily shift their shipments of subject merchandise to other exporters assigned lower rates.  Such diversion undermines the effectiveness of the antidumping order and the significance of the other antidumping duty rates the Department assigns to the various exporting entities.

Statement of Policy

*Application for Separate Rates*

When an NME antidumping investigation is initiated, the initiation notice will announce

3

that NME exporters of the subject merchandise under investigation can apply for a separate rate by completing an application for separate rates, which will be posted for each investigation on the Import Administration website at the following address: *http://ia.ita.doc.gov/*.  The application for each investigation will be tailored to some extent for that case, depending, for example, on the NME country involved in the investigation.  For firms not selected as mandatory respondents by the Department, but which nonetheless seek a separate rate, the application will replace the requirement that they respond to Section A of the Department's questionnaire.  Firms that the Department selects to be mandatory respondents will continue to be required to respond to the complete questionnaire.  Because NME firms will have the opportunity to respond to the separate rates application immediately upon initiation of the investigation and before the Department selects mandatory respondents, it is possible that an entity the Department selects to be a mandatory respondent already will have submitted an application for a separate rate.  In such cases, the firm may refer to its already submitted separate rate application for the section of the questionnaire that deals with separate rates.

The separate rates application does not change the long-established standard for eligibility for receiving a separate rate (see <u>Background</u> section above), which remains whether a firm can demonstrate an absence of both *de jure* and *de facto* governmental control over its export activities.  Rather, the application clarifies the Department's previous practice by giving more explicit instructions on how the requirements can be fulfilled, is limited to addressing a firm's independence in its export activities, and requires various company-specific information in order for the Department to determine with certainty that the firm meets the criteria for receiving separate rate status.  In addition, firms seeking separate rate status must adhere to the following conditions:

1.    The Department will not consider applications that remain incomplete by the deadline date established in paragraph 6 below.

2.    The Department will, however, notify firms whose applications are incomplete or otherwise deficient, if those applications are filed within thirty calendar days after the publication of the initiation notice, giving such firms an opportunity  to resubmit a corrected application, as long as the resubmitted applications are received by the deadline set forth in the header to the application.

3.    Firms must submit the specific application that has been posted for each case, because the application may vary from case to case (depending, for example, on the NME country and product being investigated).

4.    Firms to whom the Department sends a Quantity and Value ("Q&V") questionnaire, which is used in certain investigations to select mandatory respondents, must respond to the Q&V questionnaire to receive consideration for a separate rate.  This is necessary to ensure that the Department has the necessary information to appropriately select mandatory respondents.

5.    <u>All</u> applicants must identify in the application any affiliates in the NME country that exported to the United States during the period of investigation the merchandise described in the petition, as well as any affiliates located in the United States involved in

the sale of the subject merchandise.

6.  <u>All</u> applications are due sixty calendar days after publication of the initiation notice.  This deadline applies equally to NME-owned and wholly foreign-owned firms for completing the applicable provisions of the application and for submitting the required supporting documentation.

7.  <u>All</u> shipments to the United States declared to U.S. Customs and Border Protection must identify the exporter by its legal business name.  This name must match the name that appears on the exporter's business license/registration documents, a copy of which shall be provided to the Department as part of the exporter's request for separate rate status.

8.  <u>All</u> information in the application and supporting documentation is subject to verification, and the Department reserves the right to issue supplemental questionnaires, if necessary.

9.  <u>Each</u> applicant must submit a separate individual application regardless of any common ownership or affiliation between firms and regardless of foreign ownership.

10.  NME exporters that ultimately are wholly owned by entities located in market-economy countries[2] have different requirements for completing the application than do non-wholly market-economy owned NME exporters.  NME exporters not wholly owned by entities located in market-economy countries must fill out the application in its entirety to receive consideration for a separate rate.

11.  NME exporters that are wholly owned by market-economy entities which are in turn owned or controlled by entities located in a non-market economy are required to fill out the complete application.

12.  NME exporters that are ultimately wholly-owned by entities located in market economy countries are only required to:

A.  Fill out the certifications requested in the application and provide supporting documentation for fields in the application marked with an asterisk.[3]  These marked fields pertain to the firm's eligibility for separate rate status by having sold subject merchandise to the United States during the POI and establishing the firm's claim that it is, in fact, ultimately wholly owned by a market-economy entity.  This information is also necessary for administration once a separate rate is issued.

B.  Report, in addition to the affiliates identified in paragraph 5 above, *any other* affiliations with other firms in the NME country involved in the *production or sale* of the subject merchandise as described in the petition, including merchandise that is produced solely for domestic consumption.

---

[2]Exporters claiming to be wholly owned by a market economy entity must report the identity and location of the individual(s) or firm(s) with ultimate ownership or control over the market economy entity.

[3]This includes firms that are ultimately wholly owned by Hong Kong or Taiwan entities.

The Department's application is designed to be a more thorough approach to evaluating a firm's eligibility for separate rate status. It is meant to clarify and streamline the separate rates process for both the Department and for respondents. Since firms will have notice of the types of documents required for making a separate rate claim, firms submitting incomplete applications by the deadline referred to in paragraph 6 above will not be eligible for separate rate status in the investigation. Because substantiation of a separate rate claim is required and subject to verification, the application process is a meaningful test of a firm's eligibility for a separate rate.

This practice will be effective for all NME antidumping investigations initiated on or after the date of publication in the Federal Register of the notice announcing this policy. This practice only applies to antidumping investigations.

*Combination Rates*

As noted above, in NME investigations, the Department assigns separate rates only to exporters that have demonstrated their independence from *de jure* and *de facto* government control over their export activities (see Background section above). While continuing the practice of assigning separate rates only to exporters, all separate rates that the Department will now assign in its NME investigations will be specific to those producers that supplied the exporter during the period of investigation. Note, however, that one rate is calculated for the exporter and all of the producers which supplied subject merchandise to it during the period of investigation. This practice applies both to mandatory respondents receiving an individually calculated separate rate as well as the pool of non-investigated firms receiving the weighted-average of the individually calculated rates. This practice is referred to as the application of "combination rates" because such rates apply to specific combinations of exporters and one or more producers. The cash-deposit rate assigned to an exporter will apply only to merchandise *both* exported by the firm in question *and* produced by a firm that supplied the exporter during the period of investigation. This practice is similar to the Department's established practice in cases where firms are excluded from an antidumping duty order (i.e., due to zero or *de minimis* margins) and in new shipper reviews, both of which use exporter-producer combination rates. See Sections 733(b)(3) and 735(a)(4) of the Tariff Act of 1930, as amended, and 19 CFR 351.107(b)(1) and Import Administration Policy Bulletin 03.2: Combination Rates in New Shipper Reviews, dated March 04, 2003.

The Department's separate rates analysis and test is *not* being extended to producers. Firms that produce the subject merchandise are not required to demonstrate their eligibility for separate rate status unless they also export the merchandise to the United States. The Department's separate rates test, which focuses exclusively on the respondent's *export* activities, is not being altered by the extension of combination rates to all NME exporters receiving a separate rate.

In either their questionnaire responses or applications for separate rates or(depending on whether the firm is a mandatory respondent or a non-investigated exporter), exporters are required to provide the Department with the names and contact information of all the producers whose merchandise they exported to the United States during the period of investigation. In the case of a non-producing exporter, the exporter's "separate" cash deposit rate only applies to

6

merchandise supplied by the producer(s) reported to the Department in the investigation.  In the case of an exporter (that qualified for a separate rate) that also produced all the subject merchandise it exported to the United States during the period of investigation, the cash deposit rate the Department assigns to that entity applies only to merchandise both exported and produced by that entity.  If an exporter receiving a separate rate sourced from multiple producers (including itself) during the period of investigation, and provided the Department with the required information about each of these producers, the exporter's cash-deposit rate will be applied to merchandise it sourced from *any* combination of its identified producers without restriction.  In other words, the Department will not assign combination rates to an exporter and *individual* producers, but rather to an exporter and its producers *as a group*.

This practice is necessary to prevent the avoidance of payment of antidumping duties by firms shifting exports through exporters with the lowest assigned cash-deposit rates.  The Department's previous practice of accounting for changes in producers during administrative reviews is not sufficient to prevent these activities, because in many industries, producers can appear and disappear frequently prior to the administrative review.  Only by limiting the application of the separate rate to specific combinations of exporters and one or more producers can the Department prevent the "funneling" of subject merchandise through the exporters with the lowest rates.

As with the application for separate rates discussed above, this practice is effective in all NME antidumping investigations initiated on or after the date of publication in the <u>Federal Register</u> of the notice announcing this policy.  This practice also applies only to investigations. The Department is currently evaluating the extension of these changes in practice to administrative reviews.

Codice Civile
(Italian Civil Code)



# Codice Civile

## Edizione 2018



# CODICE CIVILE

## Libro I - Delle persone e della famiglia

---

Sommario
DISPOSIZIONI SULLA LEGGE IN GENERALE
TITOLO I – DELLE PERSONE E DELLA FAMIGLIA...............................6
TITOLO II – DELLE PERSONE GIURIDICHE........................................6
TITOLO III – DEL DOMICILIO E DELLA RESIDENZA............................8
TITOLO IV – DELL'ASSENZA E DELLA DICHIARAZIONE DI MORTE PRESUNTA.8
TITOLO V – DELLA PARENTELA E DELL'AFFINITA'............................10
TITOLO VI – DEL MATRIMONIO.....................................................10
TITOLO VII – DELLA FILIAZIONE...................................................21
TITOLO VIII – DELL'ADOZIONE DI PERSONE MAGGIORI DI ETA'.........28
TITOLO IX – DELLA POTESTA' DEI GENITORI E DEI DIRITTI E DOVERI DEL FIGLIO
(¹).......................................................................................32
TITOLO IX-BIS – ORDINI DI PROTEZIONE CONTRO GLI ABUSI FAMILIARI (¹).36
TITOLO X – DELLA TUTELA E DELL'EMANCIPAZIONE.........................36
TITOLO XI – DELL'AFFILIAZIONE E DELL'AFFIDAMENTO ....................40
TITOLO XII – DELLE MISURE DI PROTEZIONE DELLE PERSONE PRIVE IN TUTTO
OD IN PARTE DI AUTONOMIA (¹) .................................................40
TITOLO XIII – DEGLI ALIMENTI ...................................................43
TITOLO XIV – DEGLI ATTI DELLO STATO CIVILE ...........................44

---

<div align="center">

### CODICE CIVILE

</div>

## DISPOSIZIONI SULLA LEGGE IN GENERALE

### CAPO I - DELLE FONTI DEL DIRITTO

**Art. 1. Indicazione delle fonti.**
Sono fonti del diritto:
1) le leggi;
2) i regolamenti;
3)... (¹)
4) gli usi.

(1) "le norme corporative" sono state abrogate per effetto del R.D.L. 9 agosto 1943, n. 721.

**Art. 2. Leggi.**
La formazione delle leggi e l'emanazione degli atti del Governo aventi forza di legge sono disciplinate da leggi di carattere costituzionale.

**Art. 3. Regolamenti.**
Il potere regolamentare del Governo è disciplinato da leggi di carattere costituzionale.
Il potere regolamentare di altre autorità è esercitato nei limiti delle rispettive competenze, in conformità delle leggi particolari.

**Art. 4. Limiti della disciplina regolamentare.**
I regolamenti non possono contenere norme contrarie alle disposizioni delle leggi.
I regolamenti emanati a norma del secondo comma dell'art. 3 non possono nemmeno dettare norme contrarie a quelle dei regolamenti emanati dal Governo.

**Art. 5.**
(...) (¹)

(1) "Norme corporative.

Sono norme corporative le ordinanze corporative, gli accordi economici collettivi, i contratti collettivi di lavoro e le sentenze della magistratura del lavoro nelle controversie collettive." Le norme corporative sono state abrogate per effetto del R.D.L. 9 agosto 1943, n. 721.

**Art. 6.**
(...) (¹)

(1) "Formazione ed efficacia delle norme corporative.
La formazione e l'efficacia delle norme corporative sono disciplinate nel codice civile e in leggi particolari." Le norme corporative sono state abrogate per effetto del R.D.L. 9 agosto 1943, n. 721.

**Art. 7.**
(...) (¹)

(1) "Limiti della disciplina corporativa.
Le norme corporative non possono derogare alle disposizioni imperative delle leggi e dei regolamenti." Le norme corporative sono state abrogate per effetto del R.D.L. 9 agosto 1943, n. 721.

**Art. 8. Usi.**
Nelle materie regolate dalle leggi e dai regolamenti gli usi hanno efficacia solo in quanto sono da essi richiamati.
(...) (¹)

(1) "Le norme corporative prevalgono sugli usi, anche se richiamati dalle leggi e dai regolamenti, salvo che in esse sia diversamente disposto." Le norme corporative sono state abrogate per effetto del R.D.L. 9 agosto 1943, n. 721.

**Art. 9. Raccolte di usi.**
Gli usi pubblicati nelle raccolte ufficiali degli enti e degli organi a ciò autorizzati si presumono esistenti fino a prova contraria.

### CAPO II – DELL'APPLICAZIONE DELLA LEGGE IN GENERALE

**Art. 10. Inizio dell'obbligatorietà delle leggi e dei regolamenti.**
Le leggi e i regolamenti divengono obbligatori nel decimoquinto giorno successivo a quello della loro pubblicazione, salvo sia altrimenti disposto.
(...) (¹)

(1) "Le norme corporative divengono obbligatorie nel giorno successivo a quello della pubblicazione, salvo che in esse sia altrimenti disposto." Le norme corporative sono state abrogate per effetto del R.D.L. 9 agosto 1943, n. 721.

**Art. 11. Efficacia della legge nel tempo.**
La legge non dispone che per l'avvenire: essa non ha effetto retroattivo.
I contratti collettivi di lavoro possono stabilire per la loro efficacia una data anteriore alla pubblicazione, purché non preceda la stipulazione.

**Art. 12. Interpretazione della legge.**
Nell'applicare la legge non si può ad essa attribuire altro senso che quello fatto palese dal significato proprio delle parole secondo la connessione di esse, e dalla intenzione del legislatore.
Se una controversia non può essere decisa con una precisa disposizione, si ha riguardo alle disposizioni che regolano casi simili o materie analoghe; se il caso rimane ancora dubbio, si decide secondo i principi generali dell'ordinamento giuridico dello Stato.

**Art. 13.**
(...) (¹)

(1) "Esclusione dell'applicazione analogica delle norme corporative.
Le norme corporative non possono essere applicate a casi simili o a materie analoghe a quelli da esse contemplati." Le norme corporative sono state abrogate per effetto del R.D.L. 9 agosto 1943, n. 721.

**Art. 14. Applicazione delle leggi penali ed eccezionali.**
Le leggi penali e quelle che fanno eccezione a regole generali o ad altre leggi non si applicano oltre i casi e i tempi in esse considerati.

**Art. 15. Abrogazione delle leggi.**
Le leggi non sono abrogate che da leggi posteriori per dichiarazione espressa del legislatore, o per incompatibilità tra le nuove disposizioni e le precedenti o perché la nuova legge regola l'intera materia già regolata dalla legge anteriore.

**Art. 16. Trattamento dello straniero.**
Lo straniero è ammesso a godere dei diritti civili attribuiti al cittadino a condizione di reciprocità e salve le disposizioni contenute in leggi speciali.
Questa disposizione vale anche per le persone giuridiche straniere.

società ai sensi dell'articolo 2357 e 2357-bis l'assemblea straordinaria autorizza gli amministratori a disporre di tali azioni con la delibera di cui al secondo comma. Il prezzo di acquisto delle azioni è determinato secondo i criteri di cui all'articolo 2437-ter, secondo comma. Nel caso di azioni negoziate in un mercato regolamentato il prezzo di acquisto è pari almeno al prezzo medio ponderato al quale le azioni sono state negoziate nei sei mesi che precedono la pubblicazione dell'avviso di convocazione dell'assemblea.

Qualora la società accordi prestiti o fornisca garanzie per l'acquisto o la sottoscrizione delle azioni proprie a singoli amministratori della società o della controllante o alla stessa controllante ovvero a terzi che agiscono in nome proprio e per conto dei predetti soggetti, la relazione di cui al terzo comma attesta altresì che l'operazione realizza al meglio l'interesse della società.

L'importo complessivo delle somme impiegate e delle garanzie fornite ai sensi del presente articolo non può eccedere il limite degli utili distribuibili e delle riserve disponibili risultanti dall'ultimo bilancio regolarmente approvato, tenuto conto anche dell'eventuale acquisto di proprie azioni ai sensi dell'articolo 2357. Una riserva indisponibile pari all'importo complessivo delle somme impiegate e delle garanzie fornite è iscritta al passivo del bilancio.

La società non può, neppure per tramite di società fiduciaria, o per interposta persona, accettare azioni proprie in garanzia.

Salvo quanto previsto dal comma sesto, le disposizioni del presente articolo non si applicano alle operazioni effettuate per favorire l'acquisto di azioni da parte di dipendenti della società o di quelli di società controllanti o controllate.

Resta salvo quanto previsto dagli articoli 2391-bis e 2501-bis.

(1) Articolo così sostituito dall'art. 1, comma 4, del D.L.vo 4 agosto 2008, n. 142.

### Art. 2359. Società controllate e società collegate.

Sono considerate società controllate:

1) le società in cui un'altra società dispone della maggioranza dei voti esercitabili nell'assemblea ordinaria;

2) le società in cui un'altra società dispone di voti sufficienti per esercitare un'influenza dominante nell'assemblea ordinaria;

3) le società che sono sotto influenza dominante di un'altra società in virtù di particolari vincoli contrattuali con essa.

Ai fini dell'applicazione dei numeri 1) e 2) del primo comma si computano anche i voti spettanti a società controllate, a società fiduciarie e a persona interposta: non si computano i voti spettanti per conto di terzi.

Sono considerate collegate le società sulle quali un'altra società esercita un'influenza notevole. L'influenza si presume quando nell'assemblea ordinaria può essere esercitato almeno un quinto dei voti ovvero un decimo se la società ha azioni quotate in mercati regolamentati.

### Art. 2359-bis. Acquisto di azioni o quote da parte di società controllate.

La società controllata non può acquistare azioni o quote della società controllante se non nei limiti degli utili distribuibili e delle riserve disponibili risultanti dall'ultimo bilancio regolarmente approvato. Possono essere acquistate soltanto azioni interamente liberate.

L'acquisto deve essere autorizzato dall'assemblea a norma del secondo comma dell'articolo 2357.

In nessun caso il valore nominale delle azioni acquistate a norma dei commi primo e secondo può eccedere la quinta parte del capitale della società controllante qualora questa sia una società che faccia ricorso al mercato del capitale di rischio, tenendo conto a tal fine delle azioni possedute dalla medesima società controllante o dalle società di essa controllate. (¹)

Una riserva indisponibile, pari all'importo delle azioni o quote della società controllante iscritte all'attivo del bilancio deve essere costituita e mantenuta finché le azioni o quote non siano trasferite.

La società controllata la cui azione non può esercitare il diritto di voto nelle assemblee di questa.

Le disposizioni di questo articolo si applicano anche agli acquisti fatti per il tramite di società fiduciaria o per interposta persona.

(1) Il comma che recitava: "In nessun caso il valore nominale delle azioni o quote acquistate a norma dei commi precedenti può eccedere la decima parte del capitale della società controllante, tenendo conto a tal fine delle azioni o quote possedute dalla medesima società controllante e dalle società da essa controllate." è stato così sostituito dall'art. 1, D.Lgs. 29 novembre 2010, n. 224.

### Art. 2359-ter. Alienazione o annullamento delle azioni o quote della società controllante.

Le azioni o quote acquistate in violazione dell'articolo 2359-bis devono essere alienate secondo modalità da determinarsi dall'assemblea entro un anno dal loro acquisto.

In mancanza, la società controllante deve procedere senza indugio al loro annullamento e alla corrispondente riduzione del capitale, con rimborso secondo i criteri indicati dagli articoli 2437-ter e 2437-quater. Qualora l'assemblea non provveda, gli amministratori e i sindaci devono chiedere che la riduzione sia disposta dal tribunale secondo il procedimento previsto dall'articolo 2446, secondo comma.

### Art. 2359-quater. Casi speciali di acquisto o di possesso di azioni o quote della società controllante.

Le limitazioni dell'articolo 2359-bis non si applicano quando l'acquisto avvenga ai sensi dei numeri 2, 3 e 4 del primo comma dell'articolo 2357-bis.

Le azioni o quote così acquistate, che superino il limite stabilito dal terzo comma dell'articolo 2359-bis, devono tuttavia essere alienate, secondo modalità da determinarsi dall'assemblea, entro tre anni dall'acquisto. Si applica il secondo comma dell'articolo 2359-ter.

Se il limite indicato dal terzo comma dell'articolo 2359-bis è superato per effetto di circostanze sopravvenute, la società controllante, entro tre anni dal momento in cui si è verificata la circostanza che ha determinato il superamento del limite, deve procedere all'annullamento delle azioni o quote in misura proporzionale a quelle possedute da ciascuna società, con conseguente riduzione del capitale e con rimborso alle società controllate secondo i criteri indicati dagli articoli 2437-ter e 2437-quater. Qualora l'assemblea non provveda, gli amministratori e i sindaci devono chiedere che la riduzione sia disposta dal tribunale secondo il procedimento previsto dall'articolo 2446, secondo comma.

### Art. 2359-quinquies. Sottoscrizione di azioni o quote della società controllante.

La società controllata non può sottoscrivere azioni o quote della società controllante.

Le azioni o quote sottoscritte in violazione del comma precedente si intendono sottoscritte e devono essere liberate dagli amministratori, che non dimostrino di essere esenti da colpa.

Chiunque abbia sottoscritto in nome proprio, ma per conto della società controllata, azioni o quote della società controllante è considerato a tutti gli effetti sottoscrittore per conto proprio. Della liberazione delle azioni o quote rispondono solidalmente gli amministratori della società controllata che non dimostrino di essere esenti da colpa.

### Art. 2360. Divieto di sottoscrizione reciproca di azioni.

È vietato alle società di costituire o di aumentare il capitale mediante sottoscrizione reciproca di azioni, anche per tramite di società fiduciaria o per interposta persona.

### Art. 2361. Partecipazioni.

L'assunzione di partecipazioni in altre imprese, anche se prevista genericamente nello statuto, non è consentita, se per la misura e per l'oggetto della partecipazione ne risulta sostanzialmente modificato l'oggetto sociale determinato dallo statuto.

L'assunzione di partecipazioni in altre imprese comportante una responsabilità illimitata per le obbligazioni delle medesime deve essere deliberata dall'assemblea; di tali partecipazioni gli amministratori danno specifica informazione nella nota integrativa del bilancio.

### Art. 2362. Unico azionista.

Quando le azioni risultano appartenere ad una sola persona o muta la persona dell'unico socio, gli amministratori devono depositare per l'iscrizione del registro delle imprese una dichiarazione contenente l'indicazione del cognome e nome o della denominazione, della data e del luogo di nascita o lo Stato di costituzione, del domicilio o della sede e cittadinanza dell'unico socio.

Quando si costituisce o ricostituisce la pluralità dei soci, gli amministratori ne devono depositare apposita dichiarazione per l'iscrizione nel registro delle imprese.

L'unico socio o colui che cessa di essere tale può provvedere alla pubblicità prevista nei commi precedenti.

Le dichiarazioni degli amministratori previste dai precedenti commi devono essere depositate entro trenta giorni dall'iscrizione nel libro dei soci e devono indicare la data di iscrizione.

### Art. 2387. Requisiti di onorabilità, professionalità e indipendenza.

Lo statuto può subordinare l'assunzione della carica di amministratore al possesso di speciali requisiti di onorabilità, professionalità ed indipendenza, anche con riferimento ai requisiti di riguardo previsti da codici di comportamento redatti da associazioni di categoria o da società di gestione di mercati regolamentati. Si applica in tal caso l'articolo 2382.

Resta salvo quanto previsto da leggi speciali in relazione all'esercizio di particolari attività.

### Art. 2388. Validità delle deliberazioni del consiglio.

Per la validità delle deliberazioni del consiglio di amministrazione è necessaria la presenza della maggioranza degli amministratori in carica, quando lo statuto non richiede un maggior numero di presenti. Lo statuto può prevedere che la presenza alle riunioni del consiglio avvenga anche mediante mezzi di telecomunicazione.

Le deliberazioni del consiglio di amministrazione sono prese a maggioranza assoluta dei presenti, salvo diversa disposizione dello statuto.

Il voto non può essere dato per rappresentanza.

Le deliberazioni che non sono prese in conformità della legge o dello statuto possono essere impugnate solo dal collegio sindacale e dagli amministratori assenti o dissenzienti entro novanta giorni dalla data della deliberazione; si applica in quanto compatibile l'articolo 2378. Possono essere altresì impugnate dai soci le deliberazioni lesive dei loro diritti; si applicano in tal caso, in quanto compatibili, gli articoli 2377 e 2378.

In ogni caso sono salvi i diritti acquistati in buona fede dai terzi in base ad atti compiuti in esecuzione delle deliberazioni.

### Art. 2389. Compensi degli amministratori.

I compensi spettanti ai membri del consiglio di amministrazione e del comitato esecutivo sono stabiliti all'atto della nomina o dall'assemblea.

Essi possono essere costituiti in tutto o in parte da partecipazioni agli utili o dall'attribuzione del diritto di sottoscrivere a prezzo predeterminato azioni di futura emissione.

La rimunerazione degli amministratori investiti di particolari cariche in conformità dello statuto è stabilita dal consiglio di amministrazione, sentito il parere del collegio sindacale. Se lo statuto lo prevede, l'assemblea può determinare un importo complessivo per la remunerazione di tutti gli amministratori, inclusi quelli investiti di particolari cariche.

### Art. 2390. Divieto di concorrenza.

Gli amministratori non possono assumere la qualità di soci illimitatamente responsabili in società concorrenti, né esercitare un'attività concorrente per conto proprio o di terzi, né essere amministratori o direttori generali in società concorrenti, salvo autorizzazione dell'assemblea.

Per l'inosservanza di tale divieto l'amministratore può essere revocato dall'ufficio e risponde dei danni.

### Art. 2391. Interessi degli amministratori.

L'amministratore deve dare notizia agli altri amministratori e al collegio sindacale di ogni interesse che, per conto proprio o di terzi, abbia in una determinata operazione della società, precisandone la natura, i termini, l'origine e la portata; se si tratta di amministratore delegato, deve altresì astenersi dal compiere l'operazione, investendo della stessa l'organo collegiale, se si tratta di amministratore unico, deve darne notizia anche alla prima assemblea utile.

Nei casi previsti dal precedente comma la deliberazione del consiglio di amministrazione deve adeguatamente motivare le ragioni e la convenienza per la società dell'operazione.

Nei casi di inosservanza a quanto disposto nei due precedenti commi del presente articolo ovvero nel caso di deliberazioni del consiglio o del comitato esecutivo adottate con il voto determinante dell'amministratore interessato, le deliberazioni medesime, qualora possano recare danno alla società, possono essere impugnate dagli amministratori e dal collegio sindacale entro novanta giorni dalla loro data; l'impugnazione non può essere proposta da chi ha consentito con il proprio voto alla deliberazione se sono stati adempiuti gli obblighi di informazione previsti dal primo comma. In ogni caso sono salvi i diritti acquistati in buona fede dai terzi in base ad atti compiuti in esecuzione della deliberazione.

L'amministratore risponde dei danni derivati alla società dalla sua azione od omissione.

L'amministratore risponde altresì dei danni che siano derivati alla società dalla utilizzazione a vantaggio proprio o di terzi di dati, notizie o opportunità di affari appresi nell'esercizio del suo incarico.

### Art. 2391-bis. Operazioni con parti correlate.

Gli organi di amministrazione delle società che fanno ricorso al mercato del capitale di rischio adottano, secondo principi generali indicati dalla Consob, regole che assicurano la trasparenza e la correttezza sostanziale e procedurale delle operazioni con parti correlate e il rendono noti nella relazione sulla gestione; a tali fini possono farsi assistere da esperti indipendenti, in ragione della natura, del valore o delle caratteristiche dell'operazione.

I principi di cui al primo comma si applicano alle operazioni realizzate direttamente o per il tramite di società controllate e disciplinano le operazioni stesse in termini di competenza decisionale, di motivazione e di documentazione. L'organo di controllo vigila sull'osservanza delle regole adottate ai sensi del primo comma e ne riferisce nella relazione all'assemblea.

### Art. 2392. Responsabilità verso la società.

Gli amministratori devono adempiere i doveri ad essi imposti dalla legge e dallo statuto con la diligenza richiesta dalla natura dell'incarico e dalle loro specifiche competenze. Essi sono solidalmente responsabili verso la società dei danni derivanti dall'inosservanza di tali doveri, a meno che si tratti di attribuzioni proprie del comitato esecutivo o di funzioni in concreto attribuite ad uno o più amministratori.

In ogni caso gli amministratori, fermo quanto disposto dal comma terzo dell'articolo 2381, sono solidalmente responsabili se, essendo a conoscenza di fatti pregiudizievoli, non hanno fatto quanto potevano per impedirne il compimento o eliminarne o attenuarne le conseguenze dannose.

La responsabilità per gli atti o le omissioni degli amministratori non si estende a quello tra essi che, essendo immune da colpa, abbia fatto annotare senza ritardo il suo dissenso nel libro delle adunanze e delle deliberazioni del consiglio, dandone immediata notizia per iscritto al presidente del collegio sindacale.

### Art. 2393. Azione sociale di responsabilità.

L'azione di responsabilità contro gli amministratori è promossa in seguito a deliberazione dell'assemblea, anche se la società è in liquidazione.

La deliberazione concernente la responsabilità degli amministratori può essere presa in occasione della discussione del bilancio, anche se non è indicata nell'elenco delle materie da trattare, quando si tratta di fatti di competenza dell'esercizio cui si riferisce il bilancio.

L'azione di responsabilità può anche essere promossa a seguito di deliberazione del collegio sindacale, assunta con la maggioranza dei due terzi dei suoi componenti.

L'azione può essere esercitata entro cinque anni dalla cessazione dell'amministratore dalla carica.

La deliberazione dell'azione di responsabilità importa la revoca dall'ufficio degli amministratori contro cui è proposta, purché sia presa con il voto favorevole di almeno un quinto del capitale sociale. In questo caso, l'assemblea provvede alla sostituzione degli amministratori.

La società può rinunziare all'esercizio dell'azione di responsabilità e può transigere, purché la rinunzia e la transazione siano approvate con espressa deliberazione dell'assemblea, e purché non vi sia il voto contrario di una minoranza di soci che rappresenti almeno il quinto del capitale sociale o, nelle società che fanno ricorso al mercato del capitale di rischio, almeno un ventesimo del capitale sociale, ovvero la misura prevista nello statuto per l'esercizio dell'azione sociale di responsabilità ai sensi dei commi primo e secondo dell'articolo 2393-bis.

### Art. 2393-bis. Azione sociale di responsabilità esercitata dai soci.

L'azione sociale di responsabilità può essere esercitata anche dai soci che rappresentino almeno un quinto del capitale sociale o la diversa misura prevista nello statuto, comunque non superiore al terzo.

Nelle società che fanno ricorso al mercato del capitale di rischio, l'azione di cui al comma precedente può essere esercitata dai soci che rappresentino un quarantesimo del capitale sociale o la minore misura prevista nello statuto.

La società deve essere chiamata in giudizio e l'atto di citazione è ad essa notificato anche in persona del presidente del collegio sindacale.

I soci che intendono promuovere l'azione nominano, a maggioranza del capitale posseduto, uno o più rappresentanti comuni per l'esercizio dell'azione e per il compimento degli atti conseguenti.

In caso di accoglimento della domanda, la società rimborsa agli attori le spese del giudizio e quelle sopportate nell'accertamento dei fatti che il giudice non abbia posto a carico dei soccombenti o che non sia possibile recuperare a seguito della loro escussione.

I soci che hanno agito possono rinunciare all'azione o transigerla; ogni corrispettivo per la rinuncia o transazione deve andare a vantaggio della società.

a) il numero dei liquidatori e le regole di funzionamento del collegio in caso di pluralità di liquidatori;

b) la nomina dei liquidatori, con indicazione di quelli cui spetta la rappresentanza della società;

c) i criteri in base ai quali deve svolgersi la liquidazione; i poteri dei liquidatori, con particolare riguardo alla cessione dell'azienda sociale, di rami di essa, ovvero anche di singoli beni o diritti, o blocchi di essi; gli atti necessari per la conservazione del valore dell'impresa, ivi compreso il suo esercizio provvisorio, anche di singoli rami, in funzione del migliore realizzo.

Se gli amministratori omettono la convocazione di cui al comma precedente, il tribunale vi provvede su istanza di singoli soci o amministratori, ovvero dei sindaci, e nel caso in cui l'assemblea non si costituisca o non deliberi, adotta con decreto le decisioni ivi previste.

L'assemblea può sempre modificare, con le maggioranze richieste per le modificazioni dell'atto costitutivo o dello statuto, le deliberazioni di cui al primo comma.

I liquidatori possono essere revocati dall'assemblea o, quando sussiste una giusta causa, dal tribunale su istanza di soci, dei sindaci o del pubblico ministero.

### Art. 2487-bis. Pubblicità della nomina dei liquidatori ed effetti.
La nomina dei liquidatori e la determinazione dei loro poteri, comunque avvenuta, nonché le loro modificazioni, devono essere iscritte, a loro cura, nel registro delle imprese.

Alla denominazione sociale deve essere aggiunta l'indicazione trattarsi di società in liquidazione.

Avvenuta l'iscrizione di cui al primo comma gli amministratori cessano dalla carica e consegnano ai liquidatori i libri sociali, una situazione dei conti alla data di effetto dello scioglimento ed un rendiconto sulla loro gestione relativo al periodo successivo all'ultimo bilancio approvato. Di tale consegna viene redatto apposito verbale.

### Art. 2487-ter. Revoca dello stato di liquidazione.
La società può in ogni momento revocare lo stato di liquidazione, occorrendo previa eliminazione della causa di scioglimento, con deliberazione dell'assemblea presa con le maggioranze richieste per le modificazioni dell'atto costitutivo o dello statuto. Si applica l'articolo 2436.

La revoca ha effetto solo dopo sessanta giorni dall'iscrizione nel registro delle imprese della relativa deliberazione, salvo che consti il consenso dei creditori della società o il pagamento dei creditori che non hanno dato il consenso. Qualora nel termine suddetto i creditori anteriori all'iscrizione abbiano fatto opposizione, si applica l'ultimo comma dell'articolo 2445.

### Art. 2488. Organi sociali.
Le disposizioni sulle decisioni dei soci, sulle assemblee e sugli organi amministrativi e di controllo si applicano, in quanto compatibili, anche durante la liquidazione.

### Art. 2489. Poteri, obblighi e responsabilità dei liquidatori.
Salvo diversa disposizione statutaria, ovvero adottata in sede di nomina, i liquidatori hanno il potere di compiere tutti gli atti utili per la liquidazione della società.

I liquidatori debbono adempiere i loro doveri con la professionalità e diligenza richieste dalla natura dell'incarico e la loro responsabilità per i danni derivanti dall'inosservanza di tali doveri è disciplinata secondo le norme in tema di responsabilità degli amministratori.

### Art. 2490. Bilanci in fase di liquidazione.
I liquidatori devono redigere il bilancio e presentarlo, alle scadenze previste per il bilancio di esercizio della società, per l'approvazione dell'assemblea o, nel caso previsto dal terzo comma dell'articolo 2479, ai soci. Si applicano, in quanto compatibili con la natura, la finalità e lo stato della liquidazione, le disposizioni degli articoli 2423 e seguenti.

Nella relazione i liquidatori devono illustrare l'andamento, le prospettive, anche temporali, della liquidazione, ed i principi e criteri adottati per realizzarla. Nella nota integrativa i liquidatori debbono indicare e motivare i criteri di valutazione adottati.

Nel primo bilancio successivo alla loro nomina i liquidatori devono indicare le variazioni nei criteri di valutazione adottati rispetto all'ultimo bilancio approvato, e le ragioni e conseguenze di tali variazioni. Al medesimo bilancio deve essere allegata la documentazione consegnata dagli amministratori a norma del terzo comma dell'articolo 2487-bis, con le eventuali osservazioni dei liquidatori.

Quando sia prevista una continuazione, anche parziale, dell'attività di impresa, le relative poste di bilancio devono avere una indicazione separata; la relazione deve indicare le ragioni e le prospettive della continuazione; la nota integrativa deve indicare e motivare i criteri di valutazione adottati.

Qualora per oltre tre anni consecutivi non venga depositato il bilancio di cui al presente articolo, la società è cancellata d'ufficio dal registro delle imprese con gli effetti previsti dall'articolo 2495.

### Art. 2491. Poteri e doveri particolari dei liquidatori.
Se i fondi disponibili risultano insufficienti per il pagamento dei debiti sociali, i liquidatori possono chiedere proporzionalmente ai soci i versamenti ancora dovuti.

I liquidatori non possono ripartire tra i soci acconti sul risultato della liquidazione, salvo che dai dati risulti che la ripartizione non incide sulla disponibilità di somme idonee alla integrale e tempestiva soddisfazione dei creditori sociali; i liquidatori possono condizionare la ripartizione alla prestazione da parte del socio di idonee garanzie.

I liquidatori sono personalmente e solidalmente responsabili per i danni cagionati ai creditori sociali con la violazione delle disposizioni del comma precedente.

### Art. 2492. Bilancio finale di liquidazione.
Compiuta la liquidazione, i liquidatori devono redigere il bilancio finale, indicando la parte spettante a ciascun socio o azione nella divisione dell'attivo.

Il bilancio, sottoscritto dai liquidatori e accompagnato dalla relazione dei sindaci e del soggetto incaricato di effettuare la revisione legale dei conti, è depositato presso l'ufficio del registro delle imprese. ([1])

Nei novanta giorni successivi all'iscrizione dell'avvenuto deposito, ogni socio può proporre reclamo davanti al tribunale in contraddittorio dei liquidatori. I reclami devono essere riuniti e decisi in unico giudizio, nel quale tutti i soci possono intervenire. La trattazione della causa ha inizio quando sia decorso il termine suddetto. La sentenza fa stato anche riguardo ai non intervenuti.

(1) Comma così modificato dal D.L.vo 27 gennaio 2010, n. 39.

### Art. 2493. Approvazione tacita del bilancio.
Decorso il termine di novanta giorni senza che siano stati proposti reclami, il bilancio finale di liquidazione s'intende approvato, e i liquidatori, salvi i loro obblighi relativi alla distribuzione dell'attivo risultante dal bilancio, sono liberati di fronte ai soci.

Indipendentemente dalla decorrenza del termine, la quietanza, rilasciata senza riserve all'atto del pagamento dell'ultima quota di riparto, importa approvazione del bilancio.

### Art. 2494. Deposito delle somme non riscosse.
Le somme spettanti ai soci, non riscosse entro novanta giorni dall'iscrizione dell'avvenuto deposito del bilancio a norma dell'articolo 2492, devono essere depositate presso una banca con l'indicazione del cognome e del nome del socio o dei numeri delle azioni, se queste sono al portatore.

### Art. 2495. Cancellazione della società.
Approvato il bilancio finale di liquidazione, i liquidatori devono chiedere la cancellazione della società dal registro delle imprese.

Ferma restando l'estinzione della società, dopo la cancellazione i creditori sociali non soddisfatti possono far valere i loro crediti nei confronti dei soci, fino alla concorrenza delle somme da questi riscosse in base al bilancio finale di liquidazione, e nei confronti dei liquidatori, se il mancato pagamento è dipeso da colpa di questi. La domanda, se proposta entro un anno dalla cancellazione, può essere notificata presso l'ultima sede della società.

### Art. 2496. Deposito dei libri sociali.
Compiuta la liquidazione, la distribuzione dell'attivo o il deposito indicato nell'articolo 2494, i libri della società devono essere depositati e conservati per dieci anni presso l'ufficio del registro delle imprese; chiunque può esaminarli, anticipando le spese.

## CAPO IX – DIREZIONE E COORDINAMENTO DI SOCIETA'

### Art. 2497. Responsabilità.
Le società o gli enti che, esercitando attività di direzione e coordinamento di società, agiscono nell'interesse imprenditoriale proprio o altrui in violazione dei principi di corretta gestione societaria e imprenditoriale delle società medesime, sono direttamente responsabili nei confronti dei soci di queste per il pregiudizio arrecato alla redditività ed al valore della partecipazione sociale, nonché nei confronti dei creditori sociali per la lesione cagionata all'integrità

del patrimonio della società. Non vi è responsabilità quando il danno risulta mancante alla luce del risultato complessivo dell'attività di direzione e coordinamento ovvero integralmente eliminato anche a seguito di operazioni a ciò dirette [1].

Risponde in solido chi abbia comunque preso parte al fatto lesivo e, nei limiti del vantaggio conseguito, chi ne abbia consapevolmente tratto beneficio.

Il socio ed il creditore sociale possono agire contro la società o l'ente che esercita l'attività di direzione e coordinamento, solo se non sono stati soddisfatti dalla società soggetta alla attività di direzione e coordinamento.

Nel caso di fallimento, liquidazione coatta amministrativa e amministrazione straordinaria di società soggetta ad altrui direzione e coordinamento, l'azione spettante ai creditori di questa è esercitata dal curatore o dal commissario liquidatore o dal commissario straordinario.

(1) A norma dell'art. 19, comma 6, del D.L. 1 luglio 2009, n. 78, convertito con modificazioni, nella L. 3 agosto 2009, n. 102, questo comma si interpreta nel senso che "per enti si intendono i soggetti giuridici collettivi, diversi dallo Stato, che detengono la partecipazione sociale nell'ambito della propria attività imprenditoriale ovvero per finalità di natura economica o finanziaria."

**Art. 2497-bis. Pubblicità.**
La società deve indicare la società o l'ente alla cui attività di direzione e coordinamento è soggetta negli atti e nella corrispondenza, nonché mediante iscrizione, a cura degli amministratori, presso la sezione del registro delle imprese di cui al comma successivo.

È istituita presso il registro delle imprese apposita sezione nella quale sono indicate le società o gli enti che esercitano attività di direzione e coordinamento e quelle che vi sono soggette.

Gli amministratori che omettono l'indicazione di cui al comma primo ovvero l'iscrizione di cui al comma secondo, o le mantengono quando la soggezione è cessata, sono responsabili dei danni che la mancata conoscenza di tali fatti abbia recato ai soci o ai terzi.

La società deve esporre, in apposita sezione della nota integrativa, un prospetto riepilogativo dei dati essenziali dell'ultimo bilancio della società o dell'ente che esercita su di essa l'attività di direzione e coordinamento.

Parimenti, gli amministratori devono indicare nella relazione sulla gestione i rapporti intercorsi con chi esercita l'attività di direzione e coordinamento e con le altre società che vi sono soggette, nonché l'effetto che tale attività ha avuto sull'esercizio dell'impresa sociale e sui suoi risultati.

**Art. 2497-ter. Motivazione delle decisioni.**
Le decisioni delle società soggette ad attività di direzione e coordinamento, quando da questa influenzate, debbono essere analiticamente motivate e recare puntuale indicazione delle ragioni e degli interessi la cui valutazione ha inciso sulla decisione. Di esse viene dato adeguato conto nella relazione di cui all'articolo 2428.

**Art. 2497-quater. Diritto di recesso.**
Il socio di società soggetta ad attività di direzione e coordinamento può recedere:

a) quando la società o l'ente che esercita attività di direzione e coordinamento ha deliberato una trasformazione che implica il mutamento del suo scopo sociale, ovvero ha deliberato una modifica del suo oggetto sociale consentendo l'esercizio di attività che alterino in modo sensibile e diretto le condizioni economiche e patrimoniali della società soggetta ad attività di direzione e coordinamento;

b) quando a favore del socio sia stata pronunciata, con decisione esecutiva, condanna di chi esercita attività di direzione e coordinamento ai sensi dell'articolo 2497; in tal caso il diritto di recesso può essere esercitato soltanto per l'intera partecipazione del socio;

c) all'inizio ed alla cessazione dell'attività di direzione e coordinamento, quando non si tratta di una società con azioni quotate in mercati regolamentati e ne deriva un'alterazione delle condizioni di rischio dell'investimento e non venga promossa un'offerta pubblica di acquisto.

Si applicano, a seconda dei casi ed in quanto compatibili, le disposizioni previste per il diritto di recesso del socio nella società per azioni o in quella a responsabilità limitata.

**Art. 2497-quinquies. Finanziamenti nell'attività di direzione e coordinamento.**
Ai finanziamenti effettuati a favore della società da chi esercita attività di direzione e coordinamento nei suoi confronti o da altri soggetti ad essa sottoposti si applica l'articolo 2467.

**Art. 2497-sexies. Presunzioni.**
Ai fini di quanto previsto nel presente capo, si presume salvo prova contraria che l'attività di direzione e coordinamento di società sia esercitata dalla società o ente tenuto al consolidamento dei loro bilanci o che comunque la controlla ai sensi dell'articolo 2359.

**Art. 2497-septies. Coordinamento fra società.**
Le disposizioni del presente capo si applicano altresì alla società o all'ente che, fuori dalle ipotesi di cui all'articolo 2497-sexies, esercita attività di direzione e coordinamento di società sulla base di un contratto con le società medesime o di clausole dei loro statuti.

## CAPO X – DELLA TRASFORMAZIONE DELLA FUSIONE E DELLA SCISSIONE

### SEZIONE I- Della trasformazione

**Art. 2498. Continuità dei rapporti giuridici.**
Con la trasformazione l'ente trasformato conserva i diritti e gli obblighi e prosegue in tutti i rapporti anche processuali dell'ente che ha effettuato la trasformazione.

**Art. 2499. Limiti alla trasformazione.**
Può trovar luogo alla trasformazione anche in pendenza di procedura concorsuale, purché non vi siano incompatibilità con le finalità o lo stato della stessa.

**Art. 2500. Contenuto, pubblicità ed efficacia dell'atto di trasformazione.**
La trasformazione in società per azioni, in accomandita per azioni o a responsabilità limitata deve risultare da atto pubblico, contenente le indicazioni previste dalla legge per l'atto di costituzione del tipo adottato.

L'atto di trasformazione è soggetto alla disciplina prevista per il tipo adottato ed alle forme di pubblicità relative, nonché alla pubblicità richiesta per la cessazione dell'ente che effettua la trasformazione.

La trasformazione ha effetto dall'ultimo degli adempimenti pubblicitari di cui al comma precedente.

**Art. 2500-bis. Invalidità della trasformazione.**
Eseguita la pubblicità di cui all'articolo precedente, l'invalidità dell'atto di trasformazione non può essere pronunciata.

Resta salvo il diritto al risarcimento del danno eventualmente spettante ai partecipanti all'ente trasformato ed ai terzi danneggiati dalla trasformazione.

**Art. 2500-ter. Trasformazione di società di persone.**
Salvo diversa disposizione del contratto sociale, la trasformazione di società di persone in società di capitali è decisa con il consenso della maggioranza dei soci determinata secondo la parte attribuita a ciascuno negli utili; in ogni caso al socio che non ha concorso alla decisione spetta il diritto di recesso.

Nei casi previsti dal precedente comma il capitale della società risultante dalla trasformazione deve essere determinato sulla base dei valori attuali degli elementi dell'attivo e del passivo e deve risultare da relazione di stima redatta a norma dell'articolo 2343 ovvero dalla documentazione di cui all'articolo 2343-ter ovvero, infine, nel caso di società a responsabilità limitata, dell'articolo 2465. Si applicano altresì, nel caso di società per azioni o in accomandita per azioni, il secondo, terzo e, in quanto compatibile, quarto comma dell'articolo 2343 ovvero, nelle ipotesi di cui al primo e secondo comma dell'articolo 2343-ter, il terzo comma del medesimo articolo. [1]

(1) Comma così sostituito dall'art. 20, comma 5, D.L. 24 giugno 2014, n. 91, convertito, con modificazioni, dalla L. 11 agosto 2014, n. 116.

**Art. 2500-quater. Assegnazione di azioni o quote.**
Nel caso previsto dall'articolo 2500-ter, ciascun socio ha diritto all'assegnazione di un numero di azioni o di una quota proporzionale alla sua partecipazione, salvo quanto disposto dai commi successivi.

Il socio d'opera ha diritto all'assegnazione di un numero di azioni o di una quota in misura corrispondente alla partecipazione l'atto costitutivo gli riconosceva precedentemente alla trasformazione o, in mancanza, d'accordo tra i soci ovvero, in difetto di accordo, determinata dal giudice secondo equità.

Nelle ipotesi di cui al comma precedente, le azioni o quote assegnate agli altri soci si riducono proporzionalmente.

**Art. 2500-quinquies. Responsabilità dei soci.**
La trasformazione non libera i soci a responsabilità illimitata dalla responsabilità per le obbligazioni sociali sorte prima degli adempimenti previsti dal

Civil liability

# Civil Code 2023

Text of the Royal Decree 16 March 1942, n. 262 updated with the amendments made, most recently, by Law no. 41/2023

We present the text of the civil code updated with the latest legislative changes made, most recently by Legislative **Decree no. 10 October 2022. 149** , from **Legislative Decree 24 February 2023, n. 13** , converted, with amendments, by **Law 21 April 2023, n. 41** , by **Legislative Decree 2 March 2023, n. 19** , starting from 22 March 2023. and the **sentence of the Constitutional Court of 10 May - 4 July 2023, n. 135** .



**On Shop.wki it is available:**

Brief commentary on the Civil Code by Cian Giorgio, Trabucchi Alberto
Buy it now
**Civil Code** (Royal Decree 16 March 1942, n. 262)

**Provisions on the law in general**

**Book One - Of persons and the family**
Title I - Of natural persons (Art. 1-10)
Title II - Of legal persons (Art. 11-42 bis)
Title III - Of domicile and residence (Art. 43-47)
Title IV - Of absence and declaration of presumed death (Art. 48-73)
Title V - Of kinship and affinity (Art. 74-78)
Title VI - Of marriage (Art. 79-230 *bis* )
Title VII - Of filiation (Art. 231-290)
Title VIII - Of the adoption of adults (Art. 291-314)
Title IX - Of parental responsibility and the rights and duties of the child (Art. 315-342)
Title IX /bis - Protection orders against family abuse (Art. 342 *bis* -342 *ter* )
Title X - Protection and emancipation (Art. 343-399)
Title XI - Affiliation and custody (Art. 400- 403)
Title XII - Protection measures for persons deprived in whole or in part of autonomy (Art. 404-432)
Title XIII - Alimony (Art. 433-448 *bis* )
Title XIV - Civil status documents (Art. 449-455)

**Book Two - Of successions**
Title I - Of successions (Arts. 456-564)
Title II - Of legitimate successions (Arts. 565-586)

Title III - Of testamentary successions (Arts. 587-712)
Title IV - Of division (Arts . 713-768)
Title V - Donations (Art. 769-809)

**Third Book - Of property**
Title I - Of goods (Art. 810-831)
Title II - Of property (Art. 832-951)
Title III - Of surface area (Art. 952-956)
Title IV - Of emphyteusis (Art. 957-977)
Title V - Of usufruct, use and habitation (Art. 978-1026)
Title VI - Of predial servitudes (Art. 1027-1099)
Title VII - Of communion (Art. 1100-1139)
Title VIII - Of possession (Art. 1140-1170)
Title IX - Of the denunciation of new work and feared damage (Art. 1171-1172)

**Fourth Book - Of obligations**
Title I - Of obligations in general (Art. 1173-1320)
Title II - Of contracts in general (Art. 1321-1469)
Title III - Of individual contracts (Art. 1470-1986)
Title IV - Of unilateral promises (Art. 1987-1991)
Title V - Credit instruments (Art. 1992-2027)
Title VI - Business management (Art. 2028-2032)
Title VII - Payment of undue payments (Art. 2033- 2040)
Title VIII - Unjust enrichment (Art. 2041-2042)
Title IX - Illicit acts (Art. 2043-2059)

**Book Five - On work**
Title I - On the regulation of professional activities (Art. 2060-2081)
Title II - On work in the company (Art. 2082-2221)
Title III - On self-employment (Art. 2222-2238)
Title IV - Of subordinate work in particular relationships (Art. 2239-2246)
Title V - Of companies (Art. 2247-2510)
Title VI - Of cooperative enterprises and mutual insurance companies (Art. 2511-2548)
Title VII - Of associations in participation (Art. 2549-2554) Title VIII
- Of the company (Art. 2555-2574)
Title IX - Of the rights on intellectual works and industrial inventions (Art. 2575-2594)
Title of consortia (Art. 2595-2620)
Title XI - Criminal provisions relating to companies, consortia and other private entities  (Art. 2621-2642)

**Sixth Book - Of the protection of rights**
Title I - Of the transcription (Arts. 2643-2696)
Title II - Of the evidence (Arts. 2697-2739)
Title III - Of the patrimonial responsibility, of the causes of pre-emption and of the conservation of the
patrimonial guarantee (Arts . 2740-2906)
Title IV - Of the judicial protection of rights (Art. 2907-2933)
Title V - Of prescription and forfeiture (Art. 2934-2969)

**Provisions for the implementation of the civil code and transitional provisions**

 Download the PDF text of the Civil Code
for FREE

Case: 23-2266    Document: 13    Page: 267    Filed: 10/24/2023

## CIVIL CODE

(Royal Decree 16 March 1942, no. 262 - Approval of the text of the Civil Code - published in the extraordinary edition of the Official Gazette no. 79 of 4 April 1942. Text coordinated and updated with subsequent amendments and additions)

** * **

**Provisions on the law in general**

# The service is reserved for registered users

subscribe

Are you already registered? **Log in**

(C) Altalex / Wolters Kluwer

meeting authorizes the directors to dispose of such shares with the resolution referred to in the second paragraph. The purchase price of the shares is determined according to the criteria referred to in article 2437-ter, second paragraph. In the case of shares traded on a regulated market, the purchase price is at least equal to the weighted average price at which the shares were traded in the six months preceding the publication of the notice calling the meeting.

If the company grants loans or provides guarantees for the purchase or subscription of own shares to individual directors of the company or of the parent company or to the parent company itself or to third parties acting in their own name and on behalf of the aforementioned subjects, the relationship referred to in third paragraph also certifies that the operation best achieves the interests of the company.

The overall amount of the sums used and the guarantees provided pursuant to this article cannot exceed the limit of the distributable profits and available reserves resulting from the latest regularly approved financial statements, also taking into account the possible purchase of own shares pursuant to the article 2357. An unavailable reserve equal to the total amount of the sums used and the guarantees provided is entered in the liabilities side of the balance sheet.

The company cannot, not even through a trust company or through a third party, accept its own shares as collateral.

Except as provided for in the sixth paragraph, the provisions of this article do not apply to operations carried out to encourage the purchase of shares by employees of the company or those of parent or subsidiary companies.

The provisions of articles 2391-bis and 2501-bis remain unchanged.

(1) Article inserted by Legislative Decree 4 August 2008, n. 142 .

### Article 2359.
### Subsidiary companies and associated companies.

The following are considered controlled companies:

1) companies in which another company has the majority of exercisable votes in the ordinary meeting;

2) companies in which another company has sufficient votes to exercise a dominant influence in the ordinary meeting;

3) companies that are under the dominant influence of another company by virtue of particular contractual ties with it.

For the purposes of applying numbers 1) and 2) of the first paragraph, the votes held by subsidiaries, trust companies and third parties are also counted: votes held on behalf of third parties are not counted.

Companies over which another company exercises significant influence are considered associated. Influence is presumed when at least one fifth of the votes can be exercised in the ordinary meeting or one tenth if the company has shares listed on regulated markets.

––––––––––––––––

See Council of State, section. V, decision 7 May 2008, n. 2087 and Council of State, sec. V, decision 8 September 2008, n. 4285 in Altalex Massimario.
V. Draft Presidential Decree concerning equal access to the administrative and control bodies of the companies of the Council of Ministers n. 41 of 3 August 2012 .

### Art. 2359-bis.

**Purchase of shares or quotas by controlled companies.**

The subsidiary company cannot purchase shares or quotas of the parent company except within the limits of the distributable profits and available reserves resulting from the latest regularly approved financial statements. Only fully paid-up shares can be purchased.

The purchase must be authorized by the assembly in accordance with the second paragraph of article 2357.

In no case may the nominal value of the shares purchased pursuant to the first and second paragraphs exceed one fifth of the capital of the parent company if this is a company that uses the risk capital market, taking into account for this purpose the shares owned by the same parent company or by companies controlled by it. ( [1] )

An unavailable reserve, equal to the amount of the shares or quotas of the parent company registered among the assets of the balance sheet, must be established and maintained until the shares or quotas are transferred.

The company controlled by another company cannot exercise the right to vote in the latter's meetings.

The provisions of this article also apply to purchases made through trust companies or third parties.

(1) The paragraph which stated: " *In no case may the nominal value of the shares or units purchased pursuant to the previous paragraphs exceed one tenth of the capital of the parent company, taking into account for this purpose the shares or units owned by the same parent company and by the companies controlled by it* ." it was thus replaced by art. 1, paragraph 4, Legislative Decree 29 November 2010, n. 224

### Art. 2359-ter.
**Alienation or cancellation of shares or quotas of the parent company.**

The shares or quotas purchased in violation of article 2359-bis must be sold according to methods to be determined by the meeting within one year of their purchase.

Failing this, the parent company must proceed without delay with their cancellation and the corresponding reduction of the capital, with reimbursement according to the criteria indicated in articles 2437-ter and 2437-quater. If the meeting does not do so, the directors and auditors must request that the reduction be ordered by the court according to the procedure provided for in article 2446, second paragraph.

### Art. 2359-quater.
**Special cases of purchase or possession of shares or units of the parent company.**

The limitations of article 2359-bis do not apply when the purchase takes place pursuant to numbers 2, 3 and 4 of the first paragraph of article 2357-bis.

The shares or quotas thus purchased, which exceed the limit established by the third paragraph of article 2359-bis, must however be sold, according to methods to be determined by the meeting, within three years of purchase. The second paragraph of article 2359-ter applies.

If the limit indicated in the third paragraph of article 2359-bis is exceeded as a result of supervening circumstances, the parent company, within three years from the moment in which the circumstance that led to the exceeding of the limit occurred, must proceed with the cancellation of the shares or quotas in proportion to those owned by each company, with consequent reduction of the capital and with reimbursement to the controlled companies according to the criteria indicated by articles 2437-ter and 2437-quater. If the meeting does not do so, the directors and auditors must request that the reduction be ordered by the court according to the procedure provided for in article 2446, second paragraph.

### Art. 2359-quinquies.

Resolutions that are not taken in compliance with the law or the statute can only be challenged by the board of auditors and absent or dissenting directors within ninety days from the date of the resolution; Article 2378 applies to the extent compatible. Resolutions which are harmful to their rights may also be challenged by members; in this case, articles 2377 and 2378 apply, to the extent compatible

In any case, rights acquired in good faith by third parties on the basis of actions carried out in execution of the resolutions remain unaffected.

<div align="center">

**Article 2389.**
**Directors' compensation.**

</div>

The compensation due to the members of the board of directors and the executive committee is established at the time of appointment or by the meeting.

They can be made up in whole or in part by profit sharing or by the attribution of the right to subscribe to future shares at a predetermined price.

The remuneration of directors invested with particular roles in accordance with the statute is established by the board of directors, after hearing the opinion of the board of statutory auditors. If the bylaws provide for it, the meeting can determine an overall amount for the remuneration of all directors, including those invested with particular roles.

_____

Law:

- Company, **the role of director is presumed to be onerous** , Civil Court of Cassation, section. VI-1, ordinance 03 October 2018 n° 24139.

<div align="center">

**Article 2390.**
**Prohibition of competition.**

</div>

The directors cannot assume the role of partners with unlimited liability in competing companies, nor carry out a competing activity on their own behalf or on behalf of third parties, nor be administrators or general managers in competing companies, unless authorized by the assembly.

For failure to comply with this prohibition, the administrator can be removed from office and is liable for damages.

<div align="center">

**Article 2391.**
**Directors' interests.**

</div>

The director must inform the other directors and the board of auditors of any interest he, on his own behalf or on behalf of third parties, has in a specific operation of the company, specifying its nature, terms, origin and scope; if he is a managing director, he must also abstain from carrying out the operation, involving the collegiate body with the same; if he is a sole director, he must also inform the first possible meeting.

In the cases provided for in the previous paragraph, the resolution of the board of directors must adequately justify the reasons and the convenience of the operation for the company.

In cases of non-compliance with the provisions of the two previous paragraphs of this article or in the case of resolutions of the board or of the executive committee adopted with the decisive vote of the director concerned, the same resolutions, if they may cause damage to the company, may be challenged by the directors and the board of statutory auditors within ninety days of their date; the appeal cannot be proposed by those who have consented to the resolution with their vote if the information obligations provided for in the first paragraph have

been fulfilled. In any case, rights acquired in good faith by third parties based on actions carried out in execution of the resolution remain unaffected.

The director is liable for damages caused to the company by his action or omission.

The director is also liable for any damage caused to the company by the use for his own benefit or that of third parties of data, news or business opportunities learned in the exercise of his role.

## Art. 2391-bis.
### Transactions with related parties.

The administrative bodies of companies that use the risk capital market adopt, according to general principles indicated by Consob, rules that ensure the transparency and substantial and procedural correctness of transactions with related parties and make them known in the management report; for these purposes they may be assisted by independent experts, based on the nature, value or characteristics of the operation.

The principles and rules set out in the first paragraph apply to operations carried out directly or through controlled companies and govern the operations themselves in terms of decision-making competence, motivation and documentation. The supervisory body monitors compliance with the rules adopted pursuant to the first paragraph and reports on it in the report to the assembly. ( [1] )

Consob, in defining the principles indicated in the first paragraph, identifies, in compliance with article 9-quater of Directive 2007/36/EC, at least: a)

the materiality thresholds of transactions with related parties taking into account indices quantities linked to the value of the operation or its impact on one or more dimensional parameters of the company. Consob can also identify criteria of relevance that take into account the nature of the transaction and the type of related party;

b) procedural and transparency rules proportionate to the relevance and characteristics of the operations, the size of the company or the type of company that uses the risk capital market, as well as cases of exemption from application, in whole or in part , of the aforementioned rules;

c) cases in which the directors, without prejudice to the provisions of article 2391, and the shareholders involved in the operation are required to abstain from voting on the same or safeguard measures to protect the interest of the company which allow the aforementioned shareholders to take part in the vote on the operation.( [2] )

(1) Paragraph as amended by art. 1, paragraph 1, letter. a), Legislative Decree 10 May 2019, n. 49 (published in the Official Journal General Series no. 134 of 10-6-2019), starting from 10 June 2019, pursuant to the provisions of art. 7, paragraph 1, of the same Legislative Decree no. 49/2019.
(2) Paragraph added by art. 1, paragraph 1, letter. b), Legislative Decree 10 May 2019, n. 49, starting from 10 June 2019, pursuant to the provisions of art. 7, paragraph 1, of the same Legislative Decree no. 49/2019.

## Art. 2392.
### Responsibility towards society.

The directors must fulfill the duties imposed on them by law and the articles of association with the diligence required by the nature of the role and their specific skills. They are jointly and severally liable to the company for damages resulting from failure to comply with these duties, unless these are duties specific to the executive committee or functions specifically attributed to one or more directors.

A specific section has been established in the company register in which the companies or bodies that carry out management and coordination activities and those that are subject to them are indicated.

The directors who omit the indication referred to in the first paragraph or the registration referred to in the second paragraph, or maintain them when the subjection has ceased, are responsible for the damages that the lack of knowledge of such facts has caused to the shareholders or third parties.

The company must display, in a specific section of the explanatory notes, a summary of the essential data from the latest financial statements of the company or the entity that exercises management and coordination activities on it.

Likewise, the directors must indicate in the management report the relationships established with those who carry out the management and coordination activity and with the other companies that are subject to it, as well as the effect that this activity has had on the exercise of the social enterprise and on its results.

### Art. 2497-ter.
### Justification of decisions.

The decisions of companies subject to management and coordination activities, when influenced by it, must be analytically motivated and provide a precise indication of the reasons and interests whose evaluation influenced the decision. Adequate account is given of them in the report referred to in article 2428.

### Art. 2497-quater.
### Right of withdrawal.

The shareholder of a company subject to management and coordination activities can withdraw:

a) when the company or entity that carries out management and coordination activities has approved a transformation that involves a change in its corporate purpose, or has approved a modification of its corporate purpose allowing the exercise of activities that significantly alter and direct the economic and financial conditions of the company subject to management and coordination activities;

b) when a conviction has been pronounced in favor of the member, with an executive decision, of the person carrying out management and coordination activities pursuant to article 2497; in this case the right of withdrawal can only be exercised for the member's entire participation;

c) at the beginning and at the end of the management and coordination activity, when it is not a company with shares listed on regulated markets and this results in an alteration of the risk conditions of the investment and a public offer is not promoted of purchase.

The provisions envisaged for the shareholder's right of withdrawal in joint-stock companies or limited liability companies apply, depending on the case and to the extent compatible.

### Art. 2497-quinquies.
### Funding in management and coordination activities.

Article 2467 applies to loans made in favor of the company by those who exercise management and coordination activities towards it or by other subjects subordinate to it.

### Art. 2497-sexies.
### Presumptions.

For the purposes of the provisions of this chapter, it is presumed, unless proven otherwise, that the management and coordination activity of companies is exercised by the company or body required to consolidate their financial statements or which in any case controls them pursuant to article 2359.

### Art. 2497-septies.
### Coordination between companies.

The provisions of this chapter also apply to the company or entity which, outside of the cases referred to in article 2497-sexies, carries out management and coordination activities of companies on the basis of a contract with the companies themselves or clauses of their statutes.

( **Continue>>** )

# The service is reserved for registered users

subscribe
Are you already registered? **Log in**

(C) Altalex / Wolters Kluwer

Decreto Legislativo n. 58/1998 (TUF)
(Italian Finance Code)

# Testo Unico della Finanza
## Decreto legislativo 24 febbraio 1998, n. 58

**Aggiornato con le modifiche apportate dal D.Lgs. n. 29 del 10 marzo 2023**
*(in vigore dal 7 aprile 2023)*
**dal D.Lgs. n. 30 del 10 marzo 2023**
**dal D.Lgs. n. 31 del 10 marzo 2023**
*(in vigore dall'8 aprile 2023)*



A cura della
Divisione Tutela del Consumatore
Ufficio Relazioni con il Pubblico

Aprile 2023

**CONSOB**
COMMISSIONE NAZIONALE
PER LE SOCIETÀ E LA BORSA

> **Testo aggiornato con le modifiche apportate dai Decreti Legislativi n. 29, 30 e 31 del 10 marzo 2023. Le modifiche sono evidenziate in grassetto.**

## Decreto legislativo 24 febbraio 1998, n. 58:

Testo unico delle disposizioni in materia di intermediazione finanziaria, ai sensi degli articoli 8 e 21 della legge 6 febbraio 1996, n. 52[1]

---

1   Pubblicato nel supplemento ordinario alla G.U. n. 71 del 26.3.1998. Il D.Lgs. n. 58/1998 è stato successivamente modificato:

- dalla L. n. 205 del 25.6.1999 (pubblicata nella G.U. n. 149 del 28.6.1999);

- dal D.Lgs. n. 201 del 12.4.2001 (pubblicato nella G.U. n. 130 del 7.6.2001);

- dal D.L. n. 351 del 25.9.2001 (pubblicato nella G.U. n. 224 del 26.9.2001), convertito con L. n. 410 del 23.11.2001 (pubblicata nella G.U. n. 274 del 24.11.2001);

- dal D.Lgs. n. 61 dell'11.4.2002 (pubblicato nella G.U. n. 88 del 15.4.2002);

- dal D.L. n. 269 del 30.9.2003 (pubblicato nel S.O. n. 157/L alla G.U. n. 229 del 2.10.2003), convertito con L. n. 326 del 24.11.2003 (pubblicata nel S.O. n. 181/L alla G.U. n. 274 del 25.11.2003);

- dal D.Lgs. n. 274 dell'1.8.2003 (pubblicato nella G.U. n. 233 del 7.10.2003);

- dalla L. n. 350 del 24.12.2003 (pubblicata nel S.O. n. 196/L alla G.U. n. 299 del 27.12.2003);

- dal D.Lgs. n. 37 del 6.2.2004 (pubblicato nel S.O. alla G.U. n. 37 del 14.2.2004);

- dal D.Lgs. n. 170 del 21.5.2004 (pubblicato nella G.U. n. 164 del 15.7.2004);

- dal D.Lgs. n. 197 del 9.7.2004 (pubblicato nella G.U. n. 182 del 5.8.2004);

- dall'art. 9 della legge n. 62 del 18.4.2005 (pubblicata nel S.O. alla G.U. n. 96 del 27.4.2005);

- dalla legge n. 262 del 28.12.2005 (pubblicata nel S.O. n. 208/L alla G.U. n. 301 del 28.12.2005);

- dal D.Lgs. n. 303 del 29.12.2006 (pubblicato nel S.O. n. 5/L alla G.U. n. 7 del 10.1.2007);

- dall'art. 2 del D.L. 27.12.2006, n. 297, coordinato con la legge di conversione 23.2.2007, n. 15 (pubblicata nella G.U. n. 46 del 24.2.2007) e

- dall'art. 10, della L. n. 13 del 6.2.2007 – *Legge comunitaria* 2006 (pubblicata nel S.O. n. 41/L alla G.U. n. 40 del 17.2.2007);

- dall'art. 2 del D.Lgs. n. 32 del 2.2.2007 (pubblicato nella G.U. n. 73 del 28.3.2007);

- dal D.Lgs. n. 51 del 28.3.2007 (pubblicato nella G.U. n. 94 del 23.4.2007);

- dal D.Lgs. n. 164 del 17.9.2007 (pubblicato nel S.O. n. 200/L alla G.U. n. 234 dell'8.10.2007);

- dal D.Lgs. n. 195 del 6.11.2007 (pubblicato nel S.O. n. 228 alla G.U. n. 261 del 9.11.2007);

- dal D.Lgs. n. 229 del 19.11.2007 (pubblicato nella G.U. n. 289 del 13.12.2007);

- dal D.Lgs. n. 173 del 3.11.2008 (pubblicato nella G.U. n. 260 del 6.11.2008);

- dal D.L. n. 185 del 29.11.2008 (pubblicato nel S.O. n. 263/L alla G.U. n. 280 del 29.11.2008) coordinato con la legge di conversione 28.1. 2009, n. 2 (pubblicata nel S.O. n. 14/L alla G.U. n. 22 del 28.1.2009);

- dal D.L. n. 5 del 10.2.2009 (pubblicato nella G.U. n. 34 dell'11.2.2009) coordinato con la legge di conversione 9.4.2009, n. 33 (pubblicata nel S.O. n. 49/L alla G.U. n. 85 dell'11.4.2009);

- dalla legge n. 69 del 18.6.2009 (pubblicata nel S.O. n. 95/L alla G.U. n. 140 del 19.6.2009);

- dal D.Lgs. n. 101 del 17.7.2009 (pubblicato nella G.U. n. 178 del 3.8.2009);

- dal D.Lgs. n. 146 del 25.9.2009 (pubblicato nella G.U. n. 246 del 22.10.2009);

- dal D.Lgs. n. 21 del 27.1.2010 (pubblicato nella G.U. n. 44 del 23.2.2010);

- dal D.Lgs. n. 27 del 27.1.2010 (pubblicato nel S.O. n. 43/L alla G.U. n. 53 del 5.3.2010), le modifiche apportate dal D.Lgs. n. 27 del 27.1.2010 sono in vigore dal 20 marzo 2010, salvo quanto previsto dalle disposizioni finali dettate dall'art. 7 del medesimo decreto;

- dal D.Lgs. n. 39 del 27.1.2010 (pubblicato nel S.O. n. 58/L alla G.U. n. 68 del 23.3.2010), le modifiche apportate dal D.Lgs. n. 39 del 27.1.2010 sono in vigore dal 7 aprile 2010, salvo quanto previsto dalle disposizioni finali e transitorie dettate dall'art. 43 del medesimo decreto;

- dal D.L. n. 78 del 31.5.2010 (pubblicato nel S.O. n. 114/L alla G.U. n. 125 del 31.5.2010), coordinato con la legge di conversione n. 122 del 30.7.2010 (pubblicata nel S.O. n. 174 alla G.U. n. 176 del 30.7.2010);

- dal D.Lgs. n. 104 del 2.7.2010 (pubblicato nel S.O. n. 148/L alla G.U. n. 156 del 7.7.2010), le modifiche apportate dal D.Lgs. n. 104 del 2.7.2010 sono in vigore dal 16.9.2010;

- dal D.Lgs. n. 141 del 13.8.2010 (pubblicato nel S.O. n. 212/L alla G.U. n. 207 del 4.9.2010), le modifiche apportate dal D.Lgs. n. 141 del 13.8.2010 sono in vigore dal 19.9.2010;

- dal D.Lgs. n. 176 del 5.10.2010 (pubblicato nella G.U. n. 253 del 28.10.2010), le modifiche apportate dal D.Lgs. n. 176 del 5.10.2010 sono in vigore dal 12.11.2010;

- dal D.Lgs. n. 224 del 29.11.2010 (pubblicato nella G.U. n. 300 del 24.12.2010), le modifiche apportate dal D.Lgs. n. 224 del 29.11.2010 sono in vigore dall'8.1.2011;

- dal D.Lgs. n. 239 del 30.12.2010 (pubblicato nella G.U. n. 9 del 13.1.2011), le modifiche apportate dal D.Lgs. n. 239 del 30.12.2010 sono in vigore dal giorno stesso della sua pubblicazione nella G.U.;

- dal D.Lgs. n. 259 del 30.12.2010 (pubblicato nella G.U. n. 30 del 7.2.2011), le modifiche apportate dal D.Lgs. n. 259 del 30.12.2010 sono in vigore dal 22.2.2011;

- dal D.Lgs. n. 48 del 24.3.2011 (pubblicato nella G.U. n. 92 del 21.4.2011) in vigore dal 30.6.2011;

- dalla L. n. 120 del 12 luglio 2011 (pubblicata nella G.U. n. 174 del 28.7.2011) in vigore dal 12.8.2011;

- dalla L. n. 217 del 15 dicembre 2011 (pubblicata nella G.U. n. 1 del 2.1.2012) in vigore dal 17.1.2012;

- dal D.Lgs. n. 47 del 16 aprile 2012 (pubblicato nel S.O. n. 86/L alla G.U. n. 99 del 28.4.2012) in vigore dal 13.5.2012;

- dal D.Lgs. n. 91 del 18 giugno 2012 (pubblicato nella G.U. n. 152 del 2.7.2012) in vigore dal 17.7.2012, salvo quanto previsto dalle disposizioni finali dettate dall'art. 5 del medesimo decreto;

- dalla sentenza della Corte Costituzionale n. 162 del 20/27.6.2012 (pubblicata nella G.U. 1ª Serie Speciale n. 27 del 4.7.2012);

- dal D.Lgs. n. 130 del 30.7.2012 (pubblicato nella G.U. n. 184 dell'8.8.2012) in vigore dal 23.8.2012;

- dal D.Lgs. n. 160 del 14.9.2012 (pubblicato nella G.U. n. 218 del 18.9.2012) in vigore dal 3.10.2012;

- dal D.Lgs. n. 169 del 19.9.2012 (pubblicato nella G.U. n. 230 del 2.10.2012) in vigore dal 17.10.2012;

- dal D.L. n. 179 del 18.10.2012 (pubblicato nel S.O. n. 194/L alla G.U. n. 245 del 19.10.2012), in vigore dal 20.10.2012, coordinato con la legge di conversione n. 221 del 17.12.2012 (pubblicata nel S.O. n. 208/L alla G.U. n. 294 del 18.12.2012), in vigore dal 19.12.2012;

- dal D.Lgs. n. 184 dell'11.10.2012 (pubblicato nella G.U. n. 253 del 29.10.2012), in vigore dal 13.11.2012;

- dal D.L. n. 69 del 21.6.2013, (pubblicato nel S.O. n. 50, alla G.U. n. 144 del 21.6.2013), in vigore dal 22.6.2013, convertito con modificazioni dalla L. n. 98 del 9.8.2013, (pubblicata nel S.O. n. 63 alla G.U. n. 194 del 20.8.2013), in vigore dal 21.8.2013;

- dalla L. n. 97 del 6.8.2013 (pubblicata nella G.U. n. 194 del 20.8.2013), in vigore dal 4.9.2013, salvo quanto disposto dalle norme transitorie previste dall'art. 89, paragrafi 3 e 4, del regolamento (UE) n. 648/2012 del Parlamento europeo e del Consiglio, del 4 luglio 2012;

- dal D.Lgs. n. 44 del 4.3.2014 (pubblicato nella G.U. n. 70 del 25.3.2014) in vigore dal 9.4.2014, salvo quanto disposto dalle norme transitorie previste dall'art. 15 dello stesso decreto legislativo;

- dal D.Lgs. n. 53 del 4.3.2014 (pubblicato nella G.U. n. 76 dell'1.4.2014), in vigore dal 16.4.2014;

- dalla sentenza della Corte Costituzionale n. 94 del 9/15 aprile 2014 (G.U. 1ª Serie Speciale n. 18 del 23.4.2014);

- dal D.L. n. 91 del 24.6.2014 (pubblicato nella G.U. n. 144 del 24.6.2014), in vigore dal 25.6.2014 (v. anche avviso di rettifica nella G.U. n. 150 dell'1.7.2014), coordinato con la legge di conversione n. 116 dell'11.8.2014 (pubblicata nel S.O. n. 72 alla G.U. n. 192 del 20.8.2014), in vigore dal 21.8.2014;

- dal D.L. n. 133 del 12.9.2014, (pubblicato nella G.U. n. 212 del 12.9.2014), in vigore dal 13.9.2014 convertito con modificazioni dalla L. n. 164 dell'11.11. 2014 (pubblicata nel S.O. n. 85 alla G.U. n. 262 dell'11.11.2014), che ha introdotto il comma 119-*ter* all'art. 1 della L. 296 del 27.12. 2006, n. 296 (in S.O. n. 244 alla G.U. n. 299 del 27.12.2006); dalla L. n. 161 del 30.10.2014 (pubblicato nel S.O. n. 83/L alla G.U. n. 261 del 10.11.2014), in vigore dal 25.11.2014;

- dal D.L. n. 3 del 24.1.2015 (pubblicato nella G.U. n. 19 del 24.1.2015), in vigore dal 25.1.2015, convertito con modificazioni dalla L. n. 33 del 24.3.2015 (pubblicata nel S.O. n. 15 alla G.U. n. 70 del 25.3.2015), in vigore dal 26.3.2015;

- dal D.Lgs. n. 66 del 7.5.2015 2015 (pubblicato nella G.U. n. 116 del 21.5.2015), in vigore dal 5.6.2015;

- dal D.Lgs. n. 72 del 12.5.2015 (pubblicato nella G.U. n. 134 del 12.6.2015), in vigore dal 27.6.2015, salvo quanto disposto dalle disposizioni transitorie previste dall'art. 6 del medesimo decreto legislativo. Il comma

1 dell'art. 6 del D.Lgs. n. 72 del 12.5.2015 dispone che: *"I regolamenti emanati dal Ministro dell'economia e delle finanze ai sensi di norme abrogate o modificate dal presente decreto legislativo continuano a essere applicati fino alla data di entrata in vigore dei provvedimenti emanati dalla Consob e dalla Banca d'Italia nelle corrispondenti materie"*;

- dal D.Lgs. n. 181 del 16.11.2015 (pubblicato nella G.U. n. 267 del 16.11.2015), in vigore dal 16.11.2015, salvo quanto previsto dall'art. 3 del medesimo decreto legislativo;

- dalla L. n. 208 del 28.12.2015 (pubblicata nel S.O. n. 70 alla G.U. n. 302 del 30.12.2015), in vigore dall'1.1.2016;

- dal D.L. n. 18 del 14.2.2016 (pubblicato nella G.U. n. 37 del 15.2.2016), in vigore dal 16.2.2016, convertito con modificazioni dalla L. n. 49 dell'8.4.2016, (pubblicata nella G.U. n. 87 del 14.4.2016);

- dal D.Lgs. n. 25 del 15.2.2016 (pubblicato nella G.U. n. 52 del 3.3.2016), in vigore dal 18.3.2016, salvo quanto disposto dalle norme transitorie previste dall'art. 2 dello stesso decreto legislativo;

- dal D.Lgs. n. 71 del 18.4.2016 (pubblicato nella G.U. n. 117 del 20.5.2016), in vigore dal 4.6.2016;

- dal D.Lgs. n. 176 del 12.8.2016 (pubblicato nella G.U. n. 211 del 9.9.2016), in vigore dal 24.9.2016, salvo quanto disposto dalle norme transitorie previste dall'art. 5 dello stesso decreto legislativo;

- dal D.Lgs. n. 224 del 14.11.2016 (pubblicato nella G.U. n. 278 del 28.11.2016), in vigore dal 13.12.2016;

- dalla L. n. 232 dell'11.12.2016 (pubblicata nel S.O. n. 57/L alla G.U. n. 297 del 21.12.2016), in vigore dall'1.1.2017;

- dal D.Lgs. n. 254 del 30.12.2016 (pubblicato nella G.U. n. 7 del 10.1.2017), in vigore dal 25.1.2017, salvo quanto previsto dalle norme di applicazione previste dall'art. 10 dello stesso decreto legislativo;

- dal D.Lgs. n. 112 del 3.7.2017 (pubblicato nella G.U. n. 167 del 19.7.2017), in vigore dal 20.7.2017. Il D.Lgs. n. 112 del 3.7.2017 ha disposto (con l'art. 18, comma 9) che *"L'efficacia delle disposizioni del presente articolo e dell'articolo 16 è subordinata, ai sensi dell'articolo 108, paragrafo 3, del Trattato sul funzionamento dell'Unione europea, all'autorizzazione della Commissione europea, richiesta a cura del Ministero del lavoro e delle politiche sociali"*;

- dal D.Lgs. n. 129 del 3.8.2017 (pubblicato nella G.U. n. 198 del 25.8.2017), in vigore dal 3.1.2018, salvo quanto previsto dall'art. 10 dello stesso decreto legislativo; il comma 2 dell'art. 10 del D.Lgs. n. 129 del 3.8.2017 dispone che: *"Le disposizioni del decreto legislativo 24 febbraio 1998, n. 58, modificate dal presente decreto, si applicano dal 3 gennaio 2018, fatto salvo quanto diversamente previsto dall'articolo 93 della direttiva 2014/65/UE, con riferimento all'articolo 65, paragrafo 2, della direttiva medesima, le cui disposizioni attuative si applicano dal 3 settembre 2019, e dall'articolo 55 del regolamento (UE) n. 600/2014, e successive modificazioni, nonché dal comma 3. Fino alle predette date continuano ad applicarsi le disposizioni in vigore il giorno precedente alla data di entrata in vigore del presente decreto legislativo. Fermo restando quanto previsto dalle disposizioni dell'Unione europea direttamente applicabili, le disposizioni emanate dalla Banca d'Italia e dalla Consob, anche congiuntamente, ai sensi di disposizioni del decreto legislativo 24 febbraio 1998, n. 58, abrogate o modificate dal presente decreto, continuano a essere applicate fino alla data di entrata in vigore dei provvedimenti emanati dalla Banca d'Italia o dalla Consob nelle corrispondenti materie. La Banca d'Italia e la Consob adottano tali provvedimenti entro centottanta giorni dalla data di entrata in vigore del presente decreto. Al fine di garantire il coordinamento dell'esercizio delle funzioni di vigilanza nell'ambito delle rispettive competenze, continua ad applicarsi, fino alla data della sua revisione, il protocollo d'intesa stipulato dalla Consob e dalla Banca d'Italia in data 31 ottobre 2007 ai sensi dell'articolo 5, comma 5-bis, del decreto legislativo 24 febbraio 1998, n. 58, nel testo vigente prima della data di entrata in vigore del presente decreto. Al fine di assicurare il rispetto delle disposizioni attuative, emanate ai sensi delle norme abrogate o sostituite dal presente decreto, che continuano ad applicarsi, ai sensi del periodo precedente, la Banca d'Italia e la Consob, per la fase transitoria, conservano tutti i poteri previsti dal decreto legislativo 24 febbraio 1998, n. 58, previgente alla data di entrata in vigore del presente decreto"*;

- dal D.L. n. 148 del 16.10.2017 (pubblicato nella G.U. n. 242 del 16.10.2017), in vigore dal 16.10.2017, convertito con modificazioni dalla L. n. 172 del 4.12.2017 (pubblicata nella G.U. n. 284 del 5.12.2017);

- dal D.Lgs. n. 233 del 15.12.2017 (pubblicato nella G.U. n. 36 del 13.2.2018), in vigore dal 28.2.2018;

- dalla L. n. 205 del 27.12. 2017 (legge di bilancio 2018, pubblicata nel S.O. n. 62 alla G.U. n. 302 del 29.12.2017), in vigore dall'1.1.2018;

- dal D.Lgs. n. 68 del 21.5.2018 (pubblicato nella G.U. n. 138 del 16.6.2018), in vigore dall'1.7.2018;

- dal D.Lgs. n. 95 del 20.7.2018 (pubblicato nella G.U. n. 185 del 10.8.2018), in vigore dall'11.8.2018, vigente al 2.9.2018;

- dal D.Lgs. n. 107 del 10.8.2018 (pubblicato nella G.U. n. 214 del 14.9.2018), in vigore dal 29.9.2018;

- dalla Sentenza della Corte Costituzionale 25 ottobre – 5 dicembre 2018, n. 223 (pubblicata in G.U. 1ª Serie Speciale – Corte Costituzionale n. 49 del 12.12.2018), in vigore dal 13.12.2018;

- dalla L. n. 145 del 30.12.2018 (pubblicata nel S.O. n. 62/L alla G.U. n. 302 del 31.12.2018), in vigore dall'1.1.2019;

- dal D.Lgs. n. 19 del 13.2.2019 (pubblicato nella G.U. n. 61 del 13.3.2019), in vigore dal 28.3.2019;

- dal D.L. n. 22 del 25.3.2019 (pubblicato nella G.U. n. 71 del 25.3.2019), in vigore dal 26.3.2019, convertito con modificazioni dalla L. n. 41 del 20.5.2019 (pubblicata nella G.U. n. 120 del 24.5.2019), in vigore dal 25.5.2019;

- dalla Sentenza della Corte Costituzionale 20 febbraio – 21 marzo 2019, n. 63 (pubblicata in G.U. 1ª Serie Speciale - Corte Costituzionale n. 13 del 27.3.2019);

- dal D.L. n. 34 del 30 aprile 2019 (pubblicato nella G.U. n. 100 del 30.4.2019), in vigore dall'1.5.2019, convertito con modificazioni dalla L. n. 58 del 28.6.2019 (pubblicata nel S.O. n. 26/L alla G.U. n. 151 del 29.6.2019);

- dalla L. n. 37 del  3 maggio 2019 – Legge europea 2018 (pubblicata nella G.U. n. 109 dell'11.5.2019), in vigore dal 26.5.2019;

- dalla Sentenza n. 112 della Corte Costituzionale 6 marzo – 10 maggio 2019  (pubblicata in G.U. 1ª Serie Speciale - Corte Costituzionale n. 20 del 15.5.2019);

- dal D.Lgs. n. 49 del 10.5.2019 (pubblicato nella G.U. n. 134 del 10.6.2019), in vigore dal 10.6.2019, per le disposizioni transitorie e finali si veda l'art. 7 del medesimo decreto legislativo;

- dal D.L. n. 124 del 26.10.2019 (pubblicato nella G.U. n. 252 del 26.10.2019), in vigore dal 27.10.2019, convertito con modificazioni dalla L. n. 157 del 19.12.2019 (pubblicata nella G.U. n. 301 del 24.12.2019), in vigore dal 25.12.2019;

- a seguito della delibera Consob n. 21195 del 18.12.2019, con cui la società Monte Titoli S.p.A. è stata autorizzata alla prestazione di servizi in qualità di depositario centrale di titoli ai sensi del Regolamento (UE) n. 909/2014 del Parlamento Europeo e del Consiglio del 23 luglio 2014, è cessato il regime di ultrapplicazione, disposto dal D.Lgs. n. 176 del 12.8.2016, di talune previsioni previgenti del TUF, oggetto di abrogazione da parte del medesimo decreto;

- dal D.Lgs. n. 165 del 25.11.2019 (pubblicato nella G.U. n. 6 del 9.1.2020), in vigore dal 24.1.2020, per le disposizioni transitorie e finali si veda l'art. 8 del medesimo decreto legislativo;

**INDICE**

**PARTE I**          **DISPOSIZIONI COMUNI**                                        25

Art. 1          Definizioni                                                        25
Art. 2          Rapporti con il diritto dell'Unione europea e integrazione nel SEVIF    43
Art. 3          Provvedimenti                                                      43
Art. 4          Collaborazione tra autorità e segreto d'ufficio                    44

---

- dalla L. n. 160 del 27.12.2019 (Legge di Bilancio 2020) nel testo ripubblicato nella G.U. n. 13 del 17.1.2020, in vigore dall'1.1.2020;

- dal D.L. n. 162 del 30.12.2019 (pubblicato nella G.U. n. 305 del 31.12.2019), in vigore dal 31.12.2019, convertito con modificazioni dalla L. n. 8 del 28.2.2020 (pubblicata nel S.O. n. 10 alla G.U. n. 51 del 29.2.2020), in vigore dall'1.3.2020;

- dal D.L. n. 23 dell'8.4.2020 (pubblicato nella G.U. n. 94 dell'8.4.2020), in vigore dal 9.4.2020, convertito con modificazioni dalla L. n. 40 del 5.6.2020 (pubblicata nella G.U. n. 143 del 6.6.2020), in vigore dal 7.6.2020;

- dal D.L. 34 del 19.5.2020 (pubblicato nel S.O. n. 21 alla G.U. n. 128 del 19.5.2020), in vigore dal 19.5.2020, convertito con modificazioni dalla L. n. 77 del 17.7.2020 (pubblicata nel S.O. n. 25 alla G.U. n. 180 del 18.7.2020), in vigore dal 19.7.2020;

- dal D.Lgs. n. 84 del 14.7.2020 (pubblicato nella G.U. n. 190 del 30.7.2020), in vigore dal 14.8.2020. L'art. 4 del D.Lgs. n. 84 del 14.7.2020 dispone che: "1. Fermo quanto previsto dall'articolo 7 del decreto legislativo 10 maggio 2019, n. 49, l'articolo 2 si applica alle violazioni commesse dopo la data di entrata in vigore del presente decreto";

- dal D.L. n. 104 del 14.8.2020 (pubblicato nel S.O. n. 30 alla G.U. n. 203 del 14.8.2020), in vigore dal 15.8.2020, convertito con modificazioni dalla L. n. 126 del 13.10.2020 (pubblicata nel S.O. n. 37 alla G.U. n. 253 del 13.10.2020), in vigore dal 14.10.2020;

- dal D.L. n. 76 del 16.7.2020 (pubblicato nel S.O. n. 24 alla G.U. n. 178 del 16.7.2020), in vigore dal 17.7.2020, convertito con modificazioni dalla L. n. 120 dell'11.9.2020 (pubblicata nel S.O. n. 33 alla G.U. n. 228 del 14.9.2020), in vigore dal 15.9.2020;

- dalla L. n. 178 del 30.12.2020 (pubblicata nel S.O. n. 46 alla G.U. n. 322 del 30.12.2020), in vigore dall'1.1.2021;

- dal D.Lgs. n. 17 del 2.2.2021 (pubblicato nella G.U. n. 46 del 24.2.2021), in vigore dall'11.3.2021;

- dalla sentenza della Corte Costituzionale n. 13/30 aprile 2021, n. 84 (pubblicata nella G.U. 1ª Serie Speciale n. 18 del 5 maggio 2021);

- dal D.Lgs. n. 182 dell'8.11.2021 (pubblicato nella G.U. n. 284 del 29.11.2021), in vigore dal 30.11.2021, per le disposizioni transitorie si veda l'art. 4 del medesimo decreto legislativo;

- dal D.Lgs. n. 191 del 5.11.2021 (pubblicato nella G.U. n. 285 del 30.11.2021), in vigore dal 15.12.2021;

- dal D.Lgs. n. 193 dell'8.11.2021 (pubblicato nella G.U. n. 285 del 30.11.2021), in vigore dal 1.12.2021, per le disposizioni transitorie si veda l'art. 8 del medesimo decreto legislativo;

- dal D.Lgs. n. 201 del 5.11.2021 (pubblicato nella G.U. n. 286 dell'1.12.2021), in vigore dal 2.12.2021, per le disposizioni transitorie si veda l'art. 3 del medesimo decreto legislativo;

- dalla L. n. 238 del 23.12.2021 (pubblicata nella G.U. n. 12 del 17.1.2022), in vigore dall'1.2.2022;

- dal D.L. n. 50 del 17.5.2022 (pubblicato nella G.U. n. 114 del 17.5.2022), in vigore dal 18.5.2022, convertito con modificazioni dalla L. n. 91 del 15.7.2022 (pubblicata nella G.U. n. 164 del 15.7.2022), in vigore dal 16.7.2022;

- dal D.Lgs. n. 113 del 2.8.2022 (pubblicato nella G.U. n. 184 dell'8.8.2022), in vigore dal 23.8.2022;

- dal D.Lgs. n. 131 del 3.8.2022 (pubblicato nella G.U. n. 205 del 2.9.2022), in vigore dal 3.9.2022;

- dal D.L. n. 25 del 17.3.2023 (pubblicato nella G.U. n. 65 del 17.3.2023), in vigore dal 18.3.2023, convertito con modificazioni dalla L. n. 52 del 10.5.2023 (pubblicata nella G.U. n. 112 del 15.5.2023), in vigore dal 16.5.2023;

- dal D.Lgs. n. 29 del 10.3.2023 (pubblicato nella G.U. n. 70 del 23.3.2023), in vigore dal 7.4.2023;

- dal D.Lgs. n. 30 del 10.3.2023 (pubblicato nella G.U. n. 71 del 24.3.2023), in vigore dall'8.4.2023;

- dal D.Lgs. n. 31 del 10.3.2023 (pubblicato nella G.U. n. 71 del 24.3.2023), in vigore dall'8.4.2023.

Art. 4–*bis*      Individuazione dell'autorità competente e delle autorità competenti settoriali ai fini del regolamento (CE) n. 1060/2009, e successive modificazioni, relativo alle agenzie di rating del credito    47

Art. 4–*ter*      Individuazione delle autorità nazionali competenti ai sensi del regolamento (UE) n. 236/2012 relativo alle vendite allo scoperto e a taluni aspetti dei contratti derivati aventi ad oggetto la copertura del rischio di inadempimento dell'emittente (credit default swap)    47

Art. 4–*quater*      Individuazione delle autorità nazionali competenti ai sensi del regolamento (UE) n. 648/2012 del Parlamento europeo e del Consiglio, del 4 luglio 2012, e ai sensi del regolamento (UE) 2015/2365 del Parlamento europeo e del Consiglio, del 25 novembre 2015    48

Art. 4–*quinquies*      Individuazione delle autorità nazionali competenti ai sensi del regolamento (UE) n. 345/2013, relativo ai fondi europei per il venture capital (EuVECA), e del regolamento (UE) n. 346/2013, relativo ai fondi europei per l'imprenditoria sociale (EuSEF)    49

Art. 4–*quinquies*.1      Individuazione delle autorità nazionali competenti ai sensi del regolamento (UE) n. 2015/760 relativo ai fondi di investimento europei a lungo termine (ELTIF)    53

Art. 4–*quinquies*.2      Individuazione delle autorità nazionali competenti ai sensi del regolamento (UE) 2017/1131 relativo ai fondi comuni monetari (FCM)    54

Art. 4–*quinquies*.3      Individuazione delle autorità nazionali competenti ai sensi del regolamento (UE) 2019/1156 per facilitare la distribuzione transfrontaliera degli organismi di investimento collettivo e che modifica i regolamenti (UE) n. 345/2013, (UE) n. 346/2013 e (UE) n. 1286/2014    55

Art. 4–*sexies*      Individuazione delle autorità nazionali competenti ai sensi del regolamento (UE) n. 1286/2014, relativo ai documenti contenenti le informazioni chiave per i prodotti d'investimento al dettaglio e assicurativi preassemblati (PRIIPs)    55

**Art. 4–*sexies*.1**      **Individuazione delle autorità nazionali competenti ai sensi del regolamento (UE) 2020/1503, relativo ai fornitori europei di servizi di crowdfunding per le imprese, e che modifica il regolamento (UE) 2017/1129 e la direttiva (UE) 2019/1937**    57

Art. 4–*septies*      Poteri d'intervento relativi alla violazione delle disposizioni previste dal regolamento (UE) n. 1286/2014    60

Art. 4–*septies*.1      Individuazione delle autorità nazionali competenti ai sensi del regolamento (UE) 2016/1011 sugli indici usati come parametri di riferimento negli strumenti finanziari e nei contratti finanziari o per misurare la performance di fondi di investimento    61

Art. 4–*septies*.2      Individuazione delle autorità nazionali competenti ai sensi del regolamento (UE) 2017/2402 che stabilisce un quadro generale per la cartolarizzazione, instaura un quadro specifico per cartolarizzazioni semplici, trasparenti e standardizzate    62

Art. 4–*octies*      Sistemi interni di segnalazione delle violazioni del regolamento (UE) n. 1286/2014 *(abrogato)*    64

Art. 4–*novies*      Procedura di segnalazione alle Autorità di Vigilanza *(abrogato)*    64

Art. 4–*decies*      Obbligo di notifica preventiva del documento contenente le informazioni chiave sui PRIIP *(abrogato)*    64

| | | |
|---|---|---|
| Art. 4-*undecies* | Sistemi interni di segnalazione delle violazioni | 64 |
| Art. 4-*duodecies* | Procedura di segnalazione alle Autorità di Vigilanza | 65 |
| Art. 4-*terdecies* | Esenzioni | 66 |

## PARTE II — DISCIPLINA DEGLI INTERMEDIARI — 69

### TITOLO I — DISPOSIZIONI GENERALI E POTERI DI VIGILANZA — 69

#### Capo I — Vigilanza — 69

| | | |
|---|---|---|
| Art. 5 | Finalità e destinatari della vigilanza | 69 |
| Art. 6 | Poteri regolamentari | 70 |
| Art. 6-*bis* | Poteri informativi e di indagine | 76 |
| Art. 6-*ter* | Poteri ispettivi | 78 |
| Art. 7 | Poteri di intervento sui soggetti abilitati | 79 |
| Art. 7-*bis* | Poteri di intervento di cui al Titolo VII, Capo I, del regolamento (UE) n. 600/2014 | 80 |
| Art. 7-*ter* | Poteri ingiuntivi nei confronti degli intermediari nazionali e non UE | 81 |
| Art. 7-*quater* | Poteri ingiuntivi nei confronti di intermediari UE | 81 |
| Art. 7-*quinquies* | Poteri ingiuntivi nei confronti degli OICVM UE, FIA UE e non UE con quote o azioni offerte in Italia | 82 |
| Art. 7-*sexies* | Sospensione degli organi amministrativi | 83 |
| Art. 7-*septies* | Poteri cautelari applicabili ai consulenti finanziari autonomi, alle società di consulenza finanziaria ed ai consulenti finanziari abilitati all'offerta fuori sede | 83 |
| Art. 7-*octies* | Poteri di contrasto all'abusivismo | 84 |
| Art. 7-*novies* | Riserve di capitale | 84 |
| Art. 7-*decies* | Vigilanza sul rispetto di disposizioni dell'Unione europea direttamente applicabili | 85 |
| Art. 7-*undecies* | Individuazione delle autorità nazionali competenti ai sensi del regolamento (UE) 2019/2033 | 85 |
| Art. 7-*duodecies* | Disciplina applicabile alle Sim di classe 1-*minus* | 85 |
| Art. 8 | Doveri informativi | 86 |
| Art. 8-*bis* | Sistemi interni di segnalazione delle violazioni *(abrogato)* | 87 |
| Art. 8-*ter* | Segnalazione di violazioni alla Banca d'Italia e alla Consob *(abrogato)* | 87 |
| Art. 9 | Revisione legale | 87 |
| Art. 10 | Vigilanza ispettiva *(abrogato)* | 88 |
| Art. 11 | Composizione del gruppo | 88 |
| Art. 11-*bis* | Impresa madre UE intermedia | 89 |
| Art. 12 | Vigilanza sul gruppo | 90 |
| Art. 12-*bis* | Disposizioni applicabili alle società che controllano una o più imprese di investimento UE | 92 |

#### Capo II — Esponenti aziendali e partecipanti al capitale — 93

| | | |
|---|---|---|
| Art. 13 | Esponenti aziendali | 93 |
| Art. 14 | Partecipanti al capitale | 95 |
| Art. 15 | Acquisizione e cessione di partecipazioni | 96 |
| Art. 15-*bis* | Persone che agiscono di concerto | 98 |

| Art. 16 | Sospensione del diritto di voto e degli altri diritti, obbligo di alienazione | 99 |
| Art. 17 | Richiesta di informazioni sulle partecipazioni | 100 |

**TITOLO II     SERVIZI E ATTIVITA' DI INVESTIMENTO     101**

**Capo I     Soggetti e autorizzazione     101**
| Art. 18 | Soggetti | 101 |
| Art. 18-*bis* | Consulenti finanziari autonomi | 102 |
| Art. 18-*ter* | Società di consulenza finanziaria | 103 |
| Art. 19 | Autorizzazione | 103 |
| Art. 20 | Albo | 105 |
| Art. 20-*bis* | Revoca dell'autorizzazione | 105 |
| Art. 20-*bis*.1 | Sim di classe 1 | 106 |
| Art. 20-*ter* | Autorizzazione e vigilanza dei soggetti legittimati a presentare domanda di partecipazione al mercato delle aste, ai sensi del regolamento (UE) n. 1031/2010 della Commissione, del 12 novembre 2010, relativo ai tempi, alla gestione e ad altri aspetti della vendita all'asta delle quote di emissioni dei gas a effetto serra, come modificato dal regolamento (UE) n. 1210/2011 della Commissione, del 23 novembre 2011 | 108 |

**Capo II     Svolgimento dei servizi e delle attività     109**
| Art. 21 | Criteri generali | 109 |
| Art. 22 | Separazione patrimoniale | 112 |
| Art. 23 | Contratti | 112 |
| Art. 24 | Gestione di portafogli | 113 |
| Art. 24-*bis* | Consulenza in materia di investimenti | 114 |
| Art. 25 | Attività di negoziazione nei mercati regolamentati, nei sistemi multilaterali di negoziazione e nei sistemi organizzati di negoziazione | 115 |
| Art. 25-*bis* | Depositi strutturati e prodotti finanziari, diversi dagli strumenti finanziari, emessi da banche | 115 |
| Art. 25-*ter* | Prodotti di investimento assicurativo | 116 |
| Art. 25-*quater* | Obbligazioni bancarie e altri strumenti di debito | 117 |

**Capo III     Operatività transfrontaliera     117**
| Art. 26 | Succursali e libera prestazione di servizi di Sim | 117 |
| Art. 27 | Imprese di investimento dell'Unione europea | 118 |
| Art. 28 | Imprese di paesi terzi diverse dalle banche | 119 |
| Art. 29 | Banche italiane | 121 |
| Art. 29-*bis* | Banche dell'Unione europea | 121 |
| Art. 29-*ter* | Banche di paesi terzi | 122 |

**Capo IV     Disciplina dell'offerta fuori sede e della vigilanza sui consulenti finanziari     123**
| Art. 30 | Offerta fuori sede | 123 |

| | | |
|---|---|---|
| Art. 30-*bis* | Modalità di prestazione del servizio di consulenza in materia di investimenti da parte dei consulenti finanziari autonomi e delle società di consulenza finanziaria | 125 |
| Art. 31 | Consulenti finanziari abilitati all'offerta fuori sede e Organismo di vigilanza e tenuta dell'albo unico dei consulenti finanziari | 125 |
| Art. 31-*bis* | Vigilanza della Consob sull'Organismo | 129 |
| Art. 32 | Promozione e collocamento a distanza di servizi e attività di investimento e di prodotti finanziari | 129 |

**Capo IV–*bis***     **Tutela degli investitori**     130

| | | |
|---|---|---|
| Art. 32-*bis* | Tutela degli interessi collettivi degli investitori | 130 |
| Art. 32-*ter* | Risoluzione stragiudiziale di controversie | 130 |
| Art. 32-*ter*.1 | Fondo per la tutela stragiudiziale dei risparmiatori e degli investitori | 131 |

**TITOLO III**     **GESTIONE COLLETTIVA DEL RISPARMIO**     132

**Capo I**     **Soggetti autorizzati e attività esercitabili**     132

| | | |
|---|---|---|
| Art. 32-*quater* | Riserva di attività | 132 |
| Art. 33 | Attività esercitabili | 133 |

**Capo I–*bis***     **Disciplina dei soggetti autorizzati**     134

**Sezione I**     **Società di gestione del risparmio**     134

| | | |
|---|---|---|
| Art. 34 | Autorizzazione della società di gestione del risparmio | 134 |
| Art. 35 | Albo | 135 |

**Sezione II**     **Sicav e Sicaf**     135

| | | |
|---|---|---|
| Art. 35-*bis* | Costituzione | 135 |
| Art. 35-*ter* | Albi | 136 |
| Art. 35-*quater* | Capitale e azioni della Sicav | 137 |
| Art. 35-*quinquies* | Capitale e azioni della Sicaf | 137 |
| Art. 35-*sexies* | Assemblea della Sicav | 138 |
| Art. 35-*septies* | Modifiche dello statuto | 138 |
| Art. 35-*octies* | Scioglimento e liquidazione volontaria | 139 |
| Art. 35-*novies* | Trasformazione | 139 |

**Sezione III**     **Disposizioni comuni e deroghe**     140

| | | |
|---|---|---|
| Art. 35-*decies* | Regole di comportamento e diritto di voto | 140 |
| Art. 35-*undecies* | Deroghe per i GEFIA italiani | 140 |
| Art. 35-*duodecies* | Valutazione del merito di credito | 141 |

**Capo II**     **Oicr italiani**     141

**Sezione I**     **Fondi comuni di investimento**     141

| | | |
|---|---|---|
| Art. 36 | Fondi comuni di investimento | 141 |
| Art. 37 | Regolamento del fondo | 142 |

**Sezione II**     **Sicav e Sicaf in gestione esterna**     143

| | | |
|---|---|---|
| Art. 38 | Sicav e Sicaf che designano un gestore esterno | 143 |

| | | |
|---|---|---|
| **Sezione III** | **Disposizioni comuni** | 144 |
| Art. 39 | Struttura degli Oicr italiani | 144 |
| | | |
| **Sezione IV** | **Strutture master-feeder** | 146 |
| Art. 40 | Autorizzazione e regole di funzionamento delle strutture master-feeder | 146 |
| | | |
| **Sezione V** | **Fusione e scissione di organismi di investimento del risparmio** | 146 |
| Art. 40-*bis* | Fusione e scissione di Oicr | 146 |
| Art. 40-*ter* | Fusione transfrontaliera di OICVM | 147 |
| | | |
| **Capo II-***bis* | **Operatività transfrontaliera dei gestori** | 147 |
| Art. 41 | Operatività transfrontaliera delle Sgr | 147 |
| Art. 41-*bis* | Società di gestione UE | 148 |
| Art. 41-*ter* | GEFIA UE | 149 |
| Art. 41-*quater* | GEFIA non UE | 149 |
| | | |
| **Capo II-***ter* | **Pre-commercializzazione e commercializzazione di Oicr** | 150 |
| Art. 42 | Commercializzazione in Italia di quote o di azioni di OICVM UE | 150 |
| Art. 42-*bis* | Pre-commercializzazione di FIA riservati | 152 |
| Art. 43 | Commercializzazione di FIA riservati | 153 |
| Art. 44 | Commercializzazione di FIA non riservati | 156 |
| | | |
| **Capo II-***quater* | **Obblighi delle Sgr i cui FIA acquisiscono partecipazioni rilevanti e di controllo di società non quotate e di emittenti** | 158 |
| Art. 45 | Obblighi relativi all'acquisizione di partecipazioni rilevanti o di controllo di società non quotate | 158 |
| Art. 46 | Obblighi relativi all'acquisizione di partecipazioni di controllo di un emittente | 160 |
| | | |
| **Capo II-***quinquies* | **Oicr di credito** | 161 |
| Art. 46-*bis* | Erogazione diretta di crediti da parte di FIA italiani | 161 |
| Art. 46-*ter* | Erogazione diretta di crediti da parte di FIA UE in Italia | 161 |
| Art. 46-*quater* | Altre disposizioni applicabili | 162 |
| | | |
| **Capo III** | **Depositario** | 162 |
| Art. 47 | Incarico di depositario | 162 |
| Art. 48 | Compiti del depositario | 162 |
| Art. 49 | Responsabilità del depositario | 163 |
| Art. 50 | *Altre disposizioni applicabili (abrogato)* | 164 |
| | | |
| **Capo III-***bis* | **Strutture master-feeder** *(abrogato)* | 164 |
| Art. 50-*bis* | *Autorizzazione e regole di funzionamento delle strutture master-feeder (abrogato)* | 164 |
| | | |
| **Capo III-***ter* | **Fusione e scissione di organismi di investimento del risparmio** *(abrogato)* | 164 |
| Art. 50-*ter* | Fusione e scissione di Oicr *(abrogato)* | 164 |
| Art. 50-*quater* | Fusione transfrontaliera di Oicr armonizzati *(abrogato)* | 164 |

**TITOLO III-BIS**  **GESTIONE DI PORTALI PER LA RACCOLTA DI CAPITALI PER LE PICCOLE E MEDIE IMPRESE E PER LE IMPRESE SOCIALI** *(abrogato)*  165

**Capo I**  **Gestione di portali per la raccolta di capitali per le piccole e medie imprese e per le imprese sociali** *(abrogato)*  165

Art. 50-*quinquies*  Gestione di portali per la raccolta di capitali per le piccole e medie imprese e per le imprese sociali *(abrogato)*  165

**TITOLO IV**  **PROVVEDIMENTI INGIUNTIVI E CRISI**  165

**Capo I**  **Disciplina dei provvedimenti ingiuntivi** *(abrogato)*  165
Art. 51  Provvedimenti ingiuntivi nei confronti di intermediari nazionali e extracomunitari *(abrogato)*  165
Art. 52  Provvedimenti ingiuntivi nei confronti di intermediari comunitari *(abrogato)*  165
Art. 53  Sospensione degli organi amministrativi *(abrogato)*  165
Art. 54  Provvedimenti ingiuntivi nei confronti degli OICVM UE, FIA UE e non UE con quote o azioni offerte in Italia *(abrogato)*  166
Art. 55  Provvedimenti cautelari applicabili ai consulenti finanziari abilitati all'offerta fuori sede *(abrogato)*  166

**Capo I-*bis***  **Piani di risanamento, sostegno finanziario di gruppo e intervento precoce**  166
Art. 55-*bis*  Ambito di applicazione  166
Art. 55-*ter*  Piani di risanamento  167
Art. 55-*quater*  Sostegno finanziario di gruppo  167
Art. 55-*quinquies*  Intervento precoce  167
Art. 55-*sexies*  Partecipazione al Meccanismo di Vigilanza Unico e al Meccanismo di Risoluzione Unico  168

**Capo II**  **Disciplina delle crisi**  168
Art. 56  Amministrazione straordinaria  168
Art. 56-*bis*  Rimozione collettiva dei componenti degli organi di amministrazione e controllo  169
Art. 57  Liquidazione coatta amministrativa  169
Art. 58  Succursali in Italia di imprese di investimento e di gestori esteri  172
Art. 58-*bis*  Imprese di investimento operanti nell'Unione europea  173
Art. 59  Sistemi di indennizzo  173
Art. 60  Adesione ai sistemi d'indennizzo da parte di intermediari esteri  174
Art. 60-*bis*  Responsabilità delle Sim, delle Sgr, delle Sicav e delle Sicaf per illecito amministrativo dipendente da reato  174

**Capo II-*bis***  **Risoluzione delle Sim**  175
Art. 60-*bis*.1  Ambito di applicazione  175
Art. 60-*bis*.2  Piani di risoluzione  176
Art. 60-*bis*.3  Risolvibilità  176
Art. 60-*bis*.4  Risoluzione e altre procedure di gestione delle crisi  177
Art. 60-*bis*.4.*bis*  Strumenti di debito chirografario di secondo livello e valore nominale unitario minimo  178

## PARTE III        DISCIPLINA DEI MERCATI        179

**TITOLO I        DISPOSIZIONI COMUNI        179**
Art. 61        Definizioni        179
Art. 61-*bis*        Principi di regolamentazione        180

**TITOLO I–*BIS*        DISCIPLINA DELLE SEDI DI NEGOZIAZIONE
E INTERNALIZZATORI SISTEMATICI        180**

**Capo I        Finalità e destinatari della vigilanza        180**
Art. 62        Vigilanza sulle sedi di negoziazione        180
Art. 62-*bis*        Sedi di negoziazione all'ingrosso di titoli di Stato e operatori principali        180
Art. 62-*ter*        Vigilanza sulle sedi di negoziazione all'ingrosso        181
Art. 62-*quater*        Vigilanza regolamentare e informativa sulle sedi di negoziazione all'ingrosso        181
Art. 62-*quinquies*        Vigilanza sul rispetto di disposizioni dell'Unione europea direttamente applicabili        182
Art. 62-*sexies*        Vigilanza sulle sedi di negoziazione di strumenti finanziari sull'energia e il gas        182
Art. 62-*septies*        Vigilanza sui sistemi multilaterali di scambio di depositi monetari in euro        183
Art. 62-*octies*        Poteri informativi e di indagine        183
Art. 62-*novies*        Poteri ispettivi        184
Art. 62-*decies*        Poteri di intervento        184

**Capo II        Le sedi di negoziazione        185**
Art. 63        Sistemi multilaterali per la negoziazione di strumenti finanziari        185

**Sezione I        Autorizzazione del mercato regolamentato e requisiti del gestore        185**
Art. 64        L'attività di organizzazione e gestione di mercati regolamentati        185
Art. 64-*bis*        Obblighi riguardanti le persone che esercitano un'influenza significativa sulla gestione del mercato regolamentato        186
Art. 64-*ter*        Requisiti degli esponenti aziendali del gestore del mercato regolamentato        188
Art. 64-*quater*        Autorizzazione dei mercati regolamentati        189
Art. 64-*quinquies*        Revoca dell'autorizzazione, provvedimenti straordinari a tutela del mercato e crisi del gestore del mercato regolamentato        190

**Sezione II        Organizzazione e funzionamento delle sedi di negoziazione        191**
Art. 65        Requisiti organizzativi dei mercati regolamentati        191
Art. 65-*bis*        Requisiti dei sistemi multilaterali di negoziazione e dei sistemi organizzati di negoziazione        192
Art. 65-*ter*        Requisiti specifici per i sistemi multilaterali di negoziazione        193
Art. 65-*quater*        Requisiti specifici per i sistemi organizzati di negoziazione        193
Art. 65-*quinquies*        Negoziazione «matched principal»        194
Art. 65-*sexies*        Requisiti operativi delle sedi di negoziazione        195
Art. 65-*septies*        Obblighi informativi e di comunicazione        197

**Sezione III        Ammissione, sospensione ed esclusione di strumenti finanziari dalla quotazione e dalle negoziazioni        198**
Art. 66        Criteri generali di ammissione alla quotazione e alle negoziazioni        198

Art. 66-*bis*          Condizioni per la quotazione di determinate società                                    199
Art. 66-*ter*          Provvedimenti di ammissione, sospensione ed esclusione di strumenti
                       finanziari dalla quotazione e dalle negoziazioni adottati dal gestore della
                       sede di negoziazione                                                                   199
Art. 66-*quater*       Provvedimenti di sospensione ed esclusione di strumenti finanziari dalle
                       negoziazioni su iniziativa della Consob                                                200
Art. 66-*quinquies*    Negoziazione di strumenti finanziari emessi dal gestore del mercato
                       regolamentato                                                                          201


Sezione IV             Accesso alle sedi di negoziazione                                                      201
Art. 67                Criteri generali di accesso degli operatori                                            201
Art. 67-*bis*          Ammissione, sospensione ed esclusione degli operatori da un mercato
                       regolamentato                                                                          204
Art. 67-*ter*          Negoziazione algoritmica, accesso elettronico diretto, partecipazione a
                       controparti centrali                                                                   204


Sezione V              Limiti di posizione e controlli sulla gestione delle posizioni in strumenti derivati
                       su merci                                                                               206
Art. 68                Limiti alle posizioni in strumenti derivati su merci                                   206
Art. 68-*bis*          Controlli del gestore della sede di negoziazione sulle posizioni in strumenti
                       derivati su merci                                                                      208
Art. 68-*ter*          Caratteristiche dei limiti e dei controlli sulla gestione delle posizioni e
                       obblighi di informazione                                                               209
Art. 68-*quater*       Notifica dei titolari di posizioni in base alle categorie                              209
Art. 68-*quinquies*    Poteri della Consob e obblighi di collaborazione                                       210


Sezione VI             Mercati di crescita per le piccole e medie imprese                                     211
Art. 69                Mercati di crescita per le piccole e medie imprese                                     211


Sezione VII            Riconoscimento dei mercati                                                             212
Art. 70                Riconoscimento dei mercati                                                             212


Capo III               Gli internalizzatori sistematici                                                      213
Art. 71                Obblighi dell'internalizzatore sistematico                                             213


Capo IV                Obblighi di negoziazione, di trasparenza e di segnalazione di operazioni
                       in strumenti finanziari                                                                213
Art. 72                Individuazione dell'autorità competente                                                213
Art. 73                Vigilanza                                                                              213
Art. 74                Esenzioni dai requisiti di trasparenza prenegoziazione delle sedi di
                       negoziazione                                                                           213
Art. 75                Provvedimenti di temporanea sospensione degli obblighi di trasparenza pre-
                       negoziazione                                                                           214
Art. 76                Autorizzazioni alla pubblicazione differita                                            214
Art. 77                Provvedimenti di temporanea sospensione degli obblighi
                       di trasparenza post-negoziazione                                                       215
Art. 78                Informazioni da fornire ai fini della trasparenza e dell'effettuazione degli altri
                       calcoli e obblighi di pubblicazione                                                    215

**TITOLO I–ter**     **AUTORIZZAZIONE E VIGILANZA DI APA E ARM**     217
Art. 79     Individuazione dell'autorità competente     217
Art. 79–*bis*     Autorizzazione e revoca *(abrogato)*     218
Art. 79–*ter*     Requisiti dei soggetti che svolgono funzioni di amministrazione presso il fornitore di servizi di comunicazione dati *(abrogato)*     218
Art. 79–*ter*.1     Requisiti organizzativi dei fornitori di servizi di comunicazione dati *(abrogato)*     218

**TITOLO II**     **DISCIPLINA DELLE CONTROPARTI CENTRALI**     219
Art. 79–*quater*     Definizioni *(abrogato)*     219

**Capo I**     **Le controparti centrali**     219
Art. 79–*quinquies*     Individuazione delle autorità nazionali competenti sulle controparti centrali     219
Art. 79–*sexies*     Autorizzazione e vigilanza delle controparti centrali     219
Art. 79–*septies*     Garanzie acquisite nell'esercizio dell'attività di controparte centrale e prevalenza delle disposizioni in materia di segregazione e portabilità delle posizioni e delle garanzie della clientela     221

**Capo II**     **Autorità nazionali competenti per l'esercizio di ulteriori poteri di vigilanza**     222
Art. 79–*octies*     Individuazione delle autorità nazionali competenti per l'esercizio di ulteriori poteri di vigilanza ai sensi del regolamento (UE) n. 648/2012     222
Art. 79–*octies*.1     Individuazione delle autorità nazionali competenti per l'esercizio di ulteriori poteri di vigilanza ai sensi del regolamento (UE) n. 600/2014     222
Art. 79–*novies*     Poteri di vigilanza     223

**TITOLO II–*BIS***     **DISCIPLINA DEI DEPOSITARI CENTRALI E DELLE ATTIVITÀ DI REGOLAMENTO E DI GESTIONE ACCENTRATA**     223

Art. 79–*decies*     Definizioni     223

**Capo I**     **Autorità nazionali competenti e rilevanti**     223
Art. 79–*undecies*     Individuazione delle autorità nazionali competenti sui depositari centrali     223
Art. 79–*duodecies*     Individuazione delle autorità nazionali competenti a svolgere le ulteriori funzioni previste dal regolamento (UE) n. 909/2014     224
Art. 79–*terdecies*     Individuazione delle autorità nazionali rilevanti     225

**Capo II**     **Finalità e destinatari della vigilanza**     226
Art. 79–*quaterdecies*     Finalità e poteri di vigilanza     226
Art. 79–*quinquiesdecies*     Regolamento dei servizi     227
Art. 79–*sexiesdecies*     Sistemi interni di segnalazione delle violazioni *(abrogato)*     227
Art. 79–*septiesdecies*     Segnalazione di violazioni alla Banca d'Italia e alla Consob *(abrogato)*     227

**Capo III**     **I depositari centrali**     227
Sezione I     Disciplina dei depositari centrali     227
Art. 79–*octiesdecies*     Revisione legale dei conti     227
Art. 79–*noviesdecies*     Modifiche all'assetto di controllo     227

Art. 79-*noviesdecies*.1  Disposizioni applicabili allo svolgimento di servizi e attività di investimento da parte dei depositari centrali   228

**Sezione II**          **Crisi dei depositari centrali**                                 228
Art. 79-*vicies*       Crisi                                                             228
Art. 80                *Attività di gestione accentrata di strumenti finanziari (abrogato)*   228
Art. 81                *Regolamento di attuazione e regolamento dei servizi (abrogato)*   228
Art. 81-*bis*          *Accesso alla gestione accentrata (abrogato)*                      229

**Capo IV**            **Gestione accentrata di strumenti finanziari**                   229
Art. 82                Attività e regolamento della gestione accentrata                   229

**Sezione I**          Gestione accentrata in regime di dematerializzazione              231
Art. 83                *Crisi delle società di gestione accentrata (abrogato)*           231
Art. 83-*bis*          Ambito di applicazione                                            231
Art. 83-*ter*          *Emissione di strumenti finanziari (abrogato)*                    231
Art. 83-*quater*       Attribuzioni dei depositari centrali e degli intermediari         232
Art. 83-*quinquies*    Diritti del titolare del conto                                    232
Art. 83-*sexies*       Diritto d'intervento in assemblea ed esercizio del voto           233
Art. 83-*septies*      Eccezioni opponibili                                              234
Art. 83-*octies*       Costituzione di vincoli                                           234
Art. 83-*novies*       Compiti dell'intermediario                                        234
Art. 83-*novies*.1     Non discriminazione, proporzionalità e trasparenza dei costi      235
Art. 83-*decies*       Responsabilità dell'intermediario                                 235
Art. 83-*undecies*     Obblighi degli emittenti azioni                                   236
Art. 83-*duodecies*    Identificazione degli azionisti                                   236
Art. 83-*terdecies*    Pagamento dei dividendi                                           237
Art. 83-*quaterdecies* Accesso degli emittenti ad un depositario centrale stabilito in un altro Stato membro   237

**Sezione II**         Gestione accentrata di strumenti finanziari cartolari             238
Art. 84                *Rilevazioni e comunicazioni inerenti agli strumenti finanziari accentrati (abrogato)*
Art. 85                Deposito accentrato                                                238
Art. 86                Trasferimento dei diritti inerenti agli strumenti finanziari depositati   238
Art. 87                Vincoli sugli strumenti finanziari accentrati                      238
Art. 88                Ritiro degli strumenti finanziari accentrati                       239
Art. 89                Aggiornamento del libro soci                                       239

**Sezione III**        Gestione accentrata dei titoli di Stato                           239
Art. 90                Gestione accentrata dei titoli di Stato                            239

**TITOLO II-*TER***     **ACCESSO ALLE INFRASTRUTTURE DI POST–TRADING E TRA SEDI DI NEGOZIAZIONE E INFRASTRUTTURE DI POST–TRADING**    240

**Capo I**     **Autorità nazionali competenti**    240
Art. 90-*bis*     Individuazione delle autorità nazionali competenti in materia di accesso ai depositari centrali stabiliti sul territorio della Repubblica    240
Art. 90-*ter*     Individuazione delle autorità nazionali competenti in materia di accesso tra sedi di negoziazione e infrastrutture di post-trading    240

**Capo II**     **Diritto di accesso e accordi**    241
Art. 90-*quater*     Accesso alle controparti centrali su base transfrontaliera    241
Art. 90-*quinquies*     Accesso ai servizi di regolamento delle operazioni su strumenti finanziari su base transfrontaliera    241
Art. 90-*sexies*     Accordi conclusi dai gestori dei mercati regolamentati e dei sistemi multilaterali di negoziazione con controparti centrali o con depositari centrali che gestiscono servizi di regolamento    242

**Capo III**     **Vigilanza**    242
Art. 90-*septies*     Poteri di vigilanza    242

## PARTE IV     DISCIPLINA DEGLI EMITTENTI    243

**TITOLO I**     **DISPOSIZIONI GENERALI**    243

Art. 91     Poteri della Consob    243
Art. 91-*bis*     Comunicazione dello Stato membro d'origine    243
Art. 92     Parità di trattamento    243
Art. 93     Definizione di controllo    244

**TITOLO II**     **APPELLO AL PUBBLICO RISPARMIO**    244

**Capo I**     **Offerta al pubblico di sottoscrizione e di vendita**    244
Art. 93-*bis*     Definizioni    244

Sezione I     Offerta al pubblico di titoli e di prodotti finanziari diversi dalle quote o azioni di Oicr aperti    245
Art. 94     Offerta al pubblico di titoli    245
Art. 94-*bis*     Offerta al pubblico di prodotti finanziari diversi dai titoli e dalle quote o azioni di Oicr aperti    246
Art. 95     Disposizioni di attuazione    247
Art. 95-*bis*     Revoca dell'acquisto o della sottoscrizione *(abrogato)*    248
Art. 96     Bilanci dell'emittente    248
Art. 97     Poteri di indagine e di vigilanza    249
Art. 98     Pubblicazione del prospetto dei FIA chiusi o dei FIA UE chiusi    249
Art. 98-*bis*     Emittenti di Paesi extracomunitari *(abrogato)*    249

| | | |
|---|---|---|
| Sezione II | Offerta al pubblico di quote o azioni di Oicr aperti | 250 |
| Art. 98-*ter* | **KID e prospetto** | 250 |
| **Art. 98-*ter*.1** | **Offerte rivolte agli investitori non al dettaglio** | 250 |
| Art. 98-*quater* | Disposizioni di attuazione | 251 |
| Art. 98-*quinquies* | Obblighi informativi | 252 |
| Art. 98-*sexies* | Obblighi relativi alla segnalazione delle violazioni *(abrogato)* | 252 |
| | | |
| Sezione III | Disposizioni comuni | 252 |
| Art. 99 | Poteri della Consob | 252 |
| Art. 100 | Casi di esenzione | 253 |
| Art. 100-*bis* | Rivendita di titoli o prodotti finanziari diversi dai titoli | 254 |
| **Art. 100-*ter*** | **Offerte di *crowdfunding*** | 254 |
| Art. 101 | Attività pubblicitaria | 256 |
| | | |
| **Capo II** | **Offerte pubbliche di acquisto o di scambio** | 257 |
| | | |
| Sezione I | Disposizioni generali | 257 |
| Art. 101-*bis* | Definizioni e ambito applicativo | 257 |
| Art. 101-*ter* | Autorità di vigilanza e diritto applicabile | 259 |
| Art. 102 | Obblighi degli offerenti e poteri interdittivi | 260 |
| Art. 103 | Svolgimento dell'offerta | 261 |
| Art. 104 | Difese | 262 |
| Art. 104-*bis* | Regola di neutralizzazione | 263 |
| Art. 104-*ter* | Clausola di reciprocità | 264 |
| | | |
| Sezione II | Offerte pubbliche di acquisto obbligatorie | 265 |
| Art. 105 | Disposizioni generali | 265 |
| Art. 106 | Offerta pubblica di acquisto totalitaria | 266 |
| Art. 107 | Offerta pubblica di acquisto preventiva | 269 |
| Art. 108 | Obbligo di acquisto | 270 |
| Art. 109 | Acquisto di concerto | 271 |
| Art. 110 | Inadempimento degli obblighi | 271 |
| Art. 111 | Diritto di acquisto | 272 |
| Art. 112 | Disposizioni di attuazione | 272 |
| | | |
| **TITOLO III** | **EMITTENTI** | 273 |
| | | |
| **Capo I** | **Informazione societaria** | 273 |
| Art. 113 | Ammissione alle negoziazioni di titoli | 273 |
| Art. 113-*bis* | Ammissione alle negoziazioni di quote o azioni di Oicr aperti | 274 |
| Art. 113-*ter* | Disposizioni generali in materia di informazioni regolamentate | 275 |
| Art. 114 | Comunicazioni al pubblico | 277 |
| Art. 114-*bis* | Informazione al mercato in materia di attribuzione di strumenti finanziari a esponenti aziendali, dipendenti o collaboratori | 279 |
| Art. 115 | Comunicazioni alla Consob | 280 |

Art. 115-*bis*        Registri delle persone che hanno accesso ad informazioni privilegiate
                      *(abrogato)*                                                                   281
Art. 115-*ter*        Comunicazioni relative alle quote di emissioni                                281
Art. 116              Strumenti finanziari diffusi tra il pubblico                                  281
Art. 117              Informazione contabile                                                        282
Art. 117-*bis*        *Fusioni fra società con azioni quotate e società con azioni non quotate*
                      *(abrogato)*                                                                   283
Art. 117-*ter*        Disposizioni in materia di finanza etica                                      283
Art. 118              Casi di inapplicabilità                                                        283
Art. 118-*bis*        Controllo sulle informazioni fornite al pubblico                              283

**Capo II**           **Disciplina delle società con azioni quotate**                              284
Art. 119              Ambito di applicazione                                                        284

Sezione I             Assetti proprietari                                                           284
Art. 120              Obblighi di comunicazione delle partecipazioni rilevanti                      284
Art. 121              Disciplina delle partecipazioni reciproche                                    286
Art. 122              Patti parasociali                                                             287
Art. 123              Durata dei patti e diritto di recesso                                         288
Art. 123-*bis*        Relazione sul governo societario e gli assetti proprietari                    289
Art. 123-*ter*        Relazione sulla politica in materia di remunerazione e sui compensi
                      corrisposti                                                                    291
Art. 124              Casi di inapplicabilità                                                        293

Sezione I-*bis*       Informazioni sull'adesione a codici di comportamento                          294
Art. 124-*bis*        Obblighi di informazione relativi ai codici di comportamento *(abrogato)*     294
Art. 124-*ter*        Informazione relativa ai codici di comportamento                              294

Sezione I-*ter*       Trasparenza degli investitori istituzionali, dei gestori di attivi e dei
                      consulenti in materia di voto                                                  294
Art. 124-*quater*     Definizioni e ambito applicativo                                              294
Art. 124-*quinquies*  Politica di impegno                                                           295
Art. 124-*sexies*     Strategia d'investimento degli investitori istituzionali e accordi con i gestori
                      di attivi                                                                      296
Art. 124-*septies*    Trasparenza dei gestori di attivi                                             296
Art. 124-*octies*     Trasparenza dei consulenti in materia di voto                                 297
Art. 124-*novies*     Poteri regolamentari                                                          298

Sezione II            Diritti dei soci                                                              298
Art. 125              *Convocazione dell'assemblea su richiesta della minoranza (abrogato)*         298
Art. 125-*bis*        Avviso di convocazione dell'assemblea                                         299
Art. 125-*ter*        Relazioni sulle materie all'ordine del giorno                                 300
Art. 125-*quater*     Sito Internet                                                                 301
Art. 126              Convocazioni successive alla prima                                            302
Art. 126-*bis*        Integrazione dell'ordine del giorno dell'assemblea e presentazione di nuove
                      proposte di delibera                                                          302
Art. 127              Voto per corrispondenza o in via elettronica                                  303

Art. 127-*bis*        Annullabilità delle deliberazioni e diritto di recesso        304
Art. 127-*ter*        Diritto di porre domande prima dell'assemblea        304
Art. 127-*quater*        Maggiorazione del dividendo        305
Art. 127-*quinquies*        Maggiorazione del voto        306
Art. 127-*sexies*        Azioni a voto plurimo        307
Art. 128        *Denuncia al collegio sindacale e al tribunale (abrogato)*        307
Art. 129        *Azione sociale di responsabilità (abrogato)*        307
Art. 130        Informazione dei soci        308
Art. 131        *Diritto di recesso in caso di fusioni e scissioni (abrogato)*        308
Art. 132        Acquisto di azioni proprie e della società controllante        308
Art. 133        Esclusione su richiesta dalle negoziazioni        308
Art. 134        Aumenti di capitale *(abrogato)*        309

Sezione II-*bis*        Società cooperative        309
Art. 135        Percentuali di capitale        309
Art. 135-*bis*        Disciplina delle società cooperative        309
Art. 135-*ter*        *Informazione al mercato in materia di attribuzione di strumenti finanziari a esponenti aziendali, dipendenti o collaboratori (abrogato)*        309
Art. 135-*quater*        *Assemblea straordinaria (abrogato)*        310
Art. 135-*quinquies*        *Integrazione dell'ordine del giorno dell'assemblea (abrogato)*        310
Art. 135-*sexies*        *Relazioni finanziarie (abrogato)*        310
Art. 135-*septies*        *Relazioni di revisione (abrogato)*        310
Art. 135-*octies*        *Proposte di aumento di capitale (abrogato)*        310

Sezione II-*ter*        Deleghe di voto        310
Art. 135-*novies*        Rappresentanza nell'assemblea        310
Art. 135-*decies*        Conflitto di interessi del rappresentante e dei sostituti        311
Art. 135-*undecies*        Rappresentante designato dalla società con azioni quotate        312
Art. 135-*duodecies*        Società cooperative        313

Sezione III        Sollecitazione di deleghe        313
Art. 136        Definizioni        313
Art. 137        Disposizioni generali        314
Art. 138        Sollecitazione        314
Art. 139        Requisiti del committente        314
Art. 140        Soggetti abilitati alla sollecitazione        314
Art. 141        Associazioni di azionisti        315
Art. 142        Delega di voto        315
Art. 143        Responsabilità        315
Art. 144        Svolgimento della sollecitazione e della raccolta        316

Sezione IV        Azioni di risparmio ed altre categorie di azioni        317
Art. 145        Emissioni delle azioni        317
Art. 146        Assemblea speciale        318
Art. 147        Rappresentante comune        319
Art. 147-*bis*        Assemblee di categoria        319

| | | |
|---|---|---|
| Sezione IV-*bis* | Organi di amministrazione | 319 |
| Art. 147-*ter* | Elezione e composizione del consiglio di amministrazione | 319 |
| Art. 147-*quater* | Composizione del consiglio di gestione | 321 |
| Art. 147-*quinquies* | Requisiti di onorabilità | 322 |
| | | |
| Sezione V | Organi di controllo | 322 |
| Art. 148 | Composizione | 322 |
| Art. 148-*bis* | Limiti al cumulo degli incarichi | 324 |
| Art. 149 | Doveri | 324 |
| Art. 150 | Informazione | 325 |
| Art. 151 | Poteri | 326 |
| Art. 151-*bis* | Poteri del consiglio di sorveglianza | 326 |
| Art. 151-*ter* | Poteri del comitato per il controllo sulla gestione | 327 |
| Art. 152 | Denunzia al tribunale | 328 |
| Art. 153 | Obbligo di riferire all'assemblea | 328 |
| Art. 154 | Disposizioni non applicabili | 328 |
| | | |
| Sezione V-*bis* | Informazione finanziaria | 329 |
| Art. 154-*bis* | Dirigente preposto alla redazione dei documenti contabili societari | 329 |
| Art. 154-*ter* | Relazioni finanziarie | 330 |
| Art. 154-*quater* | Trasparenza dei pagamenti ai governi | 333 |
| | | |
| Sezione VI | Revisione legale dei conti | 333 |
| Art. 155 | Attività di revisione contabile | 333 |
| Art. 156 | Relazioni di revisione | 333 |
| Art. 157 | Effetti dei giudizi sui bilanci | 334 |
| Art. 158 | Proposte di aumento di capitale | 334 |
| Art. 159 | Conferimento e revoca dell'incarico | 335 |
| Art. 160 | *Incompatibilità (abrogato)* | 336 |
| Art. 161 | *Albo speciale delle società di revisione (abrogato)* | 336 |
| Art. 162 | *Vigilanza sulle società di revisione (abrogato)* | 336 |
| Art. 163 | *Provvedimenti della Consob (abrogato)* | 337 |
| Art. 164 | *Responsabilità (abrogato)* | 337 |
| Art. 165 | *Revisione contabile dei gruppi (abrogato)* | 337 |
| Art. 165-*bis* | *Società che controllano società con azioni quotate (abrogato)* | 337 |
| | | |
| Sezione VI-*bis* | Rapporti con società estere aventi sede legale in Stati che non garantiscono la trasparenza societaria | 338 |
| Art. 165-*ter* | Ambito di applicazione | 338 |
| Art. 165-*quater* | Obblighi delle società italiane controllanti | 340 |
| Art. 165-*quinquies* | Obblighi delle società italiane collegate | 341 |
| Art. 165-*sexies* | Obblighi delle società italiane controllate | 341 |
| Art. 165-*septies* | Poteri della Consob e disposizioni di attuazione | 341 |

**PARTE V**     SANZIONI     342

**TITOLO I**     **SANZIONI PENALI**     342

**Capo I**     **Intermediari e mercati**     342
Art. 166     Abusivismo     342
Art. 167     Gestione infedele     343
Art. 168     Confusione di patrimoni     343
Art. 169     Partecipazioni al capitale     343
Art. 170     Gestione accentrata di strumenti finanziari     344
Art. 170-*bis*     Ostacolo alle funzioni di vigilanza della Banca d'Italia e della Consob     344
Art. 171     *Tutela dell'attività di vigilanza (abrogato)*     344

**Capo II**     **Emittenti**     345
Art. 172     Irregolare acquisto di azioni     345
Art. 173     Omessa alienazione di partecipazioni     345
Art. 173-*bis*     Falso in prospetto     345
Art. 174     *False comunicazioni e ostacolo alle funzioni della Consob (abrogato)*     345

**Capo III**     **Revisione contabile**     346
Art. 174-*bis*     *Falsità nelle relazioni o nelle comunicazioni delle società di revisione (abrogato)*     346
Art. 174-*ter*     *Corruzione dei revisori (abrogato)*     346
Art. 175     *Falsità nelle relazioni o comunicazioni della società di revisione (abrogato)*     346
Art. 176     *Utilizzazione e divulgazione di notizie riservate (abrogato)*     346
Art. 177     *Illeciti rapporti patrimoniali con la società assoggettata a revisione (abrogato)*     346
Art. 178     *Compensi illegali (abrogato)*     347
Art. 179     *Disposizioni comuni (abrogato)*     347

**TITOLO I-***BIS*     **ABUSI DI MERCATO**     347

**Capo I**     **Disposizioni generali**     347
Art. 180     Definizioni     347
Art. 181     Informazione privilegiata *(abrogato)*     348
Art. 182     Ambito di applicazione     348
Art. 183     Esenzioni     349

**Capo II**     **Sanzioni penali**     350
Art. 184     Abuso o comunicazione illecita di informazioni privilegiate. Raccomandazione o induzione di altri alla commissione di abuso di informazioni privilegiate.     350
Art. 185     Manipolazione del mercato     351
Art. 186     Pene accessorie     351
Art. 187     Confisca     351

**Capo III**     **Sanzioni amministrative**     352
Art. 187-*bis*     Abuso e comunicazione illecita di informazioni privilegiate     352

| | | |
|---|---|---|
| Art. 187-*ter* | Manipolazione del mercato | 352 |
| Art. 187-*ter*.1 | Sanzioni relative alle violazioni delle disposizioni del regolamento (UE) n. 596/2014 del Parlamento europeo e del Consiglio, del 16 aprile 2014 | 353 |
| Art. 187-*quater* | Sanzioni amministrative accessorie | 354 |
| Art. 187-*quinquies* | Responsabilità dell'ente | 355 |
| Art. 187-*sexies* | Confisca | 356 |
| Art. 187-*septies* | Procedura sanzionatoria | 356 |

**Capo IV** | **Poteri della Consob** | 359
| Art. 187-*octies* | Poteri della Consob | 359 |
| Art. 187-*novies* | Operazioni sospette *(abrogato)* | 362 |

**Capo V** | **Rapporti tra procedimenti** | 362
| Art. 187-*decies* | Rapporti con la magistratura | 362 |
| Art. 187-*undecies* | Facoltà della Consob nel procedimento penale | 362 |
| Art. 187-*duodecies* | Rapporti tra procedimento penale e procedimento amministrativo e di opposizione | 362 |
| Art. 187-*terdecies* | Applicazione ed esecuzione delle sanzioni penali ed amministrative | 363 |
| Art. 187-*quaterdecies* | Procedure consultive | 363 |

**TITOLO II** | **SANZIONI AMMINISTRATIVE** | 364

| Art. 187-*quinquiesdecies* | Tutela dell'attività di vigilanza della Banca d'Italia e della Consob | 364 |
| Art. 188 | Abuso di denominazione | 365 |
| Art. 189 | Partecipazioni al capitale | 366 |
| Art. 190 | Sanzioni amministrative pecuniarie in tema di disciplina degli intermediari | 367 |
| Art. 190.1 | Sanzioni amministrative pecuniarie in tema di disciplina della gestione accentrata di strumenti finanziari | 370 |
| Art. 190.1-*bis* | Ulteriori sanzioni amministrative pecuniarie in tema di disciplina della gestione accentrata di strumenti finanziari *(abrogato)* | 371 |
| Art. 190.2 | Sanzioni amministrative pecuniarie relative alla violazione delle disposizioni previste dal regolamento (UE) n. 909/2014 | 371 |
| Art. 190.3 | Sanzioni amministrative in tema di disciplina dei mercati | 373 |
| Art. 190.4 | Sanzioni amministrative pecuniarie relative alle violazioni delle disposizioni previste dal regolamento (UE) n. 600/2014, dagli atti delegati e dalle norme tecniche di regolamentazione e di attuazione della direttiva 2014/65/UE e del regolamento (UE) n. 600/2014) | 374 |
| Art. 190.5 | Sanzioni amministrative pecuniarie in tema di agenzie di rating del credito relative alle violazioni delle disposizioni previste dal regolamento (CE) n. 1060/2009 | 374 |
| Art. 190-*bis* | Responsabilità degli esponenti aziendali e del personale per le violazioni in tema di disciplina degli intermediari, dei mercati, dei depositari centrali e della gestione accentrata di strumenti finanziari e dei servizi di APA e di ARM | 375 |
| Art. 190-*bis*.1 | Sanzioni amministrative relative alle violazioni delle disposizioni del regolamento (UE) 2016/1011 | 376 |

| | | |
|---|---|---|
| Art. 190-*bis*.2 | Sanzioni amministrative relative alle violazioni delle disposizioni del regolamento (UE) 2017/2402 | 377 |
| Art. 190-*ter* | Altre violazioni in tema di attività riservate *(abrogato)* | 378 |
| Art. 190-*quater* | Sanzioni amministrative in tema di **servizi di** *crowdfunding* | 378 |
| Art. 191 | Offerta al pubblico di sottoscrizione e di vendita di prodotti finanziari e ammissione alla negoziazione di titoli | 380 |
| Art. 191-*bis* | Sanzioni accessorie | 381 |
| Art. 191-*ter* | Offerta al pubblico di sottoscrizione e di vendita e ammissione alle negoziazioni di quote o azioni di OICR aperti | 382 |
| Art. 192 | Offerte pubbliche di acquisto o di scambio | 383 |
| Art. 192-*bis* | Sanzioni amministrative in tema di informazioni sul governo societario e di politica di remunerazione e compensi corrisposti | 385 |
| Art. 192-*ter* | *Ammissione alle negoziazioni (abrogato)* | 387 |
| Art. 192-*quater* | Obbligo di astensione | 387 |
| Art. 192-*quinquies* | Sanzioni amministrative in tema di operazioni con parti correlate | 387 |
| Art. 193 | Sanzioni amministrative in tema di informazione societaria e doveri dei sindaci, dei revisori legali e delle società di revisione legale | 388 |
| Art. 193-*bis* | Rapporti con società estere aventi sede legale in Stati che non garantiscono la trasparenza societaria | 392 |
| Art. 193-*bis*.1 | Sanzioni amministrative in tema di trasparenza degli investitori istituzionali, dei gestori di attivi e dei consulenti in materia di voto | 392 |
| Art. 193-*ter* | Sanzioni amministrative pecuniarie relative alle violazioni delle prescrizioni di cui al regolamento (UE) n. 236/2012 | 393 |
| Art. 193-*quater* | Sanzioni amministrative relative alla violazione delle disposizioni previste dal regolamento (UE) n. 648/2012 del Parlamento europeo e del Consiglio, del 4 luglio 2012, e dal regolamento (UE) 2015/2365 del Parlamento europeo e del Consiglio, del 25 novembre 2015 | 394 |
| Art. 193-*quinquies* | Sanzioni amministrative pecuniarie relative alle violazioni delle disposizioni previste dal regolamento (UE) n. 1286/2014 | 396 |
| Art. 193-*sexies* | Sistemi interni di segnalazione | 397 |
| Art. 194 | Deleghe di voto | 398 |
| Art. 194-*bis* | Criteri per la determinazione delle sanzioni | 399 |
| Art. 194-*ter* | Sanzioni amministrative pecuniarie relative alle violazioni delle disposizioni previste dal regolamento (UE) n. 575/2013, dagli atti delegati e dalle norme tecniche di regolamentazione e di attuazione della direttiva 2013/36/UE e del regolamento (UE) n. 575/2013 | 400 |
| Art. 194-*ter*.1 | Sanzioni amministrative pecuniarie relative alle violazioni delle disposizioni previste dal regolamento (UE) 2019/2033, dagli atti delegati e dalle norme tecniche di regolamentazione e di attuazione della direttiva (UE) 2019/2034 e del regolamento (UE) 2019/2033 | 400 |
| Art. 194-*quater* | Ordine di porre termine alle violazioni | 401 |
| Art. 194-*quinquies* | Pagamento in misura ridotta | 402 |
| Art. 194-*sexies* | Condotte inoffensive | 403 |
| Art. 194-*septies* | Dichiarazione pubblica | 404 |
| Art. 195 | Procedura sanzionatoria | 406 |
| Art. 195-*bis* | Pubblicazione delle sanzioni | 408 |
| Art. 195-*ter* | Comunicazione all'ABE e all'AESFEM sulle sanzioni applicate | 410 |
| Art. 195-*quater* | Sanzioni in caso di risoluzione | 410 |

Art. 195-*quinquies*   Inapplicabilità di specifiche disposizioni della legge 24 novembre 1981, n. 689   411
Art. 196                Sanzioni applicabili ai consulenti finanziari   411
Art. 196-*bis*          Disposizioni di attuazione   412

## PARTE VI     DISPOSIZIONI TRANSITORIE E FINALI     413

Art. 197   Personale della Consob   413
Art. 198   Girata di titoli azionari   413
Art. 199   Società fiduciarie   413
Art. 200   Intermediari già autorizzati   414
Art. 201   Agenti di cambio   414
Art. 202   *Disposizioni in tema di liquidazione coattiva di borsa (abrogato)*   416
Art. 203   Contratti a termine   417
Art. 204   Gestione accentrata   417
Art. 205   Quotazioni di prezzi   417
Art. 206   Disposizioni applicabili alle società quotate in mercati diversi dalla borsa   417
Art. 207   Patti parasociali   418
Art. 208   Deleghe di voto, azioni di risparmio, collegio sindacale e revisione contabile   418
Art. 209   Società di revisione   418
Art. 210   Modifiche al codice civile   419
Art. 211   Modifiche al T.U. bancario   419
Art. 212   Disposizioni in materia di privatizzazioni   420
Art. 213   Conversione del fallimento in liquidazione coatta amministrativa   420
Art. 214   Abrogazioni   420
Art. 215   Disposizioni di attuazione   423
Art. 216   Entrata in vigore   424

## ALLEGATO I     ELENCO DEI SERVIZI, DELLE ATTIVITÀ E DEGLI STRUMENTI FINANZIARI     425

SEZIONE A   Attività e servizi di investimento   425
SEZIONE B   Servizi accessori   425
SEZIONE C   Strumenti finanziari   426

di attuazione del comma 2, prevedendo anche la possibilità dell'utilizzo di mezzi elettronici per la trasmissione delle informazioni[750].

Art. 93
*(Definizione di controllo)*

1. Nella presente parte sono considerate imprese controllate, oltre a quelle indicate nell'articolo 2359, primo comma, numeri 1 e 2, del codice civile, anche:

   *a)* le imprese, italiane o estere, su cui un soggetto ha il diritto, in virtù di un contratto o di una clausola statutaria, di esercitare un'influenza dominante, quando la legge applicabile consenta tali contratti o clausole;

   *b)* le imprese, italiane o estere, su cui un socio, in base ad accordi con altri soci, dispone da solo di voti sufficienti a esercitare un'influenza dominante nell'assemblea ordinaria.

2. Ai fini del comma 1 si considerano anche i diritti spettanti a società controllate o esercitati per il tramite di fiduciari o di interposte persone; non si considerano quelli spettanti per conto di terzi.

## TITOLO II
## APPELLO AL PUBBLICO RISPARMIO

### Capo I[751]
### Offerta al pubblico di sottoscrizione e di vendita

Art. 93-*bis*[752]
*(Definizioni)*

1. Nel presente Capo e nel Capo I del Titolo III si intendono per:

   *a)* "regolamento prospetto": regolamento (UE) 2017/1129 del Parlamento europeo e del Consiglio, del 14 giugno 2017;

   *b)* "disposizioni attuative": gli atti delegati adottati dalla Commissione europea ai sensi dell'articolo 44 del regolamento prospetto e le relative norme tecniche di regolamentazione e di attuazione adottate dalla Commissione europea ai sensi degli articoli 10 e 15 del regolamento (UE) n. 1095/2010 del Parlamento europeo e del Consiglio, del 24 novembre 2010;

   *b-bis)* "regolamento (UE) 2019/1156": il regolamento (UE) 2019/1156 del Parlamento europeo e del Consiglio, del 20 giugno 2019, per facilitare la distribuzione

---

750  Articolo così sostituito dall'art. 1 del D.Lgs. n. 195 del 6.11.2007.

751  L'intero Capo I (artt. 93-*bis* –101) è stato dapprima sostituito dall'art. 3 del D.Lgs. n. 51 del 28.3.2007, poi modificato dall'art. 15 del D.Lgs. n. 164 del 17.9.2007; dall'art. 15 del D.Lgs. n. 164 del 17.9.2007; dall'art. 1 del D.Lgs. n. 101 del 17.7.2009; dall'art. 1 del D.Lgs. n. 47 del 16.4.2012; dall'art. 1 del D.Lgs. n. 184 dell'11.10.2012, dall'art. 1 del D.Lgs. n. 224 del 14.11.2016; dall'art. 4 del D.Lgs. n. 165 del 25.11.2019; dall'art. 3 del D.Lgs. n. 17 del 2.2.2021, dall'art. 3 del D.Lgs. n. 191 del 5.11.2021 dall'art. 3 del D.Lgs. n. 191 del 5.11.2021 e  dall'art. 1 del D.Lgs. n. 29 del 10.3.2023 nei termini indicati nelle successive note.

752  Articolo dapprima sostituito dall'art. 3 del D.Lgs. n. 51 del 28.3.2007; in seguito modificato dall'art. 15 del D.Lgs. n. 164 del 17.9.2007; dall'art. 1 del D.Lgs. n. 47 del 16.4.2012; dall'art. 6 del D.Lgs. n. 44 del 4.3.2014; di nuovo sostituito dall'art. 3 del D.Lgs. n. 17 del 2.2.2021 e infine modificato dall'art. 3 del D.Lgs. n. 191 del 5.11.2021 e  dall'art. 1 del D.Lgs. n. 29 del 10.3.2023 nei termini indicati nelle successive note.

Europea è riconosciuto dalla Consob, con le modalità e alle condizioni stabilite nel regolamento previsto dal comma 2, quale prospetto per l'ammissione alle negoziazioni in un mercato regolamentato. La Consob può richiedere, con il regolamento previsto dal comma 2, la pubblicazione di un documento per la quotazione.

4. Alla pubblicità relativa ad un'ammissione di quote o azioni di Oicr aperti alla negoziazione in un mercato regolamentato si applica l'articolo 101.

<div align="center">

Art. 113-*ter*[868]
*(Disposizioni generali in materia di informazioni regolamentate)*

</div>

1. Per informazioni regolamentate si intendono quelle che devono essere pubblicate dagli emittenti quotati, dagli emittenti quotati aventi l'Italia come Stato membro d'origine o dai soggetti che li controllano, ai sensi delle disposizioni contenute nel Capo 3 del regolamento (UE) n. 596/2014, nel presente Titolo, Capo I e Capo II, Sezioni I, I-*bis* e V-*bis*, e nei relativi regolamenti di attuazione ovvero delle disposizioni previste da Paesi extracomunitari ritenute equivalenti dalla Consob[869].

2. Le informazioni regolamentate sono depositate presso la Consob e il gestore del mercato per il quale l'emittente ha richiesto o ha approvato l'ammissione alla negoziazione dei propri valori mobiliari o quote di fondi chiusi, al fine di assicurare l'esercizio delle funzioni attribuite a detto gestore ai sensi della Parte III, Titolo I-*bis*, del presente decreto[870].

3. La Consob, nell'esercizio dei poteri ad essa attribuiti dal presente Titolo, stabilisce modalità e termini di diffusione al pubblico delle informazioni regolamentate, ferma restando la necessità di pubblicazione tramite mezzi di informazione su giornali quotidiani nazionali, tenuto conto della natura di tali informazioni, al fine di assicurarne un accesso rapido, non discriminatorio e ragionevolmente idoneo a garantirne l'effettiva diffusione in tutta la Comunità europea[871].

4. La Consob:

*a)* autorizza soggetti terzi rispetto all'emittente all'esercizio dei servizi di diffusione delle informazioni regolamentate;

*b)* autorizza il servizio di stoccaggio centralizzato delle informazioni regolamentate;

*c)* organizza e gestisce il servizio di stoccaggio centralizzato delle informazioni in assenza di soggetti autorizzati ai sensi della lettera *b)*.

---

868 Articolo dapprima inserito dall'art. 1 del D.Lgs. n. 195 del 6.11.2007 e poi modificato dall'art. 1, comma 7 del D.Lgs. n. 101 del 17.7.2009, dall'art. 3 del D.Lgs. n. 27 del 27.1.2010 e dall'art. 3 del D.Lgs. n. 107 del 10.8.2018 nei termini indicati nelle successive note.

869 Comma modificato dapprima dall'art. 3 del D.Lgs. n. 27 del 27.1.2010 che ha soppresso le parole: ", Il" e poi dall'art. 3 del D.Lgs. n. 107 del 10.8.2018 che, prima delle parole: «nel presente Titolo», ha inserito le parole: «nel Capo 3 del regolamento (UE) n. 596/2014,».

870 Comma così sostituito dall'art. 3 del D.Lgs. n. 107 del 10.8.2018.

871 Comma modificato dapprima dall'art. 1, comma 7 del D.Lgs. n. 101 del 17.7.2009 che ha inserito le parole: "ferma restando la necessità di pubblicazione tramite mezzi di informazione su giornali quotidiani nazionali,"; successivamente dall'art. 20 del D.L. n. 91 del 24.6.2014 che ha soppresso tali parole; e infine dalla legge di conversione n. 116 dell'11.8.2014 che ha eliminato la disposizione del D.L. 91 del 24.6.2014 che aboliva l'espressione in questione.

5. La Consob, in relazione alle informazioni regolamentate, stabilisce con regolamento:

*a)* modalità e termini per il deposito di cui al comma 2;

*b)* requisiti e condizioni per il rilascio dell'autorizzazione all'esercizio del servizio di diffusione, nonché disposizioni per lo svolgimento di tale attività, avendo riguardo agli obiettivi di cui al comma 3;

*c)* requisiti e condizioni per il rilascio dell'autorizzazione all'esercizio del servizio di stoccaggio, nonché disposizioni per lo svolgimento di tale attività che garantiscano sicurezza, certezza delle fonti d'informazione, registrazione dell'ora e della data della ricezione delle informazioni regolamentate, agevole accesso per gli utenti finali, procedure allineate con quelle previste per il deposito presso la Consob;

*d)* la lingua in cui devono essere comunicate;

*e)* eventuali esenzioni dagli obblighi di deposito, diffusione e stoccaggio in conformità alla disciplina comunitaria[872].

6. Se un soggetto ha chiesto, senza il consenso dell'emittente, l'ammissione alla negoziazione in un mercato regolamentato di valori mobiliari o quote di fondi chiusi, gli obblighi di comunicazione delle informazioni regolamentate sono osservati da tale soggetto, salvo il caso in cui l'emittente comunica al pubblico, ai sensi delle disposizioni del proprio Stato di origine, le informazioni regolamentate richieste dalla normativa comunitaria.

7. I soggetti tenuti alla comunicazione al pubblico delle informazioni regolamentate non possono esigere corrispettivi per tale comunicazione.

8. La Consob può rendere pubblico il fatto che i soggetti tenuti alla comunicazione delle informazioni regolamentate non ottemperano ai loro obblighi.

9. Fermo restando quanto previsto dall'articolo 66-*quater*, comma 1, la Consob può:

*a)* sospendere o richiedere che il mercato regolamentato interessato sospenda la negoziazione dei valori mobiliari o quote di fondi chiusi per un massimo di dieci giorni per volta, se ha motivi ragionevoli di sospettare che le disposizioni relative alle informazioni regolamentate siano state violate dal soggetto obbligato, ai sensi del presente articolo, alla comunicazione delle informazioni regolamentate;

*b)* proibire la negoziazione in un mercato regolamentato se accerta che le disposizioni indicate alla lettera *a)* sono state violate[873].

---

872  Vedi regolamento Consob n. 11971 del 14.5.1999 e successive modifiche e integrazioni (pubblicato nel S.O. n. 100 alla G.U. n. 123 del 28.5.1999).

873  Comma così modificato dall'art. 3 del D.Lgs. n. 107 del 10.8.2018 che, nell'alinea, ha sostituito parole: «64, comma 1-*bis*» con le parole: «66-*quater*, comma 1».

Art. 114[874]
*(Comunicazioni al pubblico)*

1. Gli emittenti quotati comunicano al pubblico le informazioni privilegiate ai sensi dell'articolo 17 del regolamento (UE) n. 596/2014, secondo le modalità stabilite dalle norme tecniche di attuazione adottate dalla Commissione europea ai sensi del medesimo articolo 17, paragrafo 10. La Consob detta disposizioni per coordinare le funzioni attribuite al gestore del mercato con le proprie e può individuare compiti da affidargli per il corretto svolgimento delle funzioni previste dall'articolo 64, comma 2, lettera *d)* [875].

2. Gli emittenti quotati impartiscono le disposizioni occorrenti affinché le società controllate forniscano tutte le notizie necessarie per adempiere gli obblighi di comunicazione previsti dalla legge e dal regolamento (UE) n. 596/2014. Le società controllate trasmettono tempestivamente le notizie richieste[876].

3. Gli emittenti quotati, in caso di ritardo nella comunicazione al pubblico di informazioni privilegiate, trasmettono su successiva richiesta della Consob la documentazione comprovante l'assolvimento dell'obbligo previsto dall'articolo 17, paragrafo 4, del regolamento (UE) n. 596/2014 e dalle relative norme tecniche di attuazione[877].

4. *...omissis...*[878]

5. La Consob può, anche in via generale, richiedere agli emittenti, ai soggetti che li controllano, agli emittenti quotati aventi l'Italia come Stato membro d'origine, ai componenti degli organi di amministrazione e controllo e ai dirigenti, nonché ai soggetti che detengono una partecipazione rilevante ai sensi dell'articolo 120 o che partecipano a un patto previsto dall'articolo 122 che siano resi pubblici, con le modalità da essa stabilite, notizie e documenti

---

874  Articolo dapprima sostituito dall'art. 9 della L. n. 62 del 18.4.2005 (*Legge comunitaria 2004*) e poi modificato dall'art. 14, comma 1 della L. n. 262 del 28.12.2005; dall'art. 1, commi 8 e 9 del D.Lgs. n. 101 del 17.7.2009; dall'art. 20 del D.L. n. 91 del 24.6.2014, coordinato con la legge di conversione n. 116 dell'11.8.2014; dall'art. 4 del D.Lgs. n. 129 del 3.8.2017 e dall'art. 3 del D.Lgs. n. 107 del 10.8.2018 nei termini indicati nelle successive note. Secondo quanto disposto dal comma 5 dell'art. 99 D.Lgs. n. 180 del 16.11.2015: "*5. La comunicazione al pubblico ai sensi dell'articolo 114 del Testo Unico della Finanza in merito alla sussistenza dei presupposti per la riduzione e conversione o per l'avvio della risoluzione ai sensi dell'articolo 20 [del D.Lgs. n. 180 del 16.11.2015], nonché in merito al provvedimento che dispone la riduzione e la conversione ai sensi dell'articolo 29 [del D.Lgs. n. 180 del 16.11.2015] o l'avvio della risoluzione ai sensi dell'articolo 32 [del D.Lgs. n. 180 del 16.11.2015] è effettuata contestualmente alla pubblicazione prevista all'articolo 32, comma 3 [del D.Lgs. n. 180 del 16.11.2015], anche se la sussistenza di tali circostanze, ancorché non divulgata al pubblico, sia conosciuta dall'emittente o dai componenti dei suoi organi di amministrazione e controllo in data anteriore. La Consob può stabilire con proprio regolamento ulteriori ipotesi in cui detta comunicazione può essere rinviata*". Vedi regolamento Consob n. 11971 del 14.5.1999 e successive modifiche e integrazioni (pubblicato nel S.O. n. 100 alla G.U. n. 123 del 28.5.1999).

875  Comma modificato dapprima dall'art. 1, comma 8 del D.Lgs. n. 101 del 17.7.2009 che ha inserito le parole: ", ferma restando la necessità di pubblicazione tramite mezzi di informazione su giornali quotidiani nazionali,"; successivamente dall'art. 1 del D.Lgs. n. 184 dell'11.10.2012 che ha soppresso le parole: "e i soggetti che li controllano"; dall'art. 20 del D.L. n. 91 del 24.6.2014 che ha soppresso le parole: ", ferma restando la necessità di pubblicazione tramite mezzi di informazione su giornali quotidiani nazionali,"; dalla legge di conversione n. 116 dell'11.8.2014 che ha eliminato la disposizione del D.L. 91 del 24.6.2014 che aboliva l'espressione in questione; dall'art. 4 del D.Lgs. n. 129 del 3.8.2017 che nel secondo periodo ha sostituito le parole: «64, comma 1, lettera *b)*» con le parole: «64, comma 2, lettera *d)*» e infine così sostituito dall'art. 3 del D.Lgs. n. 107 del 10.8.2018.

876  Comma così sostituito dall'art. 3 del D.Lgs. n. 107 del 10.8.2018.

877  Comma dapprima modificato dall'art. 1 del D.Lgs. n. 184 dell'11.10.2012 e poi così sostituito dall'art. 3 del D.Lgs. n. 107 del 10.8.2018.

878  Comma abrogato dall'art. 3 del D.Lgs. n. 107 del 10.8.2018.

necessari per l'informazione del pubblico. In caso di inottemperanza, la Consob provvede direttamente a spese del soggetto inadempiente[879].

6. Qualora gli emittenti, i soggetti che li controllano e gli emittenti quotati aventi l'Italia come Stato membro d'origine oppongano, con reclamo motivato, che dalla comunicazione al pubblico delle informazioni, richiesta ai sensi del comma 5, possa derivare loro grave danno, gli obblighi di comunicazione sono sospesi. La Consob, entro sette giorni, può escludere anche parzialmente o temporaneamente la comunicazione delle informazioni, sempre che ciò non possa indurre in errore il pubblico su fatti e circostanze essenziali. Trascorso tale termine, il reclamo si intende accolto[880].

7. Chiunque detenga azioni in misura almeno pari al dieci per cento del capitale sociale, nonché ogni altro soggetto che controlla l'emittente quotato, comunicano alla Consob e al pubblico le operazioni, aventi ad oggetto azioni emesse dall'emittente o altri strumenti finanziari ad esse collegati, da loro effettuate, anche per interposta persona. Tale comunicazione è effettuata dalle persone strettamente legate ai soggetti sopra indicati, individuati dalla Consob con regolamento. La Consob individua con lo stesso regolamento le operazioni, le modalità e i termini delle comunicazioni, le modalità e i termini di diffusione al pubblico delle informazioni, nonché i casi in cui detti obblighi si applicano anche con riferimento alle società in rapporto di controllo con l'emittente[881].

8. *...omissis...*[882]

9. Al fine di garantire che il pubblico sia correttamente informato, la Consob può richiedere la pubblicazione delle raccomandazioni in materia di investimenti e delle altre informazioni che raccomandano o consigliano una strategia di investimento da parte degli emittenti quotati, dei soggetti abilitati, nonché dei soggetti in rapporto di controllo con essi, secondo le modalità stabilite con regolamento[883].

10. La Consob valuta, preventivamente e in via generale, con le modalità da essa stabilite, la sussistenza delle condizioni indicate dall'articolo 20, paragrafo 3, quarto comma, del regolamento (UE) n. 596/2014, con riguardo alle norme di autoregolamentazione dei soggetti che esercitano l'attività giornalistica, e comunica il relativo esito, nonché le medesime norme di autoregolamentazione, al Ministero dell'economia e delle finanze[884].

11. *...omissis...*[885]

---

879  Comma già sostituito dall'art. 14, comma 1 della L. n. 262 del 28.12.2005; successivamente modificato dall'art. 1 del D.Lgs. n. 195 del 6.11.2007 e poi dall'art. 1 del D.Lgs. n. 184 dell'11.10.2012 che ha sostituito le parole: «ai soggetti indicati nel comma 1» con le parole: «agli emittenti, ai soggetti che li controllano».

880  Comma dapprima modificato dall'art. 1, comma 9 del D.Lgs. n. 101 del 17.7.2009 che ha inserito le parole: "e gli emittenti quotati aventi l'Italia come Stato membro d'origine" e poi dall'art. 1 del D.Lgs. n. 184 dell'11.10.2012 che ha sostituito le parole: «i soggetti indicati nel comma 1» con le parole: «gli emittenti, i soggetti che li controllano».

881  Comma così sostituito dall'art. 3 del D.Lgs. n. 107 del 10.8.2018.

882  Comma dapprima sostituito dall'art. 14, comma 1 della L. n. 262 del 28.12.2005 e poi abrogato dall'art. 3 del D.Lgs. n. 107 del 10.8.2018.

883  Comma così sostituito dall'art. 3 del D.Lgs. n. 107 del 10.8.2018. Vedi regolamento Consob n. 11971 del 14.5.1999 e successive modifiche e integrazioni (pubblicato nel S.O. n. 100 alla G.U. n. 123 del 28.5.1999).

884  Comma così sostituito dall'art. 3 del D.Lgs. n. 107 del 10.8.2018.

885  Comma abrogato dall'art. 3 del D.Lgs. n. 107 del 10.8.2018.

12. Le disposizioni del presente articolo si applicano anche ai soggetti italiani ed esteri che:

*a)* hanno chiesto o autorizzato l'ammissione di strumenti finanziari di propria emissione alla negoziazione su un mercato regolamentato italiano;

*b)* hanno chiesto o autorizzato la negoziazione degli strumenti finanziari di propria emissione su un sistema multilaterale di negoziazione italiano;

*c)* hanno autorizzato la negoziazione degli strumenti finanziari di propria emissione su un sistema organizzato di negoziazione italiano[886].

Art. 114–*bis*[887]
*(Informazione al mercato in materia di attribuzione di strumenti finanziari[888]*
*a esponenti aziendali, dipendenti o collaboratori)*

1. I piani di compensi basati su strumenti finanziari a favore di componenti del consiglio di amministrazione ovvero del consiglio di gestione, di dipendenti o di collaboratori non legati alla società da rapporti di lavoro subordinato, ovvero di componenti del consiglio di amministrazione ovvero del consiglio di gestione, di dipendenti o di collaboratori di altre società controllanti o controllate sono approvati dall'assemblea ordinaria dei soci.

Nei termini e con le modalità previsti dall'articolo 125–*ter,* comma 1, l'emittente mette a disposizione del pubblico la relazione con le informazioni concernenti[889]:

*a)* le ragioni che motivano l'adozione del piano;

*b)* i componenti del consiglio di amministrazione ovvero del consiglio di gestione della società, delle controllanti o controllate, che beneficiano del piano[890];

*b*-bis*)* le categorie di dipendenti o di collaboratori della società e delle società controllanti o controllate della società, che beneficiano del piano[891];

*c)* le modalità e le clausole di attuazione del piano, specificando se la sua attuazione è subordinata al verificarsi di condizioni e, in particolare, al conseguimento di risultati determinati;

*d)* l'eventuale sostegno del piano da parte del Fondo speciale per l'incentivazione della partecipazione dei lavoratori nelle imprese, di cui all'articolo 4, comma 112, della legge

---

886  Comma così sostituito dall'art. 3 del D.Lgs. n. 107 del 10.8.2018.

887  Articolo dapprima inserito dall'art. 16 della L. n. 262 del 28.12.2005 e poi così modificato dall'art. 3 del D.Lgs. n. 303 del 29.12.2006 nei termini indicati nelle successive note.

888  Rubrica così modificata dall'art. 3, comma 9 del D.Lgs. n. 303 del 29.12.2006 che ha sostituito la parola: "azioni" con le parole: "strumenti finanziari".

889  Alinea dapprima modificato dall'art. 3, comma 9 del D.Lgs. n. 303 del 29.12.2006 e poi dall'art. 3 del D.Lgs. n. 27 del 27.1.2010 che ha sostituito le parole: "Almeno quindici giorni prima del termine fissato per l'assemblea, convocata per le deliberazioni di cui al presente comma," con le parole: "Nei termini e con le modalità previsti dall'articolo 125–*ter,* comma 1,".

890  Lettera così sostituita dall'art. 3, comma 9 del D.Lgs. n. 303 del 29.12.2006.

891  Lettera inserita dall'art. 3, comma 9 del D.Lgs. n. 303 del 29.12.2006.

Art. 147
*(Rappresentante comune)*

1. Al rappresentante comune degli azionisti di risparmio si applica l'articolo 2417 del codice civile, intendendosi l'espressione obbligazionisti riferita ai possessori di azioni di risparmio.

2. *...omissis...* [1056]

3. Il rappresentante comune ha gli obblighi e i poteri previsti dall'articolo 2418 del codice civile, intendendosi l'espressione obbligazionisti riferita ai possessori di azioni di risparmio; egli inoltre ha diritto di esaminare i libri indicati nell'articolo 2421, numeri 1) e 3), del codice civile e di ottenerne estratti, di assistere all'assemblea della società e di impugnarne le deliberazioni. Le spese sono imputate al fondo previsto dall'articolo 146, comma 1, lettera *c)*.

4. L'atto costitutivo può attribuire al rappresentante comune e all'assemblea ulteriori poteri a tutela degli interessi dei possessori di azioni di risparmio e deve prevedere le modalità per assicurare un'adeguata informazione al rappresentante comune sulle operazioni societarie che possano influenzare l'andamento delle quotazioni delle azioni della categoria.

Art. 147-*bis*
*(Assemblee di categoria)*

1. Gli articoli 146 e 147 si applicano alle assemblee speciali previste dall'articolo 2376, comma 1, del codice civile, qualora le azioni siano quotate in mercati regolamentati italiani o di altri Paesi dell'Unione europea[1057].

Sezione IV-*bis*[1058]
Organi di amministrazione

Art. 147-*ter*[1059]
*(Elezione e composizione del consiglio di amministrazione)*

1. Lo statuto prevede che i componenti del consiglio di amministrazione siano eletti sulla base di liste di candidati e determina la quota minima di partecipazione richiesta per la presentazione di esse, in misura non superiore a un quarantesimo del capitale sociale o alla diversa misura stabilita dalla Consob con regolamento tenendo conto della capitalizzazione, del flottante e degli assetti proprietari delle società quotate. Le liste indicano quali sono gli amministratori in possesso dei requisiti di indipendenza stabiliti dalla legge e dallo statuto. Lo statuto può prevedere che, ai fini del riparto degli amministratori da eleggere, non si tenga conto delle liste che non hanno conseguito una percentuale di voti almeno pari alla metà di quella richiesta dallo statuto per la

---

1056    Comma abrogato dall'art. 3 del D.Lgs. n. 37 del 6.2.2004.

1057    Articolo inserito dall'art. 3 del D.Lgs. n. 37 del 6.2.2004.

1058    Sezione dapprima inserita dall'art. 1 della L. n. 262 del 28.12.2005 e poi modificata dall'art. 3, comma 13 del D.Lgs. n. 303 del 29.12.2006, dall'art. 3 del D.Lgs. n. 27 del 27.1.2010, dall'art. 1 della L. n. 120 del 12.7.2011, dall'art. 3 del D.Lgs. n. 91 del 18.6.2012, dal D.L. n. 179 del 18.10.2012, coordinato con la legge di conversione n. 221 del 17.12.2012 e dalla L. n. 160 del 27.12.2019 (Legge di Bilancio 2020) nel testo ripubblicato nella G.U. n. 13 del 17.1.2020.

1059    Articolo dapprima inserito dall'art. 1 della L. n. 262 del 28.12.2005 e poi modificato dall'art. 3, comma 13 del D.Lgs. n. 303 del 29.12.2006, dall'art. 1 della L. n. 120 del 12.7.2011, dall'art. 3 del D.Lgs. n. 91 del 18.6.2012 e dal D.L. n. 179 del 18.10.2012, coordinato con la legge di conversione n. 221 del 17.12.2012 nei termini indicati nelle successive note.

presentazione delle stesse; per le società cooperative la misura è stabilita dagli statuti anche in deroga all'articolo 135[1060].

1-*bis*. Le liste sono depositate presso l'emittente, anche tramite un mezzo di comunicazione a distanza, nel rispetto degli eventuali requisiti strettamente necessari per l'identificazione dei richiedenti indicati dalla società, entro il venticinquesimo giorno precedente la data dell'assemblea convocata per deliberare sulla nomina dei componenti del consiglio di amministrazione e messe a disposizione del pubblico presso la sede sociale, sul sito Internet e con le altre modalità previste dalla Consob con regolamento almeno ventuno giorni prima della data dell'assemblea. La titolarità della quota minima di partecipazione prevista dal comma 1 è determinata avendo riguardo alle azioni che risultano registrate a favore del socio nel giorno in cui le liste sono depositate presso l'emittente. La relativa certificazione può essere prodotta anche successivamente al deposito purché entro il termine previsto per la pubblicazione delle liste da parte dell'emittente[1061].

1-*ter*. Lo statuto prevede, inoltre, che il riparto degli amministratori da eleggere sia effettuato in base a un criterio che assicuri l'equilibrio tra i generi. Il genere meno rappresentato deve ottenere almeno due quinti degli amministratori eletti. Tale criterio di riparto si applica per sei mandati consecutivi. Qualora la composizione del consiglio di amministrazione risultante dall'elezione non rispetti il criterio di riparto previsto dal presente comma, la Consob diffida la società interessata affinché si adegui a tale criterio entro il termine massimo di quattro mesi dalla diffida. In caso di inottemperanza alla diffida, la Consob applica una sanzione amministrativa pecuniaria da euro 100.000 a euro 1.000.000, secondo criteri e modalità stabiliti con proprio regolamento e fissa un nuovo termine di tre mesi ad adempiere. In caso di ulteriore inottemperanza rispetto a tale nuova diffida, i componenti eletti decadono dalla carica. Lo statuto provvede a disciplinare le modalità di formazione delle liste ed i casi di sostituzione in corso di mandato al fine di garantire il rispetto del criterio di riparto previsto dal presente comma. La Consob statuisce in ordine alla violazione, all'applicazione ed al rispetto delle disposizioni in materia di quota di genere, anche con riferimento alla fase istruttoria e alle procedure da adottare, in base a proprio regolamento da adottare entro sei mesi dalla data di entrata in vigore delle disposizioni recate dal presente comma. Le disposizioni del presente comma si applicano anche alle società organizzate secondo il sistema monistico[1062].

---

1060    Comma così modificato dapprima dall'art. 3, comma 13 del D.Lgs. n. 303 del 29.12.2006 che ha sostituito la parola: "membri" con la parola: "componenti" e ha aggiunto, in fine, le seguenti parole: "o alla diversa misura stabilita dalla Consob con regolamento tenendo conto della capitalizzazione, del flottante e degli assetti proprietari delle società quotate. Le liste indicano quali sono gli amministratori in possesso dei requisiti di indipendenza stabiliti dalla legge e dallo statuto. Lo statuto può prevedere che, ai i fini del riparto degli amministratori da eleggere, non si tenga conto delle liste che non hanno conseguito una percentuale di voti almeno pari alla metà di quella richiesta dallo statuto per la presentazione delle stesse" e poi dal D.L. n. 179 del 18.10.2012, coordinato con la legge di conversione n. 221 del 17.12.2012, che ha inserito l'ultimo periodo. Vedi regolamento Consob n. 11971 del 14.5.1999 e successive modifiche e integrazioni (pubblicato nel S.O. n. 100 alla G.U. n. 123 del 28.5.1999).

1061    Comma dapprima inserito dall'art. 3 del D.Lgs. n. 27 del 27.1.2010 e poi così modificato dall'art. 3 del D.Lgs. n. 27 del 27.1.2010 che ha sostituito le parole: «Le liste sono depositate presso l'emittente» con le parole: «Le liste sono depositate presso l'emittente, anche tramite un mezzo di comunicazione a distanza, nel rispetto degli eventuali requisiti strettamente necessari per l'identificazione dei richiedenti indicati dalla società,» e le parole: «chiamata a» con le parole: «convocata per».

1062    Comma già inserito dall'art. 1 comma 1 della L. n. 120 del 12.7.2011 e poi sostituito dapprima dall'art. 58-*sexies*, comma 1 del D.L. n. 124 del 26.10.2019, convertito con modificazioni dalla L. n. 157 del 19.12.2019 e poi dall'art. 1, comma 302 della L. n. 160 del 27.12.2019 nel testo ripubblicato nella G.U. n. 13 del 17.1.2020. Il comma 304 dell'art. 1 della L. n. 160 del 27.12.2019 nel testo ripubblicato nella G.U. n. 13 del 17.1.2020 dispone che: "*Il criterio di riparto di almeno due quinti previsto dai commi 302 e 303 si applica a decorrere dal primo rinnovo degli organi di amministrazione e controllo delle società quotate in mercati regolamentati successivo alla data di entrata in vigore della presente legge, fermo il criterio di riparto di almeno un quinto previsto dall'articolo 2 della legge 12 luglio 2011, n. 120, per il primo rinnovo successivo alla data di inizio delle negoziazioni*". Il comma 305 dell'art. 1 della L. n. 160 del 27.12.2019 nel testo ripubblicato nella G.U. n. 13 del 17.1.2020 dispone che: "*La Consob comunica annualmente al Dipartimento*

2.   ...*omissis*...[1063]

3.   Salvo quanto previsto dall'articolo 2409-*septiesdecies* del codice civile, almeno uno dei componenti del consiglio di amministrazione è espresso dalla lista di minoranza che abbia ottenuto il maggior numero di voti e non sia collegata in alcun modo, neppure indirettamente, con i soci che hanno presentato o votato la lista risultata prima per numero di voti. Nelle società organizzate secondo il sistema monistico, il componente espresso dalla lista di minoranza deve essere in possesso dei requisiti di onorabilità, professionalità e indipendenza determinati ai sensi dell'articolo 148, commi 3 e 4. Il difetto dei requisiti determina la decadenza dalla carica[1064].

4.   In aggiunta a quanto disposto dal comma 3, almeno uno dei componenti del consiglio di amministrazione, ovvero due se il consiglio di amministrazione sia composto da più di sette componenti, devono possedere i requisiti di indipendenza stabiliti per i sindaci dall'articolo 148, comma 3, nonché, se lo statuto lo prevede, gli ulteriori requisiti previsti da codici di comportamento redatti da società di gestione di mercati regolamentati o da associazioni di categoria. Il presente comma non si applica al consiglio di amministrazione delle società organizzate secondo il sistema monistico, per le quali rimane fermo il disposto dell'articolo 2409-*septiesdecies*, secondo comma, del codice civile. L'amministratore indipendente che, successivamente alla nomina, perda i requisiti di indipendenza deve darne immediata comunicazione al consiglio di amministrazione e, in ogni caso, decade dalla carica[1065].

### Art. 147-*quater*[1066]
*(Composizione del consiglio di gestione)*

1.   Qualora il consiglio di gestione sia composto da più di quattro membri, almeno uno di essi deve possedere i requisiti di indipendenza stabiliti per i sindaci dall'articolo 148, comma 3, nonché, se lo statuto lo prevede, gli ulteriori requisiti previsti da codici di comportamento redatti da società di gestione di mercati regolamentati o da associazioni di categoria.

1-*bis*. Qualora il consiglio di gestione sia costituito da un numero di componenti non inferiore a tre, ad esso si applicano le disposizioni dell'articolo 147-*ter*, comma 1-*ter*[1067].

---

*per le pari opportunità della Presidenza del Consiglio dei ministri gli esiti delle verifiche sull'attuazione dei commi da 302 a 304 ...".*

1063   Comma abrogato dall'art. 3, comma 13 del D.Lgs. n. 303 del 29.12.2006.

1064   Comma così modificato dall'art. 3, comma 13 del D.Lgs. n. 303 del 29.12.2006 che ha sostituito la parola: "membri" con la parola: "componenti"; ha sostituito le parole "la lista risultata prima per numero di voti" con le parole: "i soci che hanno presentato o votato la lista risultata prima per numero di voti" e ha sostituito la parola: "membro" con la parola: "componente".

1065   Comma così modificato dall'art. 3, comma 13 del D.Lgs. n. 303 del 29.12.2006 che ha sostituito le parole: "qualora il consiglio di amministrazione sia composto da più di sette membri, almeno uno di essi deve" con le parole: "almeno uno dei componenti del consiglio di amministrazione, ovvero due se il consiglio di amministrazione sia composto da più di sette componenti, devono" e ha aggiunto, in fine, le seguenti parole: "L'amministratore indipendente che, successivamente alla nomina, perda i requisiti di indipendenza deve darne immediata comunicazione al consiglio di amministrazione e, in ogni caso, decade dalla carica.".

1066   Articolo dapprima inserito dall'art. 1 della L. n. 262 del 28.12.2005 e poi modificato dall'art. 1 comma 2 della L. n. 120 del 12.7.2011 nei termini indicati nella successiva nota.

1067   Comma inserito dall'art. 1 comma 2 della L. n. 120 del 12.7.2011.

### Art. 147-*quinquies*
*(Requisiti di onorabilità)*

1. I soggetti che svolgono funzioni di amministrazione e direzione devono possedere i requisiti di onorabilità stabiliti per i membri degli organi di controllo con il regolamento emanato dal Ministro della giustizia ai sensi dell'articolo 148, comma 4.

2. Il difetto dei requisiti determina la decadenza dalla carica[1068].

### Sezione V
### Organi di controllo[1069]

### Art. 148
*(Composizione)*

1. L'atto costitutivo della società stabilisce per il collegio sindacale:

   *a)* il numero, non inferiore a tre, dei membri effettivi;

   *b)* il numero, non inferiore a due, dei membri supplenti;

   *c)* ...*omissis*... [1070];

   *d)* ...*omissis*... [1071].

1-*bis*. L'atto costitutivo della società stabilisce, inoltre, che il riparto dei membri di cui al comma 1 sia effettuato in modo che il genere meno rappresentato ottenga almeno due quinti dei membri effettivi del collegio sindacale. Tale criterio di riparto si applica per sei mandati consecutivi. Qualora la composizione del collegio sindacale risultante dall'elezione non rispetti il criterio di riparto previsto dal presente comma, la Consob diffida la società interessata affinché si adegui a tale criterio entro il termine massimo di quattro mesi dalla diffida. In caso di inottemperanza alla diffida, la Consob applica una sanzione amministrativa pecuniaria da euro 20.000 a euro 200.000 e fissa un nuovo termine di tre mesi ad adempiere. In caso di ulteriore inottemperanza rispetto a tale nuova diffida, i componenti eletti decadono dalla carica. La Consob statuisce in ordine alla violazione, all'applicazione ed al rispetto delle disposizioni in materia di quota di genere, anche con riferimento alla fase istruttoria e alle procedure da adottare, in base a proprio regolamento da adottare entro sei mesi dalla data di entrata in vigore delle disposizioni recate dal presente comma[1072].

---

1068   Articolo inserito dall'art. 1 della L. n. 262 del 28.12.2005.

1069   Rubrica così sostituita dall'art. 3 del D.Lgs. n. 37 del 6.2.2004.

1070   Lettera abrogata dall'art. 2 della L. n. 262 del 28.12.2005.

1071   Lettera abrogata dall'art. 2 della L. n. 262 del 28.12.2005.

1072   Comma già inserito dall'art. 1, comma 3 della L. n. 120 del 12.7.2011 e poi sostituito dapprima dall'art. 58-*sexies*, comma 2 del D.L. n. 124 del 26.10.2019, convertito con modificazioni dalla L. n. 157 del 19.12.2019 e poi dall'art. 1, comma 303 della L. n. 160 del 27.12.2019 nel testo ripubblicato nella G.U. n. 13 del 17.1.2020. Il comma 304 dell'art. 1 della L. n. 160 del 27.12.2019 nel testo ripubblicato nella G.U. n. 13 del 17.1.2020 dispone che: "*Il criterio di riparto di almeno due quinti previsto dai commi 302 e 303 si applica a decorrere dal primo rinnovo degli organi di amministrazione e controllo delle società quotate in mercati regolamentati successivo alla data di entrata in vigore della presente legge, fermo il criterio di riparto di almeno un quinto previsto dall'articolo 2 della legge 12 luglio 2011, n. 120, per il primo rinnovo successivo alla data di inizio delle negoziazioni*". Il comma 305 dell'art. 1 della L. n. 160 del 27.12.2019 nel testo ripubblicato nella G.U. n. 13 del 17.1.2020 dispone che: "*La Consob comunica annualmente al Dipartimento*

2. La Consob stabilisce con regolamento modalità per l'elezione, con voto di lista, di un membro effettivo del collegio sindacale da parte dei soci di minoranza che non siano collegati, neppure indirettamente, con i soci che hanno presentato o votato la lista risultata prima per numero di voti. Si applica l'articolo 147-*ter*, comma 1-*bis*[1073].

2-*bis*. Il presidente del collegio sindacale è nominato dall'assemblea tra i sindaci eletti dalla minoranza[1074].

3. Non possono essere eletti sindaci e, se eletti, decadono dall'ufficio:

   *a)* coloro che si trovano nelle condizioni previste dall'articolo 2382 del codice civile;

   *b)* il coniuge, i parenti e gli affini entro il quarto grado degli amministratori della società, gli amministratori, il coniuge, i parenti e gli affini entro il quarto grado degli amministratori delle società da questa controllate, delle società che la controllano e di quelle sottoposte a comune controllo[1075];

   *c)* coloro che sono legati alla società od alle società da questa controllate od alle società che la controllano od a quelle sottoposte a comune controllo ovvero agli amministratori della società e ai soggetti di cui alla lettera *b)* da rapporti di lavoro autonomo o subordinato ovvero da altri rapporti di natura patrimoniale o professionale che ne compromettano l'indipendenza[1076].

4. Con regolamento adottato ai sensi dell'articolo 17, comma 3, della legge 23 agosto 1988, n. 400, dal Ministro della giustizia, di concerto con il Ministro dell'economia e delle finanze[1077], sentiti la Consob, la Banca d'Italia e l'Ivass, sono stabiliti i requisiti di onorabilità e di professionalità dei membri del collegio sindacale[1078], del consiglio di sorveglianza e del comitato per il controllo sulla gestione. Il difetto dei requisiti determina la decadenza dalla carica[1079].

4-*bis*. Al consiglio di sorveglianza si applicano le disposizioni di cui ai commi 1-*bis*, 2 e 3[1080].

---

per le pari opportunità della Presidenza del Consiglio dei ministri gli esiti delle verifiche sull'attuazione dei commi da 302 a 304 ...".

1073   Comma dapprima sostituito dall'art. 2 della L. n. 262 del 28.12.2005, poi modificato dall'art. 3, comma 14 del D.Lgs. n. 303 del 29.12.2006 che ha inserito le parole: ", con voto di lista," e ha aggiunto, in fine, le parole: "che non siano collegati, neppure indirettamente, con i soci che hanno presentato o votato la lista risultata prima per numero di voti" e infine modificato dall'art. 3 del D.Lgs. n. 27 del 27.1.2010 che ha aggiunto le parole: "Si applica l'articolo 147-*ter*, comma 1-*bis*.". Vedi regolamento Consob n. 11971 del 14.5.1999 e successive modifiche e integrazioni (pubblicato nel S.O. n. 100 alla G.U. n. 123 del 28.5.1999).

1074   Comma inserito dall'art. 2 della L. n. 262 del 28.12.2005.

1075   Lettera così sostituita dall'art. 3 del D.Lgs. n. 37 del 6.2.2004.

1076   Lettera dapprima sostituita dall'art. 3 del D.Lgs. n. 37 del 6.2.2004 e poi modificata dall'art. 2 della L. n. 262 del 28.12.2005 che inserito le parole: "ovvero agli amministratori della società e ai soggetti di cui alla lettera *b)*" e le parole: "o professionale".

1077   Le precedenti parole: "Ministero del tesoro, del bilancio e della programmazione economica" sono state sostituite dalle parole: "Ministero dell'economia e delle finanze" dall'art. 1 del D.Lgs. n. 37 del 6.2.2004.

1078   Vedi regolamento Ministro grazia e giustizia n. 162 del 30.3.2000 (pubblicato nella G.U. n. 141 del 19.6.2000).

1079   Comma dapprima sostituito dall'art. 2 della L. n. 262 del 28.12.2005 e poi così modificato dall'art. 4 del D.Lgs. n. 72 del 12.5.2015 che ha sostituito la parola: «Isvap» con la parola: «Ivass».

1080   Comma dapprima aggiunto dall'art. 3 del D.Lgs. n. 37 del 6.2.2004, poi sostituito dall'art. 2 della L. n. 262 del 28.12.2005 e infine così modificato dall'art. 1 comma 3 della L. n. 120 del 12.7.2011 che ha inserito le parole: "1-*bis*".

**Text updated with the amendments made by Legislative Decrees no. 29, 30 and 31 of 10 March 2023. Changes are shown in bold print.**

* * *

## LEGISLATIVE DECREE No. 58 OF 24 FEBRUARY 1998
### Consolidated Law on Finance pursuant to Articles 8 and 21 of Law no. 52 of 6 February 1996[1]

1 Published in the Ordinary Supplement of O.J. no. 71 of 26.3.1998. Legislative Decree 58/1998 was subsequently amended by:

- Decree Law 351/2001, (ratified by Law 410/2001 (published in O.J. no. 274 of 24.11.2001);

- Legislative Decree 274/2003 (published in O.J. no. 233 of 7.10.2003);

- Law 326/2003 (published in O.J. no. 274 of 25.11.2003);

- Law 350/2003 (published in the O.J. of 24.11.2001);

- Legislative Decree 37/2004 (published in the Ordinary Supplement, O.J. no. 37 of 14.2.2004);

- Legislative Decree 170/2004 (published in O.J. no. 164 of 15.7.2004);

- Legislative Decree 197/2004 (published in O.J. no. 182 of 5.8.2004);

- Article 9 of Law 62/2005 (published in the Ordinary Supplement, O.J. no. 96 of 27.4.2005, Law 262/2005 (published in the Ordinary Supplement, O.J. no. 301 of 28.12.2005);

- Legislative Decree 303/2006 (published in Ordinary Supplement no. 5/L, O.J. no. 7 of 10.1.2007);

- Article 2 of Legislative Decree no. 297 of 27.12.2006, coordinated with Enactment Law no. 15 of 23.2.2007 (published in O.J. no. 46 of 24.2.2007);

- Article 10 of Law no. 13 of 6.2.2007 – 2006 Community Law (published in Ordinary Supplement no. 41/L, O.J. no. 40 of 17.2.2007);

- Article 2 of the Legislative Decree no. 32 of 2.2.2007 (published in O.J. no. 73 of 28.3.2007);

- Legislative Decree no. 51 of 28.3.2007 (published in O.J. no. 94 of 23.4.2007);

- Legislative Decree no. 164 of 17.9.2007 (published in Ordinary Supplement no. 200/L, O.J. no. 234 of 8.10.2007);

- Legislative Decree no. 195 of 6.11.2007 (published in Ordinary Supplement no. 228, O.J. no. 261 of 9.11.2007);

- Legislative Decree no. 229 of 19.11.2007 (published in O.J. no. 289 of 13.12.2007);

- Legislative Decree no. 173 of 3.11.2008 (published in O.J. no. 260 of 6.11.2008);

- Decree Law no. 185 of 29.11.2008 (published in Ordinary Supplement no. 263/L, O.J. no. 280 of 29.11.2008) co-ordinated with the conversion Law no. 2 of 28 January 2009 (published in Ordinary Supplement no. 14/L, O.J. no. 22 of 28.1.2009);

- Decree Law no. 5 of 10.2.2009 (published in O.J. no. 34 of 11.2.2009) co-ordinated with the conversion Law no. 33 of 9 April 2009 (published in Ordinary Supplement no. 49/L, O.J. no. 85 of 11.4.2009);

- Law 69/2009 (published in Ordinary Supplement no. 95/L, O.J. no. 140 of 19.6.2009);

- Legislative Decree no. 101 of 17.7.2009 (published in O.J. no. 178 of 3.8.2009);

- Legislative Decree no. 146 of 25.9.2009 (published in O.J. no. 246 of 22.10.2009);

- Legislative Decree no. 21 of 27.1.2010 (published in O.J. no. 44 of 23.2.2010);

- Legislative Decree no 27 of 27.1.2010 (published in Ordinary Supplement no. 43/L, O.J. no. 53 of 5.3.2010), the amendments made by Legislative Decree no. 27 of 27.1.2010 shall enter into force on 20 March 2010 unless otherwise envisaged in the final provisions of Article 7 of that Decree;

- Legislative Decree no. 39 of 27.1.2010 (published in Ordinary Supplement no. 58/L, O.J. no. 68 of 23.3.2010), the amendments made by Legislative Decree no. 39 of 27.1.2010 shall enter into force on 7 April 2010 unless otherwise envisaged in the final and transitional provisions of Article 43 of that Decree;

- Decree Law no 78 of 31.5.2010 (published in Ordinary Supplement no. 114/L, O.J. no. 125 of 31.5.2010), coordinated with conversion Law no. 122 of 30.7.2010 (published in Ordinary Supplement no. 174, O.J. no. 176 of 30.7.2010);

- Legislative Decree no. 104 of 2.7.2010 (published in Ordinary Supplement no. 148/L, O.J. no. 156 of 7.7.2010), the amendments introduced by Legislative Decree no. 104 of 2.7.2010 entered into force on 16.9.2010;

- Legislative Decree no. 141 of 13.8.2010 (published in Ordinary Supplement no. 212/L, O.J. no. 207 of 4.9.2010), the amendments introduced by Legislative Decree no. 141 of 13.8.2010 entered into force on 19.9.2010;

- Legislative Decree no. 176 of 5.10.2010 (published in O.J. no. 253 of 28.10.2010), the amendments introduced by Legislative Decree no. 176 of 5.10.2010 entered into force on 12.11.2010;

- Legislative Decree no. 224 of 29.11.2010 (published in O. J. no. 300 of 24.12.2010), the changes made from Legislative Decree no. 224 of 29.11.2010 are in force from 8.1.2011;

- Legislative Decree no. 239 of 30.12.2010 (published in O. J. no. 9 of 13.1.2011), the changes made from Legislative Decree no. 239 of 30.12.2010 are in force from the date on which it was published in the O. J.;

- Legislative Decree no. 259 of 30.12.2010 (published in O. J. no. 30 of 7.2.2011), the changes made from Legislative Decree no. 259 of 30.12.2010 are in force from 22.2.2011;

- Italian Law Decree no. 26 of 25.3.2011 (published in O. J. no. 70 of 26.3.2011) in force from 27.3.2011, converted with Italian Law no. 73 of 23.5.2011 (published in O. J. no. 120 of 25.5.2011);

- Legislative Decree no. 48 of 24.3.2011 (published in O. J. no. 92 of 21.4.2011) in force from 30.6.2011;

- Law no. 120 of 12 July 2011 (published in O.J. no. 174 of 28.7.2011) in force from 12.8.2011;

- Law no. 217 of 15 December 2011 (published in O.J. no. 1 of 2.1.2012) in force from 17.1.2012;

- Legislative Decree no. 47 of 16 April 2012 (published in O.S. no 86/L to O.J. no. 99 of 28.4.2012) in force from 13.5.2012;

- Legislative Decree no. 91 of 18 June 2012 (published in the O.J. no. 152 of 2.7.2012) in force from 17.7.2012, without prejudice to that established by the final provisions dictated by Article 5 of the said Decree;

- the decision of the Constitutional Court no. 162 of 27.6.2012 (published in the O.J., 1st Special Series, no. 27 of 4.7.2012);

- Legislative Decree no. 130 of 30 July 2012 (published in the O.J. no. 184 of 8.8.2012) in effect as from 23.8.2012;

- Legislative Decree no. 160 of 14 September 2012 (published in the O.J. no. 218 of 19.9.2012) in effect as from 3.10.2012;

- Legislative Decree no. 169 of 19.9.2012 (published in the O.J. no. 230 of 2.10.2012) in effect from 17.10.2012;

- Italian Decree Law no. 179 of 18.10.2012 (published in O.S. no 194/L to O.J. no. 245 of 19.10.2012), in effect from 20.10.2012; coordinated with conversion Law no. 221 of 17.12.2012 (published in O.S. no. 208/L to O.J. no. 294 of 18.12.2012), in effect from 19.12.2012;

- Legislative Decree no. 184 of 11.10.2012 (published in O.J. no. 253 of 29.10.2012), in effect from 13.11.2012;

- Legislative Decree no. 69 of 21.6.2013, (published in the Ord. Suppl. no. 50 of O.J. no. 144 of 21.6.2013), in force from 22.6.2013, converted with amendments from Law no. 98 of 9.8.2013, (published in the Ord. Suppl. no. 63 of the O.J. no. 194 of 20.8.2013), in force from 21.8.2013;

- Law no. 97 of 6.8.2013 (published in O.J. no. 194 of 20.8.2013), in force from 4.9.2013, without prejudice to the rulings of the transitional provisions established by Article 89, paragraphs 3 and 4, of Regulation (EU) no. 648/2012 of the European Parliament and of the Council, of 4 July 2012;

- Legislative Decree no. 44 of 4.3.2014 (published in Official Journal no. 70 of 25.3.2014) in force as of 9.4.2014, without prejudice to the transitory provisions contemplated by Article 15 of the same Legislative Decree;

- Legislative Decree no. 53 of 4.3.2014 (published in Official Journal no. 76 of 1.4.2014) in force as of 16.4.2014;

- Constitutional Court Decision no. 94 of 9/15.4.2014 (O.J. 1a Special Series no. 18 of 23.4.2014);

- Legislative Decree no. 91 of 24.6.2014 (published in the O.J. no. 144 of 24.6.2014), in force since 25.6.2014 (see also notice of amendment in the O.J. no. 150 of 1.7.2014), coordinated with conversion Law no. 116 of 11.8.2014 (published in the Ord. Suppl. no. 72 of the O.J. no. 192 of 20.8.2014), in force from 21.8.2014;

- Law no. 161 of 30.10.2014 (published in the Ord. Suppl. no. 83/L of the O.J. no. 261 of 10.11.2014), in force from 25.11.2014;

- Decree Law no. 133 of 12.9.2014, (published in the O.J. no. 212 of 12.9.2014), in force since 13.9.2014 converted with amendments by Law no. 164 of 11.11. 2014, (published in the Ord. Suppl. no. 85 of the O.J. no. 262 of 11.11.2014), which has introduced Section 119-ter into Article 1 of Law 296 of 27.12. 2006, no. 296 (in the Ord. Suppl. no. 244 of the O.J. no. 299 of 27.12.2006);

- Law no. 161 of 30.10.2014 (published in the Ord. Suppl. no. 83/L of the O.J. no. 261 of 10.11.2014), in force since 25.11.2014;

- Decree Law no. 3 of 24.1.2015 (published in the O.J. no. 19 of 24.1.2015), in force since 25.1.2015, converted with amendments by Italian Law no. 33 of 24.3.2015 (published in Ordinary Supplement no. 15 of O.J. no. 70 of

_____

25.3.2015), in force since 26.3.2015;

- Legislative Decree no. 66 of 7.5.2015 (published in Official Journal no. 116 of 21.5.2015) in force as of 5.6.2015;

- Legislative Decree no. 72 of 12.05.2015 (published in Official Journal no. 134 of 12.06.2015), in force since 27.06.2015, except as provided for by the transitional dispositions of Article 6 of the same decree Paragraph 1 of Legislative Decree no. 72 of 12.05.2015 provides that: "The regulations issued by the Minister of Economy and Finance pursuant to provisions repealed or amended by this decree shall continue to apply until the date of entry into force of the provisions issued by CONSOB and the Bank of Italy on the corresponding matters";

- Italian Law no. 208 of 28.12.2015 (published in the Ordinary Section no. 70 of the Official Journal no. 302 of 30.12.2015), in force since 1.1.2016;

- Legislative Decree no. 18 of 14.2.2016 (published in the Official Journal no. 37 of 15.2.2016), in force since 16.2.2016 converted with amendments by Italian Law no. 49 of 8.4.2016, (published in the Official Journal no. 87 of 14.4.2016);

- Legislative Decree no. 25 of 15.2.2016 (published in the Official Journal no. 52 of 3.3.2016), in force since 18.3.2016, without prejudice to the transitory provisions contemplated by Article 2 of the same decree;

- Legislative Decree no. 71 of 18.4.2016 (published in the Official Journal no. 117 of 20.5.2016), in force since 4.6.2016;

- Legislative Decree no. 176 of 12.8.2016 (published in the Official Journal no. 211 of 9.9.2016), in force as of 24.9.2016, without prejudice to the transitional provisions set out by Article 5 of the same Legislative Decree;

- Legislative Decree no. 224 of 14 November 2016 (published in the Official Journal no. 278 of 28 November 2016), the provisions of Legislative Decree no. 224 of 14 November 2016, in force since 13 December 2016, are applied as of the date of the application of Regulation (EU) no. 1286/2014;

- Law No. 232 of 11 December 2016 (published in S.O. no. 57/L at the O.J. no. 297 of 21.12.2016), in force since 1 January 2017;

- Legislative Decree no. 254 of 30.12.2016 (published in the Official Journal no. 7 of 10.01.2017), in force since 25.01.2017, without prejudice to the application of the provisions of Article 10 of the same Legislative Decree;

- Legislative decree no. 112 del 3.7.2017 (published in O.J. no. 167 of 19.7.2017), in force since 20.7.2017. Legislative decree no. 112 of 3.7.2017 established (with Article 18, subsection 9) that "The efficacy of the provisions of this article and article 16 are subject, pursuant to article 108, subsection 3, of the Treaty on the Functioning of the European Union, to the authorisation of the European Commission, required by the Ministry of Labour and social policy";

- Legislative decree no. 129 of 3.8.2017 (published in O.J. no. 198 of 25.8.2017), in force since 3.1.2018, except for what is specified in Article 10 of the same Legislative Decree; paragraph 2 of Article 10 of Legislative Decree no. 129 of 3.8.2017 requires: "The provisions of Legislative Decree no. 58 of February 24 1998, modified by this decree, 3 January 2018, except for what is specified differently by article 93 of the directive 2014/65/EU, with reference to article 65, section 2, of the same directive, the implementing orders of which have been applied since September 3 2019, and by article 55 of (EU)regulations no. 600/2014, and subsequent amendments, as well as by paragraph 3. Until the aforementioned date, the provisions in force the day before this Legislative Decree comes into effect shall be applied. The provisions of the European Union that are directly applicable are not affected, the provisions issued by the Bank of Italy and CONSOB, jointly or separately, pursuant to the provisions Legislative Decree no. 58, 24 February 1998 repealed or modified by this decree, continue to be applied until the provisions issued by the Bank of Italy or CONSOB come into effect. The Bank of Italy and CONSOB adopt these provisions within 180 days of the date this decree comes into effect. In order to guarantee the coordination of the exercising of the supervisory functions in their specific areas of responsibility, the memorandum of understanding stipulated by CONSOB and the Bank of Italy on October 31, 2007 pursuant to article 5, paragraph 5-bis, of Legislative Decree 24 February 1998, no. 58, in the text in force before this decree came into effect continue to apply, until the date it is revised. In order to ensure compliance with the implementing provisions, issued pursuant to provisions repealed or substituted by this decree, that continue to be applied, pursuant to the previous period, the Bank of Italy and CONSOB, in the transitory phase, will retain all the powers provided for in Legislative Decree no. 58 of February 24th 1998, no. 58 in force before the date this decree came into force";

- Decree Law no. 148 of 16.10.2017 (published in O.J. no. 242 of 16.10.2017), in force since 16.10.2017, converted with amendments by Italian Law no. 172 of 4.12.2017 (published in O.J. no. 284 of 5.12.2017);

- Legislative Decree no. 233 of 15.12.2017 (published in O.J. no. 36 of 13.2.2018), in force since 28.2.2018;

- Law no. 205 of 27.12. 2017 (2018 Budget Law, published in the O.S. no. 62 to the Official Journal no. 302 of 29.12.2017), in force since 1.1.2018;

- Legislative Decree no. 68 of 21.05.2018 (published in O.J. no. 138 of 16.6.2018), in force since 1.7.2018;

- Legislative Decree no. 95 of 20.7.2018 (published in the O.J. no. 185 of 10.8.2018), in force since 2.9.2018;

- Legislative Decree no. 107 of 10.8.2018 (published in O.J. no. 214 of 14.9.2018), in force since 29.9.2018;

- Decision of the Constitutional Court 25 October/5 December 2018, no. 223 (published in O.J., 1st special series -

Constitutional Court - no. 13 no. 49 of 12.12.2018), in force since 13.12.2018;

- Law no. 145 of 30.12.2018 (published in the Ordinary Supplement no. 62/L to the O.J. no. 302 of 31.12.2018), in force since 1.1.2019;

- Legislative Decree no.19 of 13.2.2019 (published in the O.J. no. 61 of 13.3.2019) in force since 28.3.2019;

- Decree Law no. 22 of 25.3.2019 (published in the O.J. no. 71 of 25.3.2019), in force since 26.3.2019, converted with amendments by Law no. 41 of 20.5.2019 (published in the O.J. no. 120 of 24.5.2019), in force since 25.5.2019;

- Decision no. 63 of the Constitutional Court - 20 February/21 March 2019, (published in O.J., 1st special series - Constitutional Court no. 13 of 27.3.2019);

- Decree Law no. 34 of 30 April 2019 (published in the O.J. No. 100 of 30.4.2019), in force since 1.5.2019, converted with modifications by Law no. 58 of 28.6.2019 (published in the Ordinary Supplement No. 26/L to the O.J. No. 151 of 6.29.2019);

- Law no. 37 of 3 May 2019 – European Law 2018 (published in O.J. no. 109 of 11.5.2019) in force since 26.5.2019;

- Decision no. 112 of the Constitutional Court – 6 March/10 May 2019, (published in O.J., 1st special series - Constitutional Court no. 20 of 15.5.2019);

- Legislative Decree no. 49 of 10.5.2019 (published in O.J. no. 134 of 10.6.2019), in force since 10.6.2019, for the transitional and final provisions see Article 7 of the same Legislative Decree.

- Decree Law no. 124 of 26/10/2019 (published in O.J. no. 252 of 26.10.2019), in force since 27.10.2019, converted with amendments into Italian Law no. 157 of 19.12.2019 (published in the O.J. no. 301 of 24.12.2019), in force since 25.12.2019;

- Following Consob resolution no. 21195 of 18.12.2019, with which the company Monte Titoli S.p.A. has been authorized to provide services as a central depository pursuant to Regulation (EU) no. 909/2014 of the European Parliament and of the Council of 23 July 2014, the ultraplication regime, established by Legislative Decree no. 176 of 12.8.2016, of certain prevailing provisions of the TUF, subject to repeal by the same decree;

- Legislative Decree no. 165 of 25.11.2019 (published in O.J. no. 6 of 9.1.2020), in force since 24.1.2020, for the final and transitional provisions, see Article 8 of the same Legislative Decree;

- Law no. 160 of 27.12.2019 (the 2020 Budget Law) in the text republished in O.J. no. 12 of 17.1.2020, in force since 1.1.2020;

- Legislative Decree no. 162 of 30.12.2019 (published in the O.J. no. 305 of 31.12.2019), in force since 31.12.2019, converted with modifications by L. no. 8 of 28.2.2020 (published in the Ordinary Supplement no. 10 to the O.J. no. 51 of 29.2.2020), in force since 1.3.2020;

- Decree Law no. 23 of 8.4.2020 (published in the O.J. no. 94 of 8.4.2020), in force since 9.4.2020, converted with modifications by Law no. 40 of 5.6.2020 (published in the O.J. no. 143 of 6.6.2020), in force since 7.6.2020;

- Decree Law no. 34 of 19.5.2020 (published in the Ordinary Supplement no. 21 to the O.J. no. 128 of 19.5.2020), in force since 19.5.2020, converted with modifications by Law no. 77 of 17.7.2020 (published in the Ordinary Supplement no. 25 to the O.J. no. 180 of 18.7.2020), in force since 19.7.2020;

- Legislative Decree no. 84 of 14.7.2020 (published in the ultraplication O.J. no. 190 of 30.7.2020), in force since 14.8.2020. Art 4 of Legislative Decree no. 84 of 14.7.2020 provides that: "1. Without prejudice to the provisions of article 7, Legislative Decree no. 49 of 10 May 2019, Article 2 shall apply to the infringements committed after the date of entry into force of this decree";

- Decree Law no. 76 of 16.7.2020 (published in the Ordinary Supplement no. 24 to the O.J. No. 178 of 16.7.2020), in force since 17.7.2020, converted with amendments by Law no. 120 of 11.9.2020 (published in the Ordinary Supplement no. 33 to the O.J. no. 228 of 14.9.2020), in force since 15.9.2020;

- Decree Law no. 104 of 14.8.2020 (published in the Ordinary Supplement no. 30 to the O.J. no. 203 of 14.8.2020), in force since 15.8.2020, converted with amendments by Law no. 126 of 13.10.2020 (published in the Ordinary Supplement no. 37 to the O.J. no. 253 of 13.10.2020), in force since 14.10.2020;

- Law no. 178 of 30.12.2020 (published in the Ordinary Supplement no. 46 to the O.J. no. 322 of 30.12.2020), in force since 1.1.2021;

- Legislative Decree no. 17 of 2.2.2021 (published in the O.J. no. 46 of 24.2.2021), in force since 11.3.2021;

- Decision no. 84 of the Constitutional Court - 13/30 April 2021 (published in O.J., 1st special series - Constitutional Court no. 18 of 5.5.2021);

**INDEX**

**PART I**                    **COMMON PROVISIONS**

Article 1            Definitions
Article 2            Relationship to European Union law and integration in ESFS
Article 3            Administrative measures
Article 4            Cooperation between authorities and professional secrecy
Article 4-bis        Identification of the competent authority and sector competent authorities for the purpose of Regulation (EC) No. 1060/2009 as subsequently amended, in relation to credit ratings agencies
Article 4-ter        Identification of the national authorities with competence pursuant to regulation (EU) no. 236/2012 on short selling and certain aspects of derivative contracts for hedging the credit default swap risk
Article 4-quarter    Identification of the national authorities with competence pursuant to regulation (EU) no. 648/2012 of the European Parliament and of the Council, of 4 July 2012, and pursuant to regulation (EU) 2015/2365 of the European Parliament and of the Council, of 25 November 2015
Article 4-quinquies  Identification of the national authorities with competence pursuant to regulation (EU) no. 345/2013, relative to the European Venture Capital Fund (EuVECA), and regulation (EU) no. 346/2013, relative to the European Social Entrepreneurship Fund (EuSEF)
Article 4-quinquies.1 Identification of the competent national authorities, pursuant to Regulation (EU) no. 2015/760, in relation to European Long-Term Investment Funds (ELTIF)
Article 4-quinquies.2 Identification of the competent national authorities pursuant to Regulation (EU) 2017/1131 on money market funds (MMF)
Article 4-quinquies.3 Identification of the competent national authorities pursuant to Regulation (EU) 2019/1156 on facilitating cross-border distribution of collective investment undertakings and amending Regulations (EU) no. 345/2013, (EU) no. 346/2013 and (EU) no. 1286/2014

---

- Legislative Decree no. 182 of 8.11.2021 (published in the O.J. no. 284 of 29.11.2021), in force since 30.11.2021, for the transitional provisions, see Article 4 of the same Legislative Decree;

- Legislative Decree no. 191 of 5.11.2021 (published in the O.J. no. 285 of 30.11.2021), in force since 15.12.2021;

- Legislative Decree no. 193 of 8.11.2021 (published in the O.J. no. 285 of 30.11.2021), in force since 1.12.2021, for the transitional provisions, see Article 8 of the same Legislative Decree;

- Legislative Decree no. 201 of 5.11.2021 (published in the O.J. no. 286 of 1.12.2021), in force since 2.12.2021, for the transitional provisions, see Article 3 of the same Legislative Decree;

- Law no. 238 of 23.12.2021 (published in the O.J. no. 12 of 17.1.2022), in force since 1.2.2022;

- Decree Law no. 50 of 17.5.2022 (published in the O.J. no. 114 of 17.5.2022), in force since 18.5.2022, converted with amendments by Italian Law no. 91 of 15.7.2022 (published in the O.J. no. 164 of 15.7.2022), in force since 16.7.2022;

- Legislative Decree no. 113 of 2.8.2022 (published in the O.J. no. 184 of 8.8.2022), in force since 23.8.2022;

- Legislative Decree no. 131 of 3.8.2022 (published in the O.J. no. 205 of 2.9.2022), in force since 3.9.2022;

- Decree Law no. 25 of 17.3.2023 (published in the O.J. no. 65 of 17.3.2023), in force since 18.3.2023, converted with amendments by Italian Law no. 52 of 10.5.2023 (published in the O.J. no. 112 of 15.5.2023), in force since 16.5.2023;

- Legislative Decree no. 29 of 10.3.2023 (published in the O.J. no. 70 of 23.3.2023), in force since 7.4.2023;

- Legislative Decree no. 30 of 10.3.2023 (published in the O.J. no. 71 of 24.3.2023), in force since 8.4.2023;

- Legislative Decree no. 31 of 10.3.2023 (published in the O.J. no. 71 of 24.3.2023), in force since 8.4.2023.

Article 4-sexies            Identification of the competent national authorities pursuant to regulation
                           (EU) no. 1286/2014, relative to the documents containing the key
                           information for packaged retail investment and insurance products
                           (PRIIPs)

**Article 4-sexies.1         Identification of the competent national authorities pursuant to
                           Regulation (EU) 2020/1503, on European crowdfunding service
                           providers for business, and amending Regulation (EU) 2017/1129
                           and Directive (EU) 2019/1937**

Article 4-septies          Power to intervene in the case of breach of the provisions of
                           Regulation (EU) no. 1286/2014

Article 4-septies.1        Identification of the national authorities with competence pursuant to
                           regulation (EU) 2016/11 on indices used as benchmarks in financial
                           instruments and financial contracts or to measure the performance of
                           investment funds

Article 4-septies.2        Identification of the competent national authorities under Regulation (EU)
                           2017/2402 laying down a general framework for securitisation and
                           creating a specific framework for simple, transparent and standardised
                           securitisation

Article 4-octies           Internal systems for reporting breach of regulation (EU) no. 1286/2014
                           (repealed)

Article 4-novies           Procedure for reporting to the Supervisory Authorities (repealed)

Article 4-decies           Obligation of prior serving of the document containing the key
                           information on the PRIIPs (repealed)

Article 4-undecies         Internal reporting of infringements (Whistle-blowing)

Article 4-duodecies        Procedure for reporting to the Supervision Authorities

Article 4-terdecies        Exemptions


**PART II                    REGULATION OF INTERMEDIARIES**


**TITLE I                     GENERAL PROVISIONS AND SUPERVISORY POWERS**


**Chapter I                   Supervision**

Article 5                  Purpose and scope

Article 6                  Regulatory powers

Article 6-bis              Informative and investigatory powers

Article 6-ter              Powers of inspection

Article 7                  Powers of intervention over the qualified parties

Article 7-bis              Powers of intervention referred to in Title VII, Chapter I, of (EU)
                           regulation no. 600/2014

Article 7-ter              Powers of injunction over National and non-EU intermediaries

Article 7-quater           Powers of injunction over EU intermediaries

Article 7-quinquies        Powers of injunction over EU OICVM, EU and non-EU FIA with
                           holdings or shares offered in Italy

Article 7-sexies           Suspension of the administrative bodies

Article 7-septies          Precautionary powers that can be applied to autonomous financial
                           consultants, financial advisory firms and financial consultants authorised
                           to offer outside their offices

Article 7-octies           Powers to counteract abuse

Article 7-novies           Capital reserve

Article 7-decies           Supervision of compliance with EU provisions that can be directly
                           applied

| Article 7-undecies | Identification of the competent national authorities pursuant to Regulation (EU) 2019/2033 |
| Article 7-duodecies | Applicable regulation for Class 1-minus investment firms |
| Article 8 | Information requirements |
| Article 8-bis | Internal systems for reporting infringements (whistle blowing) (repealed) |
| Article 8-ter | Reporting of infringements to the Bank of Italy and CONSOB (repealed) |
| Article 9 | Legal audit |
| Article 10 | Inspections supervision (repealed) |
| Article 11 | Composition of groups |
| Article 11-bis | Intermediate EU parent undertaking |
| Article 12 | Supervision of groups |
| Article 12-bis | Applicable provisions for parent companies of one or more EU investment companies |

**Chapter II** — **Corporate officers and shareholders**

| Article 13 | Company representatives |
| Article 14 | Shareholders |
| Article 15 | Acquisition and sale of shareholdings |
| Article 15-bis | Persons acting in concert |
| Article 16 | Suspension of voting and other rights, obligation to dispose of shareholdings |
| Article 17 | Requests for information on shareholdings |

**TITLE II** — **INVESTMENT SERVICES**

**Chapter I** — **Persons and authorisation**

| Article 18 | Persons |
| Article 18-bis | Independent financial advisors |
| Article 18-ter | Financial advisory firm |
| Article 19 | Authorisation |
| Article 20 | Register |
| Article 20–bis | Revocation of the authorisation |
| Article 20–bis.1 | Class-1 investment firms |
| Article 20-ter | Authorisation and supervision of subjects eligible to apply for admission to bid in auctions, pursuant to Commission Regulation (EU) no. 1031/2010, of 12 November 2010, on the timing, administration and other aspects of auctioning of greenhouse gas emission allowances, as amended by Regulation (EU) no. 1210/2011 of the Commission, of 23 November 2011 |

**Chapter II** — **Performance of services**

| Article 21 | General criteria |
| Article 22 | Separation of assets |
| Article 23 | Contracts |
| Article 24 | Portfolio management |
| Article 24-bis | Investment advice |
| Article 25 | Trading activities in regulated markets, in the multilateral systems of Trade and in the organised trading facilities |
| Article 25-bis | Structured deposits and financial products, other than financial instruments, issued by banks |
| Article 25-ter | Insurance investment products |
| Article 25-quater | Bonds and other debt titles |

**Chapter III**             **Cross-border operations**
Article 26                Branches and free provision of services by investment firms
Article 27                Investment companies of the European Union
Article 28                Companies of non-EU countries other than banks
Article 29                Italian banks
Article 29-bis            Banks of the European Union
Article 29-ter            Banks of non-EU countries
**Chapter IV**              **Governing of door-to-door selling and supervision of its financial advisors**
Article 30                Door to door selling
Article 30-bis            Method of providing the investment consultancy service by independent financial advisors and of financial advisory firms
Article 31                Financial advisors qualified for door-to-door selling and supervisory body and keeping of the single register of financial advisors
Article 31-bis            CONSOB supervision over the Body
Article 32                Promotion and remote marketing of investment services and activities and financial instruments

**Chapter IV-bis**          **Protection of investors**
Article 32-bis            Protection of investors' collective undertakings
Article 32-ter            Out-of-court dispute resolution
Article 32-ter.1          Fund for the out of court protection of savers and investors

**TITLE III**               **COLLECTIVE ASSETS MANAGEMENT**

**Chapter I**               **Authorised subjects and contemplated businesses**
Article 32-quarter        Reserve assets
Article 33                Contemplated businesses

**Chapter I-bis**           **Discipline of authorised subjects**

**Section I**               **Asset management companies**
Article 34                Authorisation of asset management companies
Article 35                Register

**Section II**              **SICAVs and SICAFs**
Article 35-bis            Constitution
Article 35-ter            Registers
Article 35-quarter        SICAV capital and shares
Article 35-quinquies      SICAF capital and shares
Article 35-sexies         The SICAV shareholders' meeting
Article 35-septies        Amendments to articles of association
Article 35-octies         Winding up and voluntary liquidation
Article 35-novies         Transformation

**Section III**             **Common provisions and exceptions**
Article 35-decies         Rules of conduct and voting rights
Article 35-undecies       Exceptions for Italian AIFMs
Article 35-duodecies      Assessment of credit rating

**Chapter II**                 **Italian UCIs**

**Section I**                  **Mutual investment funds**
Article 36                     Mutual investment funds
Article 37                     Fund regulations

**Section II**                 **SICAVs and SICAFs under outsourced management**
Article 38                     SICAVs and SICAFs which appoint an external manager

**Section III**                **Common provisions**
Article 39                     Structure of Italian UCIs

**Section IV**                 **Master-feeder structures**
Article 40                     Authorisation and operating rules of master-feeder structures

**Section V**                  **Merger and spin-off of asset investment bodies**
Article 40-bis                 UCI merger and spin-off
Article 40-ter                 Cross-border UCI merger

**Chapter II-bis**             **Management company cross-border operations**
Article 41                     Cross-border operations of asset management companies
Article 41-bis                 EU management companies
Article 41-ter                 EU AIFMs
Article 41-quater              Non-EU AIFMs

**Chapter II-ter**             **Pre-marketing and marketing of UCIs**
Article 42                     Marketing in Italy of EU UCI units or shares
Article 42-bis                 Pre-marketing of reserved AIFs
Article 43                     Marketing of reserved AIFs
Article 44                     Marketing of non-reserved AIFs

**Chapter II-quarter**         **Obligations of asset management companies of which AIFs acquire
                               relevant stakes and control of non-listed companies and of issuers**
Article 45                     Obligations relative to the acquisition of relevant stakes or control of
                               non-listed companies
Article 46                     Obligations relative to the acquisition of a controlling interest of an issuer

**Chapter II-quinquies**       **UCITS credit**
Article 46-bis                 Direct issue of loans by Italian AIFs
Article 46-ter                 Direct issue of loans by EU AIFs in Italy
Article 46-quarter             Other applicable provisions

**Chapter III**                **Custodian**
Article 47                     Custodian mandate
Article 48                     The custodian's duties
Article 49                     The custodian's responsibilities
Article 50                     Other applicable provisions (repealed)

**Chapter III-bis**            **Master-feeder structures** (repealed)
Article 50-bis                 Authorisation and operating rules of master-feeder structures (repealed)

**Chapter III-ter**          **Merger and spin-off of asset investment bodies** (repealed)
Article 50-ter              UCI merger and spin-off (repealed)
Article 50-quater           Cross-border merger of harmonised UCIs (repealed)

**TITLE III-BIS**           **MANAGEMENT OF CROWDFUNDING PORTALS FOR SMALL
                            AND MEDIUM-SIZED ENTERPRISES AND FOR THE SOCIAL
                            ENTERPRISES** *(repealed)*

**Chapter I**               **Management of crowdfunding portals for small and medium-sized
                            enterprises and for the social enterprises** *(repealed)*
Article 50-quinquies        Management of crowdfunding portals for small and medium-sized
                            enterprises and for the social enterprises *(repealed)*

**TITLE IV**                **INJUNCTIVE REMEDIES AND CRISES**

**Chapter I**               **Injunctive remedies (repealed)**
Article 51                  Injunctive remedies vis-a-vis Italian and non-EU intermediaries (repealed)
Article 52                  Special measures for EU intermediaries (repealed)
Article 53                  Suspension of administrative bodies (repealed)
Article 54                  Injunction orders on EU UCITS, EU and non-EU AIFs with stakes or shares
                            offered in Italy (repealed)
Article 55                  Precautionary measures applicable to the financial advisors
                            authorised to make off-premises offers (repealed)

**Chapter I-bis**           **Recovery plans, group financial support and early intervention**
Article 55-bis              Scope of application
Article 55-ter             Recovery plans
Article 55-quater           Group financial support
Article 55-quinquies        Early intervention
Article 55-sexies           Participation in the Single Supervisory Mechanism and Single Resolution
                            Mechanism

**Chapter II**              **Crisis procedures**
Article 56                  Special administration
Article 56-bis              Collective removal of the members of administrative and control bodies
Article 57                  Compulsory administrative liquidation
Article 58                  Branches in Italy of foreign investment companies and managers
Article 58-bis              Investment firms operating in the European Union
Article 59                  Compensation systems
Article 60                  Foreign intermediaries' member ship of compensation systems
Article 60-bis              Responsibilities of investment companies, asset management companies,
                            SICAVs and SICAFs for administrative offences depending on crime

**Chapter II-bis**          **Winding up of investment companies**
Article 60-bis.1            Scope of application
Article 60-bis.2            Winding up plans
Article 60-bis.3            Winding-up possibility
Article 60-bis.4            Winding up and other crisis management procedures
Article 60-bis.4-bis        Second level unsecured debt instruments and minimum denomination per
                            unit

**PART III**　　　　　　　**REGULATION OF MARKETS**

**TITLE I**　　　　　　　　**COMMON PROVISIONS**

Article 61　　　　　　　Definitions
Article 61-bis　　　　　　Principles of regulations

**TITLE I–BIS**　　　　　**RULES GOVERNING TRADING VENUES AND SYSTEMATIC INTERNALISERS**

**Chapter I**　　　　　　　**Purpose and recipients of the supervision**
Article 62　　　　　　　Supervision over trading venues
Article 62-bis　　　　　　Wholesale government securities trading venues and main operators
Article 62-ter　　　　　　Supervision over wholesale trading venues
Article 62-quater　　　　Supervision of the regulation and information of wholesale trading venues
Article 62-quinquies　　　Supervision over compliance with directly applicable provisions the European Union
Article 62-sexies　　　　Supervision over energy and gas financial instrument trading venues
Article 62-septies　　　　Supervision of multilateral monetary deposit exchange in Euros
Article 62-octies　　　　Informative and investigatory powers
Article 62-novies　　　　Inspectional powers
Article 62-decies　　　　Powers of intervention

**Chapter II**　　　　　　　**The trading venues**
Article 63　　　　　　　Multilateral Trading Facilities in financial instruments

**Section I**　　　　　　　**Authorisation of the regulated markets and operator requirements**
Article 64　　　　　　　The activities of organisation and management of regulated markets
Article 64-bis　　　　　　Obligations concerning those who exercise a significant influence over the management of the regulated market
Article 64-ter　　　　　　Requirements of the corporate bodies of the operator of the regulated market
Article 64-quater　　　　Authorisation of the regulated markets
Article 64-quinquies　　　Revocation of the authorization, extraordinary provisions to protect the market and the crisis of the regulated market operator

**Section II**　　　　　　　**Organisation and functioning of the trading venues**
Article 65　　　　　　　Organisational requirements of the regulated markets
Article 65-bis　　　　　　Requirements of the multilateral trading facilities and of the organised trading facilities
Article 65-ter　　　　　　Specific requirements for multilateral trading facilities
Article 65-quater　　　　Specific requirements for organised trading facilities
Article 65-quinquies　　　«Matched principal» trading
Article 65-sexies　　　　Operational requirements of the trading venues
Article 65-septies　　　　Informative and communication obligations

**Section III**　　　　　　　**Admission, suspension and exclusion of financial instruments from listing and trading**
Article 66　　　　　　　General criteria for admission to the listing and trading
Article 66-bis　　　　　　Conditions the listing of certain companies

Article 66-ter          Provisions for the admission, suspension and exclusion of financial
                        instruments from listing and trading adopted by the operator of the trading
                        venues
Article 66-quater       Provisions of suspension and exclusion of financial instruments from
                        trading at CONSOB's initiative
Article 66-quinquies    Trade of financial instruments issued by operator of the regulated market

**Section IV**          **Access to the trading venues**
Article 67              General operator access criteria
Article 67-bis          Admission, suspension and exclusion of operators from a regulated market
Article 67-ter          Algorithmic trading, direct electronic access, participation in central
                        counterparties

**Section V**           **Position limits and controls over the management of the positions in
                        derivatives on commodities**
Article 68              Limits to the positions in derivatives on commodities
Article 68-bis          Checks by the trading venues operator regarding positions in derivatives
                        on commodities
Article 68-ter          Characteristics of limits and checks on the management of the positions
                        and information obligations
Article 68-quater       Notification of holders of positions by category
Article 68-quinquies    CONSOB's powers and obligations to collaborate

**Section VI**          **Growth markets for small and medium-sized enterprises**
Article 69              Growth markets for small and medium-sized enterprises

**Section VII**         **Market recognition**
Article 70              Market recognition

**Chapter III**         **Systematic internalisations**
Article 71              Obligations of the systematic internaliser

**Chapter IV**          **Obligations of trading, transparency and signalling transactions in
                        financial instruments**
Article 72              Determination of the competent authority
Article 73              Supervision
Article 74              Exemptions from the pre-trade transparency requirements of trading venues
Article 75              Provisions for the temporary suspension of pre-trade transparency
                        obligations
Article 76              Deferred publishing permissions
Article 77              Provisions of temporary suspension of the obligations of transparency
                        post-trade
Article 78              Information to be provided for the transparency and performance of other
                        calculations and publication obligations

**TITLE I-TER**         **AUTHORIZATION AND SUPERVISION OF APA AND ARM**

Article 79              Determination of the competent authority
Article 79-bis          Authorisation and revocation (repealed)
Article 79-ter          Requirements for subjects performing administrative functions at the data
                        communication service provider (repealed)

Article 79-ter.1            Organisational requirements of the data communication service
                           providers (repealed)

**TITLE II**               **REGULATION OF THE CENTRAL COUNTERPARTIES**

Article 79-quater          Definitions (repealed)

**Chapter I**              **Central counterparties**
Article 79-quinquies       Identification of the national competent authorities with regard to
                           central counterparties
Article 79-sexies          Authorisation and supervision of central counterparties
Article 79-septies         Guarantees acquired in the performance of the central counterparty's
                           activity and prevalence of the provisions on the segregation and
                           portability of the positions and of the customers' guarantees

**Chapter II**             **Competent national authorities for the exercise of additional
                           supervisory powers**
Article 79-octies          Identification of competent national authorities for the exercise of
                           additional supervisory powers pursuant to Regulation (EU) no.
                           648/2012
Article 79-octies.1        Determination of the national authorities competent for the exercise of
                           further supervisory powers pursuant to (EU) regulation no. 600/2014
Article 79-novies          Supervisory powers

**TITLE II-BIS**           **REGULATION OF CENTRAL DEPOSITORIES AND OF
                           REGULATORY AND CENTRALISED MANAGEMENT
                           ACTIVITIES**

Article 79-decies          Definitions

**Chapter I**              **Competent and relevant national authorities**
Article 79-undecies        Identification of the competent national authorities for central
                           depositories
Article 79-duodecies       Identification of the competent national authorities to carry out the
                           additional functions contemplated by Regulation (EU) No 909/2014
Article 79-terdecies       Identification of relevant national authorities

**Chapter II**             **Supervisory purposes and supervised subjects**
Article 79-quaterdecies    Supervisory purposes and powers
Article 79-quinquiesdecies Regulation of services
Article 79-sexiesdecies    Internal systems of reporting infringements (Whistleblowing)
                           (repealed)
Article 79-septiesdecies   Reporting of infringements to Bank of Italy and CONSOB (repealed)

**Chapter III**            **Central depositories**

**Section I**              **The regulation of centralised depositories**
Article 79-octiesdecies    Statutory audit of accounts
Article 79-noviesdecies    Modifications to the control framework

Article 79-noviesdecies.1    Provisions applicable to the performance of investment services and activities by central depositaries

**Section II**                **Crises of central depositories**
Article 79-vicies            Crises
Article 80                    Central depository activities in relation to financial instruments (repealed)
Article 81                    Enactment regulation and service regulations repealed)
Article 81-bis               Access to the central depository system (repealed)

**Chapter IV**                **Centralised management of financial instruments**
Article 82                    Centralised management activities and regulation

**Section I**                 **Dematerialised centralised management**
Article 83                    Central depositories in crisis (repealed)
Article 83-bis               Scope of application
Article 83-ter               Issue of financial instruments (repealed)
Article 83-quater            Powers of central depositories and of intermediaries
Article 83-quinquies         Rights of the account holder
Article 83-sexies            Right to attend shareholders' meetings and the exercise of voting rights
Article 83-septies           Opposable exceptions
Article 83-octies            Establishing restrictions
Article 83-novies            Duties of the intermediary
Article 83-novies.1          Non-discrimination, proportionality and transparency of costs
Article 83-decies            Intermediary liability
Article 83-undecies          Issuer obligations
Article 83-duodecies         Shareholder identification
Article 83-terdecies         Payment of dividends
Article 83-quaterdecies      Issuers' access to a central depositary established in another Member State

**Section II**                **Centralised management of securitised financial instruments**
Article 84                    Identification and disclosures regarding centralised financial instruments (repealed)
Article 85                    Central deposits
Article 86                    Transfer of rights attached to financial instruments on deposit
Article 87                    Restrictions on financial instruments on deposit
Article 88                    Withdrawal of financial instruments on deposit
Article 89                    Updating of the shareholders' register

**Chapter III**               **Centralised management of government securities**
Article 90                    Centralised management of government securities

**TITLE II-TER**              **ACCESS TO THE POST-TRADING INFRASTRUCTURES AND BETWEEN TRADING VENUES AND POST-TRADING INFRASTRUCTURES**

**Chapter I**                 **National competent authorities**
Article 90-bis               Identification of competent national authorities for access to central depositories established in the Republic

Article 90-ter            Identification of competent national authorities for access between trading
                          venues and post-trading infrastructures

**Chapter II**            **Access right and agreements**
Article 90-quater         Access to central counterparties on a trans-border basis
Article 90-quinquies      Access to transaction settlement services on financial instruments on a trans-
                          border basis
Article 90-sexies         Agreements concluded by regulated market operators and multilateral
                          trading facilities with central counterparties or with central depositories
                          which manage regulation services

**Chapter III**           **Supervision**
Article 90-septies        Supervisory powers

**PART IV**               **REGULATION OF ISSUERS**

**TITLE I**               **GENERAL PROVISIONS**

Article 91                CONSOB's powers
Article 91-bis            Communication of the Member State of origin
Article 92                Equal treatment
Article 93                Definition of control

**TITLE II**              **APPEAL TO PUBLIC SAVINGS**

**Chapter I**             **Public offerings**
Article 93-bis            Definitions

**Section I**             **Public offering of EU financial instruments and financial products
                          other than open-end UCITS units or shares**
Article 94                Public offering of securities
Article 94-bis            Public offering of financial products other than securities and open-end
                          UCITS units or shares
Article 95                Implementing provisions
Article 95-bis            Cancellation of a purchase or subscription (repealed)
Article 96                Issuer financial statements
Article 97                Investigation and supervisory powers
Article 98                Publication of the prospectuses of closed-ended AIFs or EU closed-ended
                          AIFs
Article 98-bis            Issuers from non-EU countries (repealed)

**Section II**            **Public offering of open-end UCITS units or shares**
Article 98-ter            **KID and prospectus**
**Article 98-ter.1**      **Offers for non-retail investors**
Article 98-quater         Implementation provisions
Article 98-quinquies      Reporting obligations
Article 98-sexies         Obligations relating to reporting violations (repealed)

**Section III**           **Common provision**
Article 99                Powers of interdiction
Article 100               Cases of exemption

Article 100-bis        Re-sale of securities or financial products other than securities
**Article 100-ter**    **Crowdfunding offers**
Article 101            Advertisements

**Chapter II**         **Public offers to buy or exchange financial instruments**

**Section I**          **General provisions**
Article 101-bis        Definitions and application environment
Article 101-ter        Supervisory authority and applicable law
Article 102            Bidder obligations and prohibitive powers
Article 103            Implementation of offers
Article 104            Defensive measures
Article 104-bis        Breakthrough
Article 104-ter        Reciprocity clause

**Section II**         **Mandatory public offers to buy**
Article 105            General provisions
Article 106            Global takeover bid
Article 107            Prior partial bids
Article 108            Commitment to squeeze-out
Article 109            Squeeze-out in concert
Article 110            Failure to comply with obligations
Article 111            Right to squeeze-out
Article 112            Implementing provisions

**TITLE III**          **ISSUERS**

**Chapter I**          **Company information**
Article 113            Admission to trading of securities
Article 113-bis        Admission to trading of open-end UCITS units or shares
Article 113-ter        General provisions on regulated disclosures
Article 114            Information to be provided to the public
Article 114-bis        Information to be provided to the market concerning the allocation of
                       financial instruments to corporate officers, employees and collaborators
Article 115            Information to be disclosed to CONSOB
Article 115-bis        Registers of persons who have access to inside information (repealed)
Article 115-ter        Information concerning emissions allowances
Article 116            Financial instruments widely distributed among the public
Article 117            Accounting information
Article 117-bis        Mergers between listed and unlisted companies (repealed)
Article 117-ter        Provisions concerning ethical finance
Article 118            Provisions not applicable
Article 118-bis        Checking information provided to the public

**Chapter II**         **Listed companies**
Article 119            Scope

**Section I**          **Ownership structures**
Article 120            Notification requirements for major holdings
Article 121            Rules governing cross-holdings
Article 122            Shareholders' agreements

Article 123          Duration of agreements and right of withdrawal
Article 123-bis      Report on corporate governance and ownership structures
Article 123-ter      Report on the policy regarding remuneration and fees paid
Article 124          Provisions not applicable

**Section I-bis**       **Information on the adoption of codes of conduct**
Article 124-bis      Disclosure obligations concerning codes of conduct (repealed)
Article 124-ter      Disclosures regarding codes of conduct

**Section I-ter**       **Transparency of institutional investors, asset managers and proxy advisors**
Article 124-quater   Definitions and scope of application
Article 124-quinquies Commitment policy
Article 124-sexies   Investment strategy of institutional investors and agreements with asset managers
Article 124-septies  Transparency of asset managers
Article 124-octies   Transparency of proxy advisors
Article 124-novies   Regulatory powers

**Section II**          **Shareholder rights**
Article 125          Calling of shareholders' meetings at the request of minority shareholders (repealed)
Article 125-bis      Notice of call to shareholders' meetings
Article 125-ter      Disclosure of items on the agenda
Article 125-quater   Web site
Article 126          Notice of second and subsequent calls
Article 126-bis      Integration of the agenda of the shareholders' meeting and presentation of new resolution proposals
Article 127          Postal or electronic voting
Article 127-bis      Voidability of resolutions and right to withdrawal
Article 127-ter      Right to submit questions prior to the shareholders' meeting
Article 127-quater   Dividend increases
Article 127-quinquies Vote increase
Article 127-sexies   Multiple-voting shares
Article 128          Complaints to the board of auditors and the courts (repealed)
Article 129          Company actions for liability (repealed)
Article 130          Information for shareholders
Article 131          Right of withdrawal from mergers and spin-offs (repealed)
Article 132          Acquisition of own or parent company shares
Article 133          Exclusion upon request from trading
Article 134          Increases in capital

**Section II bis**      **Cooperatives**
Article 135          Capital percentages
Article 135-bis      Regulation of cooperatives
Article 135-ter      Market disclosures on the assignment of financial instruments and company officers, employees or collaborators (repealed)
Article 135-quater   Extraordinary shareholders' meeting (repealed)
Article 135-quinquies Integration of the agenda of the shareholders' meeting (repealed)
Article 135-sexies   Financial reports (repealed)
Article 135-septies  Audit reports (repealed)

Article 135-octies        Proposed share capital increase (repealed)

**Section II-ter**        **Proxies**
Article 135-novies        Representation at the shareholders' meeting
Article 135-decies        Conflict of interest of the representative and substitutes
Article 135-undecies      Appointed representative of a listed company
Article 135-duodecies     Cooperatives

**Section III**           **Solicitation of proxies**
Article 136               Definitions
Article 137               General provisions
Article 138               Solicitation
Article 139               Requirements for promoters
Article 140               Persons authorised to engage in solicitation
Article 141               Shareholders' associations
Article 142               Proxies
Article 143               Liability
Article 144               Performance of solicitations and collections of proxies

**Section IV**            **Assets shares and other classes of shares**
Article 145               Issue of shares
Article 146               Special shareholders' meetings
Article 147               Common representatives
Article 147-bis           Meetings of classes of investors

**Section IV-bis**        **Administration bodies**
Article 147-ter           Election and composition of the Board of Directors
Article 147-quater        Composition of the management board
Article 147-quinquies     Integrity requirements

**Section V**             **Internal control bodies**
Article 148               Composition
Article 148-bis           Limits on the accumulation of positions
Article 149               Duties
Article 150               Information requirements
Article 151               Powers
Article 151-bis           Powers of the supervisory board
Article 151-ter           Powers of the management control committee
Article 152               Reports to the courts
Article 153               Obligation to report to the shareholders' meeting
Article 154               Provisions not applicable

**Section V-bis**         **Financial information**
Article 154-bis           Manager charged with preparing a company's financial reports
Article 154-ter           Financial reporting
Article 154-quarter       Transparency of payments to governments

**Section VI**            **Statutory audit**
Article 155               Performance of audits
Article 156               Auditors reports
Article 157               Effects of audit opinions on the accounts

Article 158            Share capital increase proposals
Article 159            Conferment and revocation of the engagement
Article 160            Incompatibility (repealed)
Article 161            Special register of independent auditors (repealed)
Article 162            Supervision of independent auditors (repealed)
Article 163            CONSOB measures (repealed)
Article 164            Liability (repealed)
Article 165            Auditing of groups (repealed)
Article 165-bis        Companies with control of listed companies (repealed)

**Section VI-bis**        **Relations with foreign companies having their registered office
                       in a country that does not ensure corporate transparency**
Article 165-ter        Scope
Article 165-quater     Obligations of Italian parent companies
Article 165-quinquies  Obligations of Italian affiliates
Article 165-sexies     Obligations of Italian subsidiaries
Article 165-septies    CONSOB's powers and implementing provisions

**PART V**                **SANCTIONS**

**TITLE I**               **PENAL SANCTIONS**

**Chapter I**             **Intermediaries and markets**
Article 166            Unauthorised activity
Article 167            Breach of duty
Article 168            Commingling of assets
Article 169            Holdings of capital
Article 170            Central depository services for financial instruments
Article 170-bis        Obstruction of the supervisory functions of the Bank of Italy and of
                       CONSOB
Article 171            Protection of supervision (repealed)

**Chapter II**            **Issuers**
Article 172            Irregular acquisition of shares
Article 173            Failure to dispose of shareholdings
Article 173-bis        False statements in prospectuses
Article 174            False notifications and obstruction of CONSOB's functions (repealed)

**Chapter III**           **Auditing of accounts**
Article 174-bis        False statements in auditing firms' reports or communications (repealed)
Article 174-ter        Corruption of auditors (repealed)
Article 175            False statements in auditing firms' reports or communications (repealed)
Article 176            Use and divulgence of confidential information (repealed)
Article 177            Illegal financial relationships with the audited company (repealed)
Article 178            Illegal compensation (repealed)
Article 179            Common provisions (repealed)

**TITLE I-BIS**           **MARKET ABUSE**

**Chapter I**             **General provisions**
Article 180            Definitions

| Article 181 | Inside information (repealed) |
| Article 182 | Scope |
| Article 183 | Exemptions |

**Chapter II**          **Penal sanctions**

| Article 184 | Illegitimate use or unlawful disclosure of inside information. Recommending that another person engage in or inducing another person to engage in illegitimate use of inside information. |
| Article 185 | Market manipulation |
| Article 186 | Accessory penalties |
| Article 187 | Confiscation |

**Chapter III**          **Administrative sanctions**

| Article 187-bis | Insider trading and unlawful disclosure of inside information |
| Article 187-ter | Market manipulation |
| Article 187-ter.1 | Sanctions for the infringements of the provisions of Regulation (EU) no. 596/2014 of the European Parliament and Council of April 16, 2014 |
| Article 187-quater | Accessory administrative sanctions |
| Article 187-quinquies | Liability of the entity |
| Article 187-sexies | Confiscation |
| Article 187-septies | Sanction procedures |

**Chapter IV**          **CONSOB's powers**

| Article 187-octies | CONSOB's powers |
| Article 187-novies | Suspicious transactions (repealed) |

**Chapter V**          **Relationship between proceedings**

| Article 187-decies | Relations with the judicial authorities |
| Article 187-undecies | CONSOB's powers in criminal proceedings |
| Article 187-duodecies | Relationship between criminal proceedings and administrative and appeal proceedings |
| Article 187-terdecies | Application and enforcement of administrative and judicial sanctions |
| Article 187-quaterdecies | Consultation procedures |

**TITLE II**          **ADMINISTRATIVE SANCTIONS**

| Article 187-quinquiesdecies | Safeguarding of the Bank of Italy's and CONSOB's supervisory functions |
| Article 188 | Unauthorised use of names |
| Article 189 | Holdings of capital |
| Article 190 | Pecuniary administrative sanctions related to rules governing intermediaries |
| Article 190.1 | Fines regarding the regulation of the centralised management of financial instruments |
| Article 190.1-bis | Further fines regarding the regulation of the centralised management of financial instruments (repealed) |
| Article 190.2 | Fines for the violation of the provisions of Regulation (EU) no. 909/2014 |
| Article 190.3 | Administrative sanctions related to the governing of markets |

| | |
|---|---|
| Article 190.4 | Pecuniary administrative sanctions relative to the infringements of the provisions of (EU) regulation no. 600/2014, delegated deeds and provisions for the technical regulation and implementation of directive 2014/65/EU and of (EU) regulation no. 600/2014 |
| Article 190.5 | Pecuniary administrative sanctions related to credit rating agencies relating to infringements of provisions of (EC) regulation no. 1060/2009 |
| Article 190-bis | Liability of corporate officers and staff for violations relating to the regulation of intermediaries, markets, centralised depositories, centralised management of financial instruments and of APA and ARM services |
| Article 190-bis.1 | Administrative sanctions for breach of the provisions of Regulation (EU) 2016/11 |
| Article 190-bis.2 | Administrative sanctions for infringements of the provisions of Regulation (EU) 2017/2402 |
| Article 190-ter | Other infringements regarding reserved activities (repealed) |
| Article 190-quater | Administrative sanctions related to **crowdfunding services** |
| Article 191 | Public offering of underwriting and sale of financial products and admission to trading of securities |
| Article 191-bis | Additional sanctions |
| Article 191-ter | Public offering of underwriting and sale and admission to trading of open-end UCITS units or shares |
| Article 192 | Takeover bids or exchange tender offerings |
| Article 192-bis | Fines regarding disclosures on corporate governance and policy on remuneration and fees paid |
| Article 192-ter | Admission to trading (repealed) |
| Article 192-quater | Obligation of abstention |
| Article 192-quinquies | Fines regarding transactions with related parties |
| Article 193 | Fines regarding corporate disclosures and the duties of auditors, statutory auditors and auditing firms |
| Article 193-bis | Business dealings with foreign companies having their registered office in a country that does not ensure corporate transparency |
| Article 193-bis.1 | Fines regarding the transparency of institutional investors, asset managers and proxy advisors |
| Article 193-ter | Fines for breach of the prescriptions of Regulation (EU) no. 236/2012 |
| Article 193-quarter | Administrative sanctions relative to breach of the provisions issued by Regulation (EU) no. 648/2012 of the European Parliament and of the Council, of 4 July 2012, and by Regulation (EU) 2015/2365 of the European Parliament and of the Council, of 25 November 2015 |
| Article 193-quinquies | Pecuniary administrative sanctions in the case of breach of the provisions of regulation (EU) no. 1286/2014 |
| Article 193-sexies | Internal reporting systems |
| Article 194 | Proxies |
| Article 194-bis | Criteria for determining sanctions |
| Article 194-ter | Pecuniary administrative sanctions for infringements of the provisions of Regulation (EU) no. 575/2013, the delegated acts and the regulatory and implementing technical standards of Directive 2013/36/EU and Regulation (EU) no 575/2013 |

Article 194-ter.1       Pecuniary administrative sanctions for infringements of the provisions of
                        Regulation (EU) no. 2019/2033, the delegated acts and the regulatory and
                        implementing technical standards of Directive 2019/2034/EU and
                        Regulation (EU) no 2019/2033
Article 194-quater     Order to cease violations
Article 194-quinquies  Payment of a reduced amount
Article 194-sexies     Harmless conduct
Article 194-septies    Public declaration
Article 195            Sanction procedures
Article 195-bis        Publication of sanctions
Article 195-ter        Communication to EBA and to ESMA of the sanctions applied
Article 195-quater     Sanctions in the case of winding up
Article 195-quinquies  Inapplicability of specific provisions of Law no. 689 of 24 November 1981
Article 196            Sanctions applicable to financial advisors
Article 196-bis        Enactment provisions


**PART VI**                **TRANSITIONAL AND FINAL PROVISIONS**

Article 197            CONSOB staff
Article 198            Endorsement of share certificates
Article 199            Trust companies
Article 200            Intermediaries already authorised
Article 201            Stockbrokers
Article 202            Provisions on compulsory stock exchange settlement (repealed)
Article 203            Forward contracts
Article 204            Central depository services
Article 205            Price quotations
Article 206            Rules applicable to companies listed on markets other than the stock
                        exchange
Article 207            Shareholders' agreements
Article 208            Proxies, saving shares, boards of auditors and auditing firms
Article 209            Auditing firms
Article 210            Amendments to the Civil Code
Article 211            Amendments to the Consolidated Law on Banking
Article 212            Provisions concerning privatizations
Article 213            Conversion of bankruptcy into compulsory administrative liquidation
Article 214            Repeals
Article 215            Implementing provisions
Article 216            Entry into force

**ANNEX I**                **LISTS OF SERVICES AND ACTIVITIES AND FINANCIAL
                        INSTRUMENTS**

SECTION A              Investment services and activities
SECTION B              Ancillary services
SECTION C              Financial instruments

of origin and of the host Member States[748].

2. For the issuers indicated under Article 1, paragraph 1, letter w-quater), numbers 3), 4) and 4-bis), which have not made the disclosure of the Member State of origin within three months from the date on which the securities are admitted for trading, for the first time in the European Union, solely on an Italian regulated market, the Member State of origin is Italy. For the issuers of securities admitted for trading on regulated markets of several Member States, including Italy, in the absence of the disclosure required by paragraph 1, both Italy and such other Member States are considered the Member State of origin, until the successive choice and relative disclosure[749].

Article 92
Equal treatment

1. Listed issuers and listed issuers with Italy as their home Member State shall guarantee the same treatment and with identical terms and conditions to all holders of the listed financial instruments.

2. Listed issuers and listed issuers with Italy as their home Member State shall guarantee the instruments and information necessary for the exercise of rights to all holders of the listed financial instruments.

3. By regulation and in compliance with EU law, CONSOB shall dictate the enactment provisions pursuant to paragraph 2, also envisaging the option to use electronic information transmission media[750].

Article 93
Definition of control

1. In this part, in addition to the companies indicated in paragraphs 1 and 2 of the first paragraph of Article 2359 of the Civil Code, the following shall also be considered subsidiaries:

    a) Italian and foreign companies over which a person has the right, by virtue of a contract or a clause in the instrument of incorporation, to exercise a dominant influence, where the applicable law permits such contracts or clauses,

    b) Italian and foreign companies where a shareholder controls alone, on the basis of agreements with other shareholders, enough votes to exercise a dominant influence in the ordinary shareholders' meeting.

2. For the purposes of paragraph 1, rights held by subsidiaries or exercised through trustees or nominees shall be considered, those held on behalf of third parties shall not be considered.

---

748 See CONSOB Regulation no. 11971 of 14.5.1999 and subsequent amendments and additions (published in the in Ord. Suppl. no. 100 of the Official Journal no. 123 of 28.5.1999).

749 Article included by Article 1 of Legislative Decree no. 25 of 15.2.2016. The paragraphs 1 and 2 of the Article 2 of Legislative Decree no. 25 of 15.2.2016 provide that "1. For the issuers of securities admitted for trading on an Italian regulated market, which have not made the disclosure of the Member State of origin before 27 November 2015, the period of three months starts from the date of the entry into force of this decree 2. The issuers referred to under Article 1, letter w-quater ), numbers 3), 4) and 4-bis), of Legislative Decree no. 58 of 24 February 1998, which have chosen Italy as the Member State of origin and which have made the disclosure before 27 November 2015, are exempted from the disclosure obligation, unless they choose another Member State of origin after that date.".

750 Article thus replaced by Article 1 of Legislative Decree no. 195 of 6.11.2007

market, the issuer shall publish a prospectus containing the information pursuant to article 98-ter[866].

2. CONSOB:

a) shall by regulation determine the content of the prospectus, related publication methods, without prejudice to the need to arrange media publication through national daily newspapers, and updating of the prospectus, dictating specific measures in cases in which admission to listing on a regulated market coincides with the timing of the public offering[867] ;

b) may indicate information to be inserted by the issuer as integrations to the prospectus and specific advertising methods;

c) shall dictate provisions to coordinate stock exchange company functions with its own and, on request from said company, may assign tasks relating to control of the prospectus, also taking into account the characteristics of the individual markets.

3. The prospectus approved by the competent authority of another EU member state shall be recognised by CONSOB, under the terms and conditions established in paragraph 2 of the regulation, as a prospectus for admission to trading on a regulated market. Under paragraph 2 of the regulation, CONSOB may request the publication of a document for the listing.

4. For the advertising of an admission to listing of open-end UCITS units or shares on a regulated market, article 101 shall apply.

Article 113-ter[868]
General provisions on regulated disclosures

1. Regulated disclosures shall mean disclosures published by listed issuers, listed issuers for which Italy is the home member state or their controlling bodies, pursuant to the provisions of Chapter 3 of Regulation (EU) no. 596/2014 in this Title, Chapters I and II, Sections 1, I-bis, and V-bis, and to related enactment regulations or provisions established by non-EU country authorities considered the equivalent of CONSOB[869].

2. Regulated disclosures shall be filed with CONSOB and the market operator for which the issuer has requested or approved admission to trading of its securities or closed-end funds, in order to guarantee that said market operator may exercise its functions pursuant to Part III, Title I-bis of this decree[870].

3. CONSOB, in exercising the powers attributed to the same by this Title, establishes the methods and terms for disclosure to the public of the regulated information, without prejudice to the required publication in national daily newspapers, taking into account the nature of said information, in order

---

866 Paragraph thus amended by Article 3 of Legislative Decree no. 17 of 2.2.2021, which cancelled the words ", paragraph 2".

867 Letter thus amended by Article 1, paragraph 6 of Legislative Decree no. 101 of 17.7.2009. See CONSOB Regulation no. 11971 of 14.5.1999 and subsequent amendments and additions (published in the Ord. Suppl. no. 100 of the Official Journal no. 123 of 28.5.1999).

868 Article first inserted by Article 1 of Legislative Decree no. 195 of 6.11.2007 and later amended by Article 1, paragraph 7 of Legislative Decree no. 101 of 17.7.2009, by Article 3 of Legislative Decree no. 27 of 27.10.2010 and by Article 3 of Legislative Decree no. 107 of 10.8.2018, according to the terms indicated in the following note.

869 Paragraph amended first by Article 3 of Legislative Decree no. 27 of 27.01.2010, which removed the words: ", II" and later by Article 3 of Legislative Decree no. 107 of 10.8.2018, which inserted the words "in Chapter 3 in Regulation (EU) no. 596/2014" before the words "in this Title".

870 Paragraph thus substituted by Article 3 of Legislative Decree no. 107 of 10.8.2018.

to ensure rapid, non-discriminatory access which can, with reasonable certainty, guarantee the effective disclosure throughout the European Community[871].

4. CONSOB shall:

a) authorise third parties to the issuer to provide disclosure services for regulatory information;

b) authorise centralised archive services for regulatory information;

c) organise and manage centralised information archive services in the absence of authorised persons pursuant to paragraph b).

5. By regulation and in relation to regulatory information, CONSOB shall establish:

a) filing terms and methods pursuant to paragraph 2;

b) requirements and conditions for the release of authorisation to exercise disclosure services, and measures for the provision of such services given the objectives of paragraph 3;

c) requirements and conditions for the release of authorisation to exercise archive services, and measures for the provision of such services to guarantee security, data source certainty, time and date stamps of the receipt of regulatory information, easy access for end users and filing procedures aligned with those of CONSOB;

d) the language to be used in the notices;

e) any exemptions from filing, disclosure and archiving obligations in compliance with EU law[872].

6. If a party has requested admission to trading of securities or closed-end funds on a regulated market, without permission from the issuer, disclosure obligations for regulatory information are observed by that party, except where the issuer, in accordance with provisions established in its home member state, discloses regulatory information to the public as required under EU law.

7. Parties obliged to disclose regulatory information to the public may not claim payment for such disclosure.

8. CONSOB may make public the fact that parties obliged to disclose regulatory information do not comply with such obligations.

9. Without prejudice to the provisions of article 66-quater, paragraph 1, CONSOB may:

a) suspend or demand that the regulated market concerned suspends the trading of securities or closed-end funds for a maximum ten days on each occasion, if there are grounds to suspect that disclosures regarding regulatory information have been violated by the party under obligation, pursuant to this article, to disclose such regulatory information;

b) prohibit trading on a regulated market if it is confirmed that the provisions of paragraph a) have been infringed[873].

---

871 Paragraph thus amended first by Article 1, paragraph 7, of Legislative Decree no. 101 of 17.7.2009 which included the text: "without prejudice to the required publication in national daily newspapers,"; subsequently by Article 20 of Italian Decree Law no. 91 of 24.6.2014 which deleted these words; and lastly by conversion Law no. 116 of 11.8.2014 which eliminated the provision of Italian Decree Law 91 of 24.6.2014 which abolished the expression in question.

872 See CONSOB Regulation no. 11971 of 14.5.1999 and subsequent amendments and additions (published in the Ord. Suppl. no. 100 of the Official Journal no. 123 of 28.5.1999).

873 Paragraph thus modified by Article 3 of Legislative Decree no. 107 of 10.8.2018, which replaced the words "64, paragraph 1-bis" with the words "66-quater, paragraph 1".

Article 114[874]
Information to be provided to the public

1. Listed issuers shall publicly disclose inside information pursuant to article 17 of Regulation (EU) no. 596/2014, in accordance with the procedures established by the technical implementing regulations adopted by the European Commission pursuant to said article 17, paragraph 10. CONSOB shall prescribe provisions to coordinate the functions assigned to the market operator with its own functions, and may identify tasks to assign the same market operator for the correct performance of in the functions provided for by article 64, paragraph 2, letter d)[875].

2. Listed issuers shall establish due provisions in order that subsidiaries provide all the information necessary to comply with the disclosure obligations established by the law and by Regulation (EU) no 596/2014. Subsidiaries shall transmit the information required in a timely manner[876].

3. In the event of delay in the public disclosure of inside information, listed issuers shall transmit, upon subsequent request by CONSOB, documents proving the fulfilment of the obligation provided for by article 17, paragraph 4 of the regulation (EU) no. 596/2014 and the relative technical implementing regulations[877].

4. ... omissis ...[878]

5. CONSOB, on a general basis or otherwise, may require to the issuers, to the subjects which control them, listed issuers for which Italy is the home Member State, the members of the board of directors, the members of the internal control body, managers and persons who hold a major holding pursuant to Article 120 or who are parties to a shareholders' agreement pursuant to Article 122 to publish, in the manner it shall establish, the information and documents needed to inform the public. Where such

---

874 Article first replaced by Article 9 of Italian Law no. 62 of 18.4.2005 (Community Law 2004) and then amended by Article 14, paragraph 1 of Italian Law no. 262 of 28.12.2005, by Article 1, paragraphs 8 and 9 of Legislative Decree no. 101 of 17.7.2009, by Article 20 of Italian Decree Law no. 91 of 24.6.2014, by article 4 of Legislative Decree no. 129 of 3.8.2017 and by Article 3 of Legislative Decree 107 of 10.8.2018 in the terms indicated in the following notes. Paragraph 5 of Article 99 of Legislative Decree no. 180 of 16 November 2015 provides that: "5. Public disclosure pursuant to Article 114 of the Consolidated Law on Finance on the existence of the conditions for the write down and conversion or for the entry into resolution in accordance with Article 20 [of Legislative Decree no. 180 of 16 November 2015], as well as on the action that has placed the write down and conversion pursuant to Article 29 [of Legislative Decree no. 180 of 16 November 2015] or the entry into resolution under Article 32 [of Legislative Decree no. 180 of 16 November 2015] is carried out simultaneously with the publication provided for in Article 32, paragraph 3 [of Legislative Decree no. 180 of 16 November 2015], although the existence of such conditions, even if not publicly disclosed, it is previously known by the issuer or by members of its administrative and control body. CONSOB may establish by its own regulation further cases where such disclosure may be postponed". See CONSOB Regulation no. 11971 of 14.5.1999 and subsequent amendments and additions (published in Ord. Suppl. no. 100 of the Official Journal no. 123 of 28.5.1999).

875 Paragraph thus amended first by Article 1, paragraph 8, of Legislative Decree no. 101 of 17.7.2009 which included the text: ", without prejudice to the need for publication in the national daily newspapers,"; subsequently by Article 1 of Legislative Decree no. 184 of 11.10.2012 which deleted the words: "and the subjects which control them"; then by Article 20 of Italian Decree Law no. 91 of 24.6.2014 which cancelled the words: ", without prejudice to the need for publication in the national daily newspapers,"; by conversion Law no. 116 of 11.8.2014, which cancelled the provision of Decree Law 91 of 24.6.2014 which abolished the expression in question; by Article 4 Italian Legislative Decree no. 129 of 3 August 2017 replacing, in the second sentence, the words: "64, paragraph 1, letter b)" with the words: "64, paragraph 2, letter d)" and finally thus substituted by Article 3 of Legislative Decree no. 107 of 10.8.2018.

876 Paragraph thus replaced by Article 3 of Legislative Decree no. 107 of 10.8.2018.

877 Paragraph first amended by Article 1 of Legislative Decree no. 184 of 11.10.2012 and then replaced by Article 3 of Legislative Decree 107 of 10.8.2018.

878 Paragraph repealed by Article 3 of Legislative Decree no. 107 of 10.8.2018.

persons fail to comply, CONSOB shall publish the material at their expense.[879]

6. Where the issuers, the subjects who control them and listed issuers with Italy as their home member country submit justified claim to the effect that public disclosure of information pursuant to paragraph 5 could seriously damage the issuer, the disclosure obligations shall be suspended. Within seven days CONSOB may waive the requirement to disclose all or part of the information permanently or temporarily, provided this is not likely to mislead the public with regard to essential facts and circumstances. On expiry of said deadline, the claim shall be deemed accepted[880].

7. Anyone holding shares for at least 10% of share capital and any other persons who control the listed shall notify CONSOB and the public of transactions involving the issuer's shares or other related financial instruments that they have carried out directly or through intermediaries. Such disclosure shall also be made by the persons closely linked to the parties indicated above, identified by CONSOB in its regulations. In the same regulations, CONSOB shall specify the transactions, procedures and deadlines for such disclosures, the procedures and deadlines for the public disclosure of the information and the cases in which such obligations shall apply, including with reference to companies that control the issuer[881].

8. ... omissis ....[882]

9. For the purpose of guaranteeing that the public is correctly informed, CONSOB may require the publication of the investment recommendations and other information recommending or advising an investment strategy by listed issuers, authorised parties as well as parties that control them, according to the procedures established with the regulations[883].

10. CONSOB shall assess, in advance and on a general basis, according to the procedures that it has established, the existence of the conditions indicated in article 20 paragraph 3, part 4 of the Regulation (EU) 596/2014 concerning the rules of self-regulation of journalists and communicate the relative outcome, as well as the said self-regulation rules, to the Ministry of the Economy and Finance[884].

11. ... omissis...[885]

12. The provisions of this article shall also apply to Italian and foreign persons who:

---

879 Paragraph already replaced by Article 14, paragraph 1 of Italian Law n° 262 of 28.12.2005; successively amended by Article 1 of Legislative Decree n° 195 of 6.11.2007 and then by Article 1 of Legislative Decree n° 184 of 11.10.2012 which has substituted the words: «to the subjects indicated in paragraph 1» with the words: to the issuers, to the subjects which control them.

880 Paragraph first amended by Article 1, paragraph 9, of Legislative Decree n° 101 of 17.7.2009 which has included the words: "and the listed issuers whose member state of origin is Italy" and then by Article 1 of Legislative Decree n° 184 of 11.10.2012 which has replaced the words: «the subjects indicated in paragraph 1» with the words: «the issuers, the subject which control them».

881 Paragraph thus replaced by Article 3 of Legislative Decree no. 107 of 10.8.2018

882 Paragraph first substituted by Article 14, paragraph 1 of Legislative Decree no. 262 of 28.12.2005 and later repealed by Article 3 of Legislative Decree no. 107 of 10.8.2018.

883 Paragraph thus substituted by Article 3 of Legislative Decree no. 107 of 10.8.2018. See CONSOB Regulation no. 11971 of 14.5.1999 and subsequent amendments and additions (published in the in O.S. no. 100 of O.J. no. 123 of 28.5.1999).

884 Paragraph thus substituted by Article 3 of Legislative Decree no. 107 of 10.8.2018.

885 Paragraph repealed by Article 3 of Legislative Decree no. 107 of 10.8.2018.

Article 147
Common representatives

1. Common representatives shall be subject to Article 2417 of the Civil Code, where the term bondholders shall be understood to refer to holders of Assets shares.

2. ...omissis... [1056]

3. Common representatives shall have the obligations and powers referred to in Article 2418 of the Civil Code, where the term bondholders shall be understood to refer to holders of Assets shares; they may also examine the books referred to in paragraphs 1) and 3) of Article 2421 of the Civil Code, obtain extracts thereof, attend shareholders' meetings and challenge the resolutions they adopt. Their expenses shall be charged to the fund referred to in Article 146(1)(c).

4. The Articles of Association may assign the common representative additional powers to protect the interests of holders of Assets shares and must establish procedures to ensure the common representative receives adequate information on corporate transactions that may influence the price of shares of the class in question.

Article 147-bis
Meetings of classes of investors

1. Articles 146 and 147 shall apply to the special meetings referred to in Article 2376, first paragraph, of the Civil Code if the shares are listed on regulated markets in Italy or other EU countries. [1057]

**Section IV-bis**[1058]
**Administration bodies**

Article 147-ter[1059]
Election and composition of the Board of Directors

1. The Statute provides for members of the Board of Directors to be elected on the basis of the list of candidates and defines the minimum participation share required for their presentation, at an extent not above a fortieth of the share capital or at a different extent established by CONSOB with the regulation taking into account capitalization, floating funds and ownership structures of listed companies. The lists indicate which are the directors holding independent requisites established by law and by the Statute. The Statute may also provide that with regard to the sector for directors to be elected, what is not to be taken into account are the lists which have not reached a percentage of votes at least equal to half of the one required by the Statute for the presentation of same; for cooperatives

---

1056 Paragraph repealed by Article 3 Legislative Decree 37/2004.

1057 Article added by Article 3 Legislative Decree 37/2004.

1058 Section first added by Article 1 of Italian Law no. 262 of 28.12.2005 and then amended by Article 3, paragraph 13 of Legislative Decree no. 303 of 29.12.2006, by Article 3 of Legislative Decree no. 27 of 27.1.2010, by Article 1 of Law no. 120 of 27.2.2011, by Article 3 of Legislative Decree no. 91 of 18.6.2012, by Decree Law no. 179 of 18.10.2012, coordinated with conversion law no. 221 of 17.12.2012 and Italian Law no. 160 of 27.12.2019 (2020 Budget Law) in the text republished in the O.J. no. 13 of 17.1.2020.

1059 Article first of all included in Article 1 of Law no. 262 of 28.12.2005 and then amended by Article 3, paragraph 13, of Legislative Decree no. 303 of 29.12.2006, by Article 1 of Law no. 120 of 12.7.2011, by Article 3 of Legislative Decree no. 91 of 18.6.2012 and by Decree Law no. 179 of 18.10.2012, coordinated with conversion Law no. 221 of 17.12.2012 according to the terms indicated in the notes below.

the percentage is established by the statutes also in derogation from article 135. [1060]

1-bis. Lists are deposited with the issuer, also by means of remote communication, in compliance with any requirements strictly necessary to identify the applicants indicated by the company, by the twenty-fifth day prior to the date of the meeting called to resolve on the appointment of the members of the board of directors and made available to the public at the company's headquarters, on the company's website and in the other ways envisaged by CONSOB by regulation, at least twenty-one days prior to the date of the shareholders' meeting. Ownership of the minimum investment envisaged by paragraph 1 is determined concerning the shares recorded in favour of the shareholder on the day on which the lists are deposited with the issuer. Related certification may also be submitted after filing, provided submission is within the time limit established for publication of the lists by the issuer[1061].

1-ter. The Statute also stipulates that the division of directors to be elected should be made on the basis of a criterion that ensures a balance between genders. The less-represented gender must obtain at least two fifths of the directors elected. This division criterion shall apply for six consecutive mandates. If the composition of the board of directors resulting from the election does not comply with the division criterion provided for in this section, CONSOB shall warn the company concerned to comply with this criterion within the maximum term of four months from the warning. In the event of non-compliance with the warning, CONSOB shall impose a fine of between Euro 100,000 and Euro 1,000,000, depending on the criteria and methods laid down in its regulations and set a new term of three months for compliance. In the event of further non-compliance with respect to this new warning, the elected members shall lose their position. The statute regulates the methods of drawing up the lists and the cases of replacement during a mandate in order to ensure compliance with the division criterion provided for in this section. CONSOB shall lay down regulations on the infringement, application and observance of the rules on gender quotas, including with reference to the investigation phase and the procedures to be adopted, on the basis of its own regulations to be adopted within six months from the date of entry into force of the rules contained in this section. The rules of this section shall also apply to companies organised according to the monistic system[1062].

---

1060 Paragraph thus amended first by Article 3, paragraph 13, of Legislative Decree no. 303 of 29.12.2006 which replaced the Italian word: "membri" with the Italian word: "componenti" (Translator's note: in English the word is always translated as "members") and lastly added the following words: "or at a different extent established by CONSOB with the regulation taking into account capitalization, floating funds and ownership structures of listed companies. The lists indicate which are the directors holding independent requisites established by Law and by the Statute. The Statute may also provide that with regard to the sector for directors to be elected, what is not to be taken into account are the lists which have not reached a percentage of votes at least equal to half of the one required by the Statute for the presentation of same" and then by Decree Law no. 179 of 18.10.2012, coordinated with conversion Law no. 221 of 17.12.2012 which has included the last sentence. See CONSOB Regulation no. 11971 of 14.5.1999 and subsequent amendments and additions (published in the Ord. Suppl. no. 100 of the Official Journal no. 123 of 28.5.1999).

1061 Paragraph added by Article 3, Legislative Decree no. 27 of 27.1.2010.

1062 Paragraph already introduced by Article 1, para. 1 of Italian Law no. 120 of 12.7.2011 and then first replaced by Article 58-sexies, para. 1 of Decree Law no. 124 of 26.10.2019, converted with amendments into Law no. 157 of 19.12.2019 and then by Article 1, para. 302 of Law no. 160 of 27.12.2019 in the text republished in the O.J. no. 13 of 17.1.2020. Para. 304 of Article 1 of Law no. 160 of 27.12.2019, in the text republished in the O.J. no. 13 of 17.1.2020, states that: "The division criterion of at least two fifths envisaged in paras. 302 and 303 shall apply from the initial renewal of the management and control bodies of companies listed on regulatory markets after the entry into force of this law, with no prejudice to the division criterion of at least one fifth provided for in Article 2 of Law no. 120 of 12 July 2011 for the first renewal after the trading start date". Para. 305 of Article 1 of Law no. 160 of 27.12.2019, in the text republished in the O.J. no. 13 of 17.1.2020, states that: "CONSOB shall communicate the results of the checks of implementation of paras. 302 to 304 annually to the Department for Equal Opportunities of the Presidency of the Council of Ministers …".

2. ...omissis...[1063]

3. Except as provided for in Article 2409-septiesdecies of the Civil Code, at least one member shall be elected from the minority slate that obtained the largest number of votes and is not linked in any way, even indirectly, with the shareholders who presented or voted the list which resulted first by the number of votes. In companies organised under the one-tier system, the member elected from the minority slate must satisfy the integrity, experience and independence requirements established pursuant to Articles 148(3) and 148(4). Failure to satisfy the requirements shall result in disqualification from the position. [1064]

4. In addition to what is provided for in paragraph 3, at least one of the members of the Board of Directors, or two if the Board of Directors is composed of more than seven members, should satisfy the independence requirements established for members of the board of auditors in Article 148(3) and, if provided for in the Articles of Association, the additional requirements established in codes of conduct drawn up by regulated stock exchange companies or by trade associations. This paragraph shall not apply to the boards of directors of companies organised under the one-tier system, which shall continue to be subject to the second paragraph of Article 2409-septiesdecies of the Civil Code. The independent director who, following his or her nomination, loses those requisites of independence should immediately inform the Board of Directors about this and, in any case falls from his/her office. [1065]

Article 147-quater[1066]
Composition of the management board

1. If the management board has more than four members, at least one of them must satisfy the independence requirements established for members of the board of auditors in Article 148(3) and, if provided for in the Articles of Association, the additional requirements established in codes of conduct drawn up by regulated stock exchange companies or by trade associations.

1-bis. If the management board has not less than three members, the rules of article 147-ter, paragraph 1-ter apply to it[1067].

---

1063 Paragraph repealed by Article 3 of Legislative Decree No. 303 of 29.12.2006.

1064 Paragraph amended by Article 3 of Legislative decree No. 303 of 29.12.2006 which replaced the word: "member" (Translator's note: in this case the Italian and the English word are similar 'membri' = 'members') with the word in Italian: "componenti" which in English remains "members"; it replaced the wording: "the list resulted first by number of votes" with the words: "the members/shareholders who presented or voted the list which resulted first by the number of votes", and replaced the word: in Italian "membro" with the Italian word "componente" (Translator's note: this word always remains "member" in English).

1065 This paragraph was amended by Article 3 of Legislative Decree No. 303 of 29.12.2006 which replaced the wording: "whenever the Board of Directors, or two if the Board of Directors is formed by more than seven members, at least one of them should" by the following wording: "at least one of the members of the Board of Directors, or two if the Board of Directors is composed of more than seven members, should", and lastly added the following words: "The independent director who, following his or her nomination, loses those requisites of independence should immediately inform the Board of Directors about this and, in any case falls from his/her office."

1066 Article first of all included in Article 1 of Law 262/2005 and then amended by Article 1, paragraph 2 of Law 120/2011 according to the terms indicated in the note below.

1067 Paragraph added by Article 1 Paragraph 2 of Law 120/2011.

Article 147-quinquies
Integrity requirements

1. Persons who perform an administrative or management role must satisfy the integrity requirements established for members of internal control bodies in the regulation issued by the Minister of Justice pursuant to Article 148, paragraph 4.

2. Failure to satisfy the requirements shall result in disqualification from the position.[1068]

## Section V
## Internal control bodies[1069]

Article 148
Composition

1. The Articles of Association of a company shall establish, for the board of auditors:
    a) the number, not less than three, of auditors;
    b) the number not less than two, of alternates;
    c) ...omissis...[1070]
    d) ...omissis...[1071]

1-bis. The Articles of Association of the company shall also state that the division of members pursuant to section 1 shall be made in such a way that the less-represented gender shall obtain at least two fifths of the regular members of the board of auditors. This division criterion shall apply for six consecutive mandates. If the composition of the board of auditors resulting from the election does not comply with the division criterion provided for in this section, CONSOB shall warn the company concerned to comply with this criterion within the maximum term of four months from the warning. In the event of non-compliance with this warning, CONSOB shall apply a fine of between Euro 20,000 and Euro 200,000 and set a new term of three months for compliance. In the event of further non-compliance with respect to this new warning, the elected members shall lose their position. CONSOB shall lay down regulations on the infringement, application and observance of the rules on gender quotas, including with reference to the investigation phase and the procedures to be adopted, on the basis of its own regulations to be adopted within six months from the date of entry into force of the rules contained in this section[1072].

2. CONSOB establishes the rules for the election procedure by list vote of a member of the Board of

---

1068 Article added by Article 1 of Law 262/2005.

1069 Title as amended by Article 3 Legislative Decree 37/2004.

1070 Paragraph repealed by Article 2 of Law 262/2005.

1071 Paragraph repealed by Article 2 of Law 262/2005.

1072 Paragraph already introduced by Article 1, para. 1 of Italian Law no. 120 of 12.7.2011 and then first replaced by Article 58-sexies, para. 1 of Decree Law no. 124 of 26.10.2019, converted with amendments into Law no. 157 of 19.12.2019 and then by Article 1, para. 302 of Law no. 160 of 27.12.2019 in the text republished in the O.J. no. 13 of 17.1.2020. Para. 304 of Article 1 of Law no. 160 of 27.12.2019, in the text republished in the O.J. no. 13 of 17.1.2020, states that: "The division criterion of at least two fifths envisaged in paras. 302 and 303 shall apply from the initial renewal of the management and control bodies of companies listed on regulatory markets after the entry into force of this law, with no prejudice to the division criterion of at least one fifth provided for in Article 2 of Law no. 120 of 12 July 2011 for the first renewal after the trading start date". Para. 305 of Article 1 of Law no. 160 of 27.12.2019, in the text republished in the O.J. no. 13 of 17.1.2020, states that: "CONSOB shall communicate the results of the checks of implementation of paras. 302 to 304 annually to the Department for Equal Opportunities of the Presidency of the Council of Ministers …".

Auditors by minority shareholders, that are not directly or indirectly associated with the shareholders that submitted or voted the list qualifying as first for the number of votes received. Article 147-ter, paragraph 1-bis shall apply[1073].

2-bis. The chairman of the board of auditors shall be appointed by the shareholders' meeting from among the auditors elected by the minority shareholders.[1074]

3. The following persons may not be elected as auditors and, where elected, they shall be disqualified from office:

a) persons who are in the conditions referred to in Article 23 82 of the Civil Code;

b) spouses, relatives and the like up to the fourth degree of kinship of the directors of the company, spouses, relatives and the like up to the fourth degree of kinship of the directors of the companies it controls, the companies it is controlled by and those subject to common control;[1075]

c) persons who are linked to the company, the companies it controls, the companies it is controlled by and those subject to common control or to directors of the company or persons referred to in paragraph b) by self-employment or employee relationships or by other relationships of an economic or professional nature that might compromise their independence.[1076]

4. In a regulation adopted pursuant to Article 17(3) of Law 400/2003, in agreement with the Minister of the Economy and Finance,[1077] after consulting CONSOB, the Bank of Italy and Ivass, the Minister of Justice shall lay down the integrity and experience requirements for the members of the board of auditors[1078], the supervisory board or the management control committee. Failure to satisfy the requirements shall result in disqualification from the position[1079].

4-bis. Paragraphs 1-bis, 2 and 3 shall apply to supervisory boards.[1080]

4-ter. Paragraphs 2-bis and 3 shall apply to management control committees. The representative of the minority shareholders shall be the director elected pursuant to Article 147-ter(3).[1081]

4-quater. In the cases provided for in this article, disqualification shall be declared by the board of

---

1073 Paragraph first replaced by Article 2, Law no. 262 of 28.12.2005 and later amended by Article 3, paragraph 14, Legislative Decree no. 303 of 29.12.2006, which added the words: ", by list voting," and at the end added the words: "that are not directly or indirectly associated with shareholders that submitted or voted on the list qualifying as first for the number of votes received", and lastly amended by Article 3, Legislative Decree no. 27 of 27.1.2010 which added the words: "Article 147-ter, paragraph 1-bis shall apply." See CONSOB Regulation no. 11971 of 14.5.1999 and subsequent amendments and additions (published in the Ord. Suppl. no. 100 of the Official Journal no. 123 of 28.5.1999).

1074 Paragraph added by Article 2 of Law 262/2005.

1075 Paragraph as amended by Article 3 Legislative Decree 37/2004.

1076 Paragraph first replaced by Article 3 of Legislative Decree 37 of 6.2.2004 and later amended by Article 2 of Law no. 262 of 28.12.2005 which included the words "or directors of the company and persons referred to under paragraph b)" and the words "or professional".

1077 The former wording "Minister of the Treasury, Budget and Economic Planning" was replaced with the wording "Minister of the Economy and Finance" by Article 1 of Legislative Decree no. 37 of 6.2.2004.

1078 See Minister of Justice Regulation no. 162 of 30.3.2000 (published in O.J. no. 141 of 19.6.2000).

1079 Paragraph first replaced by Article 2 of Legislative Decree no. 262 of 28.12.2005 and then thus amended by Article 4 of Legislative Decree no. 72 of 12.5.2015, which replaced the word: "ISVAP" with: "IVASS".

1080 Paragraph first added by Article 3 of Legislative Decree 37/2004, then replaced by Article 2 of Law 262/2005 and finally thus amended by Article 1, paragraph 3, of Law 120/2011 which included the words: "1-bis".

1081 Paragraph added by Article 3 Legislative Decree 37/2004 and subsequently amended by Article 2 of Law 262/2005.

directors or, for companies organised according to the two-tier system or the one-tier system, by the shareholders' meeting within thirty days of the appointment or of its learning of subsequent failure. In the event of inaction by the competent body, CONSOB shall declare the disqualification, at the request of any interested party or if it learns of the existence of the grounds for disqualification.[1082]

Article 148-bis
Limits on the cumulation of positions

1. CONSOB shall lay down in a regulation the limits to the cumulation of management and control positions that members of the internal control bodies of companies referred to in this chapter and of companies with financial instruments widely distributed among the public in accordance with Article 116 may hold in all the companies referred to in Book V, Title V, Chapters V, VI and VII of the Civil Code. CONSOB shall establish such limits taking into account the onerousness and complexity of each type of position, including in relation to the size of the company, the number and size of the firms included in the consolidation, and the extension and articulation of its organisational structure[1083].

2. Without prejudice to Article 2400, fourth paragraph, of the Civil Code, members of the internal control bodies of companies referred to in this chapter and of companies with financial instruments widely distributed among the public in accordance with Article 116 shall inform CONSOB and the public, within the time limits and in the ways prescribed by CONSOB in the regulation referred to in paragraph 1, of all the management and control positions they hold in companies referred to in Book V, Title V, Chapters V, VI and VII of the Civil Code. CONSOB shall declare the disqualification from positions taken on after the maximum number provided for in the regulation referred to in the first paragraph was reached.[1084]

Article 149
Duties

1. The board of auditors shall check:
        a) compliance with the law and the Articles of Association;
        b) observance of the principles of correct administration;
        c) the adequacy of the company's organisational structure for matters within the scope of the board's authority, the adequacy of the internal control system and the administrative and accounting system and the reliability of the latter in correctly representing the company's transactions;
        c-bis) the arrangements for implementing the corporate governance rules provided for in codes of conduct drawn up by regulated stock exchange companies or by trade associations that the company, by means of public disclosures, declares it complies with;[1085]
        d) the adequacy of the instructions imparted by the company to its subsidiaries pursuant to Article 114(2).

2. The members of the board of auditors shall attend the shareholders' meetings and the meetings of the board of directors and the executive committee. Members of the board of auditors who fail to attend shareholders' meetings without good cause or, in any one financial year, fail to attend two

---

1082 Paragraph added by Article 3 Legislative Decree 37/2004 and subsequently amended by Article 2 of Law 262/2005.

1083 See CONSOB Regulation no. 11971 of 14.5.1999 and subsequent amendments and additions (published in the Ord. Suppl. no. 100 of the Official Journal no. 123 of 28.5.1999).

1084 Article added by Article 2 of Law 262/2005.

1085 Paragraph added by Article 2 of Law 262/2005.

Regolamento Consob n. 17221/2010
(Operazioni con parti correlate)

(CONSOB Regulation no. 17221/2010)



**CONSOB**
COMMISSIONE NAZIONALE
PER LE SOCIETÀ E LA BORSA

# REGOLAMENTO OPERAZIONI CON PARTI CORRELATE

## Delibera n. 17221 del 12.3.2010

*(aggiornato con le modifiche apportate dalla delibera n. 22144 del 22 dicembre 2021)*

## *In vigore dal 31 dicembre 2021*

A cura della
Divisione Tutela del Consumatore
Ufficio Relazioni con il Pubblico

## Dicembre 2021

**Regolamento recante disposizioni in materia di operazioni con parti correlate** *(adottato dalla Consob con delibera n. 17221 del 12 marzo 2010 successivamente modificato con delibere n. 17389 del 23 giugno 2010, n. 19925 del 22 marzo 2017, n. 19974 del 27 aprile 2017, n. 21396 del 10 giugno 2020, n. 21624 del 10 dicembre 2020 e n. 22144 del 22 dicembre 2021)*[1].

## INDICE:

Articolo 1   - Fonti normative ……………………………………………..……………… Pag.   3

Articolo 2   - Ambito di applicazione ………………………………………………… ''   3

Articolo 3   - Definizioni …………………………………………………………… ''   3

Articolo 4   - Adozione di procedure ………………………………………………… ''   4

Articolo 5   - Informazione al pubblico sulle operazioni con parti correlate ……..………. ''   6

Articolo 6   - Operazioni con parti correlate e comunicazioni al pubblico ………….………. ''   7

Articolo 7   - Procedure per le operazioni di minore rilevanza per le società che adottano i sistemi di amministrazione e controllo tradizionale o monistico…………………. ''   8

Articolo 8   - Procedure per le operazioni di maggiore rilevanza per le società che adottano i sistemi di amministrazione e controllo tradizionale o monistico……………..……... ''   9

Articolo 9   - Procedure per le operazioni nelle società che adottano il sistema di amministrazione e controllo dualistico ……………………………….…….. ''   9

Articolo 10  - Disciplina per determinate tipologie di società ………………………………. ''   9

Articolo 11  - Operazioni di competenza assembleare ………………………………………. ''   10

Articolo 12  - Delibere-quadro ………………………………………………………. ''   11

Articolo 13  - Casi e facoltà di esclusione ……………………………………………… ''   11

Articolo 14  - Direzione e coordinamento, società controllate e società collegate ………..…. ''   13

*Allegato 1*   - Definizioni di parti correlate e operazioni con parti correlate e definizioni ad esse funzionali *(abrogato)* …………………………………………….. ''   15

---

[1] La delibera n. 17221 del 12.3.2010 e l'annesso regolamento sono pubblicati nella G.U. n. 70 del 25.3.2010 e in CONSOB, Bollettino quindicinale n. 3.1, marzo 2010. La delibera n. 17389 del 23 giugno 2010 è pubblicata nella G.U. n. 152 del 2 luglio 2010 e in CONSOB, Bollettino quindicinale n. 6.2, giugno 2010, per l'entrata in vigore delle disposizioni cfr. delibera. 17221 del 12 marzo 2010 come modificata con delibera n. 17389 del 23 giugno 2010. La delibera n. 19925 del 22 marzo 2017 è pubblicata nella G.U. n. 88 del 14 aprile 2017 e in CONSOB Bollettino quindicinale n. 4.1, aprile 2017; essa è in vigore dal quindicesimo giorno successivo alla sua pubblicazione nella G.U.. La lettera *a)* dell'art. 3 della delibera n. 19925 del 22 marzo 2017 è stata successivamente rettificata con delibera n. 20250 del 28.12.2017, pubblicata nella G.U. n. 1 del 2.1.2018. La delibera n. 19974 del 27 aprile 2017 è pubblicata nella G.U. n. 106 del 9 maggio 2017 e in CONSOB Bollettino quindicinale n. 4.2, aprile 2017; essa è in vigore dal quindicesimo giorno successivo alla sua pubblicazione nella G.U.. La delibera n. 21396 del 10 giugno 2020 è pubblicata nella G.U. n. 154 del 19 giugno 2020 e in CONSOB Bollettino quindicinale n. 6.1, giugno 2020; essa è in vigore dal giorno successivo alla sua pubblicazione nella G.U.. La delibera n. 21624 del 10 dicembre 2020 è pubblicata nella G.U. n. 317 del 22 dicembre 2020 e in CONSOB Bollettino quindicinale n. 12.1, dicembre 2020; essa è in vigore dal 1° luglio 2021. La delibera n. 22144 del 22 dicembre 2021 è pubblicata nella G.U. n. 309 del 30.12.2021 e in CONSOB Bollettino quindicinale n. 12.2, dicembre 2021; essa è in vigore dal giorno successivo alla sua pubblicazione nella G.U..

***Allegato 2*** - Procedure per le operazioni con parti correlate nelle società che adottano il sistema di amministrazione e controllo dualistico ……………………………..  ,,  16

***Allegato 3*** - Individuazione delle operazioni di maggiore rilevanza con parti correlate………………………………………………………………………  ,,  20

***Allegato 4*** - Documento informativo relativo ad operazioni di maggiore rilevanza con parti correlate ………………………………………………………………....  ,,  22

***Appendice*** - Definizioni di parti correlate e operazioni con parti correlate e definizioni ad esse funzionali secondo i principi contabili internazionali ………..………….  ,,  25

sorveglianza indipendenti":

    - gli amministratori e i consiglieri in possesso dei requisiti di indipendenza previsti dall'articolo 148, comma 3, del Testo unico e degli eventuali ulteriori requisiti individuati nelle procedure previste dall'articolo 4 o stabiliti da normative di settore eventualmente applicabili in ragione dell'attività svolta dalla società;

    - qualora la società dichiari, ai sensi dell'articolo 123-*bis*, comma 2, del Testo unico, di aderire ad un codice di comportamento promosso dal gestore di mercati regolamentati o da associazioni di categoria, che preveda requisiti di indipendenza almeno equivalenti a quelli dell'articolo 148, comma 3, del Testo unico, gli amministratori e i consiglieri riconosciuti come tali dalla società in applicazione del medesimo codice[4];

    *i)* "amministratori non correlati" e "consiglieri non correlati": gli amministratori, i consiglieri di gestione o di sorveglianza diversi dalla controparte di una determinata operazione e dalle parti correlate della controparte[5];

    *i-bis)* "amministratori coinvolti nell'operazione" e "consiglieri coinvolti nell'operazione": gli amministratori, i consiglieri di gestione o di sorveglianza che abbiano nell'operazione un interesse, per conto proprio o di terzi, in conflitto con quello della società[6];

    *l)* "soci non correlati": i soggetti ai quali spetta il diritto di voto diversi dalla controparte di una determinata operazione e dai soggetti correlati sia alla controparte di una determinata operazione sia alla società;

    *m)* "Testo unico": il decreto legislativo 24 febbraio 1998, n. 58;

    *n)* "regolamento emittenti": il regolamento adottato con delibera n. 11971 del 14 maggio 1999 e successive modificazioni e integrazioni.

Articolo 4
*(Adozione di procedure)*

    1.  I consigli di amministrazione o i consigli di gestione delle società adottano, secondo i principi indicati nel presente regolamento, procedure che assicurino la trasparenza e la correttezza sostanziale e procedurale delle operazioni con parti correlate. In particolare, tali procedure:

    *a)* identificano le operazioni di maggiore rilevanza in modo da includervi almeno quelle che superino le soglie previste nell'Allegato 3, e le operazioni di importo esiguo fissando, per queste ultime, criteri differenziati in considerazione almeno della natura della controparte[7];

    *b)* identificano i casi di esenzione previsti dagli articoli 13 e 14 ai quali le società intendono fare ricorso;

    *c)* identificano, ai fini del presente regolamento, i requisiti di indipendenza degli amministratori o dei consiglieri di gestione e di sorveglianza in conformità a quanto previsto dall'articolo 3, lettera *h)*;

    *d)* stabiliscono le modalità con cui si istruiscono e si approvano le operazioni con parti correlate e individuano regole con riguardo alle ipotesi in cui la società esamini o approvi operazioni di società controllate, italiane o estere;

    *e)* fissano le modalità e i tempi con i quali sono fornite, agli amministratori o consiglieri indipendenti che esprimono pareri sulle operazioni con parti correlate nonché agli organi di amministrazione e controllo, le informazioni sulle operazioni, con la relativa documentazione, prima della deliberazione, durante e dopo l'esecuzione delle stesse;

    *e-bis)* stabiliscono le modalità e i tempi con i quali gli amministratori o consiglieri

---

[4]    Lettera così modificata con delibera n. 21624 del 10.12.2020 che, nel secondo trattino, ha sostituito le parole: "da società di gestione" con le parole: "dal gestore".

[5]    Lettera così modificata con delibera n. 21624 del 10.12.2020 che ha sostituito le parole "dalle sue parti correlate" con le parole: "dalle parti correlate della controparte".

[6]    Lettera inserita con delibera n. 21624 del 10.12.2020.

[7]    Lettera così modificata con delibera n. 21624 del 10.12.2020 che dopo le parole: "previste nell'Allegato 3" ha aggiunto le parole: ", e le operazioni di importo esiguo fissando, per queste ultime, criteri differenziati in considerazione almeno della natura della controparte".

indipendenti che esprimono pareri sulle operazioni con parti correlate:

*i)* ricevono informazioni in merito all'applicazione dei casi di esenzione identificati ai sensi della lettera *b)* del presente comma, almeno con riferimento alle operazioni di maggiore rilevanza. L'invio di tali informazioni è effettuato su base almeno annuale;

*ii)* verificano la corretta applicazione delle condizioni di esenzione alle operazioni di maggiore rilevanza definite ordinarie e concluse a condizioni di mercato o standard, comunicate agli stessi ai sensi dell'articolo 13, comma 3, lettera *c)*, punto *i)*[8];

*f)* indicano le scelte effettuate dalle società con riguardo alle opzioni, diverse da quelle indicate nelle lettere precedenti, rimesse alle medesime società dalle disposizioni del presente regolamento.

2. Le società valutano se indicare nelle procedure come soggetti a cui applicare, in tutto o in parte, le disposizioni del presente regolamento anche soggetti diversi dalle parti correlate, tenendo conto, in particolare, degli assetti proprietari, di eventuali vincoli contrattuali o statutari rilevanti ai fini dell'articolo 2359, primo comma, n. 3), o dell'articolo 2497-*septies* del codice civile nonché delle discipline di settore alle stesse eventualmente applicabili in materia di parti correlate.

3. Le delibere sulle procedure e sulle relative modifiche sono approvate previo parere favorevole di un comitato, anche appositamente costituito, composto esclusivamente da amministratori indipendenti o, per le società che adottano il sistema di amministrazione e controllo dualistico, da consiglieri di gestione o consiglieri di sorveglianza indipendenti. Qualora non siano in carica almeno tre amministratori indipendenti, le delibere sono approvate previo parere favorevole degli amministratori indipendenti eventualmente presenti o, in loro assenza, previo parere non vincolante di un esperto indipendente.

4. Le procedure previste dal comma 1 garantiscono il coordinamento con le procedure amministrative e contabili previste dall'articolo 154-*bis* del Testo unico.

5. Nel definire le procedure, i consigli di amministrazione e di gestione identificano quali regole richiedano modifiche allo statuto e deliberano in conformità al comma 3 le conseguenti proposte da sottoporre all'assemblea.

6. L'organo di controllo vigila sulla conformità delle procedure adottate ai principi indicati nel presente regolamento nonché sulla loro osservanza e ne riferisce all'assemblea ai sensi dell'articolo 2429, secondo comma, del codice civile ovvero dell'articolo 153 del Testo unico.

7. Le procedure e le relative modifiche sono pubblicate senza indugio nel sito internet delle società, fermo l'obbligo di pubblicità, anche mediante riferimento al sito medesimo, nella relazione annuale sulla gestione, ai sensi dell'articolo 2391-*bis* del codice civile.

8. I soggetti controllanti e gli altri soggetti indicati nell'articolo 114, comma 5, del Testo unico, che siano parti correlate delle società, forniscono a queste ultime le informazioni necessarie al fine di consentire l'identificazione delle parti correlate e delle operazioni con le medesime e comunicano in modo tempestivo eventuali aggiornamenti[9].

---

[8] Lettera inserita con delibera n. 21624 del 10.12.2020.

[9] Comma così modificato con delibera n. 21624 del 10.12.2020 che dopo le parole: "operazioni con le medesime" ha aggiunto le parole: "e comunicano in modo tempestivo eventuali aggiornamenti".

**Regulations containing provisions relating to transactions with related parties** *(adopted by Consob with Resolution no. 17221 of 12 March 2010, later amended by Resolutions no. 17389 of 23 June 2010, no. 19925 of 22 March 2017, no. 19974 of 24 April 2017, no. 21396 del 10 June 2020 and no. 21624 of 10 December 2020)*[1]

**The Resolution no. 21396 of 10 June 2020 temporarily suspended, from 20 June 2020 to 30 June 2021, in the event of operations of capital strengthening, the application of the provisions of the Article no. 11, paragraph 5, and of the Article no. 13, paragraph 6 of this Regulation, where provided for that, for the purposes of recourse to the faculty of exemption for urgent cases, this faculty is envisaged by the procedures adopted pursuant to the Article no. 4, paragraph 1, of the Regulation as well as in the company statute.**

## CONTENTS:

| | | | |
|---|---|---|---|
| Article 1 | - Legal basis | Page | 3 |
| Article 2 | - Scope of application | " | 3 |
| Article 3 | - Definitions | " | 3 |
| Article 4 | - Adoption of procedures | " | 4 |
| Article 5 | - Public information on transactions with related parties | " | 5 |
| Article 6 | - Related party transactions and communications to the public | " | 7 |
| Article 7 | - Procedures for transactions of lesser importance in companies adopting traditional or one-tier management and control systems | " | 8 |
| Article 8 | - Procedures for transactions of greater importance in companies adopting traditional or one-tier management and control systems | " | 9 |
| Article 9 | - Procedures for transactions in companies adopting dualistic management and control systems | " | 9 |
| **Article 10** | **- Regulation for certain types of companies** | **"** | **9** |
| Article 11 | - Transactions attributed to the shareholders' meeting | " | 10 |
| Article 12 | - Framework-resolutions | " | 11 |
| Article 13 | - Cases and power of exclusion | " | 11 |
| Article 14 | - Management and coordination, subsidiaries and associated companies | " | 13 |
| | | | |
| *Annex 1* | - Definitions of related parties and related party transactions and functional definitions thereof (repealed) | " | 15 |
| *Annex 2* | - Procedures for transactions with related parties in companies adopting dualistic management and control systems | " | 16 |
| *Annex 3* | - Identification of transactions of greater importance with related parties | " | 20 |
| *Annex 4* | - Information document related to greater importance transactions with related parties | " | 22 |
| *Appendix* | Definitions of related parties and related party transactions and functional definitions thereof according to international accounting principles | " | 25 |

[1]  Resolution no. 17221 of 12 March 2010 and related regulation were published in Official Gazette no. 70 of 25 March 2010 and in CONSOB Fortnightly Bulletin no. 3.1, March 2010. Resolution no. 17389 of 23 June 2010 was published in Official Gazette no. 152 of 2 July 2010 and in CONSOB Fortnightly Bulletin no. 6.2, June 2010, regarding the entry into force of the provisions of Resolution no. 17221 of 12 March 2010 as amended by Resolution no. 17389 of 23 June 2010. Resolution 19925 of 22 March 2017 is published in the Official Gazette no. 88 of 14 April 2017 and in the CONSOB Fortnightly Bulletin no. 4.1 April 2017; it is in force from the fifteenth day following its publication in the Official Gazette. Letter *a)* of art. 3 of resolution no. 19925 of 22 March 2017 was subsequently amended with resolution no. 20250 of 28.12.2017, published in the Official Gazette n. 1 of 2.1.2018. Resolution 19974 of 27 April 2017 is published in the Official Gazette no. 106 of 8 May 2017 and in the CONSOB Fortnightly Bulletin no. 4.2 April 2017; it is in force from the fifteenth day following its publication in the Official Gazette. Resolution 21396 of 10 June 2020 is published in the Official Gazette no. 154 of 19 June 2020 and in the CONSOB Fortnightly Bulletin no. 6.1 June 2020; it is in force from the fifteenth day following its publication in the Official Gazette. Resolution no. 21624 of 10 December 2020 is published in the Official Gazette no. 317 of 22 December 2020 and in CONSOB Fortnightly Bulletin no. 12.1, December 2020; it enters into force on 1 July 2021. Para. 2 of Article 3 of resolution no. 21624 of 10 December 2020 provides that: *"2. The companies harmonize the procedures envisaged by article 4 of regulation no. 17221 of 12 march 2010 with the modifications made by this resolution by 30 June 2021 and apply them as from 1 July 2021"*.

*h)* "independent directors", "independent management directors" and "independent supervisory directors":

- directors and managing directors who satisfy the independence requirements pursuant to Article 148, subsection 3 of the Consolidated Law and any additional requirements identified in the procedures laid down by Article 4, or industry regulations that may apply because of the company's business;

- should a company declare, pursuant to Article 123-bis, subsection 2 of the Consolidated, to adhere to a code of conduct promoted **by the operators** of regulated markets or by trade associations, including the independence requirements at least equivalent to those pursuant to Article 148, subsection 3 of the Consolidated Law, the directors and managing directors acknowledged as such by the company pursuant to the same code[4];

*i)* "unrelated directors" and "unrelated managing directors": directors, managing or supervisory directors other than the counterparty of a particular transaction and **the counterparty's related parties**[5];

*i-bis)* **"directors involved in the transactions" and "managing directors involved in the transaction": directors, management or supervisory directors who have an interest in the transaction, be it their own or that of third parties, in conflict with that of the company**[6]*;*

*l)* "unrelated shareholders": those which hold the right to vote other than the counterparty in a particular transaction and subjects related to both the counterparty in a particular transaction or to the company itself;

*m)* "Consolidated Law": Legislative Decree No.58 of 24 February 1998;

*n)* "Issuers' Regulation": Regulation adopted by Resolution No. 11971 of 14 May 1999 and subsequent amendments and additions.

<u>Article 4</u>
*(Adoption of procedures)*

1.     The boards of directors or management board of the company shall adopt, as specified in this regulation, the necessary procedures to ensure transparency and substantial and procedural fairness of related party transactions. In particular, these procedures shall:

*a)* identify the transactions of greater importance to include at least those that exceed the thresholds in Annex 3, **and the transactions of small amount establishing, in relation thereto, distinct criteria in consideration at least of the counterparty's nature**[7];

*b)* identify the exemption cases provided for in Articles 13 and 14 to which the companies may resource;

*c)* identify, for the purposes of this Regulation, the requirements for independence of directors, managing or supervisory board members in accordance with Article 3, paragraph *h)*;

*d)* establish the manner whereby related party transactions are executed and approved and identify rules with regard to cases in which the company shall review or approve the transactions of subsidiaries, Italian or foreign;

*e)* establish the manner and timing with which they are provided, to independent directors or board members advising on transactions with related parties as well as to the management and supervisory bodies, information on transactions, and related materials, before deliberations, during and after the execution thereof;

*e-bis)* **establish the modalities and the time by which the independent directors or managing directors providing an opinion on the transactions with related parties:**

---

[4] Letter thus amended with resolution no. 21624 of 10.12.2020, which, in the second sub indentation, replaced the words: "by management companies" with the words: "by the operator."

[5] Letter thus amended with resolution no. 21624 of 10.12.2020, which replaced the words: "than its related parties" with the words: "than the counterparty's related parties."

[6] Letter added with resolution no. 21624 of 10.12.2020.

[7] Letter thus amended with resolution no. 21624 of 10.12.2020, which, after the words: "envisaged by Annex 3" has added the words: ", and the transactions of small amount establishing, in relation thereto, distinct criteria in consideration at least of the counterparty's nature."

*i)* **receive information on the application of the cases of exemption identified in accordance with letter b) of this paragraph, at least in reference to the transactions of greater importance. This information is transmitted at least once a year;**

*ii)* **verify the correct application of the conditions of exemption from the transactions of greater importance defined as regular and concluded at market or standard conditions, communicated to the same in accordance with Article 13, paragraph 3, letter c), point i)**[8]**;**

*f)* indicate the choices made by companies with regard to options, other than those mentioned in previous paragraphs, submitted to the same company from the provisions of this Regulation.

2.    Companies shall assess whether to indicate as subjects on which to apply, in whole or in part, the provisions of this regulation, even entities other than the related parties, taking account in particular of ownership, of any contractual or statutory obligations relevant to Article 2359, subsection 1, No. 3), or Article 2497-septies of the Italian Civil Code and to the applicable industry regulations for related party transactions.

3.    Resolutions on the procedures and any amendments shall be adopted following the favourable opinion of a committee, even specially formed, composed entirely of independent directors or, for companies that adopt the dual management and supervision system, of independent management and supervisory board members. Should no more than three independent directors remain in office, the resolutions shall be adopted following the favourable opinion of the existing independent directors or, failing that, after the non-binding opinion of an independent expert.

4.    The procedures provided for in subsection 1, shall ensure coordination with the administrative and accounting procedures pursuant to Article 154-bis of the Consolidated Law.

5.    In defining the procedures, boards of directors and management identifying which rules require amendments to the Statute and shall act in accordance with subsection 3 the resulting proposals to be submitted to the assembly.

6.    The oversight body will ensure compliance with the procedures adopted the principles set out in this regulation and compliance with them and report to the assembly under Article 2429, second subsection, of the Civil Code or Article 153 of the Consolidated.

7.    The procedures and amendments thereto shall be published without delay on the company website, without prejudice of the requirement of publicity, including reference to that site in its annual report on operations, under Article 2391-bis of the Civil Code.

8.    Entities with a controlling interest and any other entities specified in Article 114, subsection 5 of the Consolidated Law, which are related parties of the companies, shall provide them with the necessary information to enable identification of related parties and transactions with the same **and promptly communicate any updates thereof**[9].

<u>Article 5</u>
*(Public information on transactions with related parties)*

1.    In the event of transactions of greater importance, including those carried out by Italian or foreign subsidiaries, the company shall provide, in accordance with Article 114, subsection 5 of the Consolidated Law, an information document prepared in accordance with Annex 4.

---

[8]    Letter added with resolution no. 21624 of 10.12.2020

[9]    Paragraph thus amended with resolution no. 21624 of 10.12.2020, which, after the words: "transactions with the same" added the words: "and promptly communicate any updates thereof."

Codice di Autodisciplina, Comitato per la Corporate Governance

(Corporate Governance Code)

*Comitato per la Corporate Governance*

# CODICE
# DI AUTODISCIPLINA

*Luglio 2018*

**© 2018** *Comitato per la Corporate Governance*

Tutti i diritti di riproduzione, di adattamento totale o parziale e di memorizzazione elettronica, con qualsiasi mezzo (compresi microfilm, Floppy disk e CD), sono riservati per tutti i Paesi.

Indice

**Principi guida e regime transitorio**

**Art. 1 – Ruolo del consiglio di amministrazione**

**Art. 2 – Composizione del consiglio di amministrazione**

**Art. 3 – Amministratori indipendenti**

**Art. 4 – Istituzione e funzionamento dei comitati interni al consiglio di amministrazione**

**Art. 5 – Nomina degli amministratori**

**Art. 6 – Remunerazione degli amministratori**

**Art. 7 – Sistema di controllo interno e di gestione dei rischi**

**Art. 8 – Sindaci**

**Art. 9 – Rapporti con gli azionisti**

**Art. 10 – Sistemi di amministrazione e controllo dualistico e monistico**

## Art. 3 – Amministratori indipendenti

### Principi

**3.P.1.** Un numero adeguato di amministratori non esecutivi sono indipendenti, nel senso che non intrattengono, né hanno di recente intrattenuto, neppure indirettamente, con l'emittente o con soggetti legati all'emittente, relazioni tali da condizionarne attualmente l'autonomia di giudizio.

**3.P.2.** L'indipendenza degli amministratori è valutata dal consiglio di amministrazione dopo la nomina e, successivamente, con cadenza annuale. L'esito delle valutazioni del consiglio è comunicato al mercato.

### Criteri applicativi

**3.C.1.** Il consiglio di amministrazione valuta l'indipendenza dei propri componenti non esecutivi avendo riguardo più alla sostanza che alla forma e tenendo presente che un amministratore non appare, di norma, indipendente nelle seguenti ipotesi, da considerarsi come non tassative:

a) se, direttamente o indirettamente, anche attraverso società controllate, fiduciari o interposta persona, controlla l'emittente o è in grado di esercitare su di esso un'influenza notevole, o partecipa a un patto parasociale attraverso il quale uno o più soggetti possono esercitare il controllo o un'influenza notevole sull'emittente;

b) se è, o è stato nei precedenti tre esercizi, un esponente di rilievo dell'emittente, di una sua controllata avente rilevanza strategica o di una società sottoposta a comune controllo con l'emittente, ovvero di una società o di un ente che, anche insieme con altri attraverso un patto parasociale, controlla l'emittente o è in grado di esercitare sullo stesso un'influenza notevole;

c) se, direttamente o indirettamente (ad esempio attraverso società controllate o delle quali sia esponente di rilievo, ovvero in qualità di partner di uno studio professionale o di una società di consulenza), ha, o ha avuto nell'esercizio precedente, una significativa relazione commerciale, finanziaria o professionale:

  - con l'emittente, una sua controllata, o con alcuno dei relativi esponenti di rilievo;

  - con un soggetto che, anche insieme con altri attraverso un patto parasociale, controlla l'emittente, ovvero – trattandosi di società o ente – con i relativi esponenti di rilievo;

  ovvero è, o è stato nei precedenti tre esercizi, lavoratore dipendente di uno dei predetti soggetti;

d) se riceve, o ha ricevuto nei precedenti tre esercizi, dall'emittente o da una società controllata o controllante una significativa remunerazione aggiuntiva (rispetto all'emolumento "fisso" di amministratore non esecutivo dell'emittente e al compenso per la partecipazione ai comitati raccomandati

dal presente Codice) anche sotto forma di partecipazione a piani di incentivazione legati alla *performance* aziendale, anche a base azionaria;

e) se è stato amministratore dell'emittente per più di nove anni negli ultimi dodici anni;

f) se riveste la carica di amministratore esecutivo in un'altra società nella quale un amministratore esecutivo dell'emittente abbia un incarico di amministratore;

g) se è socio o amministratore di una società o di un'entità appartenente alla rete della società incaricata della revisione legale dell'emittente;

h) se è uno stretto familiare di una persona che si trovi in una delle situazioni di cui ai precedenti punti.

**3.C.2.** Ai fini di quanto sopra, sono da considerarsi "esponenti di rilievo" di una società o di un ente: il presidente dell'ente, il presidente del consiglio di amministrazione, gli amministratori esecutivi e i dirigenti con responsabilità strategiche della società o dell'ente considerato.

**3.C.3.** Il numero e le competenze degli amministratori indipendenti sono adeguati in relazione alle dimensioni del consiglio e all'attività svolta dall'emittente; sono inoltre tali da consentire la costituzione di comitati all'interno del consiglio, secondo le indicazioni contenute nel Codice.

Negli emittenti appartenenti all'indice FTSE-Mib almeno un terzo del consiglio di amministrazione è costituito da amministratori indipendenti. Se a tale quota corrisponde un numero non intero, quest'ultimo è arrotondato per difetto.

In ogni caso gli amministratori indipendenti non sono meno di due.

**3.C.4.** Dopo la nomina di un amministratore che si qualifica indipendente e successivamente, al ricorrere di circostanze rilevanti ai fini dell'indipendenza e comunque almeno una volta all'anno, il consiglio di amministrazione valuta, sulla base delle informazioni fornite dall'interessato o a disposizione dell'emittente, le relazioni che potrebbero essere o apparire tali da compromettere l'autonomia di giudizio di tale amministratore.

Il consiglio di amministrazione rende noto l'esito delle proprie valutazioni, dopo la nomina, mediante un comunicato diffuso al mercato e, successivamente, nell'ambito della relazione sul governo societario.

In tali documenti il consiglio di amministrazione:

- riferisce se siano stati adottati e, in tal caso, con quale motivazione, parametri di valutazione differenti da quelli indicati nel Codice, anche con riferimento a singoli amministratori;

- illustra i criteri quantitativi e/o qualitativi eventualmente utilizzati per valutare la significatività dei rapporti oggetto di valutazione.

**3.C.5.** Il collegio sindacale, nell'ambito dei compiti ad esso attribuiti dalla legge, verifica la corretta applicazione dei criteri e delle procedure di accertamento adottati dal consiglio per valutare l'indipendenza dei propri membri. L'esito di tali controlli è reso noto al mercato nell'ambito della relazione sul governo societario o della relazione dei sindaci all'assemblea.

**3.C.6.** Gli amministratori indipendenti si riuniscono almeno una volta all'anno in assenza degli altri amministratori.

### *Commento*

L'indipendenza di giudizio è un atteggiamento richiesto a tutti gli amministratori, esecutivi e non esecutivi: l'amministratore consapevole dei doveri e dei diritti connessi alla propria carica opera sempre con indipendenza di giudizio.

In particolare, gli amministratori non esecutivi, non essendo coinvolti in prima persona nella gestione operativa dell'emittente, possono fornire un giudizio autonomo e non condizionato sulle proposte di deliberazione.

Negli emittenti con azionariato diffuso l'aspetto più delicato consiste nell'allineamento degli interessi degli amministratori esecutivi con quelli degli azionisti. In tali emittenti, quindi, prevale un'esigenza di autonomia nei confronti degli amministratori esecutivi.

Negli emittenti con proprietà concentrata, o dove sia comunque identificabile un gruppo di controllo, pur continuando a sussistere la problematica dell'allineamento degli interessi degli amministratori esecutivi con quelli degli azionisti, emerge altresì l'esigenza che alcuni amministratori siano indipendenti anche dagli azionisti di controllo o comunque in grado di esercitare un'influenza notevole.

La qualificazione dell'amministratore non esecutivo come indipendente non esprime un giudizio di valore, bensì indica una situazione di fatto: l'assenza, come recita il principio, di relazioni con l'emittente, o con soggetti ad esso legati, tali da condizionare attualmente, per la loro importanza da valutarsi in relazione al singolo soggetto, l'autonomia di giudizio e il libero apprezzamento dell'operato del *management*.

Nei criteri applicativi sono indicate alcune delle più comuni fattispecie sintomatiche di assenza di indipendenza. Esse non sono esaustive, né vincolanti per il consiglio di amministrazione, che potrà adottare, ai fini delle proprie valutazioni, criteri aggiuntivi o anche solo parzialmente diversi da quelli sopra indicati, dandone adeguata e motivata comunicazione al mercato. Il collegio sindacale, nell'ambito della vigilanza sulle modalità di concreta attuazione delle regole di governo societario, è chiamato a verificare la corretta applicazione dei criteri adottati dal consiglio e delle procedure di accertamento da esso utilizzate. Tali procedure fanno riferimento alle informazioni fornite dai singoli interessati o comunque a disposizione dell'emittente, non essendo richiesta a quest'ultimo un'apposita attività di indagine volta a individuare eventuali relazioni rilevanti.

La non tassatività delle ipotesi indicate nei criteri applicativi implica la necessità di prendere in esame anche ulteriori fattispecie, non espressamente contemplate, che potrebbero apparire comunque idonee a compromettere l'indipendenza dell'amministratore.

Ad esempio, la titolarità di una partecipazione azionaria (diretta o indiretta) di entità tale da non determinare il controllo o l'influenza notevole sull'emittente

e non assoggettata a un patto parasociale potrebbe essere ritenuta idonea a pregiudicare, in particolari circostanze, l'indipendenza dell'amministratore.

La nomina di un amministratore indipendente dell'emittente in società controllanti o controllate non comporta di per sé la perdita della qualifica di indipendente: in tali casi, si dovrà prestare attenzione – tra l'altro – al fatto che da tale pluralità di incarichi non derivi una remunerazione complessiva tale da compromettere l'indipendenza dell'amministratore; appare peraltro necessario valutare caso per caso l'entità degli eventuali compensi aggiuntivi ricevuti nell'ambito di tali incarichi.

Gli esponenti di rilievo di una società che controlla l'emittente o da esso controllata (se avente rilevanza strategica) o sottoposta a comune controllo potrebbero essere considerati non indipendenti a prescindere dall'entità dei relativi compensi, in ragione dei compiti loro affidati. Anche in questo caso il consiglio di amministrazione è chiamato a una valutazione sostanziale: così, ad esempio, l'amministratore che sia, o sia stato, investito della carica di presidente non esecutivo in una controllante o controllata potrebbe essere considerato indipendente nell'emittente, laddove egli avesse ricevuto tale incarico in quanto "*super partes*"; viceversa, potrebbe risultare non indipendente un amministratore che, anche in assenza di formali deleghe, svolga di fatto un ruolo guida nella definizione delle strategie dell'emittente, di una società controllante o di una società controllata avente rilevanza strategica o ricopra l'incarico di presidente di un patto parasociale attraverso il quale uno o più soggetti possono esercitare il controllo o un'influenza notevole sull'emittente.

Per quanto riguarda le relazioni commerciali, finanziarie e professionali intrattenute, anche indirettamente, dall'amministratore con l'emittente o con altri soggetti ad esso legati, il Comitato non ritiene utile indicare nel Codice precisi criteri sulla base dei quali debba essere giudicata la loro rilevanza. Si richiede all'emittente di dare trasparenza al mercato sui criteri quantitativi e/o qualitativi eventualmente utilizzati.

In ogni caso, il consiglio di amministrazione dovrebbe valutare tali relazioni in base alla loro significatività, sia in termini assoluti che con riferimento alla situazione economico-finanziaria dell'interessato. Assume rilievo, inoltre, l'eventuale pattuizione a favore dell'amministratore (o dei soggetti ad esso legati) di condizioni economiche o contrattuali non allineate a quelle di mercato. Peraltro il fatto che la relazione sia regolata a condizioni di mercato non comporta di per sé un giudizio di indipendenza, essendo comunque necessario, come già detto, valutare la rilevanza del rapporto.

Dovrebbero essere prese in considerazione anche quelle relazioni che, sebbene non significative dal punto di vista economico, siano particolarmente rilevanti per il prestigio dell'interessato o attengano ad importanti operazioni dell'emittente (si pensi al caso della società, o del professionista, che assuma un ruolo importante in un'operazione di acquisizione o di quotazione).

Sul piano soggettivo, possono anche venire in considerazione, oltre alle relazioni direttamente intrattenute con gli esponenti di rilievo (dell'emittente, delle società dallo stesso controllate e dei soggetti controllanti), quelle

intrattenute con soggetti comunque riconducibili a tali esponenti, come ad esempio le società da essi controllate.

Il Comitato ritiene che, in particolari ipotesi, possa assumere rilevanza anche l'esistenza di relazioni diverse da quelle economiche. Ad esempio, negli emittenti a controllo pubblico, l'eventuale attività politica svolta in via continuativa da un amministratore potrebbe essere presa in considerazione ai fini della valutazione della sua indipendenza. Non rilevano, comunque, i cosiddetti rapporti di cortesia.

Anche per la definizione dei rapporti di natura "familiare" è opportuno affidarsi al prudente apprezzamento del consiglio di amministrazione, che potrebbe considerare non rilevante, tenuto conto delle circostanze di fatto, l'esistenza di un rapporto anche stretto di parentela o affinità. In linea di principio, dovrebbero essere giudicati come non indipendenti i genitori, i figli, il coniuge non legalmente separato, il convivente *more uxorio* e i familiari conviventi di una persona che non potrebbe essere considerata amministratore indipendente.

La struttura usuale degli organi amministrativi italiani comporta la possibilità che siano qualificati come non esecutivi e indipendenti anche amministratori membri del comitato esecutivo dell'emittente, in quanto ad essi non sono attribuiti poteri individuali di gestione.

Una diversa valutazione risulta, tuttavia, opportuna quando manchi l'identificazione di un amministratore delegato o quando la partecipazione al comitato esecutivo, tenuto conto della frequenza delle riunioni e dell'oggetto delle relative delibere, comporti, di fatto, il coinvolgimento sistematico dei suoi componenti nella gestione corrente dell'emittente o determini un notevole incremento del relativo compenso rispetto a quello degli altri amministratori non esecutivi.

Il Comitato ritiene che la presenza in consiglio di amministratori qualificabili come indipendenti sia la soluzione più idonea per garantire la composizione degli interessi di tutti gli azionisti, sia di maggioranza, sia di minoranza. In tal senso, nel corretto esercizio dei diritti di nomina degli amministratori, è possibile che gli amministratori indipendenti vengano proposti dagli stessi azionisti di controllo. D'altra parte, la circostanza che un amministratore sia espresso da uno o più azionisti di minoranza non implica, di per sé, un giudizio di indipendenza di tale amministratore: questa caratteristica va verificata in concreto, secondo i principi e i criteri sopra delineati.

Gli amministratori indipendenti si riuniscono ai sensi del criterio 3.C.6. tenendo riunioni convocate *ad hoc.* Le riunioni degli amministratori indipendenti sono da intendersi come riunioni separate e diverse dalle riunioni dei comitati consiliari.

*Corporate Governance Committee*

# CORPORATE GOVERNANCE CODE

*July 2018*

TRANSLATION FOR REFERENCE PURPOSES ONLY

*© 2018 Comitato per la Corporate Governance*

*All rights reserved. No part of this document may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or any information storage or retrieve system without prior permission from the copyright owners.*

## INDEX

**Main Principles and temporary regime**

**Article 1 – Role of the Board of Directors**

**Article 2 – Composition of the Board of Directors**

**Article 3 – Independent directors**

**Article 4 – Internal committees of the Board of Directors**

**Article 5 – Appointment of directors**

**Article 6 – Remuneration of directors**

**Article 7 – Internal control and risk management system**

**Article 8 – Statutory auditors**

**Article 9 – Relations with the shareholders**

**Article 10 – Two-tier and one-tier systems**

## Article 3 – Independent directors

*Principles*

**3.P.1.** An adequate number of non-executive directors shall be independent, in the sense that they do not maintain, directly or indirectly or on behalf of third parties, nor have recently maintained any business relationships with the issuer or persons linked to the issuer, of such a significance as to influence their autonomous judgement.

**3.P.2.** The directors' independence shall be assessed by the Board of Directors after the appointment and, subsequently, on a yearly basis. The results of the assessments of the Board shall be communicated to the market.

*Criteria*

**3.C.1.** The Board of Directors shall evaluate the independence of its non-executive members having regard more to the substance than to the form and keeping in mind that a director usually does not appear independent in the following events, to be considered merely as an example and not limited to:

a) if he/she controls, directly or indirectly, the issuer also through subsidiaries, trustees or third parties, or is able to exercise a dominant influence over the issuer, or participates in a shareholders' agreement through which one or more persons can exercise a control or dominant influence over the issuer;

b) if he/she is, or has been in the preceding three fiscal years, a significant representative of the issuer, of a subsidiary having strategic relevance or of a company under common control with the issuer, or of a company or entity controlling the issuer or able to exercise over the same a considerable influence, also jointly with others through a shareholders' agreement;

c) if he/she has, or had in the preceding fiscal year, directly or indirectly (e.g. through subsidiaries or companies of which he is a significant representative, or in the capacity as partner of a professional firm or of a consulting company) a significant commercial, financial or professional relationship:

- with the issuer, one of its subsidiaries, or any of its significant representatives;

- with a subject who, also jointly with others through a shareholders' agreement, controls the issuer, or – in case of a company or an entity – with the relevant significant representatives;

or is, or has been in the preceding three fiscal years, an employee of the above-mentioned subjects;

d) if he/she receives, or has received in the preceding three fiscal years, from the issuer or a subsidiary or holding company of the issuer, a significant additional remuneration (compared to the "fixed" remuneration of non-executive director of the issuer and to remuneration of the membership in the committees that are recommended by the Code) also in the form of participation in incentive plans linked to the company's performance, including stock option plans;

e) if he/she was a director of the issuer for more than nine years in the last twelve years;

f) if he/she is vested with the executive director office in another company in which an executive director of the issuer holds the office of director;

g) if he/she is shareholder or quotaholder or director of a legal entity belonging to the same network as the company appointed for the auditing of the issuer;

h) if he/she is a close relative of a person who is in any of the positions listed in the above paragraphs.

**3.C.2.** For the purpose of the above, the chairman of the entity, the chairman of the Board of Directors, the executive directors and key management personnel of the relevant company or entity, must be considered as "significant representatives".

**3.C.3.** The number and competences of independent directors shall be adequate in relation to the size of the Board and the activity performed by the issuer; moreover, they must be such as to enable the constitution of committees within the Board, according to the indications set out in the Code.

As for issuers belonging to FTSE-Mib index, at least one third of the Board of Directors members shall be made up of independent directors. If such a number is not an integer, it shall be rounded down.

Anyway, independent directors shall not be less than two.

**3.C.4.** After the appointment of a director who qualifies himself/herself as independent, and subsequently, upon the occurrence of circumstances affecting the independence requirement and in any case at least once a year, the Board of Directors shall evaluate, on the basis of the information provided by the same director or available to the issuer, those relations which could be or appear to be such as to jeopardize the autonomy of judgement of such director.

The Board of Directors shall notify the result of its evaluations, after the appointment, through a press release to the market and, subsequently, within the Corporate Governance Report.

In the documents mentioned above, the Board of Directors shall:

- disclose whether they adopted criteria for assessing the independence which are different from the ones recommended by the Code, also with reference to individual directors, and if so, specifying the reasons;

- describe quantitative and/or qualitative criteria used, if any, in assessing the relevance of relationships under evaluation.

**3.C.5.** The Board of statutory auditors shall ascertain, in the framework of the duties attributed to it by the law, the correct application of the assessment criteria and procedures adopted by the Board of Directors for evaluating the independence of its members. The result of such controls is notified to the market in the Corporate Governance Report or in the report of the Board of statutory auditors to the shareholders' meeting.

**3.C.6.** The independent directors shall meet at least once a year without the presence of the other directors.

### *Comment*

Independence of judgement is required of all directors, executive and non-executive alike: directors who are conscious of the duties and rights associated with their position always bring independent judgement to their work.

In particular, non-executive directors may provide an independent unbiased judgement on the proposed resolutions, since they are not directly involved in the operational running of the company.

The most delicate aspect in issuers with a broad shareholder base consists in aligning the interests of executive directors with those of the shareholders. In such companies, therefore, the predominant aspect is their independence from the executive directors.

In issuers with concentrated ownership, or where a controlling group of shareholders can be identified, the problem of aligning the interests of the executives directors with those of the shareholders continues to exist, but there emerges the need for some directors to be independent also from the controlling shareholders, or shareholders which are, in any case, able to exercise a dominant influence.

The qualification of a non-executive director as independent director does not express a judgement of value, but it rather indicates an actually existing situation: the absence, as the rule states, of any relation with the issuer, or with subjects linked to the issuer, such as to actually affect, due to their importance, to be evaluated in relation to the individual subject, the independence of judgement and the unbiased assessment of the management activity.

The criteria set out some of the most common elements that are symptomatic of absence of independence. Such elements are set out by way of example and are not binding on the Board of Directors, which may adopt, for the purpose of its evaluations, additional or different, in whole or in part, criteria from those mentioned above, giving adequate information to the market together with the relevant reasons. The Board of statutory auditors, in its control of the modalities of concrete implementation of the corporate governance rules, is demanded to verify the correct application of the criteria adopted by the Board and of the procedures of assessment utilized by it. Such procedures make reference to the information provided by the single parties concerned or,

however, at disposal of the issuer, since no appropriate investigation activity aimed at identifying any material relations is demanded from the issuer.

The non-exhaustive or mandatory character of the events set out in the criteria implies the need to review also additional circumstances, not expressly contemplated, which might appear, however, likely to negatively affect the independence of directors.

For example, the ownership of a (direct or indirect) shareholding of such an amount as not to determine the control or dominant influence over the issuer and not subjected to a shareholders' agreement, could be considered suitable to jeopardize, in particular circumstances, the independence of a director.

The appointment of an independent director of the issuer in companies controlling it or controlled by it does not cause the loss of independence requirement: in such cases, it should be considered, amongst other things, whether the holding of several offices could determine a total remuneration such as to hinder the independence of the director; however, it is appropriate to assess on a case-by-case basis the extent of any additional fee received by reason of each of such offices.

Significant representatives of a company controlling the issuer or controlled by the issuer (if it is strategically significant) or under common control could be considered not independent irrespective of the amount of the relevant remunerations, by reason of the duties entrusted to them. Also in this event, the Board of Directors is required to make a substantial evaluation: therefore, by way of example, a director who is vested with the office of non-executive chairman of the controlling company or of a subsidiary, could be considered independent in the issuer, if he had received such appointment because he is "*super partes*"; vice-versa, a director could appear to be non-independent, if he actually plays, also in absence of formal delegations of powers, a guidance role in the definition of strategies of the issuer, of a controlling company or a subsidiary having strategic relevance or he is the chairman of a shareholders' agreement through which one or more entities can control or have a significant influence on the issuer.

As regards commercial, financial and professional relations directly or indirectly entertained by the director with the issuer or other subjects linked to the issuer, the Committee does not deem it useful to set out in the Code precise criteria, on the basis of which their materiality must be judged. The issuer is required to disclose to the market quantitative and/or qualitative criteria used, if any.

In any event, the Board of Directors should evaluate such relationships on the basis of their significance, both in absolute terms and with reference to the economic-financial situation of the party concerned. Any agreement in favour of the director (or subjects linked to the directors) containing any financial or contractual conditions not aligned with those of the market, is to be considered material. Moreover, the fact that the relationship is governed at market conditions does not entail, *per se,* a judgement of independence, since it is, however, necessary, as already mentioned, to evaluate the relevance of the relationship.

Those relations which, even though they are not significant from an economic standpoint, are particularly material for the reputation of the director concerned or relate to important transactions of the issuer (just think to the case of a company or professional, who takes up an important role in an acquisition or listing transaction) should also be taken into consideration.

From a subjective standpoint, in addition to the relations directly entertained with significant representatives (of the issuer, subsidiaries of the issuer or controlling subjects), the relations maintained with subjects however traceable to such representatives, such as, by way of example, companies controlled by them, may also be taken into consideration.

The Committee also believes that, in certain particular circumstances, the existence of relations other than economic ones, may be material. For example, in issuers subject to public control, any political activity performed on a continuing basis by a director could be taken into consideration for the purpose of evaluating his/her independence. However, the so-called courtesy relationships are not relevant.

Also for the definition of the relations of a "family" nature, it is appropriate to rely on the prudent evaluation of the Board of Directors, which might consider as not relevant, taking into account the actual circumstances, the existence of a close family or in-law relationship. Parents, children, the spouse who is not legally separated, the companion living together and family members living together with a person, who could not be considered as an independent director, should be judged theoretically as being not independent.

The customary structure of Italian management bodies entails the possibility that also directors who are members of the executive committee of the issuer are qualified as non-executive and independent, since they are not provided with individual management powers.

A different evaluation appears, however, appropriate when a managing director is not appointed or when the participation in the executive committee, taking into account the frequency of the meetings and the scope of the relevant resolutions, entails, as a matter of fact, the systematic involvement of its members in the current running of the issuer or determines a considerable increase in the relevant remuneration compared to that of the other non-executive directors.

The Committee believes that the presence in the Board of Directors of directors who may be qualified as "independent" is the most suitable solution for guaranteeing the composition of the interests of all the shareholders, both majority and minority ones. In this respect, in the correct exercise of the rights of appointment of directors, it is possible that the independent directors are proposed by the same controlling shareholders. On the other side, the circumstance that a director is expressed by one or more minority shareholders does not imply, *per se,* a judgement of independence of such director: these characteristics must be verified in concrete, according to the principles and criteria outlined above.

In order to comply with *criterion* 3.C.6., independent directors hold specific meetings called *ad-hoc.* Independent directors' meetings have to be considered as separate and different from the ones held by the Board committees.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-2266

**Short Case Caption:** Pirelli Tyre Co., Ltd. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,179 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 10/24/2023

Signature: /s/ Daniel L. Porter

Name: Daniel L. Porter