2023-2266

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PIRELLI TYRE CO., LTD., PIRELLI TYRE S.P.A., *and* PIRELLI TIRE LLC

*Plaintiff-Appellants,*

SHANDONG NEW CONTINENT TIRE CO., LTD.,

*Plaintiff,*

v.

UNITED STATES *and* UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,

*Defendant-Appellees.*

Appeal from the U.S. Court of International Trade
Case No. 20-115
Judge Jennifer Choe-Groves

**RESPONSE BRIEF OF DEFENDANT-APPELLEE
UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND
SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC**

*Submitted by*
Roger Schagrin
Nicholas J. Birch
SCHAGRIN ASSOCIATES
900 Seventh Street NW, Suite 500, Washington, DC 20001
202-223-1700
nbirch@schagrinassociates.com
*Counsel for USW*
January 5, 2024

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

**Case Number** 23-2266

**Short Case Caption** Pirelli Tyre Co., Ltd. v. US

**Filing Party/Entity** United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/05/2024

Signature:

Name:      Nicholas J. Birch

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☑    Additional pages attached

| | | |
|---|---|---|
| Geert De Prest, formerly of Schagrin Associa | Benjamin J. Bay, formerly of Schagrin Associates | Kelsey M. Rule, formerly of Schagrin Associates |
| Paul W. Jameson, formerly of Schagrin Associates | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☑    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

STATEMENT OF RELATED CASES ..................................................... 1

STATEMENT OF THE ISSUE ............................................................... 1

STATEMENT OF THE CASE ................................................................ 2

FACTUAL BACKGROUND ................................................................. 4

SUMMARY OF THE ARGUMENT ....................................................... 9

ARGUMENT ......................................................................................... 10

I.  Pirelli's Arguments that Commerce Improperly Applied the Presumption of NME Government Control Are Without Merit.................................................................................................. 10

  A.  Commerce Has Not Applied an Irrebuttable Presumption as Pirelli Claims, But Properly Applied the Burden of Proof as Has Been Directed by this Court .............................. 10

  B.  Pirelli's Claim that Commerce Must Prove 'Day-to-Day' Control of Export Activities is Contrary to this Court's Precedent .................................................................................... 17

II.  Pirelli's Demand that this Court Reweigh Commerce's Factual Findings Must Be Rejected .............................................. 22

  A.  Pirelli's Attempts to Convince this Court to Make a Different Evidentiary Finding than the Agency Are Without Merit ................................................................... 22

  B.  The Key Factor in this Case Is Not the Minority Shareholding of the Chinese Government, But Its Majority Control of Pirelli ................................................................. 26

  C.  Pirelli's Claims Regarding Italian Law Were Not Properly Before Commerce and Were Fully Refuted by the CIT .............. 30

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ................. 34

CERTIFICATE OF COMPLIANCE

i

# TABLE OF AUTHORITIES

## Cases

*Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351
(Fed. Cir. 2023) ................................................................. 26

*Canadian Solar Int'l Ltd. v. United States*, 68 F.4th 1267
(Fed. Cir. 2023) ................................................................. 33

*China Manufacturers All., LLC v. United States*, 1 F.4th
1028 (Fed. Cir. 2021) ........................................................ 11

*Consolo v. Federal Maritime Comm'n*, 383 U.S. 607 (1966) .................. 25

*Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d
1343 (Fed. Cir. 2015) ........................................................ 15

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d
1369 (Fed. Cir. 2015) ........................................................ 23

*Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349
(Fed. Cir. 1999) ................................................................. 25

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927
(Fed. Cir. 1984) ................................................................. 24

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d
1056 (Fed. Cir. 2001) ........................................................ 24

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed.
Cir. 2016) ......................................................................... 33

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir.
2006) ................................................................................. 24

*Nuove Industrie Elettriche di Legnano S.p.A. v. United
States*, 739 F. Supp. 1567 (Ct. Int'l Trade 1990) ................. 32

*Pirelli Tyre Co., Ltd., et al. v. United States*, Slip Op. 23-86
(Ct. Int'l Trade 2022) ......................................... 3, 7, 8, 16, 31, 32, 33

*Pokarna Engineered Stone Ltd. v. United States*, 56 F.4th
1345 (Fed. Cir. 2023) ........................................................ 24

*Prime Time Com., LLC v. United States*, No. 2021-1783,
2022 WL 2313968 (Fed. Cir. June 28, 2022) ....................... 33

*QVD Food Co. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011) ............................................................................... 31

*Shandong Rongxin Imp. & Exp. Co. v. United States*, 331 F. Supp. 3d 1390 (Ct. Int'l Trade 2018), *aff'd*, 779 F. App'x 744 (Fed. Cir. 2019) ................................................................... 21

*Shandong Yongtai Grp. Co. v. United States*, 415 F. Supp. 3d 1303 (Ct. Int'l Trade 2019) ............................................... 4

*Shandong Yongtai Grp. Co. v. United States*, 487 F. Supp. 3d 1335 (Ct. Int'l Trade 2020) ............................................... 4

*Sigma Corp. v. United States*, 117 F.3d 1401 (Fed. Cir. 1997)..11, 12, 14, 17, 18, 20, 30

*SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216 (Fed. Cir. 2018) ................................................................ 33

*Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008 (Ct. Int'l Trade 1992) ...................................... 31

*Timken Co. v. United States*, 699 F.Supp. 300 (CIT 1988), *aff'd*, 894 F.2d 385 (Fed. Cir. 1990) .................................. 25

*Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017) ............................................. 21

*Zenith Electronics Corp. v. United States*, 988 F.2d 1573 (Fed. Cir. 1993) ................................................................ 12

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 65 F.4th 1364 (Fed. Cir. 2023) ................................ 11, 18, 19, 20, 28

## Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................... 23

## Administrative Determinations

*Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 22,396 (Dep't Commerce April 22, 2020) ................... 3, 5, 16, 26, 27, 31

Defendant-Appellee United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW" or the "Petitioner") respectfully submits this brief in response to the opening brief of Pirelli Tyre Co., Ltd., Pirelli Tyre S.P.A., and Pirelli Tire LLC (collectively, "Pirelli") (*"Pirelli Brief"*) in the appeal of the decision by the Court of International Trade (the "CIT") in *Pirelli Tyre Co., Ltd.,* et al. *v. United States*, CIT No. 20-115.

## STATEMENT OF RELATED CASES

In response to Fed. Cir. Rule 47.5(a), USW states that it is not aware of any other appeals in or from the same matter before the CIT that is or has been before this or any other appellate court.

## STATEMENT OF THE ISSUE

1.     Whether the Department of Commerce's ("Commerce") and the CIT's conclusions that Pirelli had failed to rebut the lawful presumption of Non-Market Economy ("NME") government control were supported by substantial evidence and otherwise were in accordance with the law.

## STATEMENT OF THE CASE

This case represents a situation that has increasingly arisen as Commerce has applied its practice that recognizes that majority ownership by an NME government subjects the owned company to potential control by the NME government. Commerce has had to address a number of situations where, as here, in response to Commerce's practice, the government of the People's Republic of China ("China") has taken a nominally 'minority' ownership position, yet has somehow maintained majority-level powers of control over a company. While the Chinese government and its state-owned subsidiaries argue that this titular minority ownership prevents Commerce from finding that government control continues to exist, Commerce has instead properly looked to the facts and recognized that control has continued in such cases.

This particular appeal arises from Commerce's final determination in the 2017-2018 annual administrative review of the antidumping order on passenger vehicle and light truck ("PVLT") tires from China. *See Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Antidumping Duty*

*Administrative Review; 2017-2018*, 85 Fed. Reg. 22,396 (Dep't Commerce April 22, 2020) (Appx0170-0173) and the accompanying Issues and Decision Memorandum (the "*IDM*") (Appx0136-0169). Here, Pirelli was again subject to Commerce's annual review, and, due to the Chinese government's ownership and indications of control over Pirelli, Commerce once again found that Pirelli had failed to rebut the presumption of NME government control Commerce applies and so was ineligible for a rate separate to that rate Commerce applied to the full entity controlled by the Chinese government. *See IDM*, Appx0146-0155. Commerce also rejected Pirelli's claims that Commerce lacks the authority to apply such an NME-entity wide rate. *Id.*, Appx0153-0155.

Having once again lost on its arguments before Commerce, Pirelli again challenged Commerce's determination to the CIT; but the CIT once again affirmed Commerce's determination that Pirelli was properly subject to the NME-entity wide rate. *See Pirelli Tyre Co., Ltd., et al. v. United States*, Slip Op. 23-86 (Ct. Int'l Trade 2022) ("*Slip Op.*"), Appx0051. Pirelli's appeal to this Court followed.

## FACTUAL BACKGROUND

This case is not the first time that Pirelli has challenged
Commerce's application of its NME methodology to Pirelli. Pirelli & C.
S. p. A. ("Pirelli Italy")—an Italian company and parent of Pirelli Tyre
("Pirelli China"), the producer and exporter in China—was acquired by
the Chinese government-owned China National Chemical Corporation
("Chem China") and other Chinese state-owned companies in 2015. *See
Shandong Yongtai Grp. Co. v. United States*, 415 F. Supp. 3d 1303,
1316 (Ct. Int'l Trade 2019) ("*Shandong Yongtai I*"); *Shandong Yongtai
Grp. Co. v. United States*, 487 F. Supp. 3d 1335, 1346 (Ct. Int'l Trade
2020) ("*Shandong Yongtai II*"). In the 2015-2016 review of this order,
Commerce determined that Pirelli was not eligible for a separate rate
as it was properly considered part of the China-wide entity that is
under government control through Chem China's ownership, as
Commerce found was demonstrated by an intertwining of operations at
Pirelli and by government control over the selection of Pirelli China's
management. *Shandong Yongtai II*, 487 F. Supp. 3d at 1344 - 1346. The
CIT would then reject Pirelli's challenges to Commerce's determination
and agree that substantial evidence did show "that Pirelli lacked

4

autonomy and that the Chinese government had decision-making control regarding the selection of Pirelli's management." *Id.*

Having been stymied in its attempt to use a purchased Italian company as a gateway into the U.S. market to skirt Commerce's NME methodology, Chem China decided to restructure its ownership of Pirelli in order to nominally become a minority owner during the 2017-2018 review period. *See Pirelli China's Separate Rate Application* (Nov. 14, 2018), Appx0225. The Chinese government, through various companies, maintained a 36.9 percent ownership of Pirelli China after the restructuring. *IDM*, Appx0149. But, as Commerce discovered, even as a nominally 'minority' shareholder, the Chinese government retained its majority-level powers to select the majority of Pirelli Italy's board (eight of the fifteen board members), which in turn selects the majority of Pirelli China's board. *Id.*, Appx0150-0152. The chairman of Chem China, Mr. Ren Jianxin, also continued to serve as the Chairman of the Board for Pirelli Italy. *Id.*, Appx0150.

Commerce also noted that no other Pirelli shareholder held more than 3 percent of the companies, highlighting the far larger share of control held ultimately by the Chinese government. *Id.*, Appx0151. That

level of control resulted in Pirelli being required to explicitly state multiple times in its annual report that it is controlled by Chem China, which is in turn controlled by the Chinese government. Commerce noted those direct statements of control in its decision as well. *Id.*, Appx0151. Commerce rejected Pirelli's claim that these direct declarations of control were merely empty statements for "accounting purposes only," as the Italian law Pirelli claimed justified that excuse was not something Pirelli had placed on the record of the review, so Commerce could actually examine the veracity of Pirelli's claims on that law. *Id.*, Appx0151.

Commerce also rejected Pirelli's arguments that eleven out of the fifteen Pirelli board members were not employed by Chem China or the Chinese government and ten of the fifteen were not Chinese nationals. Commerce instead explained that regardless of whether they were otherwise employed by the Chinese government or were Chinese, the majority of the board members were beholden to the Chinese government/Chem China for their appointment to that board. And while Pirelli argued that Italian law required a certain number of directors to be "independent," Commerce again recognized that Pirelli

6

had not provided those laws to the agency record so that Commerce could itself make a determination rather than accepting Pirelli's unsupported pronouncement as fact. *Id.*, Appx0151-0152.

Commerce also addressed Pirelli's claims that the 2017 shareholder agreement that had nominally transformed Chem China's ownership also granted exclusive authority to appoint Pirelli's management to Pirelli's Italian shareholder Marco Tronchetti Provera. Commerce found that the arrangement did not insulate Pirelli or Mr. Provera from Chinese government control, as that same agreement required Mr. Provera to carry out the plans for the business set by that very Chinese government majority-appointed board. *Id.*, Appx0152. Commerce further addressed other arguments Pirelli made, found them wanting factually, and so concluded that the presumption of NME government control had not been rebutted by Pirelli. *See id.*, Appx0150-0153.

Pirelli then sought review of Commerce's determination at the CIT, but that court instead affirmed Commerce, recognizing that the agency had properly weighed the facts and considered Pirelli's arguments. *Slip Op.*, Appx0039-0043. The CIT also went further and

7

considered the Italian law that Pirelli had failed to present on the
record to the agency (taking note of the law under the CIT's court
rules), but still found Pirelli's claims regarding that law wanting.[1] The
Court found that the Italian code that had forced Pirelli to state in its
annual report that it was controlled by Chem China in fact created a
presumption under Italian law that such control in fact existed,
contrary to Pirelli's claims. *Id.*, Appx0046-0047. The CIT also found that
protections Pirelli claimed Italian law provided to minority
shareholders only required transparency, not any limitation on the
control a more powerful shareholder could impose. *Id.*, Appx0048-0049.
Finally, the court found that the Italian law's requirement for
'independent' directors so relied on by Pirelli only extended to formal
independence, *i.e.* to not be linked to the shareholder by family or
employment, and did nothing to prevent the actual control
demonstrated by the facts. *Id.*, Appx0050-0051.

---

[1] The CIT agreed with Commerce that Pirelli had failed to place the
laws it wanted to argue on the agency record, and that therefore
Commerce had not been required to address it factually. *Slip Op.*,
Appx0044.

## SUMMARY OF THE ARGUMENT

Through this appeal, Pirelli seeks now a third bite at this apple, hoping to persuade this Court to supplant Commerce's role and re-weigh the evidence presented to the agency more to Pirelli's liking. As Pirelli's arguments are without merit and contrary to the precedent of this Court, this Court should instead reject Pirelli's attempts in full and affirm the decision reached by Commerce and by the CIT.

In its opening brief, Pirelli argues that no presumption of NME government control should have been applied to Pirelli and that Commerce instead bore the burden to prove day-to-day government control of Pirelli's actions. Those claims are entirely contrary to a long line of precedent that has been set by this Court, which has repetitively held that the burden is on an NME respondent to show evidence on multiple factors that is sufficient to fully overcome the presumption of NME government control. As this Court has established, that burden and presumption always apply in Commerce's NME practice, even where the NME respondent has been able to offer some contrary evidence if that evidence is insufficient to meet this burden.

9

Thus, in its decision denying Pirelli separate rate status,

Commerce properly applied the burden of proof to Pirelli to find that the

evidence relied on by Pirelli was insufficient to overcome the evidence of

direct Chinese government control of a majority of Pirelli's board. Pirelli

argues that this Court must require Commerce to reweigh that evidence

as Pirelli favors. But as this Court has also firmly established, the role

of the Court is not to supplant the agency as the finder of fact. As

Commerce's determination was fully supported by substantial evidence,

this Court should instead affirm Commerce's determination and the

judgement of the CIT.

## **ARGUMENT**

## I. **Pirelli's Arguments that Commerce Improperly Applied the Presumption of NME Government Control Are Without Merit**

### A. *Commerce Has Not Applied an Irrebuttable Presumption as Pirelli Claims, But Properly Applied the Burden of Proof as Has Been Directed by this Court*

This Court has long held that "it was within Commerce's authority

to employ a presumption of state control for exporters in a nonmarket

economy, and to place the burden on the exporters to demonstrate an

absence of central government control." *Sigma Corp. v. United States*,

117 F.3d 1401, 1405 (Fed. Cir. 1997). The burden on the respondent is to "*affirmatively demonstrate*" a lack of control. *Id.* (emphasis added).

Meeting that burden requires that the NME respondent demonstrate a lack of both *de jure* and *de facto* control. *Id.* As this Court has recently reiterated, "binding cases (too numerous to list in their entirety) have uniformly sustained" this precedent. *China Manufacturers All., LLC v. United States*, 1 F.4th 1028, 1036 (Fed. Cir. 2021); *see also id.* at 1039 ("We have previously affirmed Commerce's practice of applying a rebuttable presumption that all companies within an NME country are subject to government control.").

This Court has recently reaffirmed that, to show a lack of *de facto* control, an NME respondent must meet its burden to "demonstrate that it sets its prices independently, negotiates its own contracts, selects its management autonomously, and keeps its sales proceeds." *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 65 F.4th 1364, 1366 (Fed. Cir. 2023). "If the exporter fails to meet its burden in demonstrating the absence of government control" on those points, "Commerce can decline to issue a separate company-specific rate and instead apply to that exporter the country-wide antidumping duty rate." *Id.*

11

This Court has also explained that the purpose of placing the burden of proof to rebut the presumption of government control on the NME respondent is "because exporters have the best access to information pertinent to the 'state control' issue, {so that} Commerce is justified in placing on them the burden of showing a lack of state control." *Sigma*, 117 F.3d at 1405 (*citing Zenith Electronics Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993)).

In its arguments, Pirelli repeatedly seeks to entirely reverse this presumption and the burden as it has been established by this Court. Under Pirelli's claims, Commerce would instead bear the burden to prove the minutia of an NME respondent's operations to show "day-to-day" government control over specific activities, entirely eliminating any presumption that this control exists. As Pirelli's arguments are entirely incompatible with this Court's well established precedent, this Court should entirely reject Pirelli's claims.

Pirelli argues that Commerce has wrongfully applied the allowable presumption of control because, in Pirelli's view, once Pirelli proffered *any* evidence of a lack of control, any presumption must "completely vanish." *See Pirelli Brief* at 31-32. Pirelli's argument

12

entirely ignores the precedent set out above that explains how the presumption of NME government control is actually applied. The burden on the respondent is not to produce only some quanta of evidence that may suggest a lack of government control. The *affirmative* burden is on the *respondent* to demonstrate a lack of control on a number of points to establish that the presumption of NME government control factually does not apply to it in any of those ways.

Pirelli would have this Court now entirely reverse the established burden and require that Commerce provide the evidence that control exists. But as this Court has explained, that approach would be illogical. It is not Commerce that has Pirelli's records and knowledge of Pirelli's internal operations. It would be virtually impossible for the agency to ever show control over specific export activities in the face of a respondent whose interest will be to not to explain to the agency where in its records such evidence may in fact be found.

Pirelli's position that any evidence offered to show a lack of control eliminates any possibility of applying a presumption of government control and entirely shifts the burden of proof to Commerce is simply incompatible with prior decisions by this Court. Those decisions have

affirmatively recognized instead that the existence of some evidence
contrary to the presumption in no way changes the analysis to be
performed. In *Sigma* itself, where this Court set out explicitly that the
affirmative burden remains on the respondent, the respondent had
submitted some evidence of a lack of control, such as one yearly
business license that indicated independence (while another yearly
license on the record did not). *Sigma*, 117 F.3d at 1406. But the Court
did not shift the burden to Commerce to prove a lack of independence;
the Court instead agreed that "{i}t was proper for Commerce to require
{the respondent} to do more to establish {the exporter's} independence of
the central government." *Id.* As the respondent's "evidentiary showing
was *insufficient to overcome that presumption*" of government control,
the Court affirmed Commerce's finding that the burden of proof had not
been sufficiently met to establish a lack of control. *Id.* at 1407
(emphasis added).

Likewise, for example, in the 2015 *Dongtai Peak Honey* decision,
this Court also explicitly recognized that a respondent had "provided
some evidence of its eligibility for a separate rate," yet the Court
rejected the respondent's argument "that there was no record evidence

14

of government control." *Dongtai Peak Honey Indus. Co. v. United States*,

777 F.3d 1343, 1354 (Fed. Cir. 2015) (internal quotations omitted).

Instead, the Court explained, because the respondent failed to respond

to additional questions Commerce issued it regarding its separate rate

eligibility, "the company's initial Section A response was *insufficient*"

"to demonstrate the absence of de facto and de jure government control,

as required for separate-rate status." *Id.* at 1353-1354 (emphasis

added).

As shown in these decisions, this Court certainly has not agreed

with Pirelli's position that any evidence of independence terminates the

presumption of control and shifts the burden to Commerce to then prove

control. Even if some evidence of independence exists, the presumption

still applies and the burden remains on the NME respondent to fully

demonstrate a lack of governmental control.

Further, Pirelli's argument on Commerce's application of the

presumption rests on Pirelli's extreme miscoloration of Commerce's

actual determination. Pirelli claims that Commerce rested only on a

presumption of control and did not address any actual evidence in

making its decision. *See Pirelli Brief* at 33-34. But even a cursory

examination of Commerce's determination shows that this is simply

untrue. Commerce did address the evidence before it. But it found that

the evidence Pirelli offered against government control was simply far

outweighed by the evidence directly showing that control, particularly

the unescapable fact that the Chinese government's Chem China

directly appointed the majority of the Pirelli board. *See IDM*, Appx0149-

0153; *see also* the discussion of Commerce's factual determinations in

the background section above. As is discussed further below,

Commerce's determination was entirely supported by substantial

evidence; it was in no way a blind application of an empty presumption.

*See also Slip Op.*, Appx0043 (the CIT's holding that Commerce's

determination was supported by substantial evidence).

Thus, Pirelli is incorrect both that it faced only a transitory

presumption of control and not an affirmative burden to show a lack of

control and that Commerce rested only on a presumption rather than on

substantial evidence. Pirelli provides no reason for this Court to disturb

Commerce's determination on these points, as the CIT correctly found

Pirelli fails to do.

*B. Pirelli's Claim that Commerce Must Prove 'Day-to-Day' Control of Export Activities is Contrary to this Court's Precedent*

Pirelli likewise fails to square its arguments that Commerce must provide direct evidence that any Chinese government control extended to Pirelli China's day-to-day export operations with the precedent set on this issue by this Court. Pirelli argues that the purpose of Commerce's separate rate test is to determine whether a respondent's "data would actually show whether or not it is dumping and, if so, at what level," and that Commerce failed to meet the burden on Commerce to show a "direct line between the government shareholder and the day-to-day management at Pirelli Tyre." *Pirelli Brief* at 23, 30. Thus, Pirelli concludes, Commerce's determination based on the control of Pirelli's board was insufficient to meet Commerce's burden to show how that control resulted in a control of export activities. *Id.* at 29. Pirelli's claims are without merit.

First, Commerce's separate rate test is not simply based on a concern with who controls the data at a respondent as Pirelli claims. As recognized by this Court in *Sigma*, the issue underlying the presumption of government control is "a close correlation between a nonmarket economy and government control of prices, output decisions,

and the allocation of resources." *Sigma*, 117 F.3d at 1405–1406. Thus, firms under an NME government's control can be coordinated to funnel production and exports among those controlled members; for instance to take advantage of favorable individual dumping margins set by Commerce for one member of the entity, to the abuse of U.S. fair trade laws. Commerce's NME separate rate practice recognizes this reality and properly treats members of that entity as part of the larger whole for purposes of applying a unified dumping rate to that entity in its entirety. The issue is not simply whose data Commerce should examine.

More importantly, as this Court has held since *Sigma*, an NME exporter must meet the affirmative burden on it to show a lack of government control. As recently restated in *Zhejiang Machinery*, that showing requires that the respondent show a lack of control regarding price setting, contract negotiation, selection of management, and distribution of proceeds. *Zhejiang Mach.*, 65 F.4th at 1366. Stated alternatively, if the exporter fails to make an affirmative showing of a lack of control sufficient to overcome the presumption of control on any of those points, Commerce properly finds the exporter to be government controlled. *See id.*

18

As has been discussed above, this Court has never placed the burden on Commerce to show the direct link from issues such as the selection of management to specific day-to-day export activities to prove government control. Instead, the Court has agreed with Commerce's requirements that the respondent must meet its burden to show a lack of government control in a number of areas, areas not limited to day-to-day export activities. *See Zhejiang Mach.*, 65 F.4th at 1366 (stating that the burden is on the respondent to show a lack of government control over setting prices, negotiating controls, selection of management, and disposition of proceeds). Pirelli is entirely incorrect that the burden at any time shifts to Commerce to prove how control over one of those areas extends to specific day-to-day export activities. The information that shows how that control so extends will only be found in the hands of the respondent' who will not wish those facts to be discovered. Commerce and this Court have therefore rationally placed the burden to adequately demonstrate a lack of control over all those areas on the respondent possessing that information.

As the concern over NME government control is not limited to the issue of who will possess the records showing dumping as Pirelli

19

erroneously asserts, Commerce's practice of examining a more extensive set of issues than only day-to-day export activities is not only reasonable but necessary. Indeed, as this Court has held, the issues an NME respondent must address go not only to actual (that is, practiced) NME government control, but to *potential* government control. *See, e.g.*, *Zhejiang Mach.*, 65 F.4th at 1371 ("The absence of such evidence {of the used of NME government control}, however, does not necessarily negate the potential for {Government of China} control, particularly as the burden lies with {the respondent} to develop a full record and affirmatively rebut the presumption."). Matters of potential control, such as the ability to appoint a majority of a board that sets the business plans for a company as Commerce has addressed in case of Pirelli, go directly to the underlying concerns with an NME economy that were expressed by this Court in *Sigma*.

Unsurprisingly, Pirelli is unable to cite to any case law that actually supports its position that direct day-to-day control must be shown. Instead, Pirelli relies on phrases from some CIT decisions that Pirelli claims can be read to imply that Commerce must show day-to-day control. *See Pirelli Brief* at 29-30. But nowhere do those cases state

20

what Pirelli argues they imply and require Commerce to show control over specific export activities. Contrary to Pirelli's claims, the CIT has affirmatively recognized—including in decisions that have been affirmed by this Court—that the respondent must affirmatively meet its burden of proof on each of Commerce's four factors, including issues such as the selection of management and the disposition of profits that do not tie directly to day-to-day operations. *See, e.g.*, *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1326 (Ct. Int'l Trade 2017) ("Given that all four factors must be satisfied, Commerce had no further obligation to continue with the analysis {where one factor was not satisfied}."); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 331 F. Supp. 3d 1390, 1403 (Ct. Int'l Trade 2018), *aff'd*, 779 F. App'x 744 (Fed. Cir. 2019) ("To be eligible for a separate rate, a company from a nonmarket economy country must establish <u>each</u> of the four factors to rebut the presumption of government control"; emphasis in the original). Those decisions comport with this Court's recognition of *each* of those four factors as relevant to Commerce's analysis, as has been discussed above.

Thus, Commerce's practice of requiring an NME respondent such as Pirelli to adequately address each of the elements of the separate rate test entirely square with this Court's decisions placing that burden to address those issues—including issues of potential control—fully on that respondent. That practice is necessary for the agency to be able to address the recognized concerns Commerce is attempting to address with NME economies and exporters. As Commerce's application of the presumption of control to Pirelli and placement of the burden on Pirelli to fully rebut that presumption was entirely proper, Pirelli again provides no reason for this Court to reverse Commerce's determination.

## II.  Pirelli's Demand that this Court Reweigh Commerce's Factual Findings Must Be Rejected

### A. *Pirelli's Attempts to Convince this Court to Make a Different Evidentiary Finding than the Agency Are Without Merit*

Pirelli claims that Commerce did not seriously address the evidence regarding the Chinese government's control of Pirelli on the record before it. *Pirelli Brief* at 39. But Pirelli fails to show that Commerce actually failed to address any evidence before it, and Commerce did not fail to do so. Instead, Pirelli simply disagrees with how Commerce addressed that evidence and the weight Commerce gave

to the various pieces of evidence before it. Pirelli therefore asks this
Court to reweigh that evidence and spends a considerable portion of its
brief re-presenting the evidence it presented to Commerce in hopes the
Court will weigh it differently than the agency and award Pirelli with a
different outcome.

This Court must not do so.

This Court will uphold Commerce's determination unless it is
unsupported by substantial evidence or otherwise not in accordance
with the law. 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is
defined as "evidence as a reasonable mind might accept as adequate to
support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474,
477, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

In reviewing Commerce's determination, the Court does not itself
decide what the 'right' determination should be, but whether a
"reasonable mind could conclude" that the determination Commerce *did*
reach was one that could reasonably be reached on the record that was
before the agency. *Downhole Pipe & Equip., L.P. v. United States*, 776
F.3d 1369, 1379 (Fed. Cir. 2015) (internal quotation marks omitted).
Where Commerce has explained how its determination is supported by

23

that record, then its decision is supported by substantial evidence. *Id.* Even where the evidence "could be open to multiple interpretations, {that} does not require, or even allow, reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001).

As this Court has stated, even "{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Mitsubishi Heavy Indus. Ltd v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001); *see also Pokarna Engineered Stone Ltd. v. United States*, 56 F.4th 1345, 1352 (Fed. Cir. 2023) (quoting the same). Thus, "a party challenging the Commission's determination under the substantial evidence standard 'has chosen a course with a high barrier to reversal.'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (*quoting Mitsubishi*, 275 F.3d at 1060).

Because this Court is not replacing Commerce as the finder of fact, a dissatisfied plaintiff cannot ask the Court to reweigh the evidence on the record and decide the case for Commerce anew. *See Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *see also id*. at 336 ("That {an appellant} can point to evidence

of record which detracts from the evidence which supports the
{agency's} decision and can hypothesize a reasonable basis for a
contrary determination is neither surprising nor persuasive."). "It is not
within the Court's domain either to weigh the adequate quality or
quantity of the evidence for sufficiency or to reject a finding on grounds
of a differing interpretation of the record." *Timken Co. v. United States*,
699 F.Supp. 300, 306 (CIT 1988), *aff'd*, 894 F.2d 385 (Fed. Cir. 1990).
The substantial evidence standard of review "does not allow {the
Federal Circuit} to substitute our judgment for that of Commerce . . .
nor does it allow the parties to retry factual issues before us de novo."
*Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349, 1359 (Fed. Cir.
1999). Indeed, the Supreme Court has explained that "Congress was
very deliberate in adopting {the substantial evidence} standard of
review. It frees the reviewing courts of the time consuming and difficult
task of weighing the evidence, it gives proper respect to the expertise of
the administrative tribunal and it helps promote the uniform
application of the statute." *Consolo v. Federal Maritime Comm'n*, 383
U.S. 607, 620 (1966). This means that when an appellant argues, in
essence, that "Commerce should have found {certain} data more

probative than {other} data," the Court must reject that argument. *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1359 (Fed. Cir. 2023).

As discussed in the factual background section above, Commerce did address the evidence, both evidence for and evidence against government control that was on the record before it. It simply found the evidence for control should be given considerably more weight. The only points of evidence on the agency record that Pirelli even attempts to claim Commerce did not address were Pirelli's claim that a certain number of the appointed directors were legally required to be independent and the authority of an Italian owner over the appointment of management. *Pirelli Brief* at 51, 59. But Pirelli's claims Commerce did not address those points are wholly meritless; Commerce *explicitly* addressed both points and explained what contrary evidence it found outweighed Pirelli's claims. *See IDM*, Appx0150-0152.

### B. The Key Factor in this Case Is Not the Minority Shareholding of the Chinese Government, But Its Majority Control of Pirelli

Pirelli insists that the "key" fact of this case is the minority shareholding of Pirelli that was placed under the government of China. *Pirelli Brief* at 42, 44. But Pirelli steadfastly ignores that this is not a

standard shareholding situation such as those that the Court may be familiar with generally.

Typically, control of a company will follow ownership (shareholding) because each shareholder has a voting right over the controlling company board that is proportional to its level of ownership (such as one share being equal to one vote, so that 75 percent share ownership equals 75 percent control). But that is not the case here. As Pirelli itself admitted to Commerce, Pirelli's board is not voted on by shareholders based on their proportional ownership. The Chinese government and its controlled entities that are nominally minority shareholders of Pirelli never have to cast a single vote for the directors they wish to see in control of Pirelli. *See IDM*, Appx0147. Instead, the Chinese government simply gets to appoint its eight out of fifteen members of Pirelli's board. *Id.* Pirelli's focus on the shareholding percentage controlled by the Chinese government is no more than a red herring. Because the control the Chinese government and its entities are able to exercise over Pirelli and Pirelli's subsidiaries is entirely independent of the level of that shareholding, the nominally 'minority'

ownership status Pirelli insists must be the fundamental consideration here is instead entirely irrelevant.

Even where the NME government is only a minority owner, nominally or in reality, Commerce still properly looks at the facts to determine the level of government control over an NME exporter. This Court has recently addressed another case of minority Chinese government ownership that none the less resulted in Chinese government control. In its 2023 decision in *Zhejiang Machinery*, the issue was minority Chinese government ownership through the mechanism of a Chinese government-controlled labor union. *Zhejiang Mach.*, 65 F.4th at 1368. As Pirelli does here, the respondent in *Zhejiang Machinery* also argued that its government-controlled "indirect minority sharehold{er}" could not possibly be found to have control over the export activities of the respondent. *Id.* at 1370. Commerce and the courts disagreed. As this Court explained:

> The mere presence of a government-owned *minority* shareholder may not be sufficient to establish de facto government control.... But where evidence of additional indicia of control shows that the minority shareholder could exercise its right to control—such as Articles of Association without restrictions on the minority shareholder's rights, or evidence that the

> minority shareholder stifled other shareholders'
> opportunity to put competing nominations to the
> board or indirectly appointed board members—a
> determination of de facto government control is
> reasonable.

*Id.* at 1370 (emphasis in original).

And so this Court affirmed Commerce's determination that more telling than certain facts relied on by the respondent was the fact that the labor union "had the inherent ability to appoint board members" that controlled the exporter. *Id.* at 1371. This Court agreed that such board members have the ability to control other factors Commerce examines in determining *de facto* control, such as selecting management and distributing profits, and so controlled the respondent. *Id.*

This Court also dismissed that respondent's argument that, because Commerce was unable to show a particular instance where the *majority* owner of the respondent had been "unable to exercise its rights" because of the Chinese government's control, Commerce could not apply its presumption of control. Instead, the Court explained, "{t}he absence of such evidence, however, does not necessarily negate the potential for {Chinese government} control, particularly as the

29

burden lies with {the respondent} to develop a full record *and affirmatively rebut the presumption.*" *Id.* at 1371 (emphasis added; *citing Sigma*).

The situation before the Court now is much the same. Commerce did not rely simply on the existence of a minority government shareholding to find control existed. It instead looked to the facts and found that additional evidence established actual control. The attempt to disguise the Chinese government as only a minority shareholder following Commerce's (and the CIT's) prior recognition of the Chinese government's control over Pirelli has fails on the facts, as Commerce found. The true key fact, as recognized by Commerce and the CIT, is that the Chinese government yet maintained its ability to directly control the composition of Pirelli's board and exercised that control. And as the Court explained in *Zhejiang Machinery*, control of the board incorporates control of the company that board controls.

### C. Pirelli's Claims Regarding Italian Law Were Not Properly Before Commerce and Were Fully Refuted by the CIT

Pirelli also seeks to have this Court reweigh Pirelli's claims regarding whether Italian law operated to prevent the control that the Chinese government had via its ability to directly appoint the majority

of Pirelli's board. *See, e.g., Pirelli Brief* at 60-61, 63-64. This Court

should decline to conduct this reweighing as well.

First, how those Italian laws, which Pirelli seeks to present as

evidence against a finding of control, would affect the control the

Chinese government had *vis-à-vis* its singular position as a minority

shareholder enjoying majority control is a factual question. But Pirelli

failed to place those facts before Commerce. *See IDM*, Appx0151-0152.

And "the burden of creating an adequate record lies with {interested

parties} and not with Commerce." *QVD Food Co. v. United States*, 658

F.3d 1318, 1324 (Fed. Cir. 2011) (*quoting Tianjin Mach. Imp. & Exp.

Corp. v. United States*, 806 F. Supp. 1008, 1015 (Ct. Int'l Trade 1992)).

Commerce properly declined to address facts not before it or to simply

accept Pirelli's unsupported assertions of the workings of Italian law as

fact. *See IDM*, Appx0151-0152.

Pirelli then attempted an end-run around the agency by

presenting the actual Italian laws at the CIT instead. *See Slip Op.*,

Appx0044. While the CIT was not required to, it examined those laws

under its version of FRCP 44.1, and thoroughly rebutted Pirelli's

claims. *Id.*, Appx0044-0051.

31

This Court need not review Pirelli's claims regarding how Italian law functions. As discussed above, the role this Court plays in reviewing a determination by Commerce is not to weight the facts anew but to determine if Commerce's weighing of them can be accepted by a reasonable mind. Fundamental to that question is the question of what facts were before the agency for the agency to weigh. As Pirelli failed to place the facts regarding the Italian laws properly on the record before Commerce, those facts cannot be part of the proper analysis.

The ability of courts to examine questions of foreign law is not intended to allow parties to withhold facts from the determining agency, as the CIT recognized. *See Slip Op.*, Appx0044 ("It is not a backdoor for parties to supplement the record that existed before the agency."); *see also, e.g.*, *Nuove Industrie Elettriche di Legnano S.p.A. v. United States*, 739 F. Supp. 1567, 1572 (Ct. Int'l Trade 1990) (stating that "the record here cannot be supplemented" via Rule 44.1 for purposes of a substantial evidence review). "Normally, supplementation of the record is not permitted, because the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Canadian Solar Int'l Ltd. v.*

*United States*, 68 F.4th 1267, 1273 (Fed. Cir. 2023) (internal quotations omitted).

And if this Court does wish to examine the efficacy of Pirelli's claims of Italian law, we can do no better than to direct the Court to the excellent analysis presented by the CIT that explains why Pirelli's claims that Italian laws would prevent Chinese government control fail on the facts of those laws. *See Slip Op.*, Appx0044-0051. As this Court has "recognize{d} that the Trade Court has unique and specialized expertise in this field;" giving particular weight to the CIT's views. *Prime Time Com., LLC v. United States*, No. 2021-1783, 2022 WL 2313968, at *5 (Fed. Cir. June 28, 2022). While this Court is reviewing the CIT's decision here *de novo*, this Court will "give great weight to the informed opinion of the CIT and it is nearly always the starting point of our analysis." *SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018) (*quoting Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016)).

Whether the particular points of Italian law are considered or not, however, the inescapable facts remains that the record before Commerce did contain substantial evidence of the Chinese

33

government's control over Pirelli. However Italian law may treat actual minority shareholders, Italian laws make no attempt to address the particular issues and concerns of NME government control for purposes of U.S. dumping law. That is the question Commerce was addressing.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Commerce properly addressed that question by applying the presumption of control and placing the burden of proof on Pirelli to rebut that presumption on all four factors. When the weight of the evidence before Commerce showed Pirelli had failed to meet that burden on even one of those factors, Commerce found Pirelli ineligible for separate rate treatment, comporting precisely with prior decisions of this Court.

Indeed, Pirelli lets slip in its brief that all it is seeking here is to have this Court replace the role of the agency in deciding how the evidence on the agency record should be weighed. *See Pirelli Brief* at 44 (arguing that Commerce must be "required to weigh" a fact in the way Pirelli wishes). As this Court has repeatedly responded to such demands that it displace Commerce as the one to decide how to weigh

the evidence on the agency record, the Court should here too reject that illegitimate demand.

The Court should instead recognize that Commerce properly reviewed and weighed the evidence under the authority that was given to that agency by Congress. And so this Court should affirm the determination that Commerce properly reached. We respectfully request this Court do so.

Respectfully submitted,

Roger Schagrin
Nicholas J. Birch
SCHAGRIN ASSOCIATES
900 7th St. NW Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel for USW*

Dated: January 5, 2023

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 23-2266

**Short Case Caption:** Pirelli Tyre Co., Ltd. v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 7,415 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 01/05/2024

Signature:

Name: Nicholas J. Birch